# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK




GEO-GROUP COMMUNICATIONS, INC.,

       Plaintiff,

  against

JOSEPH P. GOLDBERG; HODGSON
RUSS LLP; RAVI CHOPRA; MAHENDRA
SHAH; VIPIN SHAH; and JOHN DOES 1-5,

       Defendants.

Index No. 15-cv-_____

**VERIFIED COMPLAINT**



Plaintiff GEO-GROUP COMMUNICATIONS, INC, for its complaint against Defendants, alleges as follows:

## THE NATURE OF THE PRESENT ACTION

1.  Plaintiff ("GCI") was the prevailing party in an arbitration against JAINA SYSTEMS NETWORK, INC. ("Jaina"), brought pursuant to an arbitration agreement annexed as Exhibit 1 (the "Agreement") to collect monies due for telephone minutes GCI supplied to Jaina over a period of several years which netted Jaina substantial profits.

2.  The Agreement permitted confirmation proceedings relating to an arbitration to be brought in any New York court but provided [¶ 21(a)] that controverted collection proceedings were to be brought in the United States District Court for the Southern District of New York.

3.  Jaina's long-time lawyer, Edward J. Troy ("Troy"), who represented it throughout the arbitration answered "no" when asked by the arbitrator if Jaina wanted to dispute the amount owed to Plaintiff but defended against Plaintiff's claim on various technicalities primarily related to authorization to do business in New York.

4.      However, when the arbitration award was handed down Jaina retained Joseph P. Goldberg ("Goldberg") and his firm, Hodgson Russ LLP ("Hodgson Russ") (jointly "New Counsel") to contest the award which it did through elaborate further proceedings before the arbitrator, the arbitration provider (JAMS) and Justice Schweitzer of the New York Supreme Court.

5.      In opposing confirmation New Counsel engaged in very questionable conduct which delayed confirmation of the award over an extended period.  Among other things, Goldberg attacked the arbitrator as unfair and biased, sought to continue the arbitration with a replacement arbitrator, and denigrated Troy's conduct of the arbitration.  He also drafted and submitted affidavits which he had to have known were false, among other things making the demonstrably absurd claim for the first time that Jaina was owed money by Plaintiff rather than owing it.

6.      Moreover, when the award was finally confirmed despite New Counsel's efforts Goldberg continued, and still is continuing, to delay collection of the award through various frivolous dilatory practices, including filing a totally absurd appeal from Justice Schweitzer's order confirming the award against the wishes of Jaina's founder and CEO, Surajit Bose ("Bose").

7.      More importantly, however, at that time New Counsel's mission clearly changed drastically.  Whereas New Counsel had previously purported to be representing Jaina it now began instead to represent at Jaina's expense the interests of wealthy Jaina shareholders and would-be shareholders (herein the "New Defendants"), one of whom had previously utilized Goldberg's legal services and was responsible for causing Jaina to retain him.  Goldberg's continued frivolous and dishonest dilatory practices at this point were clearly aimed at buying

time for the New Defendants to put Jaina out of business by stealing and secreting its funds which this action now seeks to recapture.

## THE PARTIES

8.     Plaintiff Geo-Group Communications, Inc. is a corporation organized under the laws of the State of Delaware and now registered to do business in the State of New York under, for reasons discussed hereinafter, the name GCI Enterprises, with offices at 6315 Bandini Boulevard, Commerce, California 90040.

9.     Defendants Joseph P. Goldberg and his law firm, Hodgson Russ LLP, maintain offices at 1540 Broadway, 24th Floor, New York, New York 10036.

10.     Defendant Ravi Chopra ("Chopra"), with a place of business at STI Consultants, 43-15 Main Street, Flushing, New York 11355, had extensive financial dealings with Jaina and was about to become a shareholder prior to the confirmation of the arbitration award herein.

11.     Defendant Mahendra Shah, Jaina's President and a shareholder, resides at 39 Capitol Avenue, Williston Park, New York 11596.

12.     Defendant Vipin Shah, the husband of a major Jaina shareholder and the brother of its President, Mahendra Shah, resides at 35 Smith Place, Williston Park, New York 11596.

13.     Defendants John Doe 1-5 are currently unknown Jaina shareholders or others who, on information and belief, have participated in and/or assisted the foregoing actions of the defendants and are in possession of funds belonging to Plaintiff which have been wrongfully and illegally withdrawn from Jaina to shut it down and to make it judgment proof.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action and venue is proper in this District by virtue of the following:

a.      The Agreement (¶ 21) provides that "This Agreement will be governed by, enforced and construed in accordance with, the laws of the State of New York" and "Each Party submits to the jurisdiction of the Unites States District Court for the Southern District of New York for enforcement of any arbitration award;"

b.      In connection with the acts alleged in this complaint, Defendants operated primarily out of the State of New York and directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephone communications; and

c.      Venue is proper in this District since most of the acts alleged herein occurred in or emanated from this District and the Agreement relating to the dispute provides for its resolution in New York City pursuant to New York law.

## GENERAL ALLEGATIONS

15.     New Counsel violated its ethical obligations to Jaina by favoring the now hostile interests of the New Defendants who have shut Jaina down by unlawfully withdrawing its funds rightfully belonging to Plaintiff, including at least $3,000,000 subsequent to the confirmation of the arbitration award.

16.     Chopra has withdrawn, he thought secretly, massive amounts of the foregoing sums from Jaina including $1,260,000 which was forwarded to Chopra's lawyers, Robinson Brog Leinwand Greene Genovese & Gluck, P.C., pursuant, upon information and belief, to demands made by Chopra of Jaina's CEO, Bose.

17.     Moreover, Chopra has further conspired with other New Defendants and with New Counsel to shut down Jaina's operations and render it judgment proof to facilitate their concealment and unlawful retention of such essentially stolen funds.  Among other things, Chopra had pretended to be negotiating a settlement of the matter with Plaintiff's president, Govind W. Vanjani ("Vanjani"), while at the same time secretly, through his wife, Shalu Suri, he

was delaying confirmation of the arbitration award by furtively forming a New York corporation utilizing Plaintiff's name with, on information and belief, the assistance of New Counsel.

