ever disputed that this number represented a compromise reduction of the prior undisputed GCI October 1, 2008 invoice which shows the final outstanding balance of $1,507,922.96 (Exhibit 4);

3.      Moreover, in a telephone conference call held April 7, 2014 for argument of the summary judgment motion, Judge Cowin repeatedly asked Mr. Troy if Jaina was disputing the $1,249,654 amount acknowledged to be due and his answer was that they were objecting to it based on GCI's purported lack of authority to do business, not as to the amount owed.

4.      However, Jaina's version of events and defenses to the Arbitration Award were transformed when, a few weeks after the Arbitration Award, Mr. Goldberg was retained as co-counsel with Mr. Troy for the purpose of delaying its confirmation.  I have learned that Jaina is once again seeking to raise money from outside investors and assume that this is part of its now frantic efforts to delay collection of the Arbitration Award.  But in doing so it has strayed very far from the truth.

5.      Mr. Goldberg's claim, that proceeding before JAMS was rife with unfairness, impropriety and misconduct, by the arbitrator, consisting in large part of his purported failure to afford Jaina an opportunity to conduct discovery, has been very conclusively rebutted in Mr. Solovay's present answering affirmation.  This affidavit will deal with and rebut in addition to the continuation of Mr. Troy's incorrect argument as to GCI's lack of authority to proceed with this action in New York, other egregiously contrived new defenses being advanced by Mr. Goldberg for the first time which give rise to the request for sanctions.  The principal ones are that:

a.      Surajit Bose, Jaina's founder and CEO, was not authorized to acknowledge the $1,249,654 debt; and

   b.  Information withheld by GCI relative to Qwest billings now shows that Jaina is owed money by GCI rather than owing it money.

   6.  After indicating that Jaina's argument regarding GCI's alleged lack of authority to do business in New York is simply wrong, I will go on to show that the above new ones advanced by Mr. Goldberg are not only wrong but have been knowingly falsely concocted by his sources. My affidavit, in concluding, will go on to discuss some of the many reasons why Jaina is contractually and procedurally barred from its present attempt to defame the arbitrator and my counsel and to re-start the arbitration.

**Jaina's Flawed Argument that GCI Lacks
Authority to Bring This Proceeding in New York**

   7.  The claim that GCI is barred from bringing this proceeding in New York was dealt with and answered appropriately by Judge Cowin. If a further response were needed it would be that GCI as a Delaware corporation had authority during the times in question to do interstate business with any company in New York since, as admitted by Jaina, GCI did not have any office, sales people or switches in New York during any time pertinent to the claim herein, and therefore did not need any registration in New York.

   8.  In any event, however, to avoid any controversy, GCI has applied for re-registration in New York and has paid all back taxes. It will presumably be registered shortly and, in the interim, the cases submitted in my JAMS Answer (plus, *Maro Leather Co. v. Aerolineas Argentinas*, 161 Misc. 2d 924, 924; see also *Air Tran N.Y., LLC v. Midwest Air Group. Inc.*, 46 AD3d 208, 214), make it clear that "the failure… to obtain a certificate pursuant to Business Corporation Law Section 1312 may be cured prior to the resolution of the action, and its absence is not a jurisdictional bar to maintaining the action."

3

**Jaina's Argument that its Founder and CEO Was Not Authorized to
Commit to Repaying GCI's Drastically Reduced Invoice is Ludicrous**

9.     These new arguments, never advanced during the arbitration, that Mr. Bose had exceeded his authority and could not commit, as he did, to repayment of sums due to GCI; that the amount Mr. Bose had promised to pay far exceeded any amount due; and that, in fact, Jaina was owed money by GCI rather than the other way around are supposedly confirmed by affidavits of Mehendra Shah and Surajit Bose submitted herein.   The facts discussed below clearly show otherwise.   However, one of the rather amusing things about the Bose/Shah affidavits is Mr. Bose description of himself as only a "shareholder" of Jaina compared with Mr. Shah's description of himself as its "President."  They both carefully avoid mentioning that Mr. Bose, Jaina's founder and top officer (CEO) was and is clearly still Mr. Shah's boss. Annexed as further confirmation if more were needed are Exhibits 5 and 6, which are copies of pages from Jaina's website, one listing Jaina's major shareholders and the other carrying a message from its CEO, Mr. Bose, and his picture.

10.     Also somewhat humorous is their joint attempt to pretend that Mr. Bose didn't know anything about the amount of Jaina's bills and obligations and never asked how much was owed before committing to repay it.  I can personally attest to the fact that Mr. Bose was a very hands on knowledgeable follower of the amounts being owed and paid to all Jaina's suppliers. Indeed it was he during the period of GCI's dealings with Jaina who personally wired the money due to all carriers from his Blackberry.

11.     Moreover, there can be no possible doubt that Mr. Bose was well aware of the amounts Jaina owed GCI.   He not only argued and bargained with me about them but was pleased when I agreed to accept the amount of $1,249,654, he acknowledged and promised to repay in lieu of the previously uncontested and acknowledged invoice due of $1,507,922.96.

4

Moreover I can attest to the fact that in confirming the reduced obligation to me in Exhibit 2, *supra*, his purpose in copying the e-mail to Vipin Shah, an important Jaina funder, and Subrota Batabyal, its CFO, was to show off what an excellent deal he had made.  Moreover, it took Jaina 2 years and 2 months from GCI's October 1, 2008 invoice (Exhibit 4, *supra*) to arrive at this number.

### The Fraudulent, Newly Contrived Argument
### That Jaina, Not GCI, Is Owed Money

12. This argument is one that can most clearly of all the new ones be labelled as deliberate perjury.  An understanding of the respective functions performed by GCI and Jaina, which was presented in my reply to Judge Cowin on GCI's motion for partial summary judgment (Exhibit 7), makes it very clear that Jaina has turned the facts upside down on this point.  GCI had always sent Jaina detailed invoices giving Call Detail Records ("CDRs") which ran between 50 and 100 pages.  However, Jaina, but not GCI, was directly connected to Qwest's switches (thanks to the valuable switches supplied to it by GCI which have never been returned). Accordingly, Jaina had state of the art billing and knew better than GCI what bills for Qwest minutes were correct or incorrect and it always made it a point to pay only that portion of GCI's invoice that it agreed with based on monitoring its own records of purchases.

13. As a result of this practice by Jaina and other of GCI's customers of paying only that portion of GCI's invoices with which they agreed, GCI was left as the injured party with an eventual overall large loss in the arbitration it initiated against Qwest in the expectation of recovering large sums.  In the course of that arbitration, which ended badly for GCI because it couldn't prove Qwest billings were frequently wrong, a re-rating of Jaina's CDRs showed that Qwest had under invoiced its account by $71,435.  How this came about would have been very

useful to GCI in the arbitration so it asked Jaina for its assistance in demonstrating what had happened to it which would have been applicable to re-rating other accounts.

14.     Jaina made a nonsensical excuse and declined to help.  The probably real reason was that it was ethically and legally obligated to pay the $71,435 undercharge back to GCI.  But it never did or intended to.  That left Jaina with a profit in that amount at GCI's expense as well as with its normal profit on the minutes it had bought and paid for.  So, rather than being injured by GCI's problems with Qwest as it has falsely claimed, Jaina has been laughing all the way to the bank about them.

### Jaina's Attempt to Undo the Arbitration Award
### Is Barred by the Arbitration Agreement

15.     The September 27, 2006 arbitration agreement between the parties (the "Arbitration Agreement") (Exhibit 8) would clearly, without more, validate not only the present Arbitration Award but a considerably higher one.  For there is no question but that Mr. Bose, on behalf of Jaina, had received GCI's October 1, 2008 Invoice showing the outstanding balance of $1,507,922.96 (Exhibit 4, *supra*).

16.     That being so, the Arbitration Agreement is very clear in regard to payment terms: It provides [(paragraph 4(a)] that invoiced amounts shall be paid within 7 days of receipt of invoices and that [pursuant to paragraph 5] "The customer shall have thirty (30) calendar days from invoice date to give notice of bona fide dispute regarding such invoice and complete documentation thereof, otherwise such invoice will be deemed correct."

17.     Jaina neither disputed the October 1, 2008 Invoice nor paid it.  Two years and two months after that invoice, Jaina's founder and CEO acknowledged that Jaina owed $1,249,654 and GCI agreed to accept this amount to avoid spending time and money, as it has now been forced to do, in contested proceedings.  However, were Jaina to succeed in getting the new

6

arbitration it has been pressing so hard for, the $1,507,922.96 would presumably be awarded in it and also, presumably, the additional $754,286.96 that GCI had unsuccessfully asked Judge Cowin to "set down for a further hearing or hearings."

### Jaina's Attempt to Undo the Arbitration Award Is Barred by JAMS' Rules

18.     Mr. Goldberg states that his letter dated August 7, 2014 was a request for a briefing schedule to allow Jaina to seek re-argument/reconsideration.  But he fails to mention that Mr. Troy had already made a similar request on July 24, 2014 (Exhibit 9).  GCI opposed that request on the ground that the application was untimely because JAMS Rule 24(j) requires a request for re-argument be made within 7 days after service of the award which was on July 10, 2014.  That objection was also made and of course applied even more fully to Mr. Goldberg's August 7, 2014 letter to Judge Cowin.  Moreover, the JAMS rule states that in such applications the arbitrator can only change typographical errors or mathematical computation errors.  What Mr. Goldberg had requested in his August 7, 2014 letter obviously went well beyond that.

### Conclusion

19.     Jaina's deceitful lies and dishonesty should not be allowed to go unpunished.

_____
Govind W. Vanjani

Sworn to before me this
24th day of September, 2014

_____
Notary Public

NORMAN SOLOVAY
Notary Public, State of New York
No. 31-4947620
Qualified in New York County
Commission Expires February 27, 2009

Exhibit 210

8/5/2017
Case 1:15-cv-01756-KPF   Document 209-1   Filed 12/14/17   Page 8 of 80
(15 unread) - mit629@yahoo.com - Yahoo Mail

Updates from Jaina India   4                                                                 Sent

 **Surajit Bose** <s.bose@jainasystems.com>                    Mar 24, 2015 at 6:07 AM
To: Vipin Shah (vipin1029@gmail.com),
Mahendra Shah (mit629@yahoo.com)

Dear Sir/s

Fe important things to be noted:

- Effective 1st January 2015 there are hardly few people left in India office and people are still resigning as there are Salary Pending from Nov 2014. I don't blame anybody. There is only 1 person left in billing who will only be doing the billings and rates. So it is extremely important we need to find out some body in USA who can manage the finance and quick books as there is no body left for the quick book entry also. If somebody from USA wants to do Audits before taking over the finance, I can ask Subrota to explain or answer and queries.

- But please note that there will be no more new entries in Quick books by the India Office so it is extremely important that somebody takes charge of the Finance in USA on a day to day basis.

- HSBC additional $ 4000.00 cash withdrawal thru ATM cards will only happen on Wednesday as I was in the bank today enquiring about why Vipin Sir was unable to withdraw... According to them they had blocked the account and upon acknowledgement from me yesterday they have unblocked the account but the INR and USD conversation value will only happen once RBI opens in India as it is foreign transaction. Realistically it will only happen on Wednesday.

**Thanks & Best Regards,**

**Surajit Bose**

 Jaina

**USA: O: +1 516 2483870 ext 210   |   C: +1 516 5038811  |  India Mob: +91 9748736445**

www.jainasystems.com

For Trouble Tickets and 24X7 Customer Support: + 1516 248 3870 Ext 220

Jaina Disclaimer:

This e-mail is private and confidential. It may also be legally privileged. If you are not the addressee then you may not copy, forward, disclose or use any part of it. If you have received this message in error, please delete all copies from your system and notify the sender immediately by a return e-mail. This message has been checked for all known viruses by Jaina System's Virus Control Center and has been found safe. Jaina Systems Network, however, uses third-party virus program by Symantec Corp. and is not responsible for any virus attacks through this email.
All rights reserved by Jaina Systems Network, Inc.

"SAVE PAPER - THINK BEFORE YOU PRINT!"

P·S   **Pooja Shah**     Begin forwarded message: Fror        Nov 30, 2016 at 12:07 PM

P·S   **Pooja Shah**     Begin forwarded message: From:       Dec 5, 2016 at 3:14 PM

P·S

# Exhibit 211

UNITED STATES DISTRICT COURT           CASE NUMBER:
SOUTHERN DISTRICT OF NEW YORK       15-CV-1756-KPF
-----------------------------------------------------------------X

GEO-GROUP COMMUNICATIONS, INC.

PLAINTIFF

-AGAINST-                                 AFFIDAVIT OF
                                                RAVI  CHOPRA

JOSEPH P. GOLDBERG, HODGSON RUSS LLP,
RAVI CHOPRA, MAHENDRA SHAH,
VIPIN SHAH, 728 MELVILLE PETRO LLC
KEDIS ENTERPRISES LLC; JMVD HILLSIDE LLC
NYC TELECOMMUNICATIONS CORP. AND
SHALU SURI

                                DEFENDANTS
-----------------------------------------------------------------X

STATE OF NEW YORK     )

COUNTY OF NASSAU     )

RAVI CHOPRA, being duly sworn deposes and says that:

    1.    I am an individual residing in the State of New York. I am one of the individual named defendants, and the President of NYC TELECOMMUNICATIONS CORP. in the above-entitled action, and as such, I am fully familiar with the facts and circumstances herein. I make this affidavit based upon review of the records maintained by my office, and information obtained from my investigation and from statements made to me.  The facts stated herein are personally known to be true, except as to those facts expressly stated to upon information and belief, and as those facts I believe them to be true.  The matters stated in this declaration are true and are of my own, and if called upon to testify thereto as a witness I can and will completely testify thereto.

    2.    This Affidavit is submitted in reply to plaintiff's opposition to, and in further support of, Defendants' Motion to Dismiss and any further relief as the Court deems just, proper and equitable.

3.      For a full recitation of legal arguments, the Court's attention is respectfully directed to the Memorandum of Law, dated July 20, 2015, and October 2, 2015.  In the interest of brevity those legal arguments and facts are not repeated herein.  The contents of said Memorandum of Law, dated July 15, 2015 and October 2, 2015 are therefore respectfully incorporated herein and made a part hereof.

4.      Geo-Group Communications, Inc. previously participated in arbitration with a non-party, Jaina Systems Network, Inc. arising out of a Telecommunications Service Agreement (the "Agreement") which was entered into between Geo-Group Communications, Inc. and Jaina Systems Network, Inc.

5.      Plaintiff confirmed the arbitration award in New York State Supreme Court and is now seeking to enforce the judgment prior to having deposed any of the judgment debtors or their principals by commencing this frivolous action against several persons and entities that were not parties to the Agreement, award or judgment, including but not limited to Ravi Chopra and NYC Telecommunications Corp. The plaintiff has discontinued all claims against Defendants, Joseph P. Goldberg, Esq. and Hodgson, Russ, LLP, and has dropped Counts 2, 3, 4 and 5 of the Second Amended Complaint as against the remaining defendants.

6.      Neither I, Ravi Chopra nor my company NYC Telecommunications Corp., were parties to the Agreement, were parties in the arbitration, and are parties to any of the other law suits pending in New York County or Nassau County. I am not now and have never been a shareholder of Jaina. Rather, my company had a business relationship with Jaina.

7.      Plaintiff fails to provide particular allegations about the acts complained of by each defendant instead relying on generalized assertions of common control and collective

wrongdoing in violation of a statute that was never previously pleaded. I and NYC Telecommunications Corp. are not insiders and never engaged in any fraudulent conveyances.

8.    Additionally, the remaining claims in the Second Amended Complaint fail to identify the date, time or nature of any alleged transfer. The complaint contains no factual allegations as how any alleged transfer rendered Jaina insolvent.

9.    I respectfully submit that this complaint can be deemed analogous to the anecdotal plate of spaghetti thrown against a wall to see what sticks. Stated less articulately, there is no "there" there.

10.   It is apparent that Plaintiff is wasting the court's time with said frivolous action. Given that the Second Amended Complaint is Plaintiff's third attempt to properly plead a claim against NYC Telecommunications Corp. and me, Plaintiff should not be given any further opportunity to amend the complaint. *See* Federal Rules of Civil Procedure 15 (a)(2).

11.   The Honorable Court has the responsibility of safeguarding the rights of all parties. The Court has the obligation to correct, on its own initiative, real or apparent improprieties which tend to lower the esteem for the system of justice which it is bound to uphold.

**WHEREFORE**, for the foregoing reasons, and the reasons explained in Defendant's Memorandum of Law, this Court should dismiss with prejudice all claims asserted in the Complaint against Defendants, RAVI CHOPRA and NYC TELECOMMUNICATIONS CORP., and grant such other and further relief as this Court deems just and proper.

Dated:  Mineola, New York
        October 2, 2015

_____
RAVI CHOPRA

Sworn to before me on this the
2nd Day of October 2015

_____
Notary Public State of New York

MATIN EMAOUNA
Notary Public, State of New York
No. 01E...
Qualified in Nassau County
Commission Expires September 18, 2017

Exhibit 212

Page 153

(R. Chopra - 8/28/17)

1
2     Q.   You met several times in 2013?
3     A.   Yes.  They got a million dollars.
4   They got 600,000.  They got other also, you
5   know, from NYC they get, they get STI
6   Consulting.  They got a lot of, you know,
7   financing.
8        But they are saying we need, you
9   know, because we are prepaid company and we have
10  to also -- a receivable.  So that kind of
11  situation.  Because we don't know.  We are not
12  in the company.  So we are outsider.  So
13  whatever they are saying, we believe that.  And
14  they have good traffic also.
15    Q.   And during these discussions,
16  that's when you learned about Jaina having a
17  dispute with Geo-Group that was the subject of
18  arbitration?
19    A.   There was -- yes.
20         THE WITNESS:  Can I go to the rest
21  room?
22         MR. LOREE:  Yes.  I'm sorry.
23         (Recess taken)
24  BY MR. LOREE
25    Q.   Do you know a person by the name

Page 154

(R. Chopra - 8/28/17)

1
2   of A Mitchell green he's require?
3     A.   What did you say?
4     Q.   Do you know a person by the name
5   of A. Mitchell Green, Esquire?
6     A.   Can you repeat it again?
7     Q.   Do you know a person by the name
8   of A. Mitchell Greene, Esquire.  I believe he's
9   a partner of Robinson Brog, the law firm of
10  Robinson Brog.
11    A.   I think I heard the name.
12    Q.   You think you heard of the name.
13  Do you remember what context you heard of it?
14    A.   Somewhere on the paper, I think.
15    Q.   You mean somewhere on this paper
16  (indicating)?
17    A.   Maybe somewhere I have seen it
18  before, the name, the law firm, Robinson, yes,
19  Robinson I heard.
20    Q.   You heard of it.  And you have --
21  are they -- have they ever done any legal work
22  for you?  You don't have to tell me what it was.
23  But yes or no.
24    A.   Robinson?
25    Q.   Yes.

Page 155

(R. Chopra - 8/28/17)

1
2     A.   No.
3     Q.   Have they ever done any legal work
4   for any of your clients, do you know?
5     A.   My client?
6     Q.   Your clients.
7     A.   What clients?
8     Q.   Any of your clients.  Any of the
9   clients of your organizations.
10    A.   I think I heard the name, you
11  know, from Surjit or Jagdish somewhere, because
12  when they repay the loan to Robinson, I think I
13  heard the name.
14    Q.   When you say "repay," what loan
15  are you talking about?  What loan?  What debt
16  was repaid to Robertson Brog?
17    A.   That is a TD Time and Vision
18  Impact.
19    Q.   TD Time and Vision Impact.  Okay.
20  So what is TD Time?
21    A.   They are trading companies.
22    Q.   TD Time is a trading company?
23    A.   Yes.
24    Q.   Isn't there a TD Bank, too?
25    A.   No.  TD Bank is also there.  But

Page 156

(R. Chopra - 8/28/17)

1
2   this is not TD bank.
3     Q.   And what about the other, the
4   other company?
5     A.   It's a trading company.
6     Q.   What do you mean?  What do they
7   trade?
8     A.   A lot of things, you know,
9   whatever.
10    Q.   You don't know --
11    A.   Wholesale items, you know.
12    Q.   What kinds of items, cars,
13  groceries?
14    A.   Cell phones, maybe some other
15  trading business.
16    Q.   Some kind of -- stuff that's
17  related to mobile phones?
18    A.   Yeah, maybe.
19    Q.   Maybe.  When you say "yeah,
20  maybe," what do you mean?  You mean yes or do
21  you mean yes, I'm not sure?
22    A.   Because generally trading a lot of
23  things.  People do trading.  You get a laptop
24  deal.  They sell laptop.  They get a perfume
25  deal, they sell.  They have dollar deals.  So

# Exhibit 213

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEO-GROUP COMMUNICATIONS, INC., | : |
| Plaintiff, | :     **Civil Action No.:** |
| | :     **15-cv-01756 (KPF)** |
| -against- | : |
| | : |
| RAVI CHOPRA; MAHENDRA SHAH; VIPIN SHAH; 728 MELVILLE PETRO LLC; KEDIS ENTERPRISES LLC; JMVD HILLSIDE LLC; NYC TELECOMMUNICATIONS CORP.; and SHALU SURI, | : |
| | : |
| | : |
| | : |
| Defendants. | : |

### THIRD AFFIDAVIT OF SANJIV CHAND

SANJIV CHAND, of full age, certifies as follows:

1.      I am the Chief Executive Officer of Kedis Enterprises LLC ("Kedis") and JMVD Hillside ("JMVD").

2.      728 Melville Petro LLC ("Melville") is managed by Jessie Gupta, my sister-in-law, and is family-owned. *See* Doc. No. 57-2, Gupta Aff. ¶ 1.

3.      During all relevant times it has been my understanding that Mahendra Shah is the Chief Executive Officer of Neminath, Inc. ("Neminath"). *See* New York State Division of Corporations Entity Information for Neminath, Inc., at Exhibit D to Moving Brief ("Mov. Br.").

4.      During all relevant times it has been my understanding that Mahendra Shah is the Chief Executive Officer of Jaina Systems Network Inc. ("Jaina"). *See* New York State Division of Corporations Entity Information for Jaina Systems Network Inc., at Exhibit D to Mov. Br.

5.      On January 18, 2013, on behalf of Kedis, I signed a Commercial Loan Agreement ("Agreement") with Neminath.  Mahendra Shah, on behalf of Neminath, also signed the

Agreement. I understood that under the Agreement Kedis was to loan $600,000 to Neminath for the benefit of Jaina. *See* Commercial Loan Agreement, at Exhibit B to Mov. Br.

6.      I understood that the money loaned under the Agreement was to be used for the benefit of Jaina. Specifically, the Agreement states the funds are "to be used for the improvement and expansion of Neminath, Inc., and/or the business of its Affiliates." The definition of "Affiliate" includes "(iv) any Person that… is Under Common Control" with Neminath. The Agreement defines "Person" to include "any…corporation." "Under Common Control" is defined as "means effective power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise." I understood that Mahendra Shah was CEO of both Jaina and Neminath, that both entities were under his common control, and consequently, that Jaina was an Affiliate of Neminath under the Agreement. *See* Commercial Loan Agreement, at 1, at Exhibit B to Mov. Br.

7.      At the time I entered into the Agreement, I understood that Jaina would ultimately be responsible for repaying the loan because it was made for Jaina's benefit.

8.      On January 22, 2013, and pursuant to the Agreement, Kedis transferred $600,000 to Neminath, and such monies were deposited into Neminath's account for the benefit of Jaina. Substantially all of these funds – $570,000 after loan costs totaling $30,000 – were then transferred from Neminath to Jaina from January 22, 2013 through February 6, 2013. *See* Neminath HSBC Bank Statement, at Exhibit E to Mov. Br.

9.      During all relevant times, I understood that the $570,000 conveyance from Kedis to Neminath and ultimately to Jaina was to be repaid by Jaina.

10.      All of the transfers from Jaina to JMVD, and all of the transfers from Jaina to Melville that are referenced in paragraphs 37 to 50 of Geo-Group Communications Inc.'s

("GCI") Third Amended Complaint ("TAC") were carried out in order to satisfy Jaina's debt to Kedis.

11.   As the president and owner of Kedis, I assigned Kedis' right to receive the payments referenced in paragraphs 37 and 44 of the TAC, which were repayments toward the $600,000 loan made under the Agreement, to JMVD and Melville.

12.   On behalf of Kedis, I asked that funds Jaina owed to Kedis be transferred to JMVD and Melville instead of Kedis. I did so because Kedis intended to make transfers in these amounts to JMVD and Melville regardless. By having Jaina transfer the funds in this manner, it saved me the trouble of transferring funds from Jaina to Kedis and then from Kedis to either JMVD or Melville.

13.   Jaina's payments to JMVD and Melville as described in paragraphs 37 and 44 of the TAC were made in satisfaction of an antecedent debt, which Jaina paid in order to satisfy the debt to Kedis under the Agreement.

14.   Jaina's two $100,000 payments directly to Kedis as described in paragraphs 51 and 52 of the TAC were also conveyed in satisfaction of an antecedent debt Jaina owed to Kedis. A $200,000 loan was made by Kedis directly to Jaina on December 16, 2013. *See* Wire Letter, at Exhibit C to Mov. Br. The loan was paid back by Jaina through the two transfers described in paragraphs 51 and 52 of the TAC.

15.   To the best of my knowledge, any and all payments from Jaina to Kedis, JMVD, and Melville did not benefit any of the personally named defendants in the TAC, including Ravi Chopra, because none of them are shareholders, directors, officers, employees, or agents of, or related in any way to the Corporate Defendants.

16892416v.1

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false I am subject to punishment.

SANJIV CHAND
CEO, Kedis Enterprises, LLC
CEO, JMVD Hillside, LLC

ANDREW HAMELSKY
Notary Public, State of New York
No. 02HA5038299
Qualified in New York County
Commission Expires March 3, 2019

16796797v.1

# Exhibit 214

1                    (D. Kumar/Direct - 9/15/17)

2     TD sent the money.

3              Q     Can you explain what you mean by

4     that answer.  It's unclear to me.  "They don't

5     pay me back from whatever we have -- we have a

6     reason that TD sent the money."

7                    I'm not sure what you mean by

8     that, maybe you can try to rephrase that

9     answer.

10             A     Whatever TD sent money, we have

11    new impacts those loans I don't get it back.

12             Q     And when you say you got back

13    all the other ones --

14             A     Yes.

15             Q     And when you say that you got

16    them back, you mean -- what do you mean by

17    that?  You mean that they paid your lawyers?

18             A     Yes.

19             Q     So one of the terms of the loan

20    was that payments would be made to Robinson

21    Brog because they have the escrow account?

22             A     Who had escrow account?

23             Q     Robinson Brog had an escrow

24    account.

25             A     He had it only for me.

                WINTER REPORTING, INC.   (212) 953-1414

32

1                    (D. Kumar/Direct - 9/15/17)

2          Q      Yeah, you.

3          A      Yes.

4          Q      So that's what they would make

5     the payment to, the escrow account?

6          A      Yes.

7          Q      And everybody understood that?

8          A      Jagdish knows only.

9          Q      Excuse me?

10         A      Jagdish he knows, that's why

11    they have to pay back.

12         Q      To the extent that there were

13    loans.

14                Now, let me show you.  All right

15    you said that there were times when you dealt

16    with Jagdish, and I think you also said there

17    were times when you dealt with Jagdish and

18    Surjeet Bose?

19         A      Um-hmm.

20         Q      Once Jagdish went into a coma, I

21    believe the witness we had here this morning

22    said that it was in February 2014, with whom

23    did you deal?

24         A      Ravi.

25         Q      I thought you said you never did

WINTER REPORTING, INC.    (212) 953-1414

Exhibit 215

NC CLERK

Attachment D to Williston Park Realty LLC
Subpoena dated August 27, 2017

**NASSAU COUNTY CLERK'S OFFICE**
**ENDORSEMENT COVER PAGE**

Recorded Date: 03-15-2013          Record and Return To:
Recorded Time: 11:29:19 a          KEDIS ENTERPRISES
                                   1414 HILLSIDE AVE
   Liber Book:                     NEW HYDE PARK, NY   11040
   Pages From:
         To:

      Control
      Number:   903
        Ref #:
   Doc Type: Z02   BUILDING LOANS

Location:               Section Block    Lot    Unit
N. HEMPSTEAD (2822)     0009   00313-00 00033
N. HEMPSTEAD (2822)     0009   00313-00 00034
N. HEMPSTEAD (2822)     0009   00313-00 00035
N. HEMPSTEAD (2822)     0009   00313-00 00036

Consideration Amount:        600,000.00

                              Taxes Total            .00
                          Recording Totals        175.00
IJC001                       Total Payment         175.00

THIS PAGE IS NOW PART OF THE INSTRUMENT AND SHOULD NOT BE REMOVED
                    MAUREEN O'CONNELL
                     COUNTY CLERK

2013031500903

GCI_Post-Bnkr-Prod - 000040

WPR 000024



*Kedis Enterprises*
*1414 Hillside Ave* ✓
*New Hyde Park,*
*NY 11040*

Attachment D to Williston Park Realty LLC
Subpoena dated August 27, 2017

*✓ 202*

# COMMERCIAL LOAN AGREEMENT

THIS COMMERCIAL LOAN AGREEMENT (this "Agreement") is made as of the 18th day of January, 2013 between NEMINATH INC. a New York a New York Corporation with its principal office located at 235 Hillside Avenue, Williston Park, New York 11596 (the "Borrower") and KEDIS ENTERPRISES LLC with offices at 1414 Hillside Avenue, New Hyde Park, NY 11040 ("Lender").

## WITNESSETH

WHEREAS, Lender and the Borrower, desire to enter into an agreement setting forth the terms of a commercial loan to be provided by Lender to the Borrower.

NOW THEREFORE, the parties hereto (the "Parties") agree as follows:

1. The Loan.

*sumo*

1.1 Purpose: Lender agrees to make loans to the Borrower in the amount US$600,000.00 (the " Loan") to be used for improvement and expansion of Neminath, Inc. and/or the business of its Affiliates. The Loan shall be referred to hereunder as the "Loan ".

*To be recorded simultaneously herewith*

The term "Affiliate" means, with respect to any Person, any (i) officer or (ii) director thereof or (iii) any Person that is, directly or indirectly, the legal or beneficial owner of or otherwise Controls more than 50% of any class of shares or other equity security of such Person, or (iv) any Person that directly or indirectly Controls or is Controlled By or is Under Common Control With such Person. "Control" of a Person (including the correlative meanings of "Controls", "Controlled By" and "Under Common Control With") means effective power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

The term "Person" means any individual, corporation, company, voluntary association, partnership, joint venture, trust, unincorporated organization or government (or any agency, instrumentality or political subdivision thereof)

Subject to the terms and conditions hereof, the Borrower may borrow on a non-revolving basis under this section 1.1. Notwithstanding anything to the contrary set forth herein, the Facility available to the Borrower hereunder and all obligations of Lender hereunder shall terminate on April19, 2014 (the "Maturity Date"), and the Borrower shall on the Maturity Date repay to Lender the full amount of principal and interest owing by the Borrower hereunder, together with any fees and all other amounts owing by the Borrower to Lender.

1.2 Promissory Note.

*Sec: 9*
*Blk: 313*  ✓
*Lot: 33, 34, 35, 36*

NY CLERK

A promissory note for the Loan (the " Loan Note") shall be executed by the Borrower in form and substance satisfactory to Lender. The Loan Note shall be payable in a lump sum. The Loan Note shall sometimes be referred to herein as the "Note".

1.3 Notice and Manner of Borrowing. The proceeds of the loans under the Loan shall be paid by Checks.

1.4 Interest. Interest shall accrue on all obligations at an interest rate (the "Interest Rate") of fifteen (15%) percent per annum.

1.5 Default Interest. Notwithstanding anything to the contrary contained herein, if the Borrower fails to repay any loan or to pay any other amount when due hereunder, then the Borrower shall, to the extent permitted by law, pay interest on such unpaid amount from such due date to the date of payment in full at the maximum interest rate allowed by applicable law.

1.6 Payments.

(a)     Borrower shall make payments of, all principal, interest and other amounts owing hereunder shall be due and payable on the Maturity Date.

(b)     All sums payable to Lender under this Agreement shall be paid in U.S. dollars in immediately available funds without any deductions or setoff not later than 3:00P.M. New York time on the day in question to Lender at its address set forth in the Note.

(c) All payments made to Lender shall be applied against amounts then due and payable under this Agreement in the following order: first, to any fees or other charges owing to the Lender hereunder or; second, to accrued and unpaid interest; and third, to the outstanding principal balance hereof.  Notwithstanding the foregoing, after the occurrence of an Event of Default, the Lender may apply payments received hereunder to the obligations evidenced by the Note in such manner as the Lender shall determine in its sole and absolute discretion.

1.7 Payment Date Adjustments. Whenever any payment hereunder shall be stated to be due on a Saturday, Sunday, or other day on which banks are not open for business in New York City (any other day being a "Banking Day"), such payment shall be due on the next succeeding day which is a Banking Day.

1.8 Use of Loan. The Loan is to be used for the Borrower's improvement and expansion of its business including but not limited to Affiliate's improvement of the business.

1.9 The Borrower shall not, directly or indirectly, use any part of such proceeds of to extend credit to any person.

2

GCI_Post-Bnkr-Prod - 000042

WPR 000026

NC CLERK

Attachment D to Williston Park Realty LLC
Subpoena dated August 27, 2017

2. Representations and Warranties. The Borrower hereby represents and warrants to Lender as follows:

2.1 Formation and Qualification. The Borrower is duly formed, validly existing, and in good standing under the laws of the State of New York. The Borrower is qualified or registered to do business in every jurisdiction where such qualification or registration is necessary.

2.2 Power and Authority. The Borrower has full legal right, power, and authority to carry on its present business, to own its property and assets, and to perform its obligations hereunder.

2.3 Authorization of Borrowing. The Borrower has taken all appropriate and necessary corporate action to authorize the execution, delivery, and performance of this Agreement and the other Collateral Documents to which the Borrower is a party.

2.4 Agreement Binding. This Agreement and the other Collateral Documents each constitute the legal, valid, and binding obligations of the Borrower or the Guarantor (as defined herein), as the case may be, enforceable in accordance with their terms. The execution, delivery, and performance of this Agreement and the other Collateral Documents do not violate any law or governmental regulation nor conflict with or result in the breach of any provisions of any agreement to which the Borrower or the Guarantor is a party or by which any of them or any of their properties or assets are bound, nor constitute a default or an event that with the giving of notice or the passing of time, or both, would constitute a default under any such agreements.

2.5 Subsidiaries and Ownership of Stock. Set forth in Exhibit "1" attached hereto is a complete and accurate list of the corporations, partnerships and other entities in which the Borrower has an interest exceeding five percent (5%) of the total equity interests therein (the "Subsidiaries"), showing the jurisdiction of incorporation or organization and the percentage of the Borrower's ownership thereof. In the case of Subsidiaries that are corporations, all of the outstanding capital stock of each such Subsidiary has been validly issued, is fully paid and non- assessable, and is owned by the Borrower free and clear of all liens and encumbrances.

2.6 Financial Statements. The consolidated balance sheet of the Borrower and its respective Subsidiaries as at                          , and the related consolidated statements of income and retained earnings of the Borrower and its Subsidiaries for the fiscal year then ended, and the accompanying footnotes, copies of which have been furnished to Lender, are complete and correct and fairly present the financial condition of the Borrower and its Subsidiaries as at such dates and the results of the operations of the Borrower and its Subsidiaries for the periods covered by such statements, all in accordance with generally accepted accounting principles consistently applied (subject to year-end adjustments in the case of interim financial statements). Since                       , there has been no material adverse change in the condition

-----------------------------

3

WPR 000027

(Financial or otherwise), business, or operations of the Borrower or any Subsidiary. There are no liabilities of the Borrower or any Subsidiary, fixed or contingent, which are material but are not reflected in the financial statements or in the notes thereto, other than liabilities arising in the ordinary course of business since                    . No information, exhibit, or report furnished by the Borrower or the Guarantor to Lender in connection with the negotiation of this Agreement contained any material misstatement of fact or omitted to state a material fact or any fact necessary to make the statements contained therein not materially misleading.

2.7 ERISA. The Borrower and its Subsidiaries are in compliance in all material respects with all applicable provisions of the Employee Retirement Income Security Act of 1974, as amended. Neither a Reportable Event (as defined in ERISA) nor a Prohibited Transaction (as defined in ERISA) has occurred and is continuing with respect to any pension plan which is covered by Title IV of ERISA and in respect of which the Borrower or any Commonly Controlled Entity (as defined in ERISA) is an "employer" as defined in Section 3(5) of ERISA (a "Plan"); no notice of intent to terminate a Plan has been filed, nor has any Plan been terminated; no circumstances exist which constitute grounds entitling the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA (the "PBGC") to institute proceedings to terminate, or appoint a trustee to administer, a Plan, nor has the PBGC instituted any such proceedings; neither the Borrower nor any Commonly Controlled Entity has completely or partially withdrawn from a Multiemployer Plan (as defined in ERISA); the Borrower and each Commonly Controlled Entity have met each minimum funding requirements under ERISA with respect to all of their Plans, and the present value of all vested benefits under each Plan exceeds the fair market value of all Plan assets allocable to such benefits, as determined on the most recent valuation date of the Plan and in accordance with the provisions of ERISA; and neither the Borrower nor any Commonly Controlled Entity has incurred any liability to the PBGC under ERISA.

2.8 Filings and Recordings. To ensure the legality, validity, and enforceability of this Agreement, the other Collateral Documents, and the grant and perfection of the security interests provided for in the Security Agreement, it is not necessary that any document or instrument be filed or recorded with any office or that any other action be taken, except for the due filing of UCC-1 financing statements with the Secretary of State of New York and the recordation of the Negative Pledge Agreement (as defined herein).

2.9 Litigation. There are no pending or threatened legal actions or arbitrations or other proceedings involving the Borrower, any Subsidiary, or the Guarantor, except as set forth on Exhibit "2" attached hereto and incorporated by reference.

2.10 Title to Properties and Assets. The Borrower has good and marketable title to all the properties and assets, ownership of which is reflected in its most recent financial statements, except for properties or assets that have been disposed of in the ordinary

4

GCI_Post-Bnkr-Prod - 000044

WPR 000028

NC CLERK

Attachment D to Williston Park Realty LLC
Subpoena dated August 27, 2017

course of business. All such properties and assets are free and clear of all mortgages, liens, charges, and other encumbrances (each a "Lien") except as noted in the lien status report provided by Borrower to Lender, a copy of which is attached as Exhibit "3" hereto and is incorporated by reference. All such properties and assets are insured against such risks and in such amounts as are customary for businesses of a like nature.

2.11 Compliance with Law. The Borrower is conducting its business and operations in compliance with all applicable laws and directives of governmental authorities having the force of law, and is in compliance with all applicable government guidelines and policy statements whether or not having the force of law. The Borrower has paid all taxes due with respect to the ownership of its assets and the conduct of its operations, except to the extent that the payment of such taxes is being contested in good faith by the Borrower. The Borrower shall set aside adequate reserves for the payment of the foregoing taxes in the event that the aforementioned contest is unsuccessful in its entirety.

2.12 Other Obligations. The Borrower is not in default in the performance, observance, or fulfillment of any obligation, covenant, or condition in any material agreement or instrument to which it is a party or by which it is bound.

3. Covenants.

Until such time as that all Loans and other sums payable by the Borrower hereunder have been paid in full and Lender has no further obligations hereunder, the Borrower covenants as follows:

3.1 Financial Statements; Other Reports.

(a) The Borrower shall maintain an accounting system in accordance with United States generally accepted accounting principles consistently applied.

(b)      Within 30 days of filing annual tax return filing, a copy of the Borrower's certified public accountant prepared fully executed and dated income tax return including all schedules and K-1s or certified public accountant compiled fully executed and dated financial statement.

(c)      Within 30 days of filing, a copy of each Guarantor's fully executed and dated income tax return including all schedules and K-1s.

(d) On an annual basis the updated and executed personal financial statement of Each Guarantor.

(e)      The Borrower shall make available such further information or documents concerning its business and affairs as Bank may from time to time reasonably request.

GCI_Post-Bnkr-Prod - 000045

WPR 000029

NC CLERK

3.2 Other Obligations. The Borrower shall pay all its indebtedness and promptly perform all contractual obligations pursuant to agreements to which it is a party or by which it is bound at any time during the term of this Agreement.

3.3 Taxes. The Borrower shall pay and discharge all taxes and governmental charges upon it or against any of its properties or assets prior to the date after which penalties attach for failure to pay, except to the extent that the Borrower shall be contesting in good faith its obligation to pay such taxes or charges. The Borrower shall set aside adequate reserves for the payment of the foregoing taxes and/or charges in the event that the aforementioned contest is unsuccessful in its entirety. The Borrower shall make timely filings of all tax returns and governmental reports required to be filed or submitted under any applicable laws or regulations.

3.4 Maintenance of Business; Insurance; Inspection. The Borrower shall maintain its corporate existence in good standing. The Borrower shall operate its business and assets in compliance with all applicable laws and regulations and shall maintain the present character of its business. The Barrower shall maintain or cause to be maintained (a) business insurance covering product liabilities, casualties, loss of income and other liabilities in amounts of coverage approved by Lender, (b) insurance (including Builder's Risk insurance) on all its properties and assets and insurance against operational risks and liabilities with coverage and in amounts as are customary for businesses of a like nature. Lender shall be named as an "additional insured" and as "loss payee" on all such policies. Upon request by Lender, the Borrower shall provide Lender with Certificates reflecting the foregoing. In the event that the Borrower fails to continue the required insurance in force when any of the insurance policies fall due, Lender may purchase such insurance that provides limited protection against physical damage to the Borrower's assets at the Borrower's expense, up to the balance of all of the Borrower's indebtedness to Lender. The cost of any such insurance, shall be payable by the Borrower on demand or shall be added to the indebtedness of the Borrower to Lender. The Borrower shall permit Lender and its representatives at all reasonable times to inspect the Borrower's facilities, activities, books of account, and records, and shall cause the Borrower's representatives, employees, and accountants to give their full cooperation and assistance in connection with any visits by, or financial conferences with, Lender or Lender's representatives or agents.

3.5 Notice. The Borrower shall promptly give notice to Lender of the occurrence of any Event of Default or an event that, with the giving of notice or the passing of time or both would constitute an Event of Default.

3.6 Financial Covenants and Miscellaneous.

(a)     There shall be no change of ownership of the Borrower, management of the Borrower without the prior written consent of the Lender, which consent shall be in Lender's sole and absolute discretion.

6

WPR 000030

.Attachment D to Williston Park Realty LLC
Subpoena dated August 27, 2017

(b)    The Borrower shall not pay any dividend or repurchase membership interests without the prior written consent of the Lender, which consent shall be in the Lender's sole and absolute discretion.

(c)    The Lender reserves the right, in its reasonable discretion, to order updated appraisal(s) conformed to the FIRREA and USPAP on the premises located at 235 Hillside Avenue, Williston Park, New York (the "Borrower Financed Premises") to be conducted by the Lender's designated appraiser.  All appraisal fees are to be borne by the Borrower. The ratio of the maximum principal balance available hereunder to the then appraised value of the Borrower Financed Premises must not exceed 50% throughout the duration of the Facility.

4. Negative Covenants.

Until such time as all Loans and other sums payable by the Borrower hereunder have been paid and Lender has no further obligations hereunder, the Borrower will not:

4.1 Liens. Create, incur, assume, or suffer to exist, or permit any Subsidiary to create, incur, assume, or suffer to exist, any Lien upon or with respect to any of their assets, now owned or hereafter acquired, except:

(a) Liens in favor of Lender;

(b) Liens for taxes or assessments or other government charges or levies not yet due and payable or, if due and payable, they are being contested in good faith by appropriate proceedings and for which appropriate reserves are maintained by the Borrower;

(c) Liens imposed by law, such as mechanics', material men's, landlords', warehousemen's, and carriers' Liens, and other similar Liens, securing obligations incurred in the ordinary course of business which are not past due for more than sixty (60) days or which are being contested in good faith by appropriate proceedings and for which appropriate reserves have been established by the Borrower;

(d) Liens under workers' compensation, unemployment insurance, Social Security, or similar legislation;

(e) Liens, deposits, or pledges to secure the performance of bids, tenders, contracts (other than contracts for the payment of money), leases (permitted under the terms of this Agreement), public or statutory obligations, surety, stay, appeal, indemnity, performance, or other similar bonds, or other similar obligations arising in connection with or in• furtherance of the Borrower's business;

(f) Judgment and other similar Liens arising in connection with court proceedings, provided that the execution or other enforcement of such Liens is effectively stayed and

7

NC CLERK

.Attachment D to Williston Park Realty LLC
Subpoena dated August 27, 2017

the claims secured thereby are being actively contested in good faith and by appropriate proceedings; and

(g) Easements, rights-of-way, restrictions, and other similar encumbrances which, in the aggregate, do not (i) materially interfere with the occupation, use, and enjoyment by the Borrower of the property or assets encumbered thereby in the normal course of its business or (ii) materially impair the value of the property subject thereto.

4.2 Mergers, etc. Wind up, liquidate or dissolve itself, reorganize, merge or consolidate with or into, or convey, sell, assign, transfer, lease, or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to any person or entity, or acquire all or substantially all of the assets or the business of any person or entity, or permit any Subsidiary to do so, except that (1) any Subsidiary may merge into or transfer assets to the Borrower and (2) any Subsidiary may merge into or consolidate with or transfer assets to any other Subsidiary.

4.3 Dividends. (a) Declare or pay any dividends; (b) purchase, redeem, retire, or otherwise acquire for value any of its membership interests now or hereafter outstanding; (c) make any distribution of assets to its members as such whether in cash, assets, or obligations of the Borrower; (d) allocate or otherwise set apart any sum for the payment of any dividend or distribution on, or for the purchase, redemption, or retirement of any shares of its member ship interests; (e) make any other distribution by reduction of capital or otherwise in respect of any of its membership interests; (f) make any withdrawals of dividend, payout or advances to any member; or (g) permit any Subsidiary to purchase of otherwise acquire for value any interest of the Borrower or another Subsidiary. Notwithstanding the foregoing, the Borrower may take the actions specified in Section 6.3(a) with Lender's written consent, which consent shall not be unreasonably withheld.

4.4 Sale of Assets. Sell, lease, assign, transfer, or otherwise dispose of, or permit any Subsidiary to sell, lease, assign, transfer, or otherwise dispose of, any of their now owned or hereafter acquired assets (including, without limitation, shares of stock and indebtedness of Subsidiaries, receivables, and leasehold interests), except: (a) inventory disposed of in the ordinary course of business; (b) the sale or other disposition of assets no longer used or useful in the conduct of its business; and (c) that any Subsidiary of the Borrower may sell, lease, assign, or otherwise transfer its assets to the Borrower.

4.5 Investments. (a) Make, or permit any Subsidiary to make, any loan or advance to any person, or (b) purchase or otherwise acquire, or permit any Subsidiary to purchase or otherwise acquire, any capital stock, or other securities of, make any capital contribution to, or otherwise invest in or acquire any interest in any person, or participate as a partner or joint venture with any other person.

GCI_Post-Bnkr-Prod - 000048

WPR 000032

NC CLERK

Attachment D to Williston Park Realty LLC
Subpoena dated August 27, 2017

4.6 Guaranties, Etc. Assume, guaranty, endorse, or otherwise be or become directly or contingently responsible or liable for, or permit any Subsidiary to assume, guaranty, endorse, or otherwise be or become directly or contingently responsible or liable for, obligations of any person, except guaranties by endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business.

4.7 Transactions with Affiliates. Enter into any transaction, including, without limitation, the purchase, sale, or exchange of property or the rendering of any service, with any Affiliate, or permit any Subsidiary to enter into any transaction, including, without limitation, the purchase, sale, or exchange of property or the rendering of any service, with any Affiliate, except in the ordinary course of and pursuant to the reasonable requirements of the Borrower's or such Subsidiary's business and upon fair and reasonable terms no less favorable to the Borrower or such

Subsidiary than would obtain in a comparable arm's-length transaction with a person not an Affiliate.

4.8    Other Borrowings. Borrow any funds from any Person or incur any debt from any other bank or financial institution without Lender's prior written consent, which consent shall be in Lender's sole and absolute discretion.

5. Conditions to Loans.

5.1 Condition to Initial Loan. Lender shall advance the Loan hereunder only upon the fulfillment, as determined by Lender in its sole discretion, of the following conditions precedent:

(a) Authorizations. Lender shall have received, in form and substance satisfactory to it in its sole discretion· certificates of good standing for the Borrower from each jurisdiction in which the Borrower does business.

(b) Security. Lender shall have received (i) a security agreement duly executed by the Borrower granting a security interest in the Collateral (as defined therein) (the "Security Agreement"), (ii) unconditional guaranties from Vipin Shah residing at 35 Smith Place, Williston Park, NY 11596, Nayana V. Shah residing at 35 Smith Place, Williston Park, NY 11596, Mehendra Shah residing at 39 Capitol Avenue, Williston Park, NY 11596 and Pooja M. Shah residing at Park, NY 11596, (collectively, the "Guaranty") in favor of Lender jointly and severally guarantying the payment when due of all amounts due hereunder, (iii) The Security Agreement, Guaranty, Loan Assignment and Negative Pledge Agreement together with any documents, notes or instruments relating to any of the foregoing are sometimes collectively referred to herein as the "Collateral Documents".

(c) Financing Statements. UCC-1 financing statements describing the Collateral subject to the Security Agreement (the "Collateral") and naming the Borrower as debtor and Lender as secured party and otherwise in form and substance satisfactory to Lender

9

GCI_Post-Bnkr-Prod - 000049

WPR 000033

shall have been authorized and delivered by the Borrower and filed in such offices as Lender shall deem necessary or desirable, and Lender shall have received evidence satisfactory to it in its sole discretion that it has a perfected, first priority security interest in the Collateral.

(d) Insurance Policies and/or Certificates.   Lender shall have received insurance policies and/or certificates with terms and conditions satisfactory to Lender at its sole discretion.

(e) Other Documents.  Lender shall have received evidence satisfactory to it that no liens, security interests, options or other charges or encumbrances exist on the property subject to any of the Collateral Documents (except such as are acceptable to Lender).

(f) Lender reserves the right, at the Borrower's expense, to hire an engineer to make on-site inspections and to examine the improvements, documents and records related to the improvements on the premises located at 235 Hillside Avenue, Williston Park, New York,

(g) Other Documents. Lender shall have received such other documents as it may reasonably request.

6. Events of Default.

6.1 Events of Default. Each of the following events and occurrences shall constitute an "Event of Default" under this Agreement:

(a) The Borrower fails to make payment to Lender when due and payable of any amount that the Borrower is obliged to pay under this Agreement or under any Collateral Document.

(b) Any representation or warranty made by the Borrower herein or in any other Collateral Document to which the Borrower is a party, or by the Guarantor in any Collateral Document to which such Guarantor is a party, shall have been incorrect or misleading in any material respect when made or confirmed, or any certificate furnished under this Agreement or any other Collateral Document proves to have been false or misleading as of its date in any material respect.

(c) The Borrower fails to perform or violates any provision of this Agreement or of any Collateral Document to which the Borrower is a party or the Guarantor fails to perform or violates any provision of any Collateral Document to which such Guarantor is a party, and such failure or violation is not remediable or, if remediable, continues for a period of ten (10) days after receipt by such party of notice from Lender.

(d) The Borrower or the Guarantor fails to pay any amount when due under any agreement or document evidencing, securing, guarantying, pledging, or otherwise relating to indebtedness of the Borrower or such Guarantor to any person or entity in excess of $50,000, or there occurs any other event of default or other event that, with the

10

GCI_Post-Bnkr-Prod - 000050

WPR 000034

NC CLERK

Attachment D to Williston Park Realty LLC
Subpoena dated August 27, 2017

giving of notice or the passing of time, or both, would constitute an event of default on the part of the Borrower or such Guarantor under any such agreement or document.

(e) The Borrower or the Guarantor becomes insolvent or unable to pay its debts when due, or the Borrower or the Guarantor commits or permits any act of bankruptcy, which then shall include (i) the filing by the Borrower or by the Guarantor of a petition in any bankruptcy, reorganization, winding-up, or liquidation proceeding, or other proceeding analogous in purpose or effect, (ii) the filing of such a petition by any person or entity against the Borrower or against the Guarantor and the failure of such petition to be discharged within thirty (30) days, (iii) application for or consent to the appointment of a receiver or trustee for the bankruptcy, reorganization, winding-up, or liquidation of the Borrower or the Guarantor, (iv) making an assignment for the benefit of creditors, (v) the admission in writing by the Borrower or by the Guarantor of its inability to pay its debts when due, or (vi) the entry of any court order or judgment confirming the bankruptcy or insolvency of the Borrower or the Guarantor or approving any reorganization, winding-up, or liquidation of the Borrower or the Guarantor or any portion of the assets of the Borrower or of the Guarantor.

(f) Any default or event of default shall occur under (1) any other agreement, document or instrument between Lender and the Borrower or the Guarantor

(g) Any judgment or decree for money damages or for a fine or penalty in excess of $50,000 or its equivalent in any other county is entered against the Borrower or the Guarantor and is not paid or discharged within thirty (30) days.

(h) The Borrower shall issue any membership interests to any party, or any current member of the Borrower shall sell or otherwise transfer any interest of the Borrower to any party without the prior consent of Lender.

(i) Any Guarantor who is a natural person shall die or shall have been adjudicated incompetent by a judicial decree(provided that no Event of Default shall be deemed to have occurred hereunder until ninety (90) days after such death or adjudication of incompetence of such Guarantor, and at the end of such period the Borrower and Lender shall have failed to agree in writing on substitute credit support acceptable to Lender in its sole discretion; and further provided that Lender shall have no obligation to advance Loans during such period), or the Guarantor shall claim that the Guaranty signed by such party or any related agreement is invalid or unenforceable or has been terminated.

(j) Any circumstance occurs affecting the Borrower or the Guarantor, which in the opinion of Lender gives reasonable grounds for Lender's belief that the Borrower or such Guarantor may not be able to perform its obligations hereunder or under such Guarantor's Guaranty or any other document delivered in connection herewith or therewith.

11

GCI_Post-Bnkr-Prod - 000051

WPR 000035

NY CLERK

(k) Any adverse change in the financial condition and/or operation of the Borrower or the Guarantor.

6.2 Consequence of Default. If an Event of Default shall occur, Lender may by notice to the Borrower declare all amounts outstanding under the Facility, accrued interest on all loans and any other sum payable hereunder and/or under any of the Collateral Documents to be immediately due and payable, and the same shall thereupon become due and payable without presentment, demand, protest, or notice of any kind, all of which are expressly waived by the Borrower. The Borrower shall also pay to Lender such additional amounts as may be necessary to compensate Lender for any costs and losses resulting from such Event of Default. No waiver of any Event of Default shall constitute a waiver of any other or any succeeding Event of Default or of the continuance of the Event of Default so waived except in accordance with the terms of such waiver.

If an Event of Default shall occur, Lender shall also have the right to pursue any remedies provided herein, in any and/or all of the Collateral Documents, and/or otherwise available to Lender at law or in equity.

7. Miscellaneous.

7.1 Entire Agreement.

(a) This Agreement may be amended but only by an instrument in writing signed by the Parties. This Agreement and the documents referred to herein constitute the entire obligation of the Parties with respect to the subject matter hereof and shall supersede any prior expressions of intent or understandings with respect to the transactions contemplated hereby (except as referred to and/or as contemplated by this Agreement) and any other documents executed in connection with either of the foregoing).

(b) Notwithstanding the foregoing, nothing set forth in this Agreement or in any Collateral Document or any other document executed in connection herewith or therewith shall diminish or otherwise affect any (i) other obligations of the Borrower or the Guarantor to Lender, (ii) security interest previously granted by the Borrower to Lender, (iii) any guaranty previously executed by the Guarantor of any obligations of the Borrower in favor of Lender or (iv) any security interest previously granted by any such Guarantor with respect to any such guaranty, and all of the foregoing shall remain in full force and effect.

7.2 Waiver. The failure or delay of Lender to require performance by the Borrower of any provision of this Agreement shall not affect Lender's right to require performance of such provision unless and until such performance has been waived by Lender in writing. Each and every right granted to Lender hereunder or under any other document or instrument delivered hereunder or in connection herewith, or allowed at law or in equity, shall be cumulative and may be exercised from time to time.

12

GCI_Post-Bnkr-Prod - 000052

WPR 000036

NC CLERK

Attachment D to Williston Park Realty LLC
Subpoena dated August 27, 2017

**7.3 Assignment.** This Agreement shall be binding upon and shall be enforceable by the Borrower and Lender and their respective successors and assigns, except that the Borrower shall not have the right to assign or transfer its rights or obligations hereunder.

**7.4 Governing Law.** This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York, without regard to principles of conflicts of laws.

**7.5 Submission to Jurisdiction; Waiver of Jury Trial.**

(a) The Borrower hereby irrevocably consents in any legal action or proceedings against it or against any of the Collateral subject to the Security Agreement, or with respect to any of the Collateral Documents or otherwise (i) to the non-exclusive in person jurisdiction of any state or federal court located in the City and State of New York, (ii) agrees to suit being brought in such courts as Lender shall elect, and (iii) the Borrower further irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, return receipt required, postage prepaid, to the Borrower at its address set forth in Section 9.7. The foregoing, however, shall not limit the right of Lender to serve process in any other manner permitted by law or to bring any legal action or proceeding or to obtain execution of judgment in any jurisdiction.

(b) Lender and the Borrower irrevocably waive their respective rights to a jury trial in any proceeding pertaining to this Agreement and/or to any of the Collateral Documents.

**7.6 Set-Offs.** Following an Event of Default, Lender shall have the right, to the extent permitted by law, to apply amounts on deposit or account with it or any of it's branches, subsidiaries, or affiliates in reduction of amounts owed by the Borrower hereunder.

**7.7 Notices.** Any notice required or permitted to be given hereunder shall be in writing and shall be delivered or sent by registered or certified mail (postage prepaid and return receipt requested) or nationally recognized overnight courier service as follows:

To The Borrower:

Neminath, Inc.
235 Hillside Avenue
Williston Park, New York 11596
Attn: Mehendra Shah

To Lender:
Kedis Enterprises LLC
1414 Hillside Avenue
New Hyde Park, New York 11040
Attention: Sanjiv Chand

13

GCI_Post-Bnkr-Prod - 000053

WPR 000037

NC CLERK

Attachment D to Williston Park Realty LLC
Subpoena dated August 27, 2017

All notices and other communications shall be deemed to have been duly given on the date of receipt. Any party may change its address for purposes hereof by notice written to the other parties delivered in accordance herewith.

9.8 Severability. If any one or more of the provisions contained in this Agreement or any document executed in connection herewith shall be invalid, illegal, or unenforceable in any respect under any applicable law, the remaining provisions contained herein shall not in any way be affected or impaired.

9.9 Counterparts. This Agreement may be signed in any number of counterparts. Any single counterpart or a set of counterparts signed, in either case, by both of the parties hereto shall constitute a full and original agreement for all purposes.

9.10 Expenses and Fees. The Borrower shall reimburse Lender on demand for all expenses incurred by Lender, including, but not limited to, fees and expenses of counsel, in connection with (a) the preparation, negotiation, execution, delivery, filing, recording, analysis, amending, administration, and/or enforcement of this Agreement, any of the Collateral Documents, and any other documents contemplated herein, (b) in any bankruptcy proceeding, (c) in any dispute or matter concerning the Borrower, this Agreement, any of the Collateral, and/or any of the Collateral Documents and (d) advising Lender as to its rights and responsibilities under this Agreement, under any of the Collateral Documents and/or under any other documents contemplated herein. Any of the foregoing fees and expenses which remain unpaid after 30 days from Lender's demand, shall be added to the principal of the loan and shall bear interest at the rate set forth in Section 1.4.

The Parties have caused this Agreement to be executed by their respective duly authorized representatives as of the day and year first above written.


KEDIS ENTERPRISES LLC

By:
Name: Sanjeeve Chand
Title: Managing Member


NEMINATH INC

By:
Name: Mehendra Shah
Title: President


GCI_Post-Bnkr-Prod - 000054

14

WPR 000038

NC CLERK

Attachment D to Williston Park Realty LLC
Subpoena dated August 27, 2017

AGREED TO AND ACCEPTED AS GUARANTOR BY:

_____
Vipin Shah

AGREED TO AND ACCEPTED AS GUARANTOR BY:

_____
Nayana V. Shah

AGREED TO AND ACCEPTED AS GUARANTOR BY:

_____
Mahendra Shah

AGREED TO AND ACCEPTED AS GUARANTOR BY:

_____

Pooja M. Shah


STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NASSAU       )

On the 18th   day of January in the year 2013 before me, the undersigned, personally
appeared   VIPIN SHAH & Nayana V. Shah personally known to me on the basis
of satisfactory evidence to be the individual whose name is subscribed to the within
instrument and acknowledged to me that he/she executed the same in his/her capacity,
and that by his/her signature on the instrument the individual, or the person on behalf of
which the individual acted, executed the instrument.

*Rakesh Aggarwal*

RAKESH AGGARWAL
Notary Public, State of New York
No. 01AG6149185
Qualified in Nassau County
Commission Expires July 03, 20__

**LEGIBILITY POOR FOR
IMAING/FILM**

15

GCP_Post-Bnkr-Prod - 000055

WPR 000039

NC CLERK

Attachment E to Williston Park Realty LLC
Subpoena dated August 27, 2017

**NASSAU COUNTY CLERK'S OFFICE**
**ENDORSEMENT COVER PAGE**

Recorded Date: 03-15-2013
Recorded Time: 11:29:19 a

Liber Book: M  38434
Pages From:       724
        To:       744 A

Record and Return To:
KEDIS ENTERPRISES
1414 HILLSIDE AVE
NEW HYDE PARK, NY   11040

Control
Number:    904
   Ref #: DD  059877
Doc Type: M07  MORTGAGE-COMMERCIAL

| Location: | Section | Block | Lot | Unit |
|---|---|---|---|---|
| N. HEMPSTEAD (2822) | 0009 | 00313-00 | 00033 | |
| N. HEMPSTEAD (2822) | 0009 | 00313-00 | 00034 | |
| N. HEMPSTEAD (2822) | 0009 | 00313-00 | 00035 | |
| N. HEMPSTEAD (2822) | 0009 | 00313-00 | 00036 | |

Consideration Amount:        600,000.00

| | |
|---|---|
| Taxes Total | 6,300.00 |
| Recording Totals | 295.00 |
| Total Payment | 6,595.00 |

IJC001

THIS PAGE IS NOW PART OF THE INSTRUMENT AND SHOULD NOT BE REMOVED
MAUREEN O'CONNELL
COUNTY CLERK

201303150090·4

GCI_Post-Bnkr-Prod - 000607

WPR 000043

RE: R
Kedis Enterprises
1414 Hillside Ave
New Hyde Park,
NY 11040

MCJ
21

Attachment E to Williston Park Realty LLC
Subpoena dated August 27, 2017

## MORTGAGE, SECURITY AGREEMENT AND ASSIGNMENT OF LEASES AND RENTS

By

NEMINATH INC

In Favor of

KEDIS ENTERPRISES, LLC

THIS MORTGAGE, SECURITY AGREEMENT, AND ASSIGNMENT OF LEASES AND RENTS made this 18th day of January, 2013, by NEMINATH INC., a New York Corporation having an office at 235 Hillside Avenue, Williston Park, New York 11596 (the "Mortgagor") in favor of KEDIS ENTERPRISES LLC, a corporation organized and existing under the New York Law having a principal place of business at 1414 Hillside Avenue, New Hyde Park, NY 11040, (the "Mortgagee").

WITNESSETH, that the Mortgagor is indebted to the Mortgagee for the payment of an indebtedness in the sum of SIX HUNDRED THOUSAND AND 00/100 DOLLARS ($600,000.00) lawful money of the United States, to be paid, with interest thereon (as such sum may be reduced from time to time, together with the interest thereon, hereinafter sometimes collectively referred to and described as the "Debt"), according to a certain note or obligation bearing even date herewith (which, as now exists, and as the same may hereafter, from time to time be extended, amended, modified, restated or superseded, hereinafter collectively referred to as the "Note").

NOW THIS INDENTURE WITNESSETH that for better securing the payment of the Debt, and the performance by the Mortgagor of the terms, covenants, conditions and obligations contained herein, in the Note and in any other documents and agreements given to secure payment of the Note according to the true intent and meaning thereof, and also for and in consideration of one dollar to the Mortgagor in hand paid by the Mortgagee at or before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, the Mortgagor has mortgaged, granted, bargained, sold, aliened, released, conveyed and confirmed, and by these presents does mortgage, grant, bargain, sell, alien, release, convey and confirm unto the Mortgagee, forever, and grants the Mortgagee a security interest in:

### MORTGAGED PROPERTY

A.     All the land located in the County of Nassau and State of New York described in Schedule A annexed hereto and made a part hereof (the "Land"), and known by the street address 235 Hillside Avenue, Williston Park, NY 11596.

Sec: 9
Blk: 313
Lot: 33, 34, 35, 36

GCI_Post-Bnkr-Prod - 000608

WPR 000044

NC CLERK

B.     All buildings, structures and improvements of every nature whatsoever now or hereafter situated on the Land (the "Improvements").

TOGETHER with all and singular rights, hereditaments, and appurtenances belonging or in any way incident or appertaining thereto, including, but not limited to:

C.     All fixtures, machinery, appliances, materials, equipment, furniture and personal property of every nature whatsoever now or hereafter owned by the Mortgagor and located in or on, or attached to, or used, or intended to be used, in connection with the operation of, or with construction on, the Land or the Improvements, including all extensions, additions, improvements, betterments, renewals and replacements to any of the foregoing and all of the right, title and interest of the Mortgagor in and to any such personal property or fixtures together with the benefit of any deposits or payments now or hereafter made by the Mortgagor or on its behalf with regard thereto (the "Personal Property").

D.     All right, title and interest of the Mortgagor, if any, in and to the land in the bed of the streets or highways abutting the Land to the center line thereof; all easements, rights of way, strips and gores of land, streets, ways, sidewalks, curbs, alleys, passages, sewer rights, waters, water courses, water rights and powers, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments, remainders, reversions and appurtenances whatsoever, in any way belonging, relating or appertaining to the Land or the Improvements, or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired by the Mortgagor (the "Appurtenances").

E.     All leases, lettings, occupancy agreements and licenses (collectively, the "Leases") of the Land and/or the Improvements or any part thereof now or hereafter entered into and all right, title and interest of the Mortgagor thereunder (including, without limitation, the cash and securities deposited thereunder), the right to receive and collect the rents, issues and profits from the Leases (the "Rents") and all the estate, right, title, interest, property, possession, claim and demand whatsoever, at law as well as in equity, of the Mortgagor of, in and to, and all proceeds of any sales or other dispositions of, the property described in Paragraphs (A), (B), (C) and (D) above and this Paragraph (E).

F.     All proceeds of and any unearned premiums on any insurance policies covering the Improvements or the Personal Property or the Rents including, without limitation, the right to receive and apply the proceeds of any insurance, judgments or settlements made in lieu thereof.

G.     All awards ("Awards"), heretofore made and hereafter to be made by any municipal, state or federal authorities to the Mortgagor and all subsequent owners of the property described above in Paragraphs (A) through (E) including any awards for any changes of grade of streets affecting the property described above in Paragraphs (A) through (E) as the result of the exercise of the power of eminent domain (a "Taking").

2

GCI_Post-Bnkr-Prod - 000609

WPR 000045

H.     All the other estate, right, title, interest, use, possession, property, claim and demand whatsoever, contract rights, general intangibles, actions and rights in action, relating to the property described above in Paragraphs (A) through (G) and proceeds, products, replacements, additions, substitutions, renewals and accessions of any of the foregoing.

All the property, interests and rights referred to in Paragraphs (A) through (H) above and any additional property, interests or rights hereafter acquired by the Mortgagor and subject to the lien of this Mortgage or intended to be so are referred to in this Mortgage as the "Mortgaged Property".

TO HAVE AND TO HOLD the Mortgaged Property to the Mortgagee, its successors and assigns, forever.

The Mortgagor hereby grants to the Mortgagee a security interest in all rights and property described above in Paragraphs (C) and Paragraphs (E) through Paragraph (H) (collectively, the "Collateral"). This Agreement shall constitute a self-operative Security Agreement under Article 9 of the Uniform Commercial Code with respect to such rights and property, but the Mortgagor agrees to execute and deliver on demand such other instruments as the Mortgagee may request in order to create or perfect its security interest or to impose the lien hereof more specifically upon any of such rights and property. The Mortgagor hereby appoints the Mortgagee its agent and attorney-in-fact (which appointment shall be deemed to be an agency coupled with an interest), with full power of substitution, to execute, deliver and file on its behalf any UCC-1 financing statements, UCC-3 continuation statements and any other instruments necessary to create or perfect the Mortgagee's security interest upon any of the Collateral granted in this Paragraph which the Mortgagor has failed or refused to execute and deliver to the Mortgagee within ten (10) days after notice and request by the Mortgagee to so execute and deliver. The Mortgagee shall have all the rights and remedies under this Mortgage, or under any applicable law or agreements with the Mortgagor, of a Secured Party under the Uniform Commercial Code in addition to those specified herein.

And the Mortgagor covenants, represents and warrants with the Mortgagee that:

## ARTICLE I

### TERMS, COVENANTS, CONDITIONS, REPRESENTATIONS AND WARRANTIES

The Mortgagor covenants, represents and warrants to the Mortgagee as follows:

Section 1.1. Payment of Debt. The Mortgagor will pay the Debt as provided in the Note.

Section 1.2. Maintenance of the Mortgaged Property and Compliance with Laws. The Mortgagor shall (at its expense in so far as is applicable by the context):

(a)   maintain the Improvements in good and substantial order and repair and in such fashion that the value and utility of the Mortgaged Property will not be diminished and will make or cause to be made all necessary and appropriate repairs, replacements, and renewals thereof, whether



GCI_Post-Bnkr-Prod - 000610

WPR 000046

Attachment E to Williston Park Realty LLC
Subpoena dated August 27, 2017

interior or exterior, structural or non-structural; all repairs, replacements and renewals to be at least equal, in quality and class, to that of the original Improvements; and

(b)     comply with, or cause to be complied with, all laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, permits, licenses, authorization, directions and requirements of all governments, departments, commissions, boards, courts, authorities, agencies, officials and officers which may, affect the Mortgaged Property or any part thereof or its use or condition.

Section 1.3. Alterations. None of the Improvements shall be removed, altered or demolished without the prior written consent of the Mortgagee in each instance.

Section 1.4. Taxes and Other Charges; Mortgage Taxes. The Mortgagor will pay when due all liens of any kind, taxes of any kind and nature (including but not limited to real and personal property taxes and income, franchise, withholding, profits and gross receipts taxes), assessments, water and sewer charges, rents and rates, and other governmental or municipal charges, fines or impositions relating to the Mortgaged Property or any part thereof.

Section 1.5. Tax and Insurance Deposits. The Mortgagor shall deposit with the Mortgagee, monthly, one-twelfth (1/12th) of the annual charges for ground or other rent, if any, real estate taxes, assessments, water, sewer (if not metered) and other charges which might become a lien upon the Mortgaged Property (or any part thereof) and insurance premiums, and the Mortgagor shall, accordingly, make such deposits. All funds so deposited with the Mortgagee shall be held by it, but not in escrow and, except to the extent required by applicable law, without interest, and, provided that no "Event of Default" (as defined below in Section 2.1.1), shall have occurred and be continuing, shall be applied in payment of the charges aforementioned when and as payable, to the extent the Mortgagee shall have such funds on hand. Should an Event of Default occur and be continuing, the funds deposited with the Mortgagee, as aforementioned, may be applied in payment of the charges for which such funds have been deposited or to the payment of the Debt or any other charges affecting the security of the Mortgagee, as the Mortgagee sees fit.

Section 1.6. Warranty of Title. The Mortgagor represents and warrants that it is the fee simple owner of the Mortgaged Property and that this Mortgage is and will be maintained as a valid first lien on the Mortgaged Property.

Section 1.7. Insurance Coverage. (a) The Mortgagor, until the Debt secured by this Mortgage shall be fully paid and satisfied, shall keep, as applicable, the Mortgagor, the Improvements and the Personal Property insured, by a company or companies and in form, amounts and with coverage and deductibles satisfactory to Mortgagee. The insurance policies required to be procured pursuant to this Mortgage shall contain a standard New York non-contributory form of mortgage endorsement satisfactory to the Mortgagee, naming the Mortgagee, its successors and assigns as their interests may appear or the equivalent mortgagee endorsement issued in the state where the premises are located.

(b)     In the event that any one or more of the properties comprising any of the Improvements or the Personal Property shall be damaged or destroyed, in whole or in part, by fire or other casualty, the Mortgagor shall promptly restore, replace, rebuild or alter the damaged or destroyed Improvements and Personal Property, in either case as nearly as possible to the

4

GCI_Post-Bnkr-Prod - 000611

WPR 000047

NC CLERK

condition the Improvements and Personal Property were in prior to such damage or destruction, without regard to the availability or adequacy of insurance proceeds provided, however, that Mortgagee shall make any insurance proceeds obtained by it available to Mortgagor to pay for such work.

Section 1.8. Insurance Proceeds. (a) The Mortgagor shall give the Mortgagee prompt notice of any damage or destruction by fire or casualty occurring at the Mortgaged Property and the Mortgagor shall make such temporary repairs as are necessary for the protection of the Improvements. The proceeds of any insurance paid on account of any damage or destruction to the Mortgaged Property shall be paid over to the Mortgagee to be applied as hereinafter provided.

(b) The Mortgagee shall have the option, in its sole discretion, to apply any insurance proceeds it may receive by reason of damage or destruction to the Mortgaged Property toward payment of the Debt, or the same maybe paid over either wholly or in part to the Mortgagor or to the heirs, successors or assigns of the Mortgagor for the repair of the Improvements and Personal Property or for the erection of new Improvements and the acquisition and installation of new Personal Property in their place, or for any other purpose satisfactory to the Mortgagee.

Section 1.9. Condemnation. (a) The Mortgagor shall give the Mortgagee prompt notice of any condemnation or eminent domain proceedings affecting the Mortgaged Property.

(b) The Mortgagor will not enter into any agreement for a Taking of the Mortgaged Property, or any part thereof without the prior written consent of the Mortgagee. All Awards are hereby assigned to the Mortgagee. The Mortgagee and its legal representatives, successors and assigns (at its or their option) are hereby irrevocably authorized and empowered to collect and receive the Awards from the authorities making the same, to give proper receipts and a quittances therefor in any of their names or in the name of the Mortgagor, and to apply the same toward the payment of the Debt, the Note or this Mortgage, in such priority and proportions as the Mortgagee in its discretion shall deem proper, although the Debt secured by this Mortgage then may not be due and payable. Notwithstanding anything set forth herein or in the Note, the application of all or part of any Awards toward payment of the Debt shall not be subject to any prepayment premium or penalty. Notwithstanding any Taking, the Mortgagor shall continue to pay the Debt at the time and in the manner provided for in the Note and in this Mortgage and the Debt shall not be reduced until any Awards shall have been actually received and applied by the Mortgagee to the discharge of the Debt.

Section 1.10. Financial Statements. (a) The Mortgagor agrees to furnish the Mortgagee, the financial statements required pursuant to the provisions of the Note.

GCI_Post-Bnkr-Prod - 000612

WPR 000048

NC CLERK

(b)   Promptly after a request therefor, the Mortgagor shall furnish to the Mortgagee such other financial data or information as the Mortgagee may reasonably request from time to time.

(c)   The Mortgagee shall have the right to inspect the books and records of the Mortgagor at reasonable times.

Section 1.11. Restrictions on Sales and Transfers. The Mortgagor shall not, without the consent in writing of the Mortgagee, voluntarily change the use of the Mortgaged Property or sell, transfer, or convey its interest in the Mortgaged Property or any part thereof in or by any one or series of transactions or permit the Mortgaged Property or any part thereof or any interest therein to be sold, transferred, or conveyed. For the purposes of this Section a "sale" shall include: (I) if the Mortgagor is a corporation, ten (10%) percent or more of its voting shares of stock shall be sold, transferred or pledged, or the majority interest therein shall be transferred by the issuance of new shares or otherwise, in any one or series of transactions; or, (II) if the Mortgagor is a partnership, limited liability company, joint venture or similar entity, ten (10%) percent or more of the interest or interests in the Mortgagor be sold, transferred or pledged or the majority of the interests therein be transferred or diluted by the admission of new partners, members or otherwise, in any one or series of transactions. Consent to one such transaction shall not be deemed to be a waiver of the right to require such consent to further or successive transactions. Consent to one such transaction shall not be deemed to be a waiver of the right to require such consent to future or successive transactions.

Section 1.12. Liens. The Mortgagor shall discharge of record, by the filing of a bond pursuant to court order or otherwise, any mechanic's or materialmen's lien or a judgment lien filed against the Mortgaged Property, within thirty (30) days after the filing thereof.

Section 1.13. Usury. Nothing herein or in the Note, and none of the terms, covenants, conditions or obligations hereof or thereof shall impose or shall be deemed to impose upon the Mortgagor an obligation to make any payment, pay any interest or late charges in excess of, or do any act or take any action, or forbear from doing any act or taking any action, in violation of any statute, rule, ordinance or regulation in effect and effective as of the date of such payment, act, action or forbearance. In no event shall the Mortgagor be required to make any such illegal or impermissible payment or to take or do any such illegal or impermissible act or forbear from so doing or so taking nor shall any such failure so to pay or act or such forbearance be deemed a default hereunder.

Section 1.14. Payment of Charges; Advances and Disbursements; Costs of Administration and Enforcement.

(a)   Upon default of the Mortgagor in the performance of any term, covenant, condition or obligation by the Mortgagor to be performed under the Note or this Mortgage, or to pay, when due, any of the sums which the Mortgagor is required to pay as hereunder the Mortgagee may, but shall not be obligated to, cure such default, or make such payment in the name and on behalf of the Mortgagor. All sums advanced and all expenses incurred at any time by the Mortgagee pursuant to this Section 1.15 or as otherwise provided under the terms, covenants, conditions or obligations of this Mortgage or under applicable law shall be reimbursed by the


6

GCI_Post-Bnkr-Prod - 000613

Attachment E to Williston Park Realty LLC
Subpoena dated August 27, 2017

Mortgagor to the Mortgagee, upon demand, and shall bear interest from the date that such sum is advanced, payment made or expense incurred, to and including the date of reimbursement, computed at the Default Rate. Any such sum paid by the Mortgagee and the interest thereon shall be a lien on the Mortgaged Property prior to any claim, lien, right, title or interest in, to or on the Mortgaged Property attaching or accruing subsequent to the lien of this Mortgage, and shall be deemed to be secured by this Mortgage and evidenced by the Note.

(b)      The Mortgagor shall bear and pay all direct and incidental expenses (including, without limitation, attorneys' fees and disbursements for legal services of every kind at trial and appellate level) relating to the administration of this Mortgage and the other Loan Documents (as defined in Section 2.1.1(g) of this Mortgage). All such expenses paid by the Mortgagee shall be reimbursed by the Mortgagor to the Mortgagee, upon demand, and shall bear interest from the date that such sum is advanced, payment made or expense incurred, to and including the date of reimbursement, computed at the Default Rate. Any such sum paid by the Mortgagee and the interest thereon shall be a lien on the Mortgaged Property prior to any claim, lien, right, title or interest in, to or on the Mortgaged Property attaching or accruing subsequent to the lien of this Mortgage, and shall be deemed to be secured by this Mortgage and evidenced by the Note.

Section 1.15. Assignment of Leases and Agreements. Neither the Mortgagor nor any tenant under any Lease shall have the right or power, as against the Mortgagee without its consent, to cancel, abridge or otherwise modify tenancies, subtenancies, leases or subleases now or hereafter in effect in respect of all or any part of the Mortgaged Property or the Improvements or to accept or make, as the case may be, prepayments of installments of rent to become due thereunder. The Rents of the Mortgaged Property are hereby transferred and assigned to the Mortgagee, and the Mortgagee shall have the right to enter upon the Mortgaged Property for the purpose of collecting the same and to let and operate the Mortgaged Property or any part thereof and to apply the Rents, either in whole or in part, as the Mortgagee elects, to the payment of all charges and expenses of the Mortgaged Property or in reduction of any part of the Debt or other sums due or to become due under the Note or this Mortgage. This assignment and grant shall continue in effect until the Debt and all other obligations secured by this Mortgage are paid if full. The Mortgagee hereby waives the right to enter upon the Mortgaged Property for the purpose of collecting the Rents and the Mortgagor shall have a license to collect and receive the Rents until an Event of Default hereunder, but such license of the Mortgagor may be revoked by the Mortgagee upon any such Event of Default. From and after the occurrence of an Event of Default hereunder all Rents collected or received by Mortgagor shall be accepted and held for Mortgagee in trust and shall not be commingled with the funds and property of Mortgagor, but shall be promptly paid over to Mortgagee. The Mortgagee may apply all Rents or any part thereof so received hereunder, after the payment of all of its expenses including costs and attorneys' fees, to the Debt in such manner as it elects or at its option the entire amount or any part thereof so received may be released to the Mortgagor.

Section 1.16. Inconsistency with Related Laws. Nothing contained in this Mortgage shall be construed as depriving the Mortgagee of any right or advantage available under Section 254, 271, 272, and 291 (f) of the Real Property Law of the State of New York., as the same may be modified or renumbered, from time to time, or any other similar, applicable law of the state in which the Mortgaged Property is located, but all terms, covenants, conditions or obligations herein differing therefrom shall be construed as conferring additional and not substitute rights and



7

GCI_Post-Bnkr-Prod - 000614

WPR 000050

advantages, except that the terms, covenants, conditions and obligations of this Mortgage shall supersede the provisions of subdivision 4 of said Section 254.

Section 1.17. Right of Inspection. The Mortgagee and its agents shall have the right to enter and inspect the Mortgaged Property at all reasonable times upon reasonable notice.

Section 1.18. Intentionally deleted

Section 1.19. Environmental Matters. (a) For purposes of this Mortgage, the following terms shall have the following meanings:

"Environmental Complaint" - shall mean any judgment, lien, order, complaint, notice, citation, action, proceeding or investigation pending before any Governmental Authority, including, without limitation, any environmental regulatory body, with respect to or threatened against or affecting the Mortgagor or relating to its business, assets, property or facilities or the Mortgaged Property, in connection with any Hazardous Material or any Hazardous Discharge or any Environmental Law.

"Environmental Laws" - shall mean any applicable federal, state or local laws, rules, regulations, resolutions, ordinances, directives or orders (whether now existing or hereafter enacted or promulgated) or any judicial or administrative interpretation of such laws, rules, regulations, resolutions, ordinances, directives or orders or any other applicable determination regarding land, water, air, health, safety or environment including, for example but not limited to, the Federal Statutes and the State Statutes, as hereinafter defined.

"Governmental Authority" - shall mean any federal, state, or local government, governing body, agency, court, tribunal, authority, subdivision, bureau or other recognized body having jurisdiction to enact, promulgate, interpret, enforce, review or repeal any Environmental Law.

"Hazardous Discharge" - shall mean any release of a Hazardous Material caused by the seeping, spilling, leaking, pumping, pouring, emitting, using, emptying, discharging, injecting, escaping, leaching, dumping or disposing of any Hazardous Material into the environment, and any liability for the costs of any cleanup or other remedial action.

"Hazardous Materials" - shall mean, without limitation, flammables, explosives, radioactive materials, radon, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls or related or similar materials, petroleum products, explosives, radioactive materials, or any other hazardous or toxic or harmful materials, wastes and substances or any other chemical, material, substance or element which is hereinafter defined, identified, prohibited, limited or regulated by the Environmental Laws, or any other chemical, material, substance or element which is known to be harmful to the health or safety of occupants of property or which is hereinafter defined as a hazardous or toxic substance by any Federal, State, or local law, ordinance, rule or regulation, including, but not limited to the Toxic Substances Control Act (15 U.S.C. 2601 et seq.), the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq.), the Clean Air Act (42 U.S.C. 7401 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. 6901 et seq.), the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. 1801 et seq.), and/or

8

GCI_Post-Bnkr-Prod - 000615

WPR 000051

NC CLERK

Attachment E to Williston Park Realty LLC
Subpoena dated August 27, 2017

the regulations promulgated in relation thereto, all as the same may be amended from time to time (collectively, the "Federal Statutes"); the New York State Environmental Conservation Law Article 27, Title 13 (the "State Statute"), and the regulations promulgated in relation thereto, all as the same may be amended from time to time.

    (b)    The Mortgagor covenants, represents and warrants that:

    (i)    to the best of the Mortgagor's knowledge, after due inquiry and investigation, the Mortgaged Property has never been used by previous owners, operators or occupants or the Mortgagor to generate, manufacture, refine, transport, treat, store, handle or dispose, transfer, produce, process or in any manner deal with any Hazardous Material,

    (ii)    the Mortgagor has duly complied, and shall continue to comply, with the provisions of the Environmental Laws governing it, its business, assets, property, facilities and the Mortgaged Property, and shall keep the Mortgaged Property free and clear of any liens imposed pursuant to such laws,

    (iii) the Mortgagor shall not, and shall not permit any of its officers, partners, members, employees, agents, contractors, licensees, tenants, occupants or others to generate, manufacture, refine, transport, treat, store, handle, dispose, transfer, produce, process or in any manner deal with any Hazardous Material on the Mortgaged Property except in accordance with all Environmental Laws applicable thereto,

    (iv) there is not now outstanding any Environmental Complaint issued by any Governmental Authority to the Mortgagor or relating to the Mortgagor's business, assets, property, and facilities or the Mortgaged Property under any Environmental Law, and there is not now existing any condition which, if known by the proper authorities, could result in any Environmental Complaint, and that

    (v)    the Mortgagor has, and will continue to have, all necessary licenses, certificates and permits under the Environmental Laws relating to the Mortgagor and its facilities, property, assets, and business, and the Mortgaged Property and the foregoing are in compliance with all Environmental Laws.

    (c)    If the Mortgagor receives any notice of (i) the presence of Hazardous Materials on the Mortgaged Property, (ii) any violation of or noncompliance with any Environmental Law, (iii) the occurrence of a Hazardous Discharge on or about any asset, business, facility or property of the Mortgagor or caused by the Mortgagor, or (iv) any Environmental Complaint affecting the Mortgagor or the Mortgaged Property or the Mortgagor's operations, assets, business, facilities or properties, then the Mortgagor will give written notice of the foregoing to the Mortgagee within ten (10) days of receipt thereof and shall promptly comply with the Environmental Laws and all other laws, regulations, resolutions and ordinances to correct, contain, cleanup, remove, resolve or minimize the impact of such Hazardous Materials, Environmental Discharge or Environmental Complaint.

    (d)    Without limitation of the Mortgagee's rights under this Mortgage or applicable law, the Mortgagee shall have the right, but not the obligation, to exercise any of its rights to cure as provided in this Mortgage or to enter onto the Mortgaged Property or to take such



9

GCI_Post-Bnkr-Prod - 000616

WPR 000052

Attachment E to Williston Park Realty LLC
Subpoena dated August 27, 2017

other actions as it deems necessary or advisable to correct, contain, cleanup, remove, resolve or minimize the impact of, or otherwise deal with, any such Hazardous Material, Hazardous Discharge or Environmental Complaint upon its receipt of any notice from any person or entity or Governmental Authority, informing the Mortgagee of such Hazardous Material, Hazardous Discharge or Environmental Complaint, which if true, could adversely affect the Mortgagor or any part of the Mortgaged Property or which, in the sole opinion of the Mortgagee, could adversely affect its collateral security under this Mortgage. All reasonable costs and expenses incurred and paid by the Mortgagee in the exercise of any such rights shall be paid by the Mortgagor to the Mortgagee upon demand, together with interest from the date that such sum is advanced, payment made or expense incurred, to and including the date of reimbursement, computed at the Default Rate. Any such sum paid by the Mortgagee and the interest thereon shall be a lien on the Mortgaged Property prior to any claim, lien, right, title or interest in, to or on the Mortgaged Property attaching or accruing subsequent to the lien of this Mortgage, and shall be deemed to be secured by this Mortgage and evidenced by the Note.

(e)     The Mortgagor and each of the general partners in Mortgagor if Mortgagor is a partnership and each of the members of Mortgagor if Mortgagor is a limited liability company, covenants and agrees, at its sole cost and expense, to indemnify, protect, and save the Mortgagee harmless against and from any and all damages, losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses of any kind or of any nature whatsoever (including, without limitation, costs and reasonable attorneys' fees and disbursements, generally, and at trial and appellate level and experts' fees and disbursements) which may at any time be imposed upon, incurred by or asserted or awarded against the Mortgagee and arising from or out of:

(i) the Mortgagor's failure to perform and comply with this Section, or

(ii) any Hazardous Material, any Hazardous Discharge, any Environmental Complaint, or any Environmental Law applicable to the Mortgagor, its operations, business, assets, property or facilities, or the Mortgaged Property, or

(iii) the imposition of any lien against the Mortgaged Property to the extent of damages caused by, or the extent of the recovery of any costs for the cleanup, release or threatened release of any Hazardous Material; or

(iv) any action against the Mortgagor under this indemnity or the assertion by the Indemnitor of any defense to its obligations hereunder.

Section 1.20. Trust Funds. The Mortgagor will receive the advances secured by this Mortgage and will hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of improvement (as defined in Section 2 of the Lien Law of the State of New York, whether or not the Mortgaged Property is located in that State), and the Mortgagor will apply the same first to the payment of the cost of improvement before using any part of the total of the same for any other purpose.

## ARTICLE II

## DEFAULTS AND REMEDIES

10

GCI_Post-Bnkr-Prod - 000617

WPR 000053

NC CLERK

Attachment E to Williston Park Realty LLC
Subpoena dated August 27, 2017

**Section 2.1.1. Events of Default-Optional Acceleration.** The Debt shall become due, at the option of the Mortgagee, upon the occurrence of any of the following events, which event shall be an "Event of Default":

(a)     after default in the payment of any installment of principal or interest as provided in the Note,

(b)     after default in the payment when due and payable of any other sum of money required to be paid or expended under this Mortgage, the Note, or any other Loan Document (as hereinafter defined),

(c)     if any warranty, representation or certification made herein or in any financial statement furnished pursuant hereto or in connection with the indebtedness evidenced by the Note and secured by this Mortgage (the "Loan") shall be materially false,

(d)     after default in keeping the Mortgaged Property insured as herein provided,

(e)     after default after notice and demand either in assigning and delivering the policies insuring the Improvements or the Personal Property against loss as hereinafter provided for or in reimbursing the Mortgagee for premiums paid on such insurance, as hereinabove provided for,

(f)     if the Mortgagor does or permits to be done anything that may in any way impair the lien of this Mortgage or impair the value of the Mortgaged Property or any of the Improvements or weaken or diminish the security intended to be given under and by virtue of this Mortgage,

(g) upon the failure of the Mortgagor to perform or comply with any other term, covenant, condition or obligation of this Mortgage or of the Note or of any term, covenant, condition or obligation of any other agreement or instrument executed by the Mortgagor which secures the indebtedness evidenced by the Note (collectively, the "Loan Documents"), or of any other agreement between the Mortgagor and the Mortgagee, in accordance with the terms hereof and thereof,

(h) a default under, or any attempted withdrawal, cancellation or disclaimer of liability under, any guarantee which guarantees payment of the Debt or any part thereof, or under any agreement giving security for any such guarantee;

(i) the failure of (i) the Mortgagor, (ii) if Mortgagor is a corporation, any shareholder in Mortgagor, (iii) if Mortgagor is a partnership, any general partner in Mortgagor or any shareholder or partner in such general partner, (iv) if the Mortgagor is a limited liability company, any member, (v) any guarantor of the Debt or any part thereof or (vi) any entity directly or indirectly controlled by any of the parties covered by (i) through (vi) above, to perform or observe any term, covenant, condition or obligation of any bond, note, loan agreement, guarantee, or any other instrument or agreement in connection with the borrowing of money or the obtaining of advances or credit, or of any instrument given to secure the same, to which such party and Mortgagee or its affiliates are parties,



11

GCI_Post-Bnkr-Prod - 000618

WPR 000054

(j) if a default occurs under any mortgage which is prior, equal or subordinate to the lien of this Mortgage or the mortgagee under any such prior, equal or subordinate mortgage commences a foreclosure action in connection with said mortgage;

(k) the further mortgage, pledge or encumbrance by the Mortgagor of the Mortgaged Property or any part thereof or any interest therein without the prior written consent of the Mortgagee;

(l) any default, for thirty (30) days after notice and demand, in the payment of any taxes of any kind and nature, assessments, water and sewer charges, rents and rates, and other governmental or municipal charges, fines or impositions relating to the Mortgaged Property or any part thereof or

(m) any failure for thirty (30) days after notice and demand to exhibit to the Mortgagee receipted bills for any taxes of any kind and nature, assessments, water and sewer charges, rents and rates, and other governmental or municipal charges, fines or impositions herein referred to.

(n) if any Governmental Authority asserts or creates a lien upon any or all of the Mortgaged Property by reason of the presence of Hazardous Materials or the occurrence of a Hazardous Discharge or Environmental Complaint or otherwise, and the Mortgagor does not, within the earlier of thirty (30) days after the recording thereof or prior to the institution by such Governmental Authority of any steps to foreclose such lien, cause such lien to be discharged of record;

(o) if any Governmental Authority asserts a claim against the Mortgagor, the Mortgaged Property or the Mortgagee for damages or cleanup or remedial costs related to any Hazardous Materials or any Hazardous Discharge or any Environmental Complaint.

Section 2.1.2. Events of Default-Automatic Acceleration. The Debt shall forthwith and automatically become due, upon the occurrence of any of the following events which event shall also be an "Event of Default":

If the Mortgagor or any guarantor of the Debt or any part thereof shall:

(i) call a meeting of or make an assignment for the benefit of creditors,

(ii) file a petition in bankruptcy, under Title 11 of the U.S. Code, as amended (the "Bankruptcy Code"), or be adjudicated insolvent or bankrupt, file a petition in bankruptcy, or be adjudicated insolvent or bankrupt,

(iii) be the subject of an order for relief under the Bankruptcy Code, or petition or apply to any tribunal for the appointment of a receiver or a trustee for it or a substantial part of its assets,

(iv) file any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any present or future



12

GCI_Post-Bnkr-Prod - 000619

WPR 000055

federal or state act or law relating to bankruptcy, insolvency, or other relief for debtors, whether now or hereafter in effect,

(v) have filed against it a petition, application or proceeding described above in subdivision (iv) or such a petition, application or proceeding shall have been commenced against it, which remains undismissed or unstayed for a period of thirty (30) days or more,

(vi) by any act or omission indicate its consent to, approval of or acquiescence in any petition, application or proceeding described above in subdivision (iv) or in the appointment of a custodian, receiver or any trustee for it or any substantial part of any of its property,

(vii) suffer any such custodianship, receivership or trusteeship to continue undischarged for a period of thirty (30) days or more,

(viii) conceal, remove or permit to be concealed or removed, any part of its property, with intent to hinder, delay or defraud its creditors or any of them,

(ix) make or suffer a transfer of any of its property which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law,

(x) make any transfer of its property to or for the benefit of a creditor at a time when other creditors similarly situated have not been paid,

(xi) shall suffer or permit, while insolvent, any creditor to obtain a lien upon any of its property through legal proceedings or distraint which is not vacated within thirty (30) days from the date thereof, or

(xii) generally not pay its debts as such debts become due.

Section 2.2. Remedies. (a) Upon the occurrence of any Event of Default, the Mortgagee may, in addition to any rights or remedies available to it hereunder or at law, take such action as it deems advisable to protect and enforce its rights against the Mortgagor and in and to the Mortgaged Property, including the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as the Mortgagee may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of the Mortgagee:

(i) declare the entire unpaid Debt to be immediately due and payable;

(ii) enter into or upon the Mortgaged Property, either personally or by its agents, nominees or attorneys, and dispossess the Mortgagor and its agents and servants therefrom, and thereupon the Mortgagee may (A) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Mortgaged Property and conduct the business thereof, (B) complete any construction on the Mortgaged Property in such manner and form as the Mortgagee deems advisable, (C) make alterations, additions, renewals, replacements and improvements to or on the Mortgaged Property, (D) exercise all rights and powers of the Mortgagor with respect to the Mortgaged Property, whether in the name of the

13

GCI_Post-Bnkr-Prod - 000620

Attachment E to Williston Park Realty LLC
Subpoena dated August 27, 2017

Mortgagor or otherwise, including the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all earnings, revenues, rents, issues, profits and other income of the Mortgaged Property and every part thereof, and (E) apply the receipts from the Mortgaged Property to the payment of the Debt, after deducting therefrom all expenses (including attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the taxes, assessments, insurance and other charges in connection with the Mortgaged Property, as well as compensation for the services of the Mortgagee, its agents and employees;

(iii) institute proceedings for the complete foreclosure of this Mortgage, in which case the Mortgaged Property may be sold for cash or credit in one or more parcels, and in such order as the Mortgagee shall determine;

(iv) with or without entry and, to the extent permitted, and pursuant to the procedures provided by, applicable law, institute proceedings for the partial foreclosure of this Mortgage for the portion of the Debt then due and payable, subject to the lien of this Mortgage continuing unimpaired and without loss of priority so as to secure the balance of the Debt not then due;

(v) sell the Mortgaged Property or any part thereof and all estate, claim, demand, right, title and interest of the Mortgagor therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, in whole or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted bylaw, and in the event of a sale, by foreclosure or otherwise, of less than all of the Mortgaged Property, this Mortgage shall continue as a lien on the remaining portion of the Mortgaged Property;

(vi) institute an action, suit or proceeding in equity for the specific performance of any covenants, conditions or agreements contained herein or in the Note;

(vii) recover judgment on the Note before, during, after or in lieu of any proceedings for the enforcement of this Mortgage;

(viii) apply for the appointment of a custodian, trustee, receiver, liquidator or conservator of the Mortgaged Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of the Mortgagor, or of any person, party or entity liable for the payment of the Debt and notice of such appointment is waived;

(ix) pursue such other remedies as the Mortgagee may have under one or more of the other Loan Documents and/or any other collateral given as security for the Loan;

(x) pursue such remedies as the Mortgagee may have under applicable law; and

(xi) foreclose this Mortgage by power of sale or any other non-judicial means permitted by the laws of the state in which the Mortgaged Property is located.

(b) The purchase money proceeds or avails of any sale made under or by virtue of this Section 2.2, together with any other sums which then may be held by the Mortgagee under



14

GCI_Post-Bnkr-Prod - 000621

WPR 000057

this Mortgage, whether under the provisions of this Section 2.2 or otherwise, shall be applied as follows:

First: To the payment of the costs and expenses of any such sale, including, without limitation, compensation to the Mortgagee, its agents and counsel, and of any judicial proceedings, including, without limitation, the costs and legal expenses of the Mortgagee in foreclosing or otherwise enforcing this Mortgage, wherein the same may be made, and of all expenses, liabilities and advances made or incurred by the Mortgagee under this Mortgage, together with interest at the Default Rate, and all taxes or assessments, except any taxes, assessments or other charges subject to which the Mortgaged Property shall have been sold.

Second: To the payment of the whole amount then due, owing or unpaid upon the Note for principal and interest with interest on the unpaid principal at the Default Rate from and after the happening of any Event of Default described above in Section 2.1 until the same is paid.

Third: To the payment of any other sums required to be paid by the Mortgagor pursuant to any provision of this Mortgage, the Note and all other Loan Documents.

Fourth: To the payment of the surplus, if any, to whosoever may be lawfully entitled to receive the same.

The Mortgagee and any receiver or custodian of the Mortgaged Property or any part thereof shall be liable to account for only those rents, issues and profits actually received by it.

(c)    The Mortgagee may adjourn from time to time any sale by it to be made under or by virtue of this Mortgage by announcement at the time and place appointed for such sale or for such adjourned sale or sales; and, except as otherwise provided by any applicable provision of law, the Mortgagee, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

(d)    Upon the completion of any sale or sales made by the Mortgagee under or by virtue of this Section 2.2, the Mortgagee, or an officer of any court empowered to do so, shall execute and deliver to the accepted purchaser or purchasers a good and sufficient instrument, or good and sufficient instruments, granting, conveying, assigning and transferring all estate, right, title and interest in and to the property and rights sold. The Mortgagee is hereby irrevocably appointed the true and lawful attorney-in-fact of the Mortgagor (coupled with an interest), in its name and stead, to make all necessary conveyances, assignments, transfers and deliveries of the Mortgaged Property and rights so sold and for that purpose the Mortgagee may execute all necessary instruments of conveyance, assignment, transfer and delivery, and may substitute one or more persons or entities with like power, the Mortgagor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Nevertheless, the Mortgagor, if so requested by the Mortgagee, shall ratify and confirm any such sale or sales by executing and delivering to the Mortgagee or to such purchaser or purchasers all such instruments as may be advisable, in the judgment of the Mortgagee, for such purpose, and as may be designated in such request. Any such sale or sales made under or by virtue of this Section 2.2, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of the Mortgagor in and to the



15

GCI_Post-Bnkr-Prod - 000622

WPR 000058

Attachment E to Williston Park Realty LLC
Subpoena dated August 27, 2017

properties and rights so sold, and shall be a perpetual bar both at law and in equity against the Mortgagor and against any and all persons or entities claiming or who may claim the same, or any part thereof, either from, through or under the Mortgagor.

(e)     Upon any sale made under or by virtue of this Section 2.2 (whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale), the Mortgagee may bid for and acquire the Mortgaged Property or any part thereof and in lieu of paying cash therefor may take settlement for the purchase price by crediting upon the Debt of the Mortgagor secured by this Mortgage the net sale price after deducting therefrom the expenses of the sale and the costs of the action and any other sums which the Mortgagee is authorized to deduct under this Mortgage.

(f)     The obligation of this Mortgage and of the Note shall continue until the Debt is paid in full notwithstanding any action or actions or partial foreclosure which may be brought to recover any amount or amounts for installments of principal, interest, taxes, assessments, water and sewer charges, rents and rates or insurance or other sums or charges due and payable under the provisions of this Mortgage.

(g)     No recovery of any judgment by the Mortgagee and no levy of an execution under any judgment upon the Mortgaged Property or upon any other property of the Mortgagor shall affect in any manner or to any extent, the lien of this Mortgage upon the Mortgaged Property or any part thereof, or any liens, rights, power or remedies of the Mortgagee hereunder, but such liens, rights, powers and remedies of the Mortgagee shall continue unimpaired as before, and notwithstanding any statutory rate of interest applicable with respect to judgments, after the entering or execution of any judgment, the Debt shall bear interest at the rate or rates payable under the Note and this Mortgage until the Debt shall have been paid in full.

(h)     THE MORTGAGOR HEREBY WAIVES THE RIGHT TO TRIAL BY JURY, THE RIGHT TO CLAIM ANY OFFSET AND THE RIGHT TO ASSERT A COUNTERCLAIM IN ANY ACTION OR PROCEEDING BROUGHT BY THE MORTGAGEE TO ENFORCE ANY OF ITS RIGHTS UNDER THE NOTE OR UNDER THIS MORTGAGE.

(i)     The Mortgagee shall have the right to receive and accept partial payment of any sum or sums which constitute a part of the Debt or the interest accrued thereon and such receipt and acceptance by the Mortgagee shall not be deemed a waiver or modification of any default or defaults by the Mortgagor existing at such time.

(j)     All remedies provided in this Mortgage are distinct from and cumulative to any other right or remedy under this Mortgage, the Note, any guarantee of the payment of the Note and/or of this Mortgage or any other agreement between, among others, if any, the Mortgagor and the Mortgagee executed simultaneously or in connection herewith, or afforded by law or equity, and may be exercised concurrently, independently or successively.

Section 2.3. Interest after Default. If any payment due hereunder or under the Note is not paid when due, whether on any stated due date, any accelerated due date or any other date or at any other time specified under any of the terms, covenants, conditions or obligations hereof or thereof, then and in such event, the Mortgagor shall pay interest on the entire outstanding and unpaid principal balance of the Debt, from and after the date on which such amount first became



16

WPR 000060

Attachment E to Williston Park Realty LLC
Subpoena dated August 27, 2017

due, at the Default Rate and such interest shall be due and payable, on demand, at such rate until the entire amount due is paid to the Mortgagee, whether or not any action shall have been taken or proceeding commenced to recover the same or to foreclose this Mortgage. All accrued but unpaid interest shall be secured by this Mortgage as part of the Debt together with interest from the date that such sum is advanced, payment made or expense incurred, to and including the date of reimbursement, computed at the Default Rate. Nothing in this Section 2.3 or in any other provision of this Mortgage shall constitute an extension of the time of payment of the Debt or shall increase the maximum principal amount which may under any contingency be secured by this Mortgage.

Section 2.4. Possession of the Mortgaged Property. Upon the occurrence of any Event of Default hereunder, it is agreed that the Mortgagor, if it is then the occupant of the Mortgaged Property or any part thereof, shall immediately surrender possession of the space so occupied to the Mortgagee, custodian, trustee, receiver, liquidator or conservator of the Mortgaged Property, as may be the case, and if the Mortgagor is permitted to remain in possession, the possession shall be as a month-to-month tenant of the Mortgagee, and, on demand, the Mortgagor shall pay to the Mortgagee monthly, in advance, a reasonable rental for the space so occupied and in default thereof the Mortgagor may be dispossessed by the usual summary proceedings. The covenants herein contained may be enforced by a receiver of the Mortgaged Property or any part thereof. Nothing in this Section 2.4 shall be deemed to be a waiver of the provisions of this Mortgage prohibiting the sale or other disposition of the Mortgaged Property without the Mortgagee's prior written consent.

## ARTICLE III

## MISCELLANEOUS

Section 3.1. Notices. All notices or other communications required or otherwise given pursuant to this Mortgage shall be in writing and shall be personally delivered, delivered by overnight courier or mailed by registered or certified mail, postage prepaid, with return receipt requested, addressed as follows:

If to the Mortgagor:

NEMINATH INC.
235 Hillside Avenue
Williston Park, NY 11596
Attention: Mahendra Shah

If to the Mortgagee:

KEDIS ENTERPRISES LLC
1414 Hillside Avenue
New Hyde Park, NY 11040
Attention: Sanjiv Chand

Any party may change the person or address to whom or which notices are to be given

17

NC CLERK

hereunder, by notice duly given hereunder; provided, however, that any such notice shall be deemed to have been given hereunder only when actually received by the party to which it is addressed. Any notice or other communication given hereunder shall be deemed to have been given or delivered, if personally delivered, upon delivery, if sent by overnight courier, on the first (1st) business day of the Mortgagee after being sent, and if sent by mail, on the third (3rd) business day of the Mortgagee after mailing. Each party shall be entitled to rely on all communications which purport to be given on behalf of any other party hereto and purport to be signed by an authorized signatory of such party.

Section 3.2. Consent to Jurisdiction; Waivers. (a) The Mortgagor hereby consents to the jurisdiction of the courts of the State of New York. In addition, the Mortgagor irrevocably and unconditionally waives any objection which the Mortgagor may now or hereafter have to the laying of venue of any of the aforesaid actions, suits, or proceedings arising out of or in connection with the Note or this Mortgage brought in any of the aforesaid courts, and hereby further irrevocably and unconditionally waives the right to plead or claim that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum; and

(b)       The Mortgagor waives the requirements of personal service in connection with any actions, suits or proceedings arising out of or in connection with the Note or this Mortgage, and consents that all service of process may be made by certified mail, return receipt requested, addressed to the Mortgagor at the address of the Mortgagor set forth above in Section 3.1 as such address may be changed as therein set forth.

Section 3.3. Governing Law. Except to the extent that the law of the state where the Mortgaged Property is located must be applied because this Mortgage constitutes a lien on premises located in that state, this Mortgage shall be construed in accordance with the laws of the State of New York.

Section 3.4. Captions. The title of this document and the captions used herein are inserted only as a matter of convenience and for reference and shall in no way define, limit or describe the scope or intent of this Mortgage or any of the provisions hereof.

Section 3.5. Severability. If any term, covenant, condition or obligation of this Mortgage shall be held to be invalid, illegal or unenforceable in any respect, this Mortgage shall be construed without such term, covenant, condition or obligation.

Section 3.6. Set-Off. The Mortgagor, to further secure the Debt, hereby (a) pledges and grants to the Mortgagee a security interest in and to and a lien on, any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Mortgagee or any affiliate thereof to or for the credit or account of the Mortgagor (collectively, "Deposits"), and (b) irrevocably authorizes and directs the Mortgagee or any affiliate thereof at any time and from time to time upon the occurrence of an Event of Default under this Mortgage, or a default under the Note or any other Loan Document, without notice to the Mortgagor (any such notice being expressly waived by the Mortgagor) and to the fullest extent permitted by law, to set off and apply any such Deposits against any and all obligations of the Mortgagor now or hereafter existing under the Loan Documents, or to hold such Deposits for future application against obligations thereafter arising under any of the Loan Documents irrespective of whether or not the Mortgagee shall have made any demand under any of the Loan



18

NC CLERK

Documents and although such obligations may be contingent or un -matured.

Section 3.7. General Conditions. (a) No provision of this Mortgage maybe waived, changed, amended, modified or discharged orally and no executory agreement shall be effective to modify or discharge it in whole or in part, unless it is in writing and signed by the party against whom enforcement of the waiver, change, amendment, modification or discharge is sought.

(b) No waiver by the Mortgagee or modification of the terms hereof shall be effective unless it is in writing and then only in the specific instance and for the specific purpose for which given and, notwithstanding anything to the contrary herein, all such waivers and modifications may be given or withheld in the sole judgment of the Mortgagee.

(c) If the Mortgagor consists of more than one person or entity, the obligations and liabilities of each such person or entity hereunder shall be joint and several. The relative words herein of single or plural number, or masculine or feminine or neuter gender shall be read as if written in the single or plural, or in the male, neuter or female gender, as the context and as the case may be.

(d) The Mortgaged Property is not improved nor is to be improved by one or more structures containing, in the aggregate, not more than six residential nits, each unit with separate cooking facilities. *Commercial Property*

IN WITNESS WHEREOF this Mortgage has been duly executed by the Mortgagor on the day and year first above written.

For NEMINATH INC, a New York Corporation

By: _(signature)_
Name:   Mahendra Shah
Title:   President

STATE OF NEW YORK   )
                                      )ss:
COUNTY OF NEW YORK )

On the 18th day of January in the year 2013 before me, the undersigned, personally appeared Mahendra Shah, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_(signature)_
Notary Public

**LEGIBILITY POOR
FOR MICROFILM**

RAKESH AGGARWAL
Notary Public, State of New York
No. 01AG6149185
Qualified in Nassau County
Commission Expires July 03 20 14

19

GCI_Post-Bnkr-Prod - 000626

WPR 000062

Attachment F to Williston Park Realty LLC
Subpoena dated August 27, 2017     3020-816862

**BARGAIN AND SALE DEED**
**WITH COVENANT AGAINST GRANTOR'S ACTS**

*THIS INDENTURE*, made the \\ day of October, 2016

Between **Williston Park Realty LLC**, having an office address of 1414 Hillside Avenue, New
Hyde Park, New York 11040, **party of the first part**, and

**Williston Park Realty LLC**, having an address at 1 Harnat Court, Hicksville, New York,
11801, **collectively party of the second part**:



    *WITNESSETH*, that the party of the first part, in consideration of ten dollars and other
good and valuable consideration, lawful money of the United States, paid by the party of the
second part, does hereby grant and release unto the party of the second part, the heirs or
successors and assigns of the party of the second part forever;

    *ALL* that certain plot piece or parcel of land, with the buildings and improvements
thereon erected, situate, lying, and being in the Town of Williston Park, County of Nassau, State
of New York, as more particularly described in Schedule A attached hereto and made a part
hereof.

    *BEING* and intended to be the same premises as conveyed to the grantor herein by Deed
dated January 14, 2016 and recorded February 23, 2016 in Book: 13324, Page 230 and

    *TOGETHER* with all right, title and interest, if any, of the party of the first part in and to
any streets and roads abutting the above described premises to the center lines thereof;

    *TOGETHER* with the appurtenances and all the estate and rights of the party of the first
part in and to said premises;

    *TO HAVE AND TO HOLD* the premises herein granted unto the party of the second
part, the heirs or successors and assigns of the party of the second part forever.

    *AND* the party of the first part covenants that the party of the first part has not done or
suffered anything whereby the said premises have been encumbered in any way whatever, except
as aforesaid.

    And the party of the first part/grantor, in compliance with Section 13 of the Lien Law,
covenants that the party of the first part/grantor will receive the consideration for this
conveyance and will hold the right to receive such consideration as a trust fund to be applied first
for the purpose of paying the cost of the improvement and will apply the same first to the
payment of the cost of the improvement before using any part of the total of the same for any
other purpose. The word "party" or "grantor" shall be construed as if it read "parties" or
"grantors" whenever the sense of this document so requires.

GCI_Post-Bnkr-Prod - 000630

WPR 000066

Attachment F to Williston Park Realty LLC
Subpoena dated August 27, 2017

**IN WITNESS WHEREOF,** the party of the first part has hereunto set his hand and seal the day and year first above written.

<u>Williston Park Realty LLC</u>

*Mariana Ramirez*
Name: Mariana Ramirez
Title: Managing Member

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF . KINGS          )

On the 11ᵗᴴ day of October in the year 2016, before me, the undersigned, personally appeared MARIANA D Ramirez , personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that she executed the same in her capacity(ies), and that by her signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)

MICHELLE S. HARRY
Notary Public, State of New York
No. 01HAB129021
Qualified in Kings County
Commission Expires 6/30/2019

·2·

GCL_Post-Bnkr-Prod - 000631

WPR 000067

Joseph A. Vogel (JV-5533)
KRAVET & VOGEL, LLP
555 Fifth Avenue, 14th Floor
New York, New York 10017-9257
Tel.: 212-997-7634
Fax: 212-986-5316
Email: jvogel@kvnylaw.com
*Attorneys for Non-Party Potential Witness*
*Williston Park Realty LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

GEO-GROUP COMMUNICATIONS, INC.,

          Plaintiff,

      -against-

RAVI CHOPRA; MAHENDRA SHAH; VIPIN
SHAH; 728 MELVILLE PETRO LLC; KEDIS
ENTERPRISES LLC; JMVD HILLSIDE LLC;
NYC TELECOMMUNICAITONS CORP.; and
SHALU SURI,

          Defendants.
------------------------------------------------------------------x

Civil Action No.: 15-cv-01756
(KPF)

**DECLARATION OF
MARIANA RAMIREZ
IN SUPPORT OF MOTION**

    **MARIANA RAMIREZ**, pursuant to the requirements of 28 U.S.C. § 1746, hereby

declares and states that the following is true and correct under the penalties of perjury:

    1.    I am a resident of the State of New York and reside at 1 Harnat Court, Hicksville,

New York 11801.

    2.    I submit this Declaration, based on personal knowledge, in support of the

accompanying motion to quash or modify the Subpoena to Testify At a Deposition In a Civil

Action, dated August 27, 2017 (the "Subpoena"), that was issued by the attorneys for plaintiff

Geo-Group Communications, Inc. ("Geo-Group") and addressed to Williston Park Realty LLC, a

non-party in this action; a copy of the Subpoena was left at my personal residence on September

WPR 000069

1, 2017.  A true copy of the Subpoena that I received is annexed as Exhibit 1 to the

accompanying Declaration of Joseph A. Vogel, as Exhibit 1.[1]

     3.    I am the sole owner, member and managing member of Williston Park Realty

LLC ("Williston Park").  A true copy of Williston Park's filing with the New York State

Secretary of State, showing its formation on November 20, 2015, is annexed hereto as **Exhibit 5.**

     4.    In addition to my ownership of Williston Park, I own and work full-time at a

Manhattan-based 24-hour delicatessen business, with second floor eat-in dining space, known as

Al's Deli, located at 458 7th Avenue, New York, New York (between 34th and 35th Streets).  Al's

Deli has been at this location since 1976 and is open 24-hours.  I spend most of my time, seven

days a week, working at the store.  I acquired the business of Al's Deli in 2014 from Sanjiv

Chand,[2] who, through one of his companies, was the prior owner of Al's Deli.  Since that time, I

have stayed in touch with Sanjiv Chand and consider him a friend and trusted business advisor.

     5.    Williston Park was formed on November 20, 2015 for a single purpose, to acquire

and hold in its name, a certain one-story storefront commercial building located at 235 Hillside

Avenue, Williston Park, New York (the "Property").  I acquired the Property, held in the name of

Williston Park, on January 14, 2016, for a purchase price of $425,000 using my personal funds.

A true copy of the deed is annexed as Attachment C to the Subpoena (Vogel Declr., Exh. 1).  I

acquired the Property for investment purposes and in the event that I wanted to expand my

delicatessen business, as it is ideally suited for such use.

     6.    I came to know of the Property's availability for purchase from Sanjiv Chand,

---

[1] References to "Vogel Declr." refer to the accompanying declaration of Joseph A. Vogel, dated September 11, 2017, filed in support of this motion.

[2] Sanjiv Chand is the principal and owner of the now-dismissed defendant LLCs 728 Melville Petro LLC, Kedis Enterprises LLC, and JMVD Hillside LLC (*see* Third Affidavit of Sanjiv Chand, ¶¶ 1-2, filed March 31, 2016) (*Docket No. 119*) (Vogel Declr., Exh. 3).

2

WPR 000070

who brought the deal to me to consider as a possible investment.  Mr. Chand had negotiated the purchase price of $425,000 directly with the seller, an entity named Neminath, Inc.,[3] and upon review and consideration, I believed it to be a fair price for the Property at the time, compared to other recent sales in the area, and decided to go forward with the acquisition.  No professional appraisals were ever done concerning the Property, as this was an "all cash" deal (i.e., my personal funds); I did not need, nor did I seek any bank financing for the acquisition of the Property.  At the time, the Property was assessed by Nassau County with a full market value of $321,000; since my acquisition, its full market value, according to Nassau County, has decreased to $300,500.  Attached hereto as **Exhibit 6** are true copies of the Property's Notices of Tentative Assessed Value for 2016 and 2017.

7.     At the Property's January 14, 2016 closing, I met Mahendra Shah, who signed the deed as president of the seller Neminath, Inc.[4]  At the time, I did not know that Mr. Shah was involved in this lawsuit commenced by Geo-Group, although I do know that now after seeing his name on the front of the Subpoena.  At the closing, Neminath, Inc. also signed a 2-year lease with Williston Park to rent and occupy the store at the premises for purposes of continuing to run its convenience store business, a use that I understand Neminath, Inc. had previously been conducting at the storefront location of the Property since it first acquired the Property back in 2002 for $120,000, as noted on public records shown to be at the closing.

8.     At the January 14, 2016 closing for the Property, I also learned that, approximately 3 years earlier, on January 18, 2013 (when Williston Park did not yet exist), one of Sanjiv Chand's companies, Kedis Enterprises LLC ("Kedis"), had made a commercial loan to

---

[3] Neminath, Inc. is not a party in this action, however, Mahendra Shah, who represented himself to be the president of Neminath, Inc., is a named defendant.

[4] *See*, Subpoena, Attachment C (Vogel Declr., Exh. 1).

3

WPR 000071

Neminath of $600,000 and, as security, received a mortgage that was filed against the Property on March 15, 2013. At the closing, I was advised that, despite the mortgage filing, this loan was repaid and that a satisfaction of the mortgage would be recorded in due course. The affidavit filed by Sanjiv Chand in this action on March 31, 2016, confirms that this $600,000 loan was repaid.[5]

9.      On October 11, 2016, approximately nine months after the January 14, 2016 closing, I signed a correction deed on behalf of Williston Park to correct an address error that appeared in the original deed. Geo-Group attaches a copy of this correction deed as Attachment F to the Subpoena (Vogel Declr., Exh. 1). The recording of the correction deed did not result in a transfer of the Property, the Property is still owned today by Williston Park.

10.     Neither I, nor Williston Park, ever received any monies or other assets from Jaina Systems Network Inc. ("Jaina"), which I now understand is a judgment debtor and the subject of alleged improper transfers that Geo-Group has claimed against the named defendants in this lawsuit. Williston Park's only dealings were with Neminath, Inc., a non-party to this lawsuit, and only in connection with the acquisition of the Property in January 2016.

11.     Likewise, neither I nor Williston Park, ever transferred any monies or other assets to any of the parties named in this lawsuit. Williston Park's only dealings were with Neminath, Inc., a non-party, concerning the Property and Neminath, Inc.'s sale of its own property to Williston Park.

12.     All of my dealings with Neminath, a non-party in this lawsuit, have been at arms' length, and through counsel.

13.     I have had no personal dealings with any of the named individual defendants in this lawsuit, other than as described above at the closing on the Property.

---

[5] *See* Third Affidavit of Sanjiv Chand, ¶ 11, filed March 31, 2016 (*Docket No. 119*) (Vogel Declr., Exh. 3).

4

WPR 000072

14.    Despite my and Williston Park's non-involvement with any of the parties named in this lawsuit, the 68-page Subpoena that I received on behalf of Williston Park, notices me (I am the only member of Williston Park) for a deposition, at which Geo-Group seeks inquiry concerning 21 (including subparts) broad ranging topics, of which I have no personal knowledge, other than as stated above.

15.    Included among the topics that Geo-Group seeks detailed inquiry of me, are topics concerning documents that were created almost 3 years _before_ Williston Park even came into existence in late 2015 – e.g., the Commercial Loan Agreement and the Mortgage Security Agreement entered into between Neminath, Inc. and Kedis Enterprises, LLC in early 2013 (_see_ Subpoena, Attachment A, at page 7; Vogel Declr., Exh. 1).[6]  Williston Park cannot possibly give testimony about events that occurred prior to its formation, and in which I had no involvement.

16.    Several of the other topic designations in the Subpoena are so overbroad, vague and far reaching that I would not even know where to begin to prepare for them.  For example, the Subpoena requests that I be prepared to discuss, in detail:

> F.    Any Agreements or understandings between Williston Park Realty and _any other Person_ concerning the Transaction, the Property, the Commercial Laon Agreement, or the Mortgage Security Agreement, whether written, unwritten, formal, informal, oral, verbal, recorded or unrecorded, executory or fully performed, including without limitations, contracts of sale, side agreements, lease- or buy-back agreements, loans or promises, understandings, or representations _of any kind or nature._[7]

17.    As noted above, Williston Park was only involved with Neminath, Inc. (a non-party) in January 2016 in connection with Williston Park's acquisition of the Property for

---

[6] Kedis Enterprises, LLC was dismissed from this action by the Opinion and Order issued by this Court on July 27, 2016 (_Docket No. 134_) (Vogel Declr., Exh. 4).

[7] _See_, Subpoena, Attachment A, at 8 (Vogel Declr., Exh. 1).

5

$425,000, and the execution of a 2-year storefront lease with Neminath, Inc. Nevertheless, the Subpoena's topics are so overbroad as to encompass "any other Person" with whom I or Williston Park ever had any contact with, "of any kind or nature," even on matters wholly unrelated to the closing of the Property. I would not even know where to begin preparing to respond to this topic.

    18.    Similarly objectionable is the Subpoena's broad ranging request that I be prepared to testify about the following topic:

> G.    Whether, and if so, how and to what extent at any time any of the following Persons were involved in, structured, worked on, brokered, facilitated, provided assistance or advice, obtained financing for, and had a direct or indirect financial interest in, or otherwise played some role in or with respect to, the Commercial Loan Agreement, the Mortgage Security Agreement, or the Transaction: (1) R. Chopra; (2) Sanjiv Chand; (3) Neminath; (4) Kedis; (5) M. Shah; (6) V. Shah; (7) Surajit Bose; (8) Nayana Shah; (9) Jaina; (10) NYC Telecom; (11) STI Consultants I; (12) STI Consultants II; (13) New York Main Street Consultants, Inc.; (14) Pooja Shah; (15) STI Phone Card; and (16) STI Phone Card, Inc.[8]

    19.    As noted above, the only two of the above-named individuals that I ever had contact with were non-party Sanjiv Chand, who I have known as a friend and business advisor for years, and defendant Mahendra Shah, who I met for the first time at the January 16, 2016 closing of the Property, in his capacity as president of non-party Neminath, Inc. Likewise, the only entity that Williston Park ever had contact with was non-party Neminath, Inc.

    20.    More significantly, neither I nor Williston Park have any information that would advance the claims or defenses that I understand remain in this lawsuit.[9]

    21.    Because of the above reasons, the requests for deposition topics and documents

---

[8] *Id.*

[9] *See,* Geo-Group's Third Amended Complaint (Vogel Declr., Exh. 2).

WPR 000074

## CONTRACT OF SALE
## (THIS IS NOT A BULK SALE TRANSACTION)

This Contract, dated January 14, 2016 is entered into by NEMINATH, INC., of 235 Hillside Avenue, Williston Park, NY (hereinafter, "SELLER") and WILLISTON PARK REALTY, LLC of 1414 Hillside Avenue, New Hyde Park, NY (hereinafter, "BUYER"), collectively known as the "Parties" as follows:

WHEREAS, NEMINATH, INC. is the owner of certain real property located at 235 Hillside Avenue, Williston Park, NY; and

WHEREAS, NEMINATH, INC. desires to sell and convey its fee simple interest in said real property; and

WHEREAS, WILLISTON PARK REALTY, LLC desires to purchase the aforesaid fee simple interest in the real property located at 235 Hillside Avenue, Williston Park, NY;

NOW, THEREFORE, in consideration for the mutual promises contained herein, together with other valuable consideration, the sufficiency and receipt of which is hereby acknowledged, it is agreed by and between the parties as follows:

FIRST: NEMINATH, INC. hereby warrants and states that it is the fee simple interest owner of the property aforesaid and is fully authorized to enter into this agreement.

SECOND: SELLER further warrants that, except for the liens specifically listed herein on Schedule A, there are no liens, encumbrances or other clouds on the title of the subject premises.

THIRD: The BUYER hereby agrees to purchase the subject property subject to the liens listed on Schedule A provided, however, that The Law Offices of Edward J. Troy, Esq. holds in escrow a sum equal to the total of the liens listed on Schedule A and the firm has the permission to make such payments as are necessary to prevent the default on the liens. And, further providing that in any event the existing liens will be satisfied or discharged within 180 days with the filing of the necessary UCC-3 forms.

FOURTH: The BUYER agrees to pay and the SELLER agrees to accept the sum of FOUR HUNDRED TWENTY-FIVE and xx/100 ($425,000.00) Dollars in full

WPR 000085

sought by the Subpoena, create an undue burden upon Williston Park — a non-party. Indeed, the Subpoena is particularly burdensome for me as it would unduly interfere in my full-time work as owner of Al's Deli, a 24-hour 7-day a week ongoing business operation.

22.    Accordingly, I respectfully request that the Subpoena be quashed in its entirety, or in the alternative, severely narrowed and modified, and limited to the information described above concerning Williston Park's acquisition of the Property for a fair exchange of value - $425,000 of my personal funds.

I declare under penalty of perjury that the foregoing is true and correct based upon my personal knowledge, information and belief.

Executed on September 11, 2017

Mariana Ramirez
Mariana Ramirez

7

WPR 000075

consideration for the transfer of the title by a Bargain and Sale Deed with Covenants Against Grantors' Acts.

    (a) FIFTH: Seller's Deliveries. Seller shall as applicable:

        (i)    deliver a bargain and sale deed with covenant against grantor's acts ("Deed") as to the Premises, complying with RPL§ 339-0 and containing the covenant required by Lien Law § 13(5), conveying to Purchaser title to Premises free and clear of all liens and encumbrances other than Permitted Exceptions. The Deed shall be executed and acknowledged by Seller in proper statutory form for recording; (ii) Such affidavits and/or other evidence as the title company ("Title Company") from which Purchaser has ordered a title insurance report and which is authorized to do business in New York State shall reasonably require in order to omit from its title insurance policy all exceptions for judgments, bankruptcies or other returns against Seller and persons or entities whose names are the same as or are similar to Seller's name; (iii) Equalization Report and Affidavit in Lieu of Registration Statement pursuant to the Multiple Dwelling Law.

        (ii)    deliver copies of (1) the certificate of incorporation and by-laws of each Seller, and (2) an incumbency certificate executed by a secretary or an assistant secretary of each Seller, with respect to the officer(s) of Seller executing any documents or instruments in connection with the transactions contemplated by this Agreement;

        (iii)    execute and deliver a non-foreign certification; execute and deliver the NYS Combined Real Estate Transfer Tax Return and Credit Line Mortgage Certificate (TP-584), and provide bank, certified or attorney's escrow check(s) for the payment of the NYS Transfer Tax, in accordance with Section 2,6;

        (iv)    a copy of the resolutions of the directors of Seller authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement certified as true, correct

WPR 000086

and complete by the Secretary of Seller, along with copies of Seller's operating agreements;

(v)   The transaction that is the subject matter of this contract of sale is NOT a Bulk Sale Transfer.

(vi)  Execute and deliver such other documents and make such other payments as may be reasonably required to be executed, delivered and paid by Seller hereunder, including but not limited to a triple net lease for the premises.

(b) SIXTH: Purchaser's Deliveries. The Purchaser shall:

(i)   deliver (A) copies of (1) if Purchaser is a limited liability company, the certificate of formation or organization, and operating agreement, of Purchaser and the resolutions of the members or managers, as applicable of Purchaser authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement certified as true, correct and complete by a member or manager, as applicable, of Purchaser, (II) if Purchaser is a corporation, the articles of incorporation and by-laws, of Purchaser and the resolutions of the directors and/or shareholders, as required, of Purchaser authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement certified as true, correct and complete by the Secretary of Purchaser, or (III) if Purchaser is a partnership or other entity, the certificate or articles of formation or organization, and partnership and/or other governing agreements, as applicable, of Purchaser and the resolutions or consent of the partners or other principals, as applicable, of Purchaser authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement certified as true, correct and complete by a general partner (or other principal as applicable with authority

to do so), of Purchaser, (B) a good standin4.t certificate issued by the Secretary of State of organization of Purchaser, dated within thirty (30) days of the Closing Date, unless the purchasing entity was formed not more than sixty (60) days prior to the Closing; (C) copies of all articles and certificates of formation or organization of Purchaser certified by the Secretary of State of organization of Purchaser, dated within thirty (30) days of the Closing Date; (D) if Purchaser is not organized in New York, a good standing certificate issued by the Secretary of State of the State of New York, and copies of all foreign entity filings as required to do business in the State of New York certified by the Secretary of the State of New York, all dated within thirty (30) days of the Closing Date; and (E) an incumbency certificate executed by a member or manager, secretary, or general partner, as applicable, of Purchaser with respect to the member (or manager), officer, or partner, as applicable, of Purchaser executing any documents or instruments in connection with the transactions contemplated herein;

(ii)  pay to Seller (or as otherwise directed by Seller) in immediately available funds as Seller may direct an amount equal to the Balance Due at Closing plus any amounts payable to Seller;

(iii) execute and deliver the NYS Combined Real Estate Transfer Tax Return;

(iv)  execute and deliver the Smoke Detector Affidavit;

(v)   execute and deliver such other documents and make such other payments as may be reasonably required to be executed, delivered and paid by Purchaser either hereunder or as same be required to complete the transaction herein.

SEVENTH: **Representations and Warranties by Seller.** Seller makes the

following representations and warranties as to itself, for the benefit of Purchaser, which is true and correct on the date hereof and which shall be true and correct as of the Closing Date:

(a) Authority; Binding on Seller; Enforceability. The entity that compromise Seller is duly organized and validly existing in the States of New York. Seller has the corporate power and authority for the making and performing of this Agreement. Seller has taken all corporate action required to execute, deliver and perform this Agreement as well as all documents required to be executed and delivered by Seller hereunder, and to make all of the provisions of this Agreement the valid and enforceable obligations they purport to be and has caused this Agreement to be executed by a duly authorized officer of Seller.

(b) To Seller's knowledge, there are no agreements (written or oral) in the nature of space subleases, rights of occupancy, licenses, permits, franchises, concessions, or occupancy agreements affecting the Property other than as set forth in the Rent Roll ("Exhibit B") annexed hereto and made a part hereof (such space leases, licenses, permits, franchises, concessions and agreements, being hereinafter collectively referred to as the "Leases", and each individually, a "Lease") and true and complete copies of all Leases, including all agreements, amendments, guarantees, side letters and other documents relating thereto shall be or have been exhibited or made available to the Purchaser.

(c) To the best of Seller's knowledge, (1) all certificates of occupancy, licenses, certificates and permits (hereinafter collectively referred to as the "Permits") issued by any governmental or quasi-governmental agency or authority or any board of fire underwriters or real estate board or similar organization or institution for or used in connection with the operation of the Premises are sufficient to meet the requirements of law and; (2) the current use and occupation of any portion of the Premises does not violate any of, and, where applicable, is in material compliance with, the Permits.

(d) To the best of Seller's knowledge, there are no special or other governmental, quasi-governmental, public or private assessments for public improvements or otherwise now affecting the Premises

WPR 000089

(other than those special assessments or typical municipal maintenance and operation of such items as sewer, water, drainage and the like which appear annually as a part of the real estate tax bill affecting the Premises) nor are there any pending or threatened special assessments affecting the Premises or any contemplated improvements affecting the Premises that may result in special assessments affecting the Premises.

(e) To the best of Seller's knowledge, no services, material or work have been supplied to the Premises at the direction of Seller for which payment has not been made in full and, except as may be permitted herein, there are no liens encumbering the Premises.

(f) Seller hereby warrants and represents to Purchaser that as of the date hereof there are no condemnation proceedings or applications to change the location or route of any roads servicing the Property pending, or to the best of the Seller's knowledge, threatened.

(g) The Seller represents and agrees that it will maintain all its current insurance policies in full force and effect until the date of closing.

(h) Seller represents that no brokerage commission or compensation of any kind will be due or will become due from Purchaser for space leased in the Premises prior to the date of this contract.

(i) The Seller is not a "foreign person" as defined in the Internal Revenue Code Section 1445.

(j) The Seller specifically represents that it is not aware of any condition or state of fact that would represent an adverse environmental condition(s)

The representations contained herein shall be true and correct at closing and shall survive closing

EIGHTH: The Parties agree that the $425,000.00 is the gross purchase price. It shall be reduced by SIXTY and xx/100 THOUSAND ($60,000.00) Dollars for security deposit for rent security

WPR 000090

The BUYER shall also withhold the sum of SIXTY and xx/100 THOUSAND ($60,000.00) Dollars from the purchase price as and for the pre-payment of the first year's rent, such rent to be $5000 per month.

EIGHTH: It is additionally agreed by the Parties that all transfer and/or recording taxes shall be the responsibility of the SELLER.

NEMINATH, INC.                    WILLISTON PARK REALTY, LLC

WPR 000091

MARIANA RAMIREZ

1-25
210
9948820045

155

Date 12/15/16

Pay to the order of _Williston Park Realty_  $ 60,000

_Sixty thousand only_  Dollars

citibank

CITIBANK, N.A. 89, 926
7TH AVENUE AT 34TH STREET
NEW YORK, NY 10001

Memo

Mariana Ramirez

⑆0210000089⑆ 99486 20045⑈ 0155

---

MARIANA RAMIREZ

1-25
210
9948820045

156

Date 1/14/16

Pay to the order of _Williston Park Realty_  $ 60,000.00

_Sixty Thousand only_  Dollars

citibank

CITIBANK, N.A. 89, 926
7TH AVENUE AT 34TH STREET
NEW YORK, NY 10001

Memo

Mariana Ramirez

⑆0210000089⑆ 99486 20045⑈ 0156

---

MARIANA RAMIREZ

1-25
210
9948820045

153

Date 1/14/16

Pay to the order of _Edward Troy as escrow agent_  $ 286,995.57

_Two hundred eighty six thousand Nine hundred Ninety five_  Dollars

citibank

CITIBANK, N.A. 89, 926
7TH AVENUE AT 34TH STREET
NEW YORK, NY 10001

Memo

Mariana Ramirez

⑆0210000089⑆ 99486 20045⑈ 0153

---

MARIANA RAMIREZ

1-25
210
9948820045

154

Date 1/14/16

Pay to the order of _All State Abstract_  $ 18,004.43

_eighteen thousand four_ 43/100  Dollars

citibank

CITIBANK, N.A. 89, 926
7TH AVENUE AT 34TH STREET
NEW YORK, NY 10001

Memo

Mariana Ramirez

⑆0210000089⑆ 99486 20045⑈ 0154

WPR 000137

D12
425,000 inc.

— Bargain and Sale Deed, with Covenant against Grantor's Acts — Individual or Corporation (Single Sheet)

N89736

CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT—THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY.

THIS INDENTURE, made the 14 day of January in the year 2016

BETWEEN Neminath, Inc, 235 Hillside Ave Williston Park NY 11596

party of the first part, and Williston Park Realty, LLC, 1414 Hillside Ave New Hyde Park

party of the second part,

WITNESSETH, that the party of the first part, in consideration of            ten dollars

paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever, same premises conveyed to the grantor herein by deed dated 8-14-02 and recorded 9-9-2002 in liber 11522 page 850

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the SEE SCHEDULA A This conveyance is made in the ordinary and regular course of business actually conducted by the party of the first part

TOGETHER with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part covenants that the party of the first part has not done or suffered anything whereby the said premises have been encumbered in any way whatever, except as aforesaid.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose. The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

IN WITNESS WHEREOF, the party of the first part has duly executed this deed the day and year first above written.

IN PRESENCE OF:

_____

_____

Mahendra Bow

NEMINATH, INC.
Mahendra Shah president

## CORPORTATE RESOLUTION

I, Mahendra Shah, President of Neminath, Inc., organized and existing under the laws of the State of New York and having its principal place of business at 235 Hillside Avenue, Williston Park, NY, hereby certify that the following is a true copy of a resolution adopted by the Board of Directors of the Corporation at a meeting convened and held on January 14, 2016 at which a quorum was present and voting throughout and that such resolution is now in full force and effect and is in accordance with the provisions of the charter and by-laws of the Corporation.

RESOLVED: That the Corporation approves, authorizes and directs the President of this corporation to execute and enter into a Contract of Sale with Williston Park Realty, LLC for the real property located at 235 Hillside Avenue, Williston Park, NY;

RESOLVED: that the President of the Corporation is hereby authorized to sign on behalf of the Corporation any contracts or forms, including a Bargain and Sale Deed for the transfer of the corporations' interest in the aforesaid property, and a lease of the aforesaid property;

RESOLVED FURTHER: That the President and/or Secretary are hereby authorized and directed to certify to any interested party that this resolution has been duly adopted, is in full force and effect, and is in accordance with the provisions of the charter and by-laws of the Corporation.

I further certify that this Corporation is duly organized and existing, and has the power to take the action called for by the foregoing resolution.

DIRECTORS AND OFFICERS

PRESIDENT _____  DATE 1/14/2016

VICE PRESIDENT _____  DATE 1/14/2016

SECRETARY _____  DATE 1/14/2016

TREASURER _____  DATE 1/14/2016

It is hereby resolved that a majority of outstanding shares are held by the undersigned & undersigned hereby authorized the corporation to enter into a contract of sale, a lease & a deed for the property located at 235, Hillside Ave

Mahendra Boks

WPR 000095

## LEASE AGREEMENT

THIS LEASE AGREEMENT is made and entered into this 14th day of January 2016by and between NEMINATH, INC. ("Tenant") and WILLISTON PARK REALTY, LLC ("Landlord").

### ARTICLE 1
### PREMISES

1.01    In consideration of the payment of rent as hereinafter provided and the covenants and agreement herein contained, the Landlord does hereby demise and lease to Tenant, and Tenant does hereby take and lease from Landlord, that certain parcel of real property as improved (the "Premises") located within Nassau County, NY at 235 Hillside Avenue, Williston Park, NY to-wit:

### SEE SCHEDULE A

1.02    The Premises shall include all improvements thereon.

### ARTICLE 2
### TERM

2.01    The initial term of this lease shall commence on December 31, 2015 and continue for a period of two years with option to extend the term for three additional years. Should Tenant remain in occupancy of the Premises after the expiration of the Lease Term, and should Landlord accept rent from Tenant, this Lease shall be presumed to be renewed on a month to month basis. If the lease is renewed on a month to month basis, either party can terminate the lease by 30 days written notice to the other party. Monthly rent during any hold over period shall be equal to twice the amount of monthly rent payable immediately prior to the expiration of the Lease Term.

### ARTICLE 3
### RENT

3.01    The Tenant shall pre-pay to Landlord (i) the sum of $60,000 (sixty thousand dollars) as the full first year's rent at the rate of $5,000 per month (the "Monthly Rent") The amount of the Monthly Rent during the second year shall be paid on the fifth of the month starting in January 2017. The rent shall increase 5% per year.

WPR 000178