3.02   Monthly Rent, and any other sums due Landlord from the Tenant which are not paid on or before the fifth day after such amounts are due shall each incur a late charge of fifty dollars per day for every day after such fifth day until the affected sums are paid in full.

3.03   Tenant shall deposit a security deposit equal to 12 months of rent.

## ARTICLE 4
## USE

4.01   The Premises shall be used by the Tenant for purposes of operating a general merchandise retail store or any other legal use.

4.02   Tenant shall obtain and maintain all licenses, permits or other instruments of authority required by law for Tenant to operate its business at the Premises, and Tenant shall comply with all law and regulation including without exception environmental law and regulation applicable to the Premises and to Tenant's business and operation of the Premises.

4.03   Tenant shall not conduct any illegal activities at the Premises nor cause any charges to be filed against the Tenant by any government unit or agency.

4.04   In the event of any violation of the provisions of this Section, Tenant shall be responsible for curing same.

4.05   All rights provided Landlord in this Article 4 are in addition to such rights as Landlord may have at law or in equity.

## ARTICLE 5
## ALERATIONS AND IMPROVEMENTS

5.01   Prior to making any alteration or improvements to the Premises Tenant shall submit to Landlord written notice of same.

5.02   The Tenant shall at all times during the term of this Lease, subject to the terms and provisions of this Lease, have the sole and exclusive right to erect, build, rebuild, repair and change buildings and improvements at the Premises, so long as the resulting appearance is consistent with the use of the Premises in accordance with the use clause as set forth in Section 4.01, above. At the end of the term of the Lease, or any Lease Extension Option period, such improvement shall become the property of Landlord. Tenant shall also have the right to alter or otherwise construct such buildings, appurtenances, or other improvements for use as the Tenant in its sole discretion may determine so long as same are used for lawful purposes and in accordance with zoning regulations. Tenant covenants that any such improvements shall not result in a lien upon the Demised Premises. All

WPR 000179

work by Tenant under this provision shall be performed in a good and workmanlike manner and substantially in compliance with all applicable codes and ordinances.

5.03    Tenant shall keep the premises and building of which the Premises are a part (the "Building") free from all liens of mechanics and materialmen for work done or material furnished to Tenant. In the event a lien is placed on the Premises or the Building in violation of Tenant's obligations hereunder, Tenant must use diligent efforts to remove such lien within forty days after the lien is filed. Tenant indemnifies and holds Landlord harmless from any damages, costs or expense, including reasonable attorney fees, incurred by Landlord as a result of Tenant's failure to maintain the premises and the Building free and clear of liens.

## ARTICLE 6

## SIGNAGE

6.06 The Tenant shall be allowed to erect and install exterior signage on the Premises provided that the sign complies with all applicable law and regulations, is professionally prepared and consists of materials of a quality and durability that will prevent any such signage from becoming a nuisance or eyesore and is reasonably consistent in appearance with current signage.

## ARTICLE 7

## REPAIR AND MAITENANCE

7.01    The Tenant shall keep the Premises in a clean and orderly condition and shall not allow the accumulation of garbage or similar materials. The Tenant shall be responsible for the repair and maintenance of the Building and outdoor areas of the Premises including without limitation broken window glass and other glass, indoor floor coverings and outdoor paving and landscaping.

7.02    Tenant shall provide necessary repairs and maintenance of the heating and air-conditioning systems, hot water heating system, plumbing, water, sewer, gas, electrical system, parking lot and roof and structural elements of the Building.

## ARTICLE 8

## SNOW AND TRASH REMOVAL

8.01 Tenant is responsible to make arrangements for and to pay for the prompt removal from the Premises of (i) snow and weather related ice, (ii) accumulated rain water, (iii) garbage (municipal solid waste) and (iv) construction and demolition debris without regard to the sources of such materials.

## ARTICLE 9

### UTILITIES

9.01  The Tenant is responsible to make arrangements including any required physical connections and pay for electricity, water, sewer, natural gas, cable TV, telephone, Internet connection systems that Tenant requires or elects to have service the Premises.

## ARTICLE 10

### TAXES AND SPECIAL ASSESSMENTS

10.01  The Tenant shall pay all taxes and special assessments levied against the Premises during the life of this Lease by any unit of government.

## ARTICLE 11

### INSURANCE

11.01  The Tenant at its sole cost and expense shall be responsible to provide reasonable insurance for Tenant's personal property used or located at or about the Premises.

11.02  Tenant, at its sole cost and expense, shall obtain and for the life of this Lease maintain in full force and effect in manner reasonably acceptable to landlord (i) comprehensive general public liability insurance on both per occurrence and aggregate bases with minimum limits of liability in an amount not less than one million dollars ($1,000,000.00) and (ii) fire and casualty insurance for the full replacement value of the real property of the Premises.

11.03  Tenant shall provide Landlord at the time this Lease is executed a copy of each insurance policy required of Tenant hereunder, and Tenant shall provide Landlord with certificates of insurance naming Landlord as an additional insured under each such policy to the extent permitted by law and the affected policy terms.

## ARTICLE 12

## FIRE AND OTHER CASUALTY

12.01 In the event the Premises are due to fire or other casualty destroyed or damaged to the point where the Premises are unsafe for occupancy, Landlord shall as soon as reasonably possible repair and restore the roof and exterior walls of the Premises to substantially the same condition existing immediately prior to such casualty and Landlord shall be entitled to receive any related insurance proceeds and use them to make those repairs to the Premises.

12.02 Notwithstanding the foregoing, Landlord shall be entitled to such additional time to complete such repairs as shall equal the time lost by reason of any strikes, shortages of material, acts of God, and other similar causes beyond Landlord's control.

12.03 As further insurance for Landlord, Tenant indemnifies and holds Landlord harmless from any and all claims of whatsoever kind whether in law or equity that may arise against Landlord or any of its owners based on claims of personal injury, building code violations or other violations of law or regulation, breaches of contract or any other facts or circumstances arising during the life of this Lease related or allegedly related to the conduct, misconduct or failures to act of Tenant or Tenant's owners, employees, agents, customers, business invitees, suppliers or affiliates. The indemnification and hold harmless provisions of this paragraph include an obligation for Tenant to pay Landlord's reasonable attorney fees for enforcing this paragraph.

## MISCELLANEOUS

13.01 Tenant warrants that it is on the date of this Lease that it is in good standing with the NY Department of State

13.02 Tenant may not sublet the Premises or assign this Lease at any time during the Lease Term or Lease Extension Option periods, without consent of Landlord. In the event approves of any such assignment or subletting, Tenant shall not be released from its obligations hereunder. In the event of any such subletting, any sublease agreement shall be made specifically subject to and conditioned by all the terms of this Lease.

13.03 Upon Landlord's request Tenant shall provide Landlord an estoppel certificate in a form reasonably acceptable to Landlord stating among other things whether at the time of the estoppel Tenant has any claims against Landlord.

13.04 Tenant agrees that the Lease is now subordinate to mortgage financing Landlord has obtained for the Premises and shall in the future at Landlord's request be made subordinate to any other mortgage financing Landlord or any successor in interest to Landlord may obtain for the Premises. Landlord agrees upon request by Tenant to secure

WPR 000182

and deliver to tenant a Subordination, Non-Disturbance, Attornment Agreement from the current and any future mortgage holder in a form reasonably acceptable to Tenant.

13.05 Landlord and representatives of Landlord including lenders and insurance company representatives may on one day's notice to Tenant enter on and inspect the Premises provided such entry does not interfere unduly with Tenant's conduct of business at the Premises. In emergencies Landlord or its agents may enter the Premises without notice to Tenant.

13.06 If the building or any portion of the Premises is damaged or rendered un-tenantable by fires or other casualty, Tenant shall give immediate written notice thereof to Landlord. Thereafter, Tenant shall thereupon and without further notice to Landlord repair or replace said building, provided, however, that Tenant shall not be required or obligated to expend for such repairs or replacement any amount in excess of the proceeds derived from applicable insurance policies paid to Tenant as a result thereof and, provided, further, that Tenant shall rebuild or architecturally complete structure having the same basic value as that which was destroyed and capable of operating a business similar to that having been conducted prior to such casualty. Rent shall be abated proportionate to the damage while Tenant is making said repairs. In case of damage or destruction occurring in the last three (3) years of this Lease, or any extension or renewal thereof, to the extent of fifty percent (50%) or more of the insurable value of the building at any given Location, Tenant may, at its option, in lieu of replacing or repairing same, elect to terminate this Lease as it applies to such Location as of the date of said damage or destruction, and adjust the rental paid accordingly, paying to the Landlord the value of the insurance proceeds for the damage as required under this Lease. If at any time that this Lease is in full force and effect, including during the Lease Extension Option periods, the Premises are rendered wholly unusable, or if the building shall be so damaged that it would need to be demolished or rebuilt, then, in any of such events, Tenant may elect to terminate this lease by written notice to Landlord, given within 90 days after such fire or casualty, or 30 days after adjustment of the insurance claim for such fire or casualty, whichever is sooner, specifying a date for the expiration of the Lease, and upon the date specified in such notice the term of this Lease shall expire as fully and completely as if such date were the date set forth above for the expiration of this Lease and Tenant shall surrender and vacate the Premises, and any rent owing shall be paid up to the surrender date and no further payments of rent shall be owed by Tenant.

13.07 Any delay or failure by Landlord to enforce any of its rights hereunder shall not operate as a waiver of that right or any of Landlord's other rights hereunder.

13.08 At the end of the Lease Term or any of the Lease Extension Options exercised by Tenant, Tenant shall remove its personal property from the Premises within a reasonable period of time, and any of Tenant's personal property that is left on the Premises as of sixty days after the end of Lease shall belong to Landlord with Landlord having the right to remove and discard it as waste.

13.09 In the event Landlord chooses to contest by certiorari or other proceeding related to the real property assessment value of the Property, the real property tax rate applied to the Property or other aspect of the taxation of the Property, Tenant agrees to cooperate with Landlord at no expense to Tenant in such proceeding and any tax reduction won in such proceeding shall be used first to reimburse Landlord for its reasonable costs including attorney fees in prosecuting the action, with the reimbursement made year by year if necessary based on the amount in each such year of the related tax savings. The balance of any reimbursement shall inure to the benefit of the Tenant, which will have paid the taxes.

13.10 (a) Tenant shall have a Right of First Refusal at any time during the Lease Term or any Lease Extension Option period, with respect to purchasing the Premises. During that time, the Tenant shall have the right to re-purchase the premises in the first year for $650,000 plus all the sellers expenses paid by the purchaser and in the second year for $850,000 plus all the sellers' expenses paid by the purchaser. This option to re-purchase shall survive until January 1, 2018. If Tenant elects to re-purchase the Premises as provided herein, then Landlord and Tenant shall enter into a contract for the purchase of the Premises upon the terms and conditions specified above.

(b) If Tenant elects not to purchase the Premises, Tenant will, upon Landlord's request, promptly execute and deliver to Landlord a waiver, in recordable form, confirming such election not to exercise its option to purchase the Premises but the absence of such waiver shall not limit or impair Landlord's right to sell the Premises if Tenant has not timely delivered the OPTION Notice.

This agreement is the entire understanding of the Tenant and Landlord on these matters. No provision of this Lease may be amended or added except by a written agreement signed by all parties hereto or their respective successors in interest. If any provision of this Lease is held by a court of competent jurisdiction to be unenforceable the balance of the Lease terms shall continue in force to the maximum extent allowed by law. Disputes arising hereunder shall be resolved under the laws of New York.

IN WITNESS HEREOF, the parties have caused this lease to be executed on the day and year first written above.

LANDLORD                                         TENANT

WILLISTON PARK REALTY, LLC                       NEMINATH, INC

By: *Mouana Ramirez*                             By: *Mahendra Bhatt*

Its: managing member                             Its: *President*

WPR 000184

3020-8168862

# BARGAIN AND SALE DEED
# WITH COVENANT AGAINST GRANTOR'S ACTS

**THIS INDENTURE**, made the 11 day of **October, 2016**

Between **Williston Park Realty LLC**, having an office address of 1414 Hillside Avenue, New Hyde Park, New York 11040, party of the first part, and

**Williston Park Realty LLC**, having an address at 1 Hamat Court, Hicksville, New York, 11801, collectively party of the second part:





Section 9 Block 313 Lot 33

    **WITNESSETH**, that the party of the first part, in consideration of ten dollars and other good and valuable consideration, lawful money of the United States, paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever;

    **ALL** that certain plot piece or parcel of land, with the buildings and improvements thereon erected, situate, lying, and being in the Town of Williston Park, County of Nassau, State of New York, as more particularly described in Schedule A attached hereto and made a part hereof.

    **BEING** and intended to be the same premises as conveyed to the grantor herein by Deed dated January 14, 2016 and recorded February 23, 2016 in Book: 13324, Page 230 and

    **TOGETHER** with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof;

    **TOGETHER** with the appurtenances and all the estate and rights of the party of the first part in and to said premises;

    **TO HAVE AND TO HOLD** the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

    **AND** the party of the first part covenants that the party of the first part has not done or suffered anything whereby the said premises have been encumbered in any way whatever, except as aforesaid.

    And the party of the first part/grantor, in compliance with Section 13 of the Lien Law, covenants that the party of the first part/grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose. The word "party" or "grantor" shall be construed as if it read "parties" or "grantors" whenever the sense of this document so requires.

WPR 000204

IN WITNESS WHEREOF, the party of the first part has hereunto set his hand and seal the day and year first above written.

<u>Williston Park Realty LLC</u>

*Mariana Ramirez*
Name: Mariana Ramirez
Title: Managing Member

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF KINGS        )

On the 11th day of October in the year 2016, before me, the undersigned, personally appeared MARIANA D Ramirez, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that she executed the same in her capacity(ies), and that by her signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
(signature and office of individual taking acknowledgment)

MICHELLE S. HARRY
Notary Public, State of New York
No. 01HA6129021
Qualified in Kings County
Commission Expires 6/30/2017

-2-

D12
3  $426,000 inc.
42,000 inc.

— Bargain and Sale Deed, with Covenant against Grantor's Acts — Individual or Corporation (Single Sheet)    N89736

CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT—THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY.

THIS INDENTURE, made the 14 day of January in the year 2016

BETWEEN Neminath, Inc., 235 Hillside Ave Williston Park NY 11596

party of the first part, and Williston Park Realty, LLC, 1414 Hillside Ave New Hyde Park
party of the second part,
WITNESSETH, that the party of the first part, in consideration of

ten dollars

paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors
and assigns of the party of the second part forever, premises conveyed to the grantor herein by deed dated
being and intended to be the same
8-19-02 and recorded 9-4-2002 in liber 11522 page 850
ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being
in the SEE SCHEDULE A   This conveyance is made in the ordinary and regular course of business
actually conducted by the party of the first part.
TOGETHER with all right, title and interest, if any, of the party of the first part in and to any streets and roads
abutting the above described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and
rights of the party of the first part in and to said premises; TO HAVE AND TO HOLD the premises herein granted unto the
party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part covenants that the party of the first part has not done or suffered anything whereby the said
premises have been encumbered in any way whatever, except as aforesaid.
AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will
receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied
first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the
improvement before using any part of the total of the same for any other purpose. The word "party" shall be construed as if it
read "parties" whenever the sense of this indenture so requires.

IN WITNESS WHEREOF, the party of the first part has duly executed this deed the day and year first above written.

IN PRESENCE OF:

_____        _Mahendra B. Shah_
                                       NEMINATH, INC.
                                       Mahendra Shah president

_____        _____

# Exhibit 216

| Loans taken by Jaina from Vision Impex and T D Time ||  |
|---|---|---|
| Date | Source of Funds | Amount |
| 1/22/2014 | T D Time | $102,500 |
| 1/29/2014 | T D Time | $211,500 |
| 4/25/2014 | Vision Impex Ltd | $249,100 |
| 5/9/2014 | Vision Impex Ltd | $201,450 |
| 5/22/2014 | Vision Impex Ltd | $198,500 |
| 8/22/2014 | Vision Impex Ltd | $49,220 |
| 9/23/2014 | Vision Impex Ltd | $190,200 |
| 10/16/2014 | Vision Impex Ltd | $102,500 |
| 11/3/2014 | Vision Impex Ltd | $105,600 |
| TOTAL |  | $1,410,570 |

Exhibit 217

FILED: NEW YORK COUNTY CLERK 02/02/2015 05:59 PM
NYSCEF DOC. NO. 114

Case 1:15-cv-01756-KPF   Document 4-3   Filed 03/20/15   Page 2 of 122
INDEX NO. 652219/2014
RECEIVED NYSCEF: 02/02/2015

JUDICIAL ARBITRATION AND MEDIATION SERVICE

| | |
|---|---|
| GEO-GROUP COMMUNICATIONS, INC., Claimant, | JAMS Ref. No. 1425013898 |
| -against- | AFFIDAVIT |
| JAINA SYSTEMS NETWORK, INC., Respondent. | |

COUNTY OF NEW YORK  )
                    :ss:
STATE OF NEW YORK   )

GOVIND W. VANJANI, being duly sworn, deposes and says:

1. I am the President and founder of Claimant, Geo-Group Communications, Inc., and make this affidavit in support of its Motion for Summary Judgment.

2. I confirm the accuracy of the facts stated in that motion and want to add the following additional ones:

3. I formed the Claimant corporation prior to retiring from an important position at General Electric in 2000 in order to be able to capitalize on and turn what I had learned over the years into socially useful purposes. In doing so, I enlisted as shareholders a number of wealthy investors whom I knew through my work at General Electric to participate with me and back our venture. (A copy of my resume and a list and description of Claimant's shareholders is annexed as Exhibit 1.)

4. The present most important project occupying me almost full time is one in which I have developed potentially valuable patents for providing electricity at half the present going price to the many Indian villages which can't presently afford to buy an amount adequate for

their needs. I have donated these patents and my work on the project but had felt obliged when I left General Electric to earn money in order to repay my shareholder/investors without whose support I couldn't have done what I am now doing. Because of my connections with telecommunication companies as a result of some of the work I had been doing at General Electric, the kind of arrangements relating to the purchase and sale of telephone minutes involved in the present contract with Jaina seemed an easy and natural way to do that.

5. In proceeding with such work I was very careful to dot all I's and cross all T's by meeting all applicable state and federal regulations. I don't think that the Respondent's lawyer was deliberately lying in asserting the defenses in Respondent's Answer about our lack of incorporation or failure to comply with regulations. But his so-called research, which didn't even contain correct address information, was obviously mistaken. Copies of some of the documents confirming that are included in Exhibit 2 to this affidavit with more available if they are required.

6. The course of profitable dealing with telephone minutes we sold to Respondent for almost two years is reflected in invoices sent to and paid by it between January 2007 and August 2008 (copies of which are annexed as Exhibit 3). Not including the profit made by Respondent on the minutes sold to it and billed in the still unpaid September 2008 and October 2008 invoices (copies of which are annexed as Exhibit 4) which are the subject of this arbitration a reasonably accurate estimate of the profits previously made by Respondent as a result of its dealings with Claimant would be $1.1 million. Respondent sold the minutes reflected in those two invoices totaling $1,507,922.96 and its profits from them would probably have come to over $150,000. However, as the Motion for Summary Judgment correctly states, because of a billing

omission on Claimant's part the October 2008 invoice was $200,000 lower than it should have been.

7. Claimant had itself paid over $1.7 million to Qwest to purchase the minutes involved in that October invoice and remains out-of-pocket for that entire amount. Respondent, however, after selling the minutes, never paid back a penny on account of those invoices despite continued promises from Surajit Bose, its CEO and part owner, that it was going to as soon as it could afford to. (A few but far from all of those written promises are reflected in e-mails attached as Exhibit 5.) Claimant stopped doing business with Respondent after October 2008 for obvious reasons based on that non-payment. However, Respondent still continues in the same business, and with the advantage of hindsight I have now come to believe that its non payment was due to having made better arrangements with another supplier coupled with an intent from the start to cheat Claimant out of what was owed for those last two months.

8. It is true, as the Summary Judgment Motion states, that my company's shareholders, who had made seven figure profits on other matters we were doing, could not have cared less about the loss involved in this contract so there was no special pressure on me to pursue this claim. Accordingly, instead of doing so at the time, as I now realize I should have, I remained in touch with and on friendly terms with Mr. Bose, to whom I had originally been introduced by an important and respected contact, the Senior Vice President of Tata Communications, one of leading India's leading telecommunication companies.

9. In maintaining this relationship with Mr. Bose I foolishly continued to accept and rely on his many oral and written acknowledgments that those two invoices would be paid in due course when Respondent's finances improved. I would probably never have instituted collection proceedings except for the fact Mr. Bose felt so secure in our friendship that he was free to call

on me in 2010 for an allegedly urgently needed $150,000 loan which he promised would be repaid within two months along with at least a start at repaying the still outstanding October 2008 invoice. A copy of Mr. Bose's December 20, 2010 e-mail profusely thanking me for the loan which is quoted in the Motion for Summary Judgment is attached as Exhibit 6.)

10. However, Mr. Bose's making and breaking promises to return even my personal loan over many months which ended with a hostile exchange between us opened my eyes to how foolish I had been in my dealings with him. At that point I felt, and continue to feel, guilty towards my shareholders for permitting my gullibility to have caused them this loss and for having foolishly permitted this matter to drag on for so long. I accordingly arranged to file the present claim, while making it clear to them that I will continue to fund and pursue it but do not intend to keep any of the recovery which I plan to return to them.

Govind W. Vanjani

Sworn to before me this
17 day of February, 2014.

Notary Public

NORMAN SOLOVAY
Notary Public, State of New York
No. 31-4947620
Qualified in New York County
Commission Expires February 27, 20__

4