18.     New Counsel, while still purporting to represent Jaina and to be taking directions from its CEO, Bose, filed the above-referenced frivolous notice of appeal against his wishes at a time and in a way that, upon information and belief, was intended to, and did in fact, disrupt the settlement discussions Bose insisted on conducting when he realized that Jaina would otherwise be shut down.

19.     In attempting to negotiate a settlement, Bose at first requested that it be only between him and Vanjani, without counsel.  After the disruption of those negotiations, Bose retained new counsel of his own, Akhilesh Krishna, Esq., and made it clear he did not want to be involved with or represented by Goldberg whom he described as having previously required him to submit an affidavit that they both knew was false.

20.     Bose thereafter reached another revised tentative agreement with Plaintiff's president, Vanjani, which he insisted be submitted for approval by Bose's new lawyer. However, prior to signing it, Bose advised Vanjani know he was going to discuss that agreement with one or more of the New Defendants who, on information and belief, by both threats and promises and with the help of New Counsel, thereafter dissuaded him from proceeding with the settlement.

## COUNT I
### (Treble Damages Pursuant to N.Y. Judiciary Law § 487 for Misconduct by Attorneys)

21.     Plaintiff repeats and incorporates paragraphs 1 through 20 above as if fully set forth herein.

22.     As a direct result of misconduct, including, deceit, collusion, bringing of frivolous proceedings with intent to deceive the Court and Plaintiff and subornation of perjury by

Defendants Goldberg and his firm, Hodgson Russ, Plaintiff has suffered substantial losses and is entitled by virtue of the above-cited statute to recover the sum of $8,065,974.03 (representing treble damages on the $2,688,658.01 Judgment as of March 8, 2015), plus further interest and attorneys' fees as the Court may award.

**COUNT II**
**(Violation of Various Sections of Article 10 of**
**the New York Debtor and Creditor Law and**
**¶ 21(a) of the Agreement)**

23.    Plaintiff repeats and incorporates paragraphs 1 through 22 above as if fully set forth herein.

24.    Upon information and belief, Jaina, upon the insistence of Defendants Chopra, Vipin Shah, Mahendra Shah, and John Does 1-5 and with the knowledge and approval of New Counsel, transferred all or substantially all of its assets to defendants Defendants Chopra, Vipin Shah, Mahendra Shah, and John Does 1-5 (the "Transfer").

25.    As a result of the Transfer, there are insufficient assets, if any, remaining in Jaina's possession to satisfy the Judgment.

26.    Defendants Chopra, Vipin Shah, Mahendra Shah, and John Does 1-5, assisted, upon information and belief, by Defendants Goldberg and Hodgson Russ, were the vehicles for carrying out the fraudulent conveyances set forth herein.

27.    The Transfer was without consideration.

28.    The Transfer was without consideration as defined in Article 10 of the New York Debtor and Creditor Law.

29.    The Transfer was without good faith as defined in Article 10 of the New York Debtor and Creditor Law.

30.     The Transfer rendered Jaina insolvent, or was made at a time when Jaina was insolvent, as defined under Article 10 of the New York Debtor and Creditor Law.

31.     The Transfer was made with the actual intent to hinder, delay, or defraud creditors of Jaina, especially including Plaintiff.

32.     The Transfer was received with the actual intent to hinder, delay or defraud creditors of Jaina, especially including Plaintiff.

33.     The Transfer was made at a time when Jaina had incurred debts beyond its ability to pay as they matured.

34.     The Transfer occurred at a time when Jaina was engaged or about to engage in a business or transaction for which the property remaining in its account after conveyance was an unreasonably small capital.

35.     By virtue of the Transfer Plaintiff has lost access to assets which could be applied to enforce the Award.

36.     The Transfer violated Section 273, 273-a, 274, 275 and/or 276 of Article 10 of the New York Debtor and Creditor Law and ¶ 21(a) of the Agreement.

37.     Plaintiff is entitled to have the Transfer deemed fraudulent and void.

38.     As a result of the foregoing, Defendants Chopra, Vipin Shah, Mahendra Shah, Goldberg, Hodgson Russ and John Does 1-5, individually, jointly and severally, owe plaintiff the amount the sum of $8,065,974.03 (representing treble damages on the $2,688,658.01 Judgment as of March 8, 2015), plus further interest and attorneys' fees as the Court may award.

## COUNT III
### (Attorneys' Fees Upon Violation of Section 276-a
### Article 10 of the New York Debtor Creditor Law
### and ¶ 21(a) of the Agreement)

39.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "38" inclusive, with the same force and effect as if more fully set forth at length herein.

40.     The Transfer violated Section 276-a of Article 10 of the New York Debtor and Creditor Law.

41.     By reasons of the foregoing, pursuant to the aforesaid Section of the New York Debtor and Creditor Law, Plaintiff is entitled to recover its reasonable attorneys' fees from Defendants.

42.     As a result of the aforesaid violations, Defendants Chopra, Vipin Shah, Mahendra Shah, and John Does 1-5, individually, jointly and severally are indebted to the Plaintiff for attorneys' fees in an amount determined by the Court.

## COUNT IV
### (Violation of Bulk Transfer Law)

43.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "42" inclusive, with the same force and effect as if more fully set forth at length herein.

44.     Upon information and belief Defendants Chopra, Vipin Shah, Mahendra Shah, and John Does 1-5 are in violation of the Bulk Transfer Law under Article 6 of the Uniform Commercial Code, in that the aforesaid Defendants have taken over as owner, operator of the business from Jaina, and have given no notice of said bulk transfer to plaintiff, no notice to creditors, and no schedule of property to be transferred and otherwise failed to comply with

Article 6 of the Uniform Commercial Code and or other laws/statutes, thereby making the transfer ineffective.

45.     In light of the ineffective transfer, the Defendants Chopra, Vipin Shah, Mahendra Shah, and John Does 1-5 are individually, jointly, and severally liable to Plaintiff in the sum of $8,065,974.03 (representing treble damages on the $2,688,658.01 Judgment as of March 8, 2015), plus further interest and attorneys' fees as the Court may award.

## COUNT V
## (Fraud)

46.     Plaintiff repeats, reiterates and realleges each and every allegation of the complaint numbered "1" through "45" thereof, inclusive of the complaint as though each were fully set forth herein at length.

47.     Upon information and belief, in engaging in the above conduct, Defendants Chopra, Vipin Shah, Mahendra Shah, and John Does 1-5 committed an unconscionable practice, deception, fraud, falsity, or misrepresentation in violation of the Bulk Transfer Law under Article 6 of the Uniform Commercial Code.

48.     As a result of the aforesaid fraudulent conduct, Plaintiff has been damaged by and requests compensatory damages from the Defendants Chopra, Vipin Shah, Mahendra Shah, and John Does 1-5, individually, jointly, and severally for the amount of the Award in the sum of $8,065,974.03 (representing treble damages on the $2,688,658.01 Judgment as of March 8, 2015), plus further interest and attorneys' fees as the Court may award.

## COUNT VI
## (Alter Egos)

49.     Plaintiff repeats, reiterates and realleges each and every allegation of the complaint numbered "1" through "48" thereof, inclusive of the complaint as though each were fully set forth herein at length.

50.    Under the Alter Ego doctrine, upon information and belief, Jaina and Defendants Chopra, Vipin Shah, Mahendra Shah, and John Does 1-5 are alter egos of one another in that they now own and operate the same or a similar derivative business and cater to the same clientele and as such they are liable to Plaintiff for the amount of the Award in the sum of $8,065,974.03 (representing treble damages on the $2,688,658.01 Judgment as of March 8, 2015), plus further interest and attorneys' fees as the Court may award.

### COUNT VII
### (Quantum Meruit)

51.    Plaintiff repeats, reiterates and realleges each and every allegation of the complaint numbered "1" through "50" thereof, inclusive of the complaint as though each were fully set forth herein at length.

52.    Under the doctrine of *quantum meruit* plaintiff performed services for the benefit of Defendants with the full expectation of being compensated in the amount of the Award in the sum of $8,065,974.03 (representing treble damages on the $2,688,658.01 Judgment as of March 8, 2015), plus further interest and attorneys' fees as the Court may award.

### COUNT VIII
### (Conspiracy)

53.    Plaintiff repeats, reiterates and realleges each and every allegation of the complaint numbered "1" through "52" thereof, inclusive of the complaint as though each were fully set forth herein at length.

54.    Upon information and belief, Defendants Chopra, Vipin Shah, Mahendra Shah, and John Does 1-5 are Jaina's successors in interest yet all have conspired to operate the business in such a manner as to make it seem as though Jaina were a continuing business to the public. In so doing, Defendants Chopra, Vipin Shah, Mahendra Shah, and John Does 1-5 have violated New York Debtor and Creditor Law and are liable to plaintiff for the amount of the Award in the

sum of $8,065,974.03 (representing treble damages on the $2,688,658.01 Judgment as of March 8, 2015), plus further interest and attorneys' fees as the Court may award.

**WHERFORE**, Plaintiff prays for judgment as follows:

(a)     For Count I of Plaintiff's Complaint, judgment against Defendants Goldberg and Hodgson Russ LLP in the sum of $8,065,974.03 (representing treble damages on the $2,688,658.01 Judgment as of March 8, 2015), plus further interest and attorneys' fees as the Court may award.

(b)     For Count II of Plaintiff's Complaint, judgment against Defendants Chopra, Vipin Shah, Mahendra Shah, Goldberg, Hodgson Russ and John Does 1-5 in the sum of $8,065,974.03 (representing treble damages on the $2,688,658.01 Judgment as of March 8, 2015), plus further interest and attorneys' fees as the Court may award.

(c)     For Count III of Plaintiff's Complaint, judgment against Defendants Chopra, Vipin Shah, Mahendra Shah, and John Does 1-5 in an amount of attorneys' fees as the Court may award.

(d)     For Count IV of Plaintiff's Complaint, judgment against Defendants Chopra, Vipin Shah, Mahendra Shah, and John Does 1-5 in the sum of $8,065,974.03 (representing treble damages on the $2,688,658.01 Judgment as of March 8, 2015), plus further interest and attorneys' fees as the Court may award.

(e)     For Count V of Plaintiff's Complaint, judgment against Defendants Chopra, Vipin Shah, Mahendra Shah, and John Does 1-5 in the sum of $8,065,974.03 (representing treble damages on the $2,688,658.01 Judgment as of March 8, 2015), plus further interest and attorneys' fees as the Court may award.

(f)     For Count VI of Plaintiff's Complaint, judgment against Defendants Chopra, Vipin Shah, Mahendra Shah, and John Does 1-5 in the sum of $8,065,974.03 (representing treble damages on the $2,688,658.01 Judgment as of March 8, 2015), plus further interest and attorneys' fees as the Court may award.

(g)     For Count VII of Plaintiff's Complaint, judgment against Defendants Chopra, Vipin Shah, Mahendra Shah, and John Does 1-5 in the sum of $8,065,974.03 (representing treble damages on the $2,688,658.01 Judgment as of March 8, 2015), plus further interest and attorneys' fees as the Court may award.

(h)     For Count VIII of Plaintiff's Complaint, judgment against Defendants Chopra, Vipin Shah, Mahendra Shah, and John Does 1-5 in the sum of $8,065,974.03 (representing treble damages on the $2,688,658.01 Judgment as of March 8, 2015), plus further interest and attorneys' fees as the Court may award.

(i)     And for such other damages as the Court shall see fit to award.

Dated: New York, New York
        February 27, 2015

Respectfully submitted,

The Solovay Practice
Attorneys for Plaintiff

By: _____
        Norman Solovay
260 Madison Avenue, 15th Floor
New York, New York 10016
*Tel.* (646) 278-4295

## VERIFICATION

STATE OF NEW YORK          )
                                               :ss:
COUNTY OF NEW YORK      )

GOVIND W. VANJANI, being duly sworn, says: I am an officer of the petitioner, Geo-Group Communications, Inc., in the within action. I have read the foregoing complaint and know the contents thereof. The contents are true to my own knowledge except as to matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

_____
Govind W. Vanjani

Sworn to before me this
____ day of February, 2015.

_____
Notary Public

NORMAN SOLOVAY
Notary Public, State of New York
No. 31-4947620
Qualified in New York County
Commission Expires February 27, 200__

Exhibit 1

## TELECOMMUNICATIONS SERVICE AGREEMENT

**THIS TELECOMMUNICATIONS SERVICE AGREEMENT** is entered into this 27th day of September 2006 by and between GEO-Group Communications Inc., a Delaware corporation with offices at Six Landmark Square, 4th Floor, Stamford, Connecticut 06901 ("*GCI*"), and Jaina Systems Neywork, Inc, a company with offices at 235 Hillside Ave, Suite B, Williston Park, NY 11596(the "*Customer*"; GCI and the Customer are sometimes hereinafter referred to separately as a "*Party*" and collectively as the "*Parties*").

### RECITALS:

**A.** GCI provides certain telecommunications services (the "*Services*") as specified in the service exhibits attached hereto and made a part hereof (the "*Service Exhibits*").

**B.** The Customer wishes to order Services from time to time in accordance with the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements contained herein, the parties hereto hereby agree as follows:

1. **Services**

    (a) The Customer may order Services from GCI by completing and returning to GCI one or more of GCI's service order forms (an "*Order Form*"). GCI reserves the right not to accept a service order under this Agreement at any time. Once GCI has accepted an order form, GCI will provide the Services specified therein, or cause such Services to be provided, directly to the Customer. Each of the Services shall be provided pursuant to the terms and conditions of this Agreement. The terms of this Agreement, including any Service Exhibit, shall supersede any inconsistent terms and conditions contained in an Order Form.

    (b) The Customer acknowledges and agrees that the Services shall be offered by GCI or any third party pursuant to subsection (a) above subject to (i) any applicable tariffs; (ii) compliance with all applicable laws and regulations; (iii) obtaining any domestic or foreign approvals and authorizations required or advisable; (iv) continued availability of any of the Services in any jurisdiction, country or to any location; and (iv) continued availability of access lines in any particular jurisdiction, country or location. The Customer acknowledges and agrees that GCI may elect not to offer the Services in or to any particular jurisdiction, location or country, or may block Services to or from any particular jurisdiction, location or country if GCI determines, in its sole discretion, that the continuation of such Service is not permitted or advisable and GCI shall endeavor to provide the Customer notice, if reasonably practicable, prior to discontinuing a Service for this reason. Further, GCI's provision of the Services to the Customer and the availability of the associated pricing as set forth herein are subject to availability of required facilities.

## 2.    End Users

(a)    The Customer will be GCI's sole customer of record for all of the Services. GCI shall have no responsibility for dealing directly with any of the Customer's end users or customers ("*End Users*") for any purpose related to the Services, including but not limited to sales, ordering, billing, maintenance or repair. The Customer is solely responsible for all products and services it provides to its End Users.

(b)    No End User or any other third party shall be considered a party to or beneficiary of this Agreement or have any claim under this Agreement against either GCI or the Customer. The Customer agrees to indemnify and hold GCI harmless from and against any and all claims: (i) by End Users (including without limitation any claim with respect to any of the services provided by the Customer which may incorporate the Services provided by GCI hereunder) and/or (ii) arising out of the Customer's acts or omissions or breach of this Agreement.

(c)    Customer is solely responsible for obtaining all licenses, approvals, and regulatory authority for its use and operation of the Services and the provision of Services to its End Users. In connection with its resale of the Services, Customer is solely responsible for all billing, billing adjustments/credits, customer service, creditworthiness and other service-related requirements of its End Users, and GCI shall have no liability to Customer's End Users under this Agreement. Customer shall timely file and maintain any required regulatory filings related to its purchase and/or resale of the Services. Customer's payment obligations hereunder are not contingent upon Customer's ability to collect payments or charges from its End Users, Affiliates (as defined below), agents, brokers or re-sellers. For the purposes of this Agreement, "*Affiliate*" shall mean, with respect to any Party, any entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Party, *i.e.* possesses, directly or indirectly, the power to direct or cause the direction of the affairs or management of that Party, whether through the ownership of voting securities, as trustee, by contract or otherwise.

(d)    GCI may suspend any or all of the Services immediately and/or terminate the Agreement pursuant to Section 9(a) if: (a) Customer fails to comply with any applicable foreign, federal, state or local law or regulation applicable to Customer's resale of the Services; or (b) Customer or its End Users commit any illegal acts relating to the subject matter of this Agreement. During any period of suspension pursuant to the foregoing sentence, no Service outage or interruption shall be deemed to occur. Customer shall: (i) be liable to GCI for any damages caused by any intentional or illegal acts of Customer, (*e.g.*, slamming) in connection with its use or resale of the Services; and (ii) indemnify, defend and hold harmless GCI from and against any third party (including End Users') claims, actions, damages, liabilities, costs, judgments or expenses (including attorney fees) arising out of or relating to Customer's or End Users use, resale or modification of the Services or Customer's failure to comply with any regulatory filing requirements or failure to make any required regulatory or contributory payments (including but not limited to universal service support mechanisms).



### 3. **Financial Terms**

(a)     Each attached Service Exhibit specifies the description, rates, charges and other terms applicable to the Services. The rates do not include Taxes (as defined below), access or access related charges, or CPE (as defined below). All Service order requests or cancellations require Customer's completion and GCI's acceptance of the Order Form. Unless otherwise set forth in a Service Exhibit or on an accepted Order Form, Customer is solely responsible for coordination of all local access and, in any event, shall be solely responsible for any costs associated with such access, including, without limitation, any early termination fees associated with any Service provisioned hereunder. For the purposes of this Agreement, (i) "*Tax*" or "*Taxes*" shall mean any and all applicable foreign, national, federal, state and local taxes, including, without limitation, all use, sales, value-added, goods and services, surcharges, excise, franchise, commercial, gross receipts, license, privilege or other similar taxes, surcharges, duties, fees or other tax-related surcharges whether charged to or against the Customer, with respect to the supply of the Services or underlying facilities provided under this Agreement, as well as any other imposition by any governmental authority which has the effect of increasing GCI's cost of providing the Services or the underlying facilities and (ii) "*CPE*" shall mean Customer premise equipment, software and/or other materials associated with the Service.

(b)     Each party acknowledges and agrees that the rates and charges for the Services provided hereunder do not include certain Taxes that are additional and the obligation of the Customer (whether such Taxes are assessed by a governmental authority directly upon GCI or the Customer). Such Taxes shall be separately set forth on the invoices and shall be paid by the Customer at the same time as all other charges set forth on the invoices. If the Customer believes that it should be exempt from the application and collection of certain Taxes, it shall provide GCI with an appropriately completed and valid Tax exemption certificate or other evidence acceptable to GCI and the relevant taxing authority that neither GCI nor the Customer is subject to such Taxes. GCI shall not be required to issue any exemption, credit or refund of any Tax payment for usage prior to the Customer's submission of such acceptable Tax exemption evidence. The Customer shall protect, indemnify and hold GCI harmless from and against any Taxes imposed by any governmental authority on or with respect to the Services furnished pursuant to this Agreement, including any interest and/or penalties related thereto.

(c)     All payments due hereunder shall be made free and clear without deduction or withholding for, any and all present and future Taxes. In the event that any payment to be made to GCI hereunder should be subject to any reduction by reason of a required deduction or withholding of any Tax, the Customer agrees to pay GCI such further amounts as would have been necessary so that the aggregate net amount received by GCI after deduction or withholding of any Taxes, shall be the same amount as would have been received by GCI if there had been no requirement to deduct or withhold any Taxes.

(d)     Each party shall be solely responsible for all taxes on its own business, the measure of which is its own net income or net worth and shall be responsible for any related tax filings, payment, protest, audit and litigation. Each party shall be solely responsible for the billing, collection and proper remittance of all applicable Taxes relating to its own services provided to its own customers.



4.   **Payments**

(a)   GCI will invoice the Customer monthly for all Services.  All invoiced amounts shall be paid within seven days of receipt of the invoice (the "*Due Date*") via wire transfer to: Bank of America, 1 Atlantic Street, Stamford, CT 06901 U.S.A, ABA Routing No: 011900571; Account No: 95085 76116, or such other location or account as may be specified by GCI from time to time.  GCI shall state all invoices in U.S. dollars, and the Customer shall deliver all payments to GCI in U.S. dollars.

(b)   All amounts, other than amounts subject to a Bona Fide Dispute (as defined below), not paid in full by the Due Date will be considered past due and subject to an interest charge commencing from the Due Date at the lesser rate of one percent (1%) per month, compounded monthly, or the maximum rate allowable by applicable law.  If Customer fails to pay or dispute any invoice as provided for herein by the Due Date, in addition to its termination rights under Section 9(a), GCI may: (i) immediately, upon notice refuse to accept additional Order Forms; (ii) with twenty-four (24) hours prior notice, temporarily suspend any and all Services until the Customer has paid all past due amounts (including interest); and/or (iii) with notice, offset such unpaid balances from any amounts that GCI owes to Customer under any other agreement(s) between the parties.  During any period of suspension, no Service outage or interruption shall be deemed to occur.

5.   **Billing Disputes**

All Bona Fide Disputes along with Complete Documentation (as defined below) must be submitted in writing and submitted with payment of all amounts due (provided, however, that the Customer may withhold amounts disputed hereunder not to exceed ten percent (10%) of the total invoiced amount except in the case of Manifest Error as defined below), or, alternatively, if the Customer has already paid its invoice, the Customer shall have thirty (30) calendar days from invoice date to give notice of a Bona Fide Dispute regarding such invoice, and Complete Documentation thereof, otherwise such invoice will be deemed correct.  For the purposes of this Agreement, (i) "*Bona Fide Dispute*" shall mean a good faith assertion of a right, claim, billing adjustment or credit that the Customer reasonably believes it is entitled to under this Agreement based on the application by GCI of a billing rate other than the applicable rate specified in the attached Service Exhibits, provided, however, that a Bona Fide Dispute shall not include, and the Customer may not withhold amounts invoiced for, actual calls made by the Customer, the Customer's End Users or unauthorized third parties (*e.g.*, fraudulent calls), (ii) "*Complete Documentation*" shall mean documentation and other detailed written support that identifies with specificity the basis and the charges that are subject to the Bona Fide Dispute, the Service interruption credit or other credit to which the Customer reasonably believes itself entitled, and the amounts being withheld by the Customer pending resolution of the Bona Fide Dispute and (iii) "*Manifest Error*" shall mean an error on the invoice that is beyond dispute and that is obvious to both parties.  The Customer shall notify GCI in writing when the Customer believes that Manifest Error or any error is present in an invoice.  GCI shall use reasonable efforts to determine in its reasonable judgment whether Manifest Error is present within ten (10) calendar days and such determination shall not be arbitrarily withheld.  Notification and Complete Documentation of a Bona Fide Dispute must be sent to such location or in such manner as may be specified by GCI from time to time.  An amount will not be considered "in

-4-

dispute" until the Customer has provided GCI with written notification and Complete Documentation of the Bona Fide Dispute, and the parties will promptly address and attempt to resolve the claim. GCI, in its discretion exercised in good faith, may request additional supporting documentation or reject the Customer's Bona Fide Dispute as inadequate. If GCI rejects such Bona Fide Dispute, GCI will so notify the Customer, and the Customer shall pay the withheld portion of the invoice plus interest commencing from the invoice Due Date at the rate of one percent (1%) per month, compounded monthly, within three (3) business days of such notice, unless such payment obligation is suspended thereafter by operation of <u>Section 21(b)</u>. If GCI determines that the Customer is entitled to credits or adjustments for Service outages pursuant to provisions of applicable Service Exhibits, then GCI will credit the Customer's invoice for such amount on the next appropriate billing cycle.

### 6.  <u>Use of Name and Marks</u>

Neither Party shall, without the other Party's prior written consent, use any trademark, service mark, brand name, copyright, patent or any other intellectual property of the other Party or any of its respective Affiliates. GCI's name and the names of its Affiliates are proprietary and nothing herein constitutes a license authorizing their use, and in no event shall Customer attempt to sell service to its End Users using the name of GCI or its Affiliates. In addition, Customer shall not state to End Users or prospective End Users: (i) that they will be GCI customers or that they may obtain GCI service from Customer; or (ii) that Customer has any relationship with GCI other than an agreement to purchase Services on a wholesale basis. Since a breach of this material obligation may cause irreparable harm for which monetary damages may be inadequate, in addition to other available remedies, the non-breaching Party may seek injunctive relief for any disclosure in violation hereof.

### 7.  <u>Security</u>

The Customer shall complete GCI's standard Credit Application. GCI shall review Customer's credit and thereafter establish credit terms and conditions. The credit terms and conditions are incorporated into this Agreement by this reference. The Customer may be required to provide GCI with a cash deposit or irrevocable letter of credit drawn on a United States financial institution reasonably acceptable to GCI in such amounts as GCI may determine. In the event that the Customer meets or exceeds its credit limit with unpaid charges whether billed or not or in dispute, the Customer may be required to provide GCI with an additional deposit and/or increase the dollar amount of an irrevocable letter of credit, whichever is applicable and deemed to be appropriate under the circumstances. In addition, if requested by GCI, Customer agrees to provide, within five (5) calendar days of GCI's request, appropriate financial records to evaluate Customer's continuing ability to pay. In no event shall the Customer exceed its available credit limit. Additionally, credit limits may be adjusted periodically at GCI's sole discretion. In addition to its termination rights under <u>Section 9(a)</u>, GCI may, with notice, suspend the Services if the Customer fails to comply with these security obligations. During any period of suspension, no Service outage or interruption shall be deemed to occur. Upon a default by the Customer not cured in a timely manner, GCI shall have the right to offset against any security instruments any amounts owed to GCI by the Customer and shall remit the balance to the Customer without interest, unless obligated by law to do so.

8.    **Term**

This Agreement shall be effective as of the Effective Date and continue for twelve (12) months (the "*Initial Term*"). After the expiration of the Initial Term, this Agreement will continue on a month-to-month basis unless terminated by either Party on fifteen (15) calendar days prior written notice (the Initial Term and any month-to-month extensions hereof shall be collectively referred to as the "*Term*").

9.  **Termination**

(a)    GCI may terminate this Agreement, in whole or in part, for Cause (as defined below) upon notice and applicable right to cure (as set forth in this Agreement). In addition, GCI may, immediately and without notice, terminate any or all Services provided pursuant to this Agreement if the Customer (i) becomes or is declared insolvent or bankrupt, (ii) is the subject of any proceedings related to its liquidation, insolvency or for the appointment of a receiver or similar officer for it, (iii) makes an assignment for the benefit of its creditors, or (iv) enters into an agreement for the composition, extension or readjustment of all or substantially all of its obligations. If GCI terminates this Agreement for any of the aforementioned reasons, Customer shall be obligated to pay the following: (i) any early termination fees due under any Service Exhibit; and (ii) any charges accrued but unpaid as of the termination date.

(b)    Customer may terminate a Service Exhibit for Cause, or if Cause exists to terminate all or substantially all of the Services, then Customer may terminate the Agreement in its entirety. If Customer terminates this Agreement for Cause, Customer shall only be liable for charges accrued but unpaid as of the termination date. If Customer terminates this Agreement prior to the conclusion of the Initial Term for reasons other than Cause, Customer shall be obligated to pay the following: (i) any early termination fees due under any Service Exhibit; and (ii) any charges accrued but unpaid as of the termination date.

(c)    For the purposes of this Agreement, "*Cause*" shall mean the failure of a Party to perform a material obligation under this Agreement, which failure is not remedied, if curable: (i) in the event of a payment or security default, upon two (2) calendar days written notice, or (ii) in the event of any other general default, upon twenty (20) calendar days written notice (unless a shorter notice period is expressly set forth in this Agreement, in which case the shorter notice period shall apply).

10.    **Limitation of Liability and Disclaimer of Warranties**

(a)    WITHOUT LIMITING ANY EXPRESS FINANCIAL OR LIABILITY PROVISIONS PROVIDED FOR IN THIS AGREEMENT (INCLUDING, WITHOUT LIMITATION, CUSTOMER'S PAYMENT AND INDEMNIFICATION OBLIGATIONS UNDER THIS AGREEMENT), NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INDIRECT, CONSEQUENTIAL, EXEMPLARY, SPECIAL, RELIANCE, COVER-TYPE, INCIDENTAL OR PUNITIVE DAMAGES (INCLUDING WITHOUT LIMITATION, LOST BUSINESS, REVENUE, PROFITS, OR GOODWILL) ARISING IN CONNECTION WITH THIS AGREEMENT OR THE PROVISION OF SERVICES HEREUNDER (INCLUDING ANY SERVICE IMPLEMENTATION DELAYS/FAILURES), UNDER ANY

THEORY OF TORT, CONTRACT, WARRANTY, STRICT LIABILITY OR NEGLIGENCE, EVEN IF THE PARTY HAS BEEN ADVISED, KNEW OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES. GCI MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY SERVICE PROVISIONED HEREUNDER.

(b)     CUSTOMER'S EXCLUSIVE REMEDIES FOR CLAIMS UNDER THIS AGREEMENT SHALL BE LIMITED TO CUSTOMER'S PROVEN DIRECT DAMAGES; UNLESS CUSTOMER'S DAMAGES ARE OTHERWISE LIMITED BY THIS AGREEMENT TO OUTAGE CREDITS IN THE APPLICABLE SERVICE EXHIBIT, IN WHICH CASE GCI'S TOTAL LIABILITY SHALL NOT EXCEED THE AGGREGATE AMOUNT OF ANY APPLICABLE OUTAGE CREDITS DUE UNDER THE SERVICE EXHIBIT FOR THE AFFECTED SERVICE.

(c)     GCI SPECIFICALLY DISCLAIMS ANY   AND   ALL   IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR TITLE OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS,

(d)     Customer acknowledges and accepts the reasonableness of the foregoing warranty disclaimer and limitations of liability.  No cause of action under any theory which accrued more than one (1) year prior to the institution of a legal proceeding alleging such cause of action may be asserted by either Party against the other.

(e)     Customer acknowledges that this Agreement is a contract between Merchants and that the Consumer Protection Laws of the various jurisdictions are inapplicable to this Agreement.

## 11.   <u>Relationship</u>

Neither Party shall have the authority to bind the other by contract or otherwise or make any representations or guarantees on behalf of the other and the relationship arising from this Agreement does not constitute an agency, joint venture, partnership, employee relationship or franchise.

## 12.   <u>Assignment or Sale</u>

This Agreement shall be binding upon the Parties and their respective successors and assigns.  Neither Party may assign this Agreement or any of its rights or obligations hereunder without the prior written consent of the other Party, which consent shall not be unreasonably withheld or delayed.  Notwithstanding the foregoing: (i) subject to the prior credit review and approval by GCI of Customer's proposed assignee, Customer may assign this Agreement to any Affiliate of the Customer, successor through merger, or acquirer of substantially all of its assets; and (ii) GCI may assign this Agreement without prior written consent (x) to any Affiliate of GCI, successor through merger, or acquirer of substantially all of its business assets or (y) if necessary to be in compliance with the rules and/or regulations of any regulatory agency, governmental agency, legislative body or court of competent jurisdiction; provided that in all cases the assignee of Customer or GCI, as applicable, provides the other Party with a prior written acknowledgment  of its assumption of the obligations of the assignor

hereunder.  Any attempted assignment in violation hereof shall be of no force or effect and shall be null and void.  GCI may assign this Agreement or rights hereunder, without notice, for the purpose of collecting from Customer unpaid balances or other funds due and owing GCI.

### 13.   Reporting Requirements

If reporting obligations or requirements are imposed upon GCI by any third party or regulatory agency in connection with either this Agreement or the Services, including use of the Services by Customer or its End Users, Customer agrees to assist GCI in complying with such obligations and requirements, as reasonably required by GCI and to hold GCI harmless for any failure by Customer in this regard.

### 14.   Survival.

The expiration or termination of this Agreement shall not relieve either Party of those obligations that by their nature are intended to survive.

### 15.   Nondisclosure/Publicity

Neither Party shall disclose to any third party during the Term of this Agreement and for two (2) years following the expiration or termination hereof, (i) any of the terms of this Agreement, including pricing; (ii) the existence, negotiation or result of any arbitrations or settlements related hereto; or (iii) other information of the other Party that such Party has marked or otherwise indicated is confidential or proprietary (or, if not so marked or indicated, which , if disclosed to any third party, could reasonably and foreseeably cause competitive harm to the owner of such information), unless such disclosure is required by any state or federal governmental agency, is otherwise required to be disclosed by law, or is necessary in any proceeding establishing rights or obligations under this Agreement.  No publicity regarding the existence and/or terms of this Agreement may occur without GCI's prior express written consent, and such written consent, if granted, may be granted only by the President of GCI or his authorized designee.  The content and timing of any press releases and all other publicity regarding the subject matter of this Agreement or Customer's relationship with GCI, if authorized, shall be mutually agreed upon by the Parties in advance.  Notwithstanding anything to the contrary, Customer may not make any disclosure to any other person or any public announcement regarding this Agreement or any relation between Customer and GCI, without GCI's prior written consent.  In addition, both Parties shall comply with the provisions contained in Section 6 of this Agreement.  GCI shall have the right to terminate this Agreement and any other agreements between the Parties if Customer violates this provision.

### 16.   Waiver

The terms, representations and warranties of this Agreement may only be waived by a written instrument executed by the Party waiving compliance.  Except as otherwise provided for herein, neither Party's failure, at any time, to enforce any right or remedy available to it under this Agreement shall be construed as a continuing waiver of such right or a waiver of any other provision hereunder.

17. **Severability**

If any provision of this Agreement is held to be invalid or unenforceable, the remainder of the Agreement will remain in full force and effect, and such provision will be deemed to be amended to the minimum extent necessary to render it enforceable.

18. **Notices**

Except as otherwise provided herein, all required notices shall be in writing, transmitted to the Parties' addresses specified in the signature page or such other addresses as may be specified by written notice, and will be considered given either: (i) when delivered by facsimile or e-mail, so long as duplicate notification is sent via US Mail; (ii) when delivered in person to the recipient named on the signature page; (iii) if sent in the U.S., when deposited in either registered or certified U.S. Mail, return receipt requested, postage prepaid; or (iv) when delivered to an overnight courier service.

19. **Force Majeure/System Maintenance**

Neither Party shall be liable to the other for any delay or failure in performance of any part of this Agreement if such delay or failure is caused by a Form Majeure Event (as defined below). The Party claiming relief under this Section shall notify the other in writing of the existence of the Form Majeure Event and shall be excused on a day-by-day basis to the extent of such prevention restriction or interference until the cessation of such Form Majeure Event. GCI will use reasonable efforts during the Term of this Agreement to minimize any Service interruptions that might occur as a result of planned system maintenance required to provision the Services. For the purposes of this Agreement, "*Force Majeure Event*" shall mean an unforeseeable event (other than a failure to comply with payment obligations) beyond the reasonable control of a Party, including without limitation: act of God, fire; flood; labor strike; sabotage; fiber cut; material shortages or unavailability or other delay in delivery not resulting from the responsible Party's failure to timely place orders therefore; lack of or delay in transportation; government codes, ordinances, laws, rules, regulations or restrictions; war or civil disorder.

20. **Governing Law**

This Agreement will be governed by, enforced and construed in accordance with, the laws of the State of New York excluding the choice of law provisions thereof other than Section 5-1401 of the New York General Obligations Law, except and to the extent that (a) the United States Communications Act of 1934, as amended and interpreted by the United States Federal Communications Commission ("*FCC*"), or (b) the telecommunications regulatory law of another national jurisdiction, applies to this Agreement. GCI reserves the right to suspend, modify or terminate any Service without liability where: (1) Regulatory Activity (as defined below) prohibits, restricts or otherwise prevents GCI from furnishing such Service; or (ii) any material rate, charge or term of such Service is substantially changed by a legitimate regulatory body, governmental authority, or by order of the highest court of competent jurisdiction to which the matter is appealed. For the purposes of this Agreement, "*Regulatory Activity*" means any



regulation and/or ruling, including modifications thereto, by any regulatory agency, legislative body or court of competent jurisdiction.

### 21.   Arbitration of Disputes

(a)   Except with respect to disputes arising under Section 6 of this Agreement, or any breach of that section, any dispute arising out of, or relating to, this Agreement shall be settled by arbitration to be conducted in accordance with the Judicial Arbitration and Mediation Services ("*JAMS*") Comprehensive Arbitration Rules. The Federal Arbitration Act, 9 U.S.C. Sections 1-16, not state law, shall govern the arbitrability of the dispute. New York law, without regard to choice of law principles, will otherwise govern and apply to any and all claims. The costs of the arbitration, including the arbitrator's fees, shall be shared equally by the Parties; provided, however, that each Party shall bear the cost of preparing and presenting its own claims and/or defenses (including its own attorneys' fees). The arbitration will be held in New York, New York. A single arbitrator engaged in the practice of law, who is knowledgeable about the subject matter of the contract, shall conduct the arbitration. The arbitrator has no authority to award any indirect, incidental, special, reliance, exemplary, punitive, or consequential damages, including damages for lost profits, Except for misapplication of law, the arbitrator's decision shall be final, binding, and enforceable in a court of competent jurisdiction. If either Party fails to comply with the dispute resolution process set forth herein (including without limitation, non-payment of an arbitration award) and a Party is required to enforce such compliance in court or elsewhere, then the non-complying Party shall reimburse all of the costs and expenses incurred by the Party seeking such enforcement (including reasonable attorneys' fees). GCI shall have the right to determine whether the Federal Rules of Civil Procedure and Federal Rules of Evidence shall govern such arbitration.

(b)   If either Party notifies the other that it intends to request an arbitration proceeding, Customer shall promptly place all disputed and withheld amounts, if any, on an on-going basis with an escrow agent to be named by GCI, pursuant to a mutually agreeable escrow agreement. GCI reserves the right to suspend provisioning of the Services or terminate the Agreement pursuant to Section 9(a) if Customer fails to comply with the above escrow obligation.

(c)   Each Party submits to the jurisdiction of the United States District Court for the Southern District of New York for enforcement of any arbitration award.

### 22.   Headings

The headings used in this Agreement are for convenience only and do not in any way limit or otherwise affect the meaning of any terms of this Agreement.

### 23.   Authorization

Customer represents and warrants that: (i) the full legal name of the legal entity intended to receive the benefits and Services under this Agreement is accurately set forth herein; (ii) the person signing this Agreement has been duly authorized to execute this Agreement on Customer's behalf; and (iii) the execution hereof is not in conflict with law, the terms of any charter, bylaw, articles of association, or any agreement to which Customer is bound or affected.

-10-

GCI may act in reliance upon any instruction, instrument, or signature reasonably believed by GCI to be genuine. GCI may assume that any employee of Customer who gives any written notice, Order Form, or other instruction in connection with this Agreement has the authority to do so.

24.     **Third Party Beneficiaries**

The terms, representations, warranties and agreements of the Parties set forth in this Agreement are not intended for, nor shall they be for the benefit of or enforceable by, any third party (including, without limitation, Customer's Affiliates and End Users).

25.     **Export Requisitions**

The Parties acknowledge and agree that both (i) certain equipment, software and technical data which may be provided or utilized in connection with the furnishing of the Services hereunder; and (ii) the use of such services may be subject to export, re-export or import controls under the United States Export Administration Regulations or similar regulations of the United States or of any other country.

26.     **Foreign Corrupt Practices Act**

Notwithstanding anything to the contrary herein, the Parties each hereby acknowledge and agree that certain laws of the United States, including the Foreign Corrupt Practices Act, 15 U.S.C. Sections 78dd-1 at seq., prohibit any person subject to the jurisdiction of the United States from making or promising to make any payment of money or anything of value, directly or indirectly, to any government official, political party, or candidate for political office for the purpose of obtaining or retaining business. The Parties each hereby represent and warrant that, in the performance of its obligations hereunder, it has not made, and will not make, any such proscribed payment.

27.     **Amendments**

This Agreement may be amended, modified or supplemented only by written agreement of GCI and Customer.

28.     **Entire Agreement**

This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements and understandings among the Parties with respect thereto.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first written above.

GEO- GROUP COMMUNICATIONS, INC.

By:_____

Six Landmark Square
Stamford, Connecticut 06901
Tel: (203) 359-5724
Fax: (203) 547-6015


Jaina Systems Neywork, Inc

By: _____

Address: 235 Hillside Ave, Suite B
Williston Park, NY 11596
Tel: (516) 248 3870
Fax: (516) 248 0583