UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
GEO-GROUP COMMUNICATIONS, INC.,

                    Plaintiff,            Index No. 15-cv-01756
                                           (KPF)

-v.-

RAVI CHOPRA; MAHENDRA SHAH; VIPIN
SHAH; 728 MELVILLE PETRO LLC; KEDIS
ENTERPRISES LLC; JMVD HILLSIDE LLC;
NYC TELECOMMUNICATIONS CORP.; and
SHALU SURI,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

CERTIFICATION OF GOVIND VANJANI IN OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Pursuant to 28 U.S.C. § 1746, I, Govind Vanjani, certify, state and

declare under penalties of perjury as follows:

1.    I am President and co-founder of Plaintiff Geo-Group

Communications, Inc. ("Geo-Group"), a position that I have held since 2000,

while the Company was formed in Feb 1998. I submit this certification in

opposition to the motions for summary judgment filed by defendants Ravi

Chopra, NYC Telecommunications Corp., Mahendra Shah, and Vipin Shah in

this matter.

INTRODUCTION

2.    This action seeks money damages from the defendants, each of

whom are insiders of Jaina Systems Network, Inc., for actually and

constructively fraudulent transfers made in violation of New York's Debtor and Creditor Law. The money was unlawfully transferred from Jaina Systems Network, Inc. ("Jaina") during a period beginning with the commencement and prosecution by Geo-Group of an arbitration proceeding against Jaina and continuing when and after the arbitrator made an award against Jaina in favor of Geo-Group, and Geo-Group commenced proceedings in New York State Supreme Court to confirm the award, which ultimately resulted in the entry of a judgment against Jaina. Discovery has revealed that additional sums in an amount of at least in excess of $4,526,981.00 have disappeared, without explanation, from the companies' books, as reflected in Jaina's tax returns and bank statements, another matter that will be demonstrated and discussed below.

3.      Except where I indicate otherwise, I have personal knowledge of the facts set forth in this Certification. That personal knowledge is based on: (a) my very extensive first-hand involvement as the person at Geo-Group with principal, day-to-day responsible for Geo-Group's contractual relationship with Jaina, and for all in-person, written and telephonic communications with Jaina; (b) my extensive, first-hand involvement in the underlying arbitration and litigation proceedings against Jaina, which resulted in an April 2015 confirmation judgment entered against Jaina, which was affirmed by the New York Supreme Court,  Appellate Division, First Department on November 29, 2016; (c) my extensive, personal involvement in Geo-Group's efforts to settle the dispute with Jaina both before and after the judgment was entered; and (d)

my extensive, personal involvement as the person at Geo-Group with responsibility for this litigation, which includes, among many other things, working closely and coordinating litigation efforts and strategy with Geo-Group's lead counsel, Loree & Loree; and attending all depositions and testifying at my own (as both an individual and a corporate representative of Geo-Group).

4.    I have read all of the decisions the Court has made in this matter thus far; followed all of the correspondence between the parties, and the correspondence between the parties and the Court; reviewed multiple times all documents produced by all parties, including by Geo-Group; as respects certain key financial documents, such as bank statements, Jaina's and Neminath's tax returns, and others, I have reviewed even more closely, and used the data in them to help explain in this Certification why the defendants' motions for summary judgment should be denied. I was the person at Geo-Group who determined, with the assistance of Geo-Group's counsel, what documents should be produced by Geo-Group in response to defendants' document production requests, and I produced to Loree & Loree those documents from electronic files I have at all times maintained in the ordinary course of Geo-Group's business.

5.    I have also reviewed all of the deposition transcripts (including my own) in this matter at least twice and have reviewed key portions of those depositions transcripts multiple times.

CAST OF CHARACTERS (INCLUDING THE PARTIES)

*Geo-Group*

6.     Geo-Group Communications, Inc., is a Delaware corporation with its principal place of business in California. Until a few years ago, Geo-Group was in the business of providing telecommunications services to customers. These services included obtaining telephone minutes from one or more other telecommunications providers, and selling them to Geo-Group customers, who in turn would resell them to their own customers.

7.     Jaina Systems Network, Inc. ("Jaina"), is, according to the New York Department of State, a New York domestic stock corporation with its principal place of business in Williston Park, New York. Jaina was one of Geo-Group's customers. Since 2015 Jaina has, at least overtly, transacted little or no business, has no bank accounts in its name, and no other unencumbered assets having any meaningful value in New York, with two possible exceptions.

8.     First, according to Form 1120, Schedule L of Jaina's 2015 tax return (the most recent one we have), as of year-end 2015 Jaina had accounts receivable in the amount of $2,213,217.00. (See Ex. M.) Geo-Group does not know from whom these receivables are allegedly due, what their actual value is (if anything), whether they even still exist, or whether any attempts have been made to assign or collect them.

9.     Second, Defendants Mahendra and Vipin Shah have possession, custody and control of the software and hardware constituting Jaina's

4

telecommunication network, which according to Defendant Ravi Chopra, may be worth $10,000,000.00 or more to a company who wanted to salvage, implement it, or integrate it into its own telecommunications network, even though its book value has been depreciated to $0.00 (zero) according to Jaina's 2015 tax return (see Ex. M, Form 1120, Schedule L, Lines 10a & 10b).

*Defendant Mahendra Shah*

10.     Defendant Mahendra B. Shah ("M. Shah") is a natural person who, until recently, I understand, resided in Williston Park, New York, but now has moved to South Florida, near Tampa.

11.     At all relevant times, M. Shah was and is the person at Jaina with principal decision-making authority. M. Shah's official title at Jaina is apparently "President," but M. Shah has since 2002, when Jaina was formed, held himself out, and has continued to hold himself out, to the State of New York as the "chief executive officer" of Jaina by signing New York Department of State ("NYDOS") filings. (See copies of Jaina's New York Department of State filings, which Geo-Group obtained from the Department of State by request made by Philip J. Loree Jr. of Loree & Loree, copies of which are attached as Ex. A; see also a copy of the information available on the Department of State website, a copy of which is attached as Ex. B.)

12.     The New York Department of State ("NYDOS") required the filing forms that M. Shah signed on behalf of Jaina to be signed by the corporation's "chief executive officer," which the forms define as "the individual who is the

principal decision maker" for the corporation. (See Ex. A, at GCI-003778, GCI-003780, GCI-003781, GCI-003785.) According to NYDOS records, no person other than M. Shah has signed any of Jaina's NYDOS filings as the "chief executive officer" of Jaina. (See Exs. A & B.)

13.    M. Shah is also a shareholder of Jaina, and currently claims to have a 25% interest in Jaina. (Transcript of the August 11, 2017 Deposition of Mahendra Shah (the "M. Shah Tr."), at 41-44; a copy of the M. Shah Tr. is attached as Ex. C.) He also claims that there are three other shareholders, each of whom allegedly owns a 25% share: (a) Frank Vella ("F. Vella"); (b) Nayana Chandra Vipin Shah ("N. Shah"); and (c) Surajit Bose ("S. Bose" or "Surajit Bose").

14.    M. Shah is also an owner (along with Debtor Defendant Vipin Bhogilal Shah ("V. Shah")), and the President of, Neminath, Inc., which until very recently, owned the 235 Hillside Ave. property in which Jaina conducted its operations. According to Defendant Vipin Shah's testimony, M. Shah owns 5% of Neminath, M. Shah's spouse Pooja Shah owns 45%, V. Shah owns 5%, and his spouse, Nayana Shah, owns 45%. (See Transcript of the August 8, 2017 Deposition of Defendant Vipin Shah ("V. Shah Tr.") at 27, 29; a copy of the V. Shah Tr. is attached as Ex. D.)

15.    Neminath is effectively the Shah family business. Each of the two families are fully represented as shareholders.

16.     I understand that M. Shah also held himself out to the New York
State Department of State as the individual with principal decision making
authority for Jaina Infrastructure Inc., a New York Domestic Business
Corporation (New York Department of State ID No. 3720760) ("Jaina
Infrastructure"); Jaina Call India, Inc., a New York Domestic Business
Corporation (New York Department of State ID No. 3403880) ("Jaina Call
India"); Jaina Realty Inc., a New York Domestic Business Corporation (New
York Department of State ID No. 3720719) ("Jaina Realty"); and Ipsita Telecom
Services, Inc., a New York Domestic Business Corporation (New York
Department of State ID No. 3757308) ("Ipsita Telecom"). M. Shah also owns a
25% interest in Jaina Infrastructure. Geo-Group, though its counsel, Philip J.
Loree Jr., Esq. obtained from the New York Department of State website
information backing-up my understanding, which he will attach to the
Certification that I understand he will file in opposition to the summary
judgment motions.

### *Defendant Vipin Shah*

17.     V. Shah is an individual who, to the best of my knowledge, lives in
Williston Park, New York.

18.     V. Shah is M. Shah's brother and is married to N. Shah, who is, as
discussed above, a shareholder and officer of Jaina, who is claimed to have a
25% ownership interest in the company.

19.     V. Shah was in the phone card sector of the telecom industry

since at least the 1990s and did business through a company named Ambe Sports Cards, Inc., which later became Ambe Phone Card. Inc. (See Ex. D, V. Shah Tr. at 17-19, 23.) He also owned and controlled a company named Ambe Telecommunications, Inc. ("Ambe Telecom"), which sold phone cards. (See Ex. D, V. Shah Tr. at 33-36.) He placed Ambe Telecom, into voluntary, Chapter 7 bankruptcy in November 2003, and I understand that a final decree discharging Ambe Telecom was entered in 2005. (See Ex. D, V. Shah Tr. at 36-38; Ex. E, *Re Ambe Telecommunications, Inc.*, No. 1-03-25119-ESS (E.D.N.Y. Bankr.) Docket Sheet, which I understand Geo-Group's counsel, Philip J. Loree Jr., recently downloaded from the Public Access to Court Electronic Records ("PACER") online database.)

20.     The Ambe entities he owned and controlled sold phone cards to customers. (See Ex. D, V. Shah Tr. at 17-19.) V. Shah, a corporate insider, claims to have lent some amount ranging from just less than $2,000,000.00 to $2,500,000.00, and was the beneficiary of more than $680,000.00 that Jaina—a company for which his brother was the principal decision maker and his spouse a major shareholder—transferred to him in violation of Article 10 of the NYDCL.

21.     Although he is an insider, V. Shah never was an officer or director of Jaina and does not contend in this litigation that he is such an officer or director. In or about March 22, 2012, he falsely represented to Citibank, N.A. that he was the President of Jaina, and applied to Citibank for financing for

Jaina in March 2012. The Citibank, N.A. term sheet for the financing in question is countersigned by a person who does not identify himself by name but claims to be Jaina's "President." Vipin Shah admitted that the signature is his and that he was not President of Jaina (Ex. D, V. Shah Tr. at 90-91, which means he falsely represented to Citibank that he was a representative of Jaina for purposes of obtaining a loan for Jaina. Based on the Term Sheet, Citibank made a $1 million line of credit to Jaina (see Transcript of August 28, 2017 Deposition of Defendants R. Chopra and NYC Telecommunications, Inc. ("Chopra Vol I Tr.") at 58, 81-82, 83, 84-90, 101-05, 115-118; Ex. D, V. Shah Tr. at 84-86, 88-98)

22.     Contemporaneously, Defendant V. Shah, in the purported capacity as an "individual of Jaina Systems Network, Inc." entered into a one-page, three-year-term loan agreement with Chopra as an "individual of STI Consultants," which he signed in the lower-left hand corner as "Vipin Shah, Jaina Systems Network, Inc." V. Shah admitted in his deposition that when he signed this document he was not an officer or director of Jaina (see Ex. D, V. Shah Tr. at 88-98) and, in any event, there is no dispute that he never was an officer or director of Jaina. (A copy of the Loan Agreement is attached as Ex. G.)

23.     V. Shah was an extraordinarily close insider with a very substantial stake in Jaina. When Mahendra Shah and Surjit Bose started Jaina's telecom business in 2003 or 2004, they turned to Vipin for financing, who started by investing $100,000.00, and continued to invest more sums over

9

time. While in his testimony Mr. V. Shah claimed not to be "involved with Jaina," he testified, "But the thing is that when my brother [Mahendra] needed the money [for Jaina], when [Surjit] Bose need money [for Jaina], they always come to me." (Ex. D, V. Shah Tr. at 97)

24.     In exchange for providing financial support to Jaina, M. Shah and S. Bose agreed to provide V. Shah's spouse, N. Shah, with a 25% interest in the company, and make her an officer. (See Ex. D, V. Shah Tr. at 20, 39.) V. Shah testified that N. Shah was not actively involved in Jaina as either a shareholder or an officer. (Ex. D, V. Shah Tr. at 19-21) But her positions at the company ensured that V. Shah would, as her spouse, share in the profits, and the arrangement also positioned him to exert his influence on Jaina's management and operations.

25.     I know from personal experience that Vipin Shah had a big stake in Jaina, for during the twice monthly or so visits I made to Jaina's 235 Hillside Avenue premises during the 2006 through 2008 period—premises which were also home to a convenience store and Subway franchise/deli owned and operated by V. Shah and M. Shah as part of their Neminath business— I would typically see V. Shah and M. Shah, and would discuss with them, among other things, Geo-Group's business with Jaina. And in 2015, when various attempts at settlements were made between Jaina and Geo-Group, V. Shah was involved in some of the negotiations.

*Surjit Bose*

26.     Surajit Bose was, with M. Shah, a cofounder of Jaina. He was a shareholder of the company, who, according to the information Jaina filed in its Form 499 disclosure with the Federal Communications Commission (the "FCC"), held the title "Hon. Project Manager & Developments (Implementation)" and was listed as a "Chairman or other Senior Officer," whereas M. Shah was listed as "Chief Executive Officer" and N. Shah as "President or other Senior Officer." (See Ex. D, V. Shah Dep. Ex. 8, FCC Form 499 Detailed Information, at GCI-2017 004284 & 4285; copy attached as Ex. F.)

27.     During the period 2006 through 2008, S. Bose falsely held himself out to me and other members of the public as Jaina's CEO, and Jaina held him out as CEO on its website, which has since been taken down.

28.     The Defendants acknowledge that Surjit Bose was never the Chief Executive Officer or President, and that M. Shah, a U.S. Citizen, held that title "on paper," allegedly because S. Bose was a Citizen of India who did not have resident alien status (but apparently had an L-1 Visa), and that some real or imagined law precluded him from serving as the Chief Executive Officer or President of Jaina.

29.     I understand that S. Bose is not living in the U.S. anymore, and he has not been named a party in this action. He was not named a party because based on my dealings with him, I had no reason to believe that he played a meaningful role in the defendants' efforts in this case to hinder, frustrate, and

delay Geo-Group's attempts to collect its judgment. If anything, he attempted to good faith to resolve the dispute with Geo-Group, but defendants M. Shah and R. Chopra deliberately and actively thwarted those attempts.

30.    All of the defendants have resorted to one or another version of the familiar, "It wasn't me, it was he or she" defense, especially when confronted with facts suggestive of fraudulent or other wrongful acts. Bose is generally the one blamed, but in a number of cases those accusations have been demonstrated to be objectively false.

31.    For example, M. Shah and his (now resigned) lawyer repeatedly claimed that it was S. Bose who made the wire transfers without the knowledge or consent of M. Shah and that M. Shah did not have the means to control him because he was the "CEO."   But at his deposition, M. Shah admitted that although in earlier years S. Bose was given authority to perform banking transactions, Jaina took that authority away from him no later than early 2013, a year or more before the transfers at issue in this case were made. (See Ex. C, M. Shah Tr. at 229-30.)

32.    At the time the transfers in this case were made, wire transfers and other banking transactions using Jaina's Citibank account were made online through a Citibusiness account. Those transactions could not be done without the use of a "fob"—i.e., a device often attached to a keychain that generates temporary, random passwords, which must be used to effect certain kinds of transactions, including transfers of money. (Ex. C, M. Shah Tr. at 228-

12

32, 240-41, 244, 246-47.)

33.     As of 2013 and 2014, when the transfers were made, Jaina only had two fobs: one which M. Shah used for banking transactions, and another which N. Shah held as a backup for "emergencies" if and when M. Shah was not around or if he lost or misplaced his own fob. (Ex. C, M. Shah Tr. at 228-32, 240-41, 244, 246-47.)

34.     M. Shah testified that when S. Bose wanted to transfer money, Bose would advise M. Shah, and M. Shah would typically ask to whom the transfer was being made, and then let S. Bose borrow the fob to make the transfer. He thus maintained the right to control each of the transfers, and, as a matter of speaking, by having control over the fob, he held the proverbial financial keys to the Jaina kingdom. (See Ex. C, M. Shah Tr. at 228-32, 240-41, 244, 246-47.)

35.     In his summary judgment papers M. Shah admits to having exercised his financial control over S. Bose very recently. Although at his deposition M. Shah testified that he had not spoken with S. Bose since 2015, he admitted in his summary judgment affidavit that S. Bose visited the 235 Hillside Avenue premises in May 2016, which Neminath now leases from Williston Park Realty LLC. According to M. Shah, "Bose returned in about May 2016 asking if he could take some computer hardware, so he could start a business with some other partner[,]" and that Bose "was upset M. Shah refused to hand over the requested computer hardware." (See Affidavit of M. Shah

dated December 7, 2017, ¶10, Dk. 208 at 3 of 10.)

36.    The so-called "computer hardware" M. Shah is referring to is
Jaina's telecommunications network, which consists not simply of hardware,
but a combination of hardware, software and an operating system that,
together, allow a business the expertise, wherewithal and desire, to conduct a
telecom business, which requires, among other things, the ability to interface
and connect with the switches of telecom carriers throughout the world. At his
deposition R. Chopra testified that he believes Jaina's telecom system would be
worth about $10,000,000.00 to a business that had had the ability and desire
to use it. The book value of this asset, according to Jaina's 2015 tax return, is
$0.00 (zero). (See Ex. M at Shah_Ds-000273, Jaina's 2015 tax return, Form
1120, Schedule L, Lines 10.a & 10.b.)

## DEFENDANTS RAVI CHOPRA AND NEW YORK CITY TELECOMMUNICATIONS CORP.

37.    Ravi Chopra is a Jaina insider who was constantly and continually
involved in Jaina's affairs, lent hundreds of thousands of dollars to the
company, arranged many highly questionable, transactions involving close
friends or business associates (which involved three or even four parties),
which he (and his friends and associates) claim are "loans," but which a jury
could conclude were designed to evade IRS or other financial-regulator or law-
enforcement scrutiny.

38.    Ravi Chopra is the sole owner and operator of New York City

Telecommunications Corp., which does business under the name "STI Phone Card Warehouse," and, as we discuss in our other summary judgment papers, he is the sole owner and operator of a number of other entities who do business under other names, including New York Main Street Consultants, Inc., a company that does business under the name of "STI Consultants."

39.     Chopra, executed as "an individual of STI Consultants]", the one-page loan purported agreement (the "Loan Agreement") with V. Shah, who signed the document as "an individual of Jaina Systems Network, Inc.[,]" even though V. Shah was never an officer or director or shareholder of Jaina.  (See Ex. G.)

40.     As stated in the Loan Agreement, Chopra, on behalf of STI Consultants II, "agree[d] to provide financial consulting service to Mr. Vipin Shah for financing through bank." In return, "Mr. Vipin Shah agree[d] to pay STI Consultants [II] 4% of the financing or loan amount provided to Jaina Systems Network Inc located at Hillside Ave, New York for the loan arranged by STI Consultants." (See Ex. G.)

41.     The Loan Agreement also stated that "Mr. Vipin Shah further agrees. .  .[t]o pay STI Consultants 4% of all subsequent additional financing or loan amount obtained from banks or financial institutions initially arranged to Mr. Vipin Shah for the Jaina Systems Network, Inc. located at Hillside Ave., New York." V. Shah further agreed that "[T]his is an exclusive loan agreement which is good for three years unless replaced by a separate agreement and any

changes of this agreement must be consent in writing signed by both parties."
(See Ex. G.)

42.     The Loan Agreement was effective March 21, 2012.

43.     It was pursuant to this Loan Agreement, that Chopra assisted V.
Shah in obtaining from Citibank a $1,000,000.00 line of credit for Jaina. As
discussed above, V. Shah obtained that loan for Jaina under false pretenses,
Chopra was involved in that transaction, and Chopra knew that V. Shah was
not an officer or director or shareholder of Jaina, let alone its President.

44.     M. Shah and V. Shah contend that they are potentially personally
liable to Chopra for $200,000.00. Chopra is himself a substantial, unsecured
creditor in the M. Shah and V. Shah bankruptcies.

45.     Whether these amounts reflect loans Chopra or entities owned and
controlled by Chopra made to Jaina or the Shahs for the use of Jaina, whether
they are commission debts on loans Chopra procured for Jaina from financial
institutions, or both, they are additional evidence of the extensive and close,
special relationship between Chopra, Jaina, Jaina's shareholders, and Jaina's
management. Irrespective of whether Chopra formally became a shareholder,
officer or director of Jaina, he invested much time and substantial funds in
working with M. Shah, V. Shah and S. Bose.

46.     Ravi contacted me in September 2014 to discuss settlement on
behalf of Jaina, and we had five meetings for that purpose. During those

16

meetings Ravi spoke with great authority, as one might for one's own company.

47.     Ravi made three offers to me at the second meeting, the third and highest being $1.6 million. I thought I had reached a deal with him for a $1.6 million settlement payment, but he reneged on that and told me the settlement would have to be on an instalment basis without any lump sum payment. That was unacceptable to me and despite our efforts we were unable to reach a compromise.

48.     I have a clear, and not particularly fond, memory of Chopra becoming angry with me when I would not accept what he was offering, he angrily exclaimed in a threatening voice: "You'll never get a penny out of this."

49.     At the time, and since then, it has struck me that there is no rational explanation for someone to become so emotionally involved in a settlement negotiation, and make a threat like that, unless the person has a significant personal or financial stake in the matter. That's a very fair inference to draw.

50.     Ravi and the Shah Defendants insist that R. Chopra never became a shareholder in the company, and S. Bose made the same statement in a December 2014 email, but there are circumstances that suggest otherwise. First, in one of S. Bose's emails, S. Bose explains that Frank Vella, left the company in 2011 and Jaina never paid him any "compensation or returns." (See Ex. H, S. Bose 12/28/2014 email to G. Vanjani at NYC CHOPRA 000325.)

That raises the question of what became of F. Vella's shares, a question none of the defendants has provided a meaningful answer, other than to state that F. Vella is still somehow a shareholder—that is, as if S. Bose never indicated otherwise in his December 28, 2014 email.

51.     Second, R. Chopra is in the Phone Card sector of the Telecom industry, is knowledgeable about it, and perhaps most importantly, is very interested in it. In his deposition testimony he testified almost animatedly about how great Jaina's telecom infrastructure was and how valuable he thinks it is.

52.     That he apparently wants to have a piece of that—even now—helps explain why he lent Jaina so much money, why he was so angry at me during the settlement negotiations, why he was even involved in the settlement negotiations in the first place, and why he went to such great lengths to hinder or delay Geo-Group's efforts to collect on the Award by having his spouse, Shalu Suri,  incorporate in New York a company named "Geo-Group Communications, Inc." to attempt to thwart Geo-Group's efforts to obtain a license to do business in New York.

53.     As respects why Geo-Group was attempting to obtain a license to do business in New York in the fall of 2014, Geo-Group had advised the New York confirmation court of its intent to do that as a way to neutralize Jaina's argument that somehow New York's so-called "door closing" statute barred Geo-Group, which was not licensed to do business in New York at the time

18

(and wasn't required to be), from confirming and enforcing an award in a New York court, even though the award arose out of a contract evidencing transactions in interstate commerce. And while ultimately Geo-Group was able to obtain a license to do business in New York, it had to do it under a fictitious name, and Chopra's and Shalu Suri's fraudulent ruse caused additional delay.

54.     Third, Internal Revenue Service ("IRS") Form 1120, Schedule K, line 4.b queries whether "any individual or estate own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote?" and states "If 'Yes,' complete Part II of Schedule G Form 1120[,]" which requires the taxpayer to identify each "individual or estate" that holds such ownership and voting interests in the company. (See Ex. I, Jaina's 2011 Tax Return, Form 1120, Schedule K., line 4.b at NYC-CHOPRA 000031; Ex. I, Jaina's 2011 Tax Return, Form 1120, Schedule G, Part II, at NYC-CHOPRA 000035; Ex. J, Jaina's 2012 Tax Return, Form 1120, Schedule K., line 4.b at NYC-CHOPRA 000047; Ex. J, Jaina's 2012 Tax Return, Form 1120, Schedule G, Part II, at NYC-CHOPRA 000051.)

55.     For the 2011 and 2012 tax years, Mahendra Shah signed tax returns answering "Yes" to the Schedule K, line 4.b query and identifying in Schedule G, Part II of those returns M. Shah, N. Shah, F. Vella, and S. Bose as individuals who "own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote[,]" and disclosed each of their ownership interests in Jaina to be

25%.

56.     But in its 2013, 2014, and 2015 tax returns, Jaina answered the Schedule K, line 4.b query "No," and by doing so, was able to evade its obligation to disclose the identity of the persons who had 20% or more of the total voting power of all classes of Jaina's stock. (See Exs. K, L, & M.)

57.     M. Shah's and the other defendants' continuing insistence that the ownership of Jaina did not change after 2012 is not only inconsistent with those 2013 through 2015 returns, but also irreconcilable with them. Even if the number and identity of the shareholders remained the same during that period, but there was a change in the allocation of voting rights, then the answer to the Schedule K, line 4.b query would have to be "Yes," as it was in 2011 and 2012. The only difference, if any, would be that fewer than four shareholders would need to be disclosed in Schedule G, Part II.

58.     Even apart from whether R. Chopra took over Frank Vella's shares in Jaina, R. Chopra's close, special relationship with Jaina would, I understand, confer insider status on him, irrespective of whether he was ever made an officer, director or shareholder of Jaina.

59.     While I won't here purport to provide an exhaustive discussion of why Chopra would be an insider irrespective of whether he was a shareholder, officer, or director, I note that V. Shah and M. Shah have both characterized Mr. Chopra as playing multiple, and important roles in his dealings with Jaina.

60.    V. Shah characterized him as a "broker, consultant and lender," who also happened to be in the Phone Card business, and who had done business with V. Shah, who has known him for many years. (See Ex. D, V. Shah Tr. at 72, 75, 76.) As M. Shah described Chopra's role at his deposition, "Chopra used to lend, he was a loan broker, lender, as well as consultant[]" (see Ex. C, M. Shah Tr. at 222-23), and in M. Shah's affidavit in support of his summary judgment motion, "Chopra was a lender, a finance broker and a negotiator for [Jaina]." (See Affidavit of M. Shah, sworn to December 7, 2017, ¶ 17, Dk. 208 at 4 of 10.)

61.    A person who played all those roles with respect to Jaina, and who had as close a relationship with the company as Chopra had, could easily be said to have a special relationship with the company.

### THE DISPUTE BETWEEN GEO-GROUP AND JAINA

62.    On or about September 26, 2006 Geo-Group and Jaina entered into a Telecommunications Service Agreement (the "Telecommunications Agreement"), which governed the commercial and legal relationship between them. The Telecommunications Agreement contained a broad arbitration agreement (the "Arbitration Agreement"). (A copy of the Telecommunications Agreement is attached as Exhibit N; the Arbitration Agreement is Section 6 of Telecommunications Agreement.)

*Purchase and Sale of Minutes under the Telecommunications Agreement*

63.    As contemplated by the Telecommunications Agreement, during the period December 2006 and September 2008, Geo-Group purchased minutes—that is, telephone time—from Qwest Communications Corp. ("Qwest"), a publicly-held, Delaware corporation which, in industry parlance, was referred to as a "tier 1" carrier. These purchases were made for purposes of resale to Jaina.

64.    During most or all this December 2006 through September 2008 period, Geo-Group streamlined the mechanics of distributing the minutes by arranging for Jaina to connect directly to Qwest's telecom switch facilities so that purchased minutes could be transmitted directly from Qwest to Jaina, without the need to route the minutes through Geo-Group.

65.    That direct arrangement had two consequences. First, records of time were (and could be) maintained only by Jaina and Qwest, not Geo-Group. Second, Geo-Group paid Qwest for the minutes based on Qwest's records of the time transmitted, and Jaina paid Geo-Group based on Jaina's records of time received.

*Billing and Payment under the Telecommunications Agreement*

66.    Geo-Group began billing Jaina for time obtained from Qwest on behalf of Jaina on February 15, 2007, for charges incurred in December 2006. GCI sent to Jaina additional bills on February 17, 2007 (for charges incurred in

January 2007), and on March 8, 2007, for charges incurred in February 2007.

67.     Jaina paid $140,000.00 to Geo-Group in March 2007, representing its first payment under the Telecommunications Agreement. Subsequently, Geo-Group submitted billings on a monthly basis, and Jaina made monthly payments, which generated a revolving account.

68.     Jaina's monthly payments were only partial payments, and as a consequence, the account was in arrears each month. The largest balance due was $1,654,357.04, which was shown on the May 1, 2008 bill. (See July 10, 2014 Arbitration Award at 3; a copy of the July 10, 2014 Arbitration Award (the "Award") is attached as Ex. O.)

69.     Geo-Group submitted its final bill on October 1, 2008. While as of October 1, 2008 Jaina had paid more than $10,000,000.00 on the revolving account, the October 1, 2008 final invoice nevertheless showed a balance due and owing Geo-Group in the amount of $1,507,922.96. (See Ex. O., Award at 3.)

*Disputes Arise between Geo-Group and Qwest, which are Submitted to Arbitration, and the Geo-Group v. Qwest Arbitrator Rules in Favor of Qwest*

70.     At or around the same time, billing disputes arose between Geo-Group and Qwest, which ultimately resulted in Geo-Group refusing to pay Qwest's invoices in July, August and September 2008. Qwest accordingly terminated its business relationship with Geo-Group, and Geo-Group, its

source of minutes gone, could not continue to provide services to Jaina under the Telecommunications Agreement.

71.     The dispute between GCI and Qwest was submitted to arbitration. Qwest sought as damages the amount set forth in its disputed invoices and Geo-Group claimed that the invoices were not accurate because of accounting errors concerning certain discounts Geo-Group was supposed to receive.

72.     Geo-Group lost the arbitration with Qwest. While JAMS arbitrator Mr. Davidson observed that there were "significant, pervasive and continuing errors in Qwest's billing" related principally to its difficulty calculating discounts, he nevertheless concluded that Qwest's "final tally ... was substantially accurate." (See Ex. O, Award at 4.)

*Jaina Acknowledges in Writing that Jaina owes Geo-Group $1,249,654.00*

73.     Beginning on December 16, 2010, S. Bose, holding himself out as Jaina's Chief Executive Officer, forwarded to me several email communications evidencing Jaina's acknowledgment of the existence of a sum certain of undisputed debt Jaina owes to Geo-Group.

74.     An email dated December 16, 2010 from Jaina to Geo-Group, which was also copied to Defendant V. Shah, provides: "This is to acknowledge that Jaina owes $1,249,654.00 from (sic) [Geo-Group] and we will start paying from Jan. 2011. It will be paid in installments." (See Ex. O, Award at 4; a copy of S. Bose's December 16, 2010 email is attached as Ex. P.) On December 20,

24

2010, I forwarded wire instructions to Jaina, and Bose emailed me again, thanking him for a loan I made to Jaina of $150,000.

75.     On March 7, 2011, after Geo-Group lost its arbitration with Qwest, and after not receiving Jaina's previously promised instalment payments of undisputed balances, I emailed S. Bose once again, stating: "[Geo-Group] will have to pay Qwest $9.2 million. You had suggested that Jaina will start paying from Jan onward toward that payment? How should we handle this issue too as this will become hard for me? Let's discuss at your earliest convenience?" (See Ex. O, Award at 4; a copy of my March 7, 2011 email to Bose is attached as Ex. Q.)

76.     On August 31, 2011, after I met with Bose concerning overdue balances, S. Bose sent me an email stating: "Honestly I need a little bit more time. As I said we acknowledge the payable so please give me more time so that I put everything in a proper way as we will make a settlement agreement." (See Ex. O, at R. 48-49)

77.     On September 26, 2011, S. Bose informed me by email that: "This is what I propose formally for your approval. Jaina Systems Network Inc. acknowledges that they owe GCI $1,250,000 (sic) since Sept 2008.  .  .  .  Jaina fully intends to pay this obligation as follows. Stocks: Jaina intends to do IPO in the 1st Qtr. 2012 in India and will issue shares equivalent to $2,250,000 to [Geo-Group] or its nominee. Alternately if Jaina is not successful in doing IPO or [Geo-Group] doesn't get Its valuation or Jaina changes its intention to do

IPO, then Jaina will repay by 31st Dec 2012. Jaina is agreeable to put this in a formal agreement." (See Ex. O, Award at 5.)

78.     But despite Jaina's repeated promises to pay and its written acknowledgement of debt, it made no payments. (See Ex. O, Award at 6.)

*Geo-Group Demands Arbitration*

79.     On May 30, 2013 Geo-Group demanded, under the auspices of JAMS, arbitration against Jaina, seeking, among other relief, damages in the amount of $1,507,922.96, that is, the full amount of Geo-Group's October 2008 final invoice. (A copy of Geo-Group's Arbitration Demand is attached as Ex. Q.) JAMS appointed Hon. William I. Cowin (ret.), a retired former Massachusetts Appeals Court judge (the "Arbitrator"), to serve as the arbitrator.

80.     On January 22, 2014 the Arbitrator held a telephonce conference with the parties concerning case management. Geo-Group had just hired new counsel, Norman Solovay of the Solovay Law Practice. (The Solovay Law Practice is co-counsel with Loree & Loree in this case.)

81.     On or about February 13, 2014 Geo-Group made a motion for partial summary judgment (the "Dispositive Motion"). Geo-Group's Dispositive Motion sought an award in the principal amount of $1,507,922.96, which was the principal amount of the Award it sought in its arbitration demand and corresponded to the amount sought by Geo-Group's final October 2008 invoice.

82.    On July 10, 2014 the Arbitrator granted Geo-Group's "motion for summary disposition in part, and award[ed] [Geo-Group] the principal sum of $1,249, 654." (See Ex. O, Award.) The Arbitrator found, based on the email correspondence between Vanjani and Bose, that the undisputed amount was $1,249, 654, not the $1,507,922.96 balance due set forth in Geo-Group's October 2008 final invoice. (See Ex. O.) The Award also required Jaina to pay Geo-Group interest at the rate of one-percent (1%) per month, compounded monthly from October 8, 2008, the date of Jaina's breach of contract.

83.    The Award gave Geo-Group the option to accept the award as a final disposition of the matter or allow the award to be held in abeyance pending Geo-Group's prosecution of the additional claims it sought to add to its Arbitration Demand.

84.    Geo-Group opted to consent to the immediate entry of a final award in the lesser, undisputed principal amount of $1,249,654 rather than risk further delay in a bid to obtain the nearly $800,000 in additional damages to which it believed it was also entitled.

*Geo-Group Moves to Confirm the Award*
*and Jaina Moves to Vacate It*

85.    On or about July 16, 2014 Geo-Group commenced a special proceeding in New York Supreme Court, New York County, to confirm the Award.

86.    In the meantime, Jaina retained Attorney Joseph P. Goldberg, Esq.

of Hodgson Russ LLP to assist Attorney Edward Troy, Esq., Jaina's arbitration counsel, in making three failed attempts to overturn the Award: (a) a motion for reconsideration, which was made on July 24 and August 8, 2014, and denied on August 18, 2014; (b) a motion made to JAMS, the arbitration provider, to disqualify the Arbitrator, made on September 2, 2014 and denied on September 24, 2014; and (c) a motion to vacate the Award under Article 7511 of the CPLR, which was made on September 5, 2015 and denied by the court below on December 2, 2014. (Copies of the decisions denying each of these applications are attached as Exs. R, S, & T.)

87.    On October 15, 2014, the Court in the confirmation proceeding held oral argument on the parties' competing motions to confirm and vacate the Award. (A copy of the October 15, 2014 Oral Argument Transcript is attached as Ex. U.)

88.    On December 8, 2014 the Court in the confirmation proceeding entered an Order granting Geo-Group's motion to confirm the Award and denying Jaina's motion to vacate. (See Ex. V.)

89.    The Court in the confirmation proceeding entered Judgment on April 3, 2015, a copy of which is attached as Ex. W.

90.    The Judgment awarded Geo-Group $2,712,175.51, which represents: (a) the $1,249,654 principal sum; plus (b) pre-judgment interest in the amount of $1,461,986.51; plus (c) $535.00 in costs and disbursements.

(See Ex. W.)

91.     Jaina failed and refused to satisfy the judgment, and Geo-Group seeks in this litigation to recover from M. Shah, V. Shah, Chopra, and New York City Telecommunications Corp. the amount necessary to satisfy the judgment (including the post-judgment interest that has been accruing since the Judgment was entered). I understand that, as of January 22, 2018, the value of the judgment, including post-judgment interest is $3,388,956.18.

92.     Jaina also unsuccessfully attempted to appeal the Judgment, but on November 29, 2016 the Appellate Division, First Department affirmed the Judgment. *See Matter of Geo-Group Communications, Inc. v. Jaina Systems Network, Inc.*, 144 A.D.3d 598 (2016). Jaina never sought to obtain to leave to appeal to the New York Court of Appeals, and I understand that the time to do so has expired.

93.     Jaina never paid any portion of the Judgment, and as of April 26, 2017 the amount required to satisfy the Judgment, including post-judgment interest, is $3,216,417.24.

MAHENDRA AND VIPIN SHAH TORPEDOES. BOSE'S ATTEMPT TO SETTLE
JAINA'S LIABILITY

94.     On or about December 22, 2014, shortly after the New York Supreme Court made its Order confirming the Award, S. Bose contacted me to discuss settlement. Before December 22, 2014, I had engaged in settlement

negotiations with R. Chopra, and with V. Shah and M. Shah.

95.     S. Bose made three proposals in a December 28, 2014 email, a copy of which is attached as Ex. X.

96.     On behalf of Geo-Group I accepted one of those three proposals, which involved a settlement and forbearance agreement. The Solovay Practice, drafted a settlement and forbearance agreement, which S. Bose did not sign, because he wanted to have his attorney review it first.

97.     S. Bose requested that the draft agreement be modified before his attorney, Akhilesh Krishna reviewed it, and Geo-Group offered to have the Solovay Practice do that to save S. Bose money, and S. Bose accepted that offer.

98.     The Solovay Practice drafted the agreement and on January 21, 2015 I sent it to Mr. Bose and cc'd it to Mr. Krishna.

99.     On January 23, 2015, S. Bose called and confirmed that he would send Geo-Group some proposed changes to the agreement but wanted me to meet with his partners. I responded by inquiring as to the purpose of this meeting as we had reached an agreement on settlement.

100.    S. Bose called me on January 24, 2014 saying he would call me in about an hour to schedule a time for his partners and their attorney to meet with me and my attorney in New York.

101.   I did not receive the promised call, and on January 25, 2015 I emailed S. Bose to confirm what had transpired and to express some frustration with how settlement negotiations were proceeding. (A copy of my January 25, 2015 e mail to S. Bose is attached as Ex. Y.)

102.   Ultimately S. Bose cancelled the meeting and called me to communicate that M. Shah had threatened to cut off the power if S. Bose were to sign the agreement. As Jaina rented space from Neminath at the Neminath owned and controlled 235 Hillside Avenue premises, that was no idle threat. That would have shut down Jaina's extensive telecom network, rendering it unable to transact any business, and S. Bose's proposal was designed to allow Jania to continue to do business.

103.   At M. Shah's deposition I had a person-to-person discussion with M. Shah, which both parties knew was on the record, and which is excerpted below. It shows that M. Shah admitted that he frustrated the settlement, and did not contest my assertion that he did so by threatening to cut off Jaina's power:

> [MR. VANJANI:]....You talked to him. And it is very clear.
>
> And we had settled the amount. Because I gave him [S. Bose] carte blanche. And I had given the carte blanche to Ravi also when he was negotiating with me. I said, Listen, you tell me what is the settlement amount, you give me the details, you write it, and I'll get it approved from my shareholders. He did it. And then he went back to you guys, and this is what he -- see, this is what he told me. Okay. Now, what is true and what is not true, the person has to be there. And what he told me, that you guys didn't wanted to do that and you threatened him. As a matter of fact, those are his

words, that he -- you personally threatened him that if he signed that deal, you will shut off the power to him.....

....

THE DEPONENT [M. Shah]: ....And, yes, you did go offer the settlement offer, and he came with that, $1.5 million right in front. Where is the money? There is no money left.

MR. VANJANI: Okay. Mr. Mahendra, that settlement offer was from him, not from me.

THE DEPONENT: But that's what I'm trying to tell you. He wasn't thinking practically. He destroyed me and my brother, and still he want to pay 1.5. I don't know where he's going to get the money from.

MR. VANJANI: So if he's going to get and if he is the one who is arranging all that thing, what difference does it make to you? But why would you stop him?

THE DEPONENT: I stopped because I know that, you know, we going to -- then we going to get into deport because I was on the paper the president. He kept telling me. And, you know, I don't want to be liable for that.

....

(Ex. C, M. Shah Tr. at 262, 273-74.)

TRANSFERS TO DEFENDANT V. SHAH

104.   During the period from the commencement of the Arbitration through June 2014, Jaina's Citibank statements covering the period June 5, 2013 through December 26, 2014 show that Jaina made the following payments to Defendant V. Shah in the following amounts and on the following dates:

| | Amount of Transfer | Date of Transfer |
|---|---|---|
| | $4,400.00 | 6/5/2013 |
| | $4,400.00 | 7/5/2013 |
| | $2,700.00 | 7/22/2013 |
| | $18,699.00 | 7/29/2013 |
| | $4,400.00 | 8/2/2013 |

| | | |
|---|---:|---|
| | $10,000.00 | 8/23/2013 |
| | $4,400.00 | 9/4/2013 |
| | $4,400.00 | 10/2/2013 |
| | $4,400.00 | 11/6/2013 |
| | $15,000.00 | 11/26/2013 |
| | $62,000.00 | 11/27/2013 |
| | $4,400.00 | 12/6/2013 |
| | $10,000.00 | 12/13/2013 |
| | $34,000.00 | 12/20/2013 |
| | $41,000.00 | 12/26/2013 |
| | $4,400.00 | 1/6/2014 |
| | $71,000.00 | 1/7/2014 |
| | $5,000.00 | 1/10/2014 |
| | $18,904.00 | 1/30/2014 |
| | $4,400.00 | 2/4/2014 |
| | $3,900.00 | 2/7/2014 |
| | $4,400.00 | 3/4/2014 |
| | $50,000.00 | 3/19/2014 |
| | $4,400.00 | 4/4/2014 |
| | $42,000.00 | 4/7/2014 |
| | $10,000.00 | 5/2/2014 |
| | $4,400.00 | 5/5/2014 |
| | $8,000.00 | 5/5/2014 |
| | $4,400.00 | 6/5/2014 |
| | $30,000.00 | 6/6/2014 |
| | $35,000.00 | 6/11/2014 |
| | $4,400.00 | 7/3/2014 |
| | $42,000.00 | 7/10/2014 |
| | $5,000.00 | 7/16/2014 |
| | $18,000.00 | 7/21/2014 |
| | $4,400.00 | 8/6/2014 |
| | $50,000.00 | 8/6/2014 |
| | $4,400.00 | 10/7/2014 |
| | $5,000.00 | 10/8/2014 |
| | $28,000.00 | 11/26/2014 |
| **Total:** | **$685,603.00** | |

(Copies of Jaina's 2013 and 2014 Citibank statements are attached at Exs. CC & Z.)

33

105.   In Geo-Group's Third Amended Complaint (the "TAC") (Dk. 105 at ¶ 59), we believed that the total amount transferred by Jaina to Vipin by wire was $760,603.00 because our chart contained two inaccurate entries – one indicating a $30,000.00 transfer had taken place on December 20, 2014, and the other showing a $41,000.00 transfer had taken place on December 26, 2014.

106.   We have determined, however, that those two entries were erroneous.  While the bank statements show that transfers in those amounts occurred on December 20, 2013 and on December 26,2013, a fact reflected in the chart that appears in paragraph 59 of the TAC, transfers from Jaina to V. Shah in those amounts (or any other amount) did not occur on December 20, 2014 and December 26, 2014, and they do not appear in revised chart, above.

107.   But as it turns out, discovery has shown that Jaina made, by checks signed by M. Shah, additional payments to V. Shah in the amount of at least $140,079.00. M. Shah produced Citibank Bank statements for 2014 that evidence that Jaina paid a total of $ $848,183.68 in checks in 2014. Copies of those banks statements (from which Geo-Group has redacted information only where required by law) are attached as Ex. Z and are Bates Numbered Shah_Ds-000151 – 208.

108.   Jaina did not make any payments by check in 2014 until June of that year and the amount of those payments spiked during the period from July through November 2014, that is, the period during which the Arbitration

Award was made (July 10, 2014), the Confirmation Proceeding was commenced (July 20, 2014), Jaina was aggressively challenging the Award, Chopra was conducting settlement negotiations on behalf of Jaina, and Chopra's spouse Shalu Suri incorporated a company named Geo-Group Communications, Inc., which she licensed with the New York Secretary of State in an attempt orchestrated by Chopra to impair the enforcement of the Award.

109.   The following chart (Figure 1), prepared from the underlying data I analyzed, indicates the amounts of payments by check made by Jaina in 2014 and the bank statement periods in which Citibank paid those checks. It also contains Bates Stamp references showing where the data supporting the numbers in the chart appears in the 2014 Citibank bank statements statements produced by M. Shah, copies of which are attached as Ex. Z:

| Bank Statement Period | Total Checks Paid that Period | Bates Stamp Reference |
|---|---|---|
| January 1, 2014 through June 6, 2014 | $ - | Shah_Ds-000151-Shah_Ds-000173 |
| June 7, 2014 to July 8, 2014 | $ 69,490.00 | Shah_Ds-000178 |
| July 9, 2014 - August 7, 2014 | $ 73,846.67 | Shah_Ds-000182 |
| August 8, 2014 - September 8, 2014 | $ 143,705.42 | Shah_Ds-000186 |
| September 9, 2014 - October 7, 2014 | $ 280,210.73 | Shah_Ds-000190 |
| October 8, 2014 - November 7, 2014 | $ 213,516.64 | Shah_Ds-000194 |
| November 8, 2014 - December 5, 2014 | $ 57,035.47 | Shah_Ds-000204 |
| December 6, 2014 through December 31, 2014 | $ 10,378.75 | Shah_Ds-000206 |
| TOTAL: | $ 848,183.68 | |

**Figure 1**
**Certification of Govind Vanjani**

110.   Only one of the Citibank statements M. Shah produced, the October 8, 2014 through November 7, 2014 statement, contains images of the Jaina checks paid during that period, and the Citibank statements do not otherwise list the names of check payees. (See Ex. Z at Shah_Ds-000197-200.)

111.   Using the imaged checks, I determined that $140,079.00 out of the $213,516.64 total amount of checks paid during the October 8, 2014 through November 7, 2014 period were paid to V. Shah. Put differently, approximately 66% (roughly, two-thirds) of the total funds paid by check were paid to M. Shah's brother, Jaina insider V. Shah. If that percentage holds true for all the checks, then, in addition to the $685,603.00 Jaina wired to V. Shah, M. Shah

36

paid him an additional sum of approximately $559,801.00, that is, approximately $1,320,404.00.

112.   But even without copies of all the 2014 imaged checks, the evidence shows—without the need for extrapolation— that, in addition to the $685,603.00 Jaina transferred to V. Shah during the period paid V. Shah at least $140,079.00 by check, making the total amount transferred to V. Shah $825,682.00.

113.   Vipin, an insider, contends in his summary judgment papers that the payments he received were repayment of money he loaned to Jaina, and, as I understand it, that contention, even if true, doesn't (or at least shouldn't) advance his case, let alone give him grounds for moving for summary judgment. But even if it might help his case, the record doesn't support it.

114.   None of these "loans" is evidenced by a loan agreement, note or other written contract or instrument.

115.   None is listed on Jaina's tax returns. For example, V. Shah testified that as 2010, Jaina owed him about $650,000.00.

116.   In Jaina's 2011 return, Jaina was required to disclose to the IRS on Form 1120, Schedule L, line 20, its beginning and end of the tax year liabilities for "Mortgages, notes, bonds payable in 1 year or more." It listed as of the beginning of the tax year liabilities in the amount of $730,746, and a schedule attached to the return itemized those liabilities, which consisted of

two loans from "GE" and one from Ambe Sports Card, Inc. The return also shows that the Ambe Sports Card, Inc. loan as reduced from $501,000.00 to $348,731.00 by year end.  (See Ex. I, Jania's 2011 Tax Return, at NYC-CHOPRA 000033 & NYC-CHOPRA 000044).

117.   Schedule L, Line 17 of the return requires disclosure of "Mortgages, notes, bonds payable in less than 1 year," but no liabilities were listed there, let alone itemized. (See Ex. I at NYC-CHOPRA 000033.)

118.   Schedule L, Line 18, required disclosure of "Other current liabilities" and indicated that a schedule should be attached. There, Jaina stated that its beginning-of-the-year current liabilities were $189,118.00, which were reduced to $168,997.00 by year end. (See Ex. I at NYC-CHOPRA 000033.)

119.   Jaina also attached the required "Ln 18 Stmt" schedule. (See Ex. I at NYC-CHOPRA 000042.) The schedule disclosed a "Loan Payable – Govind," an interest-free loan in the amount of $150,000.00 I made on behalf of Geo-Group to Jaina in 2011, while I was working with S. Bose to attempt to resolve the Geo-Group - Jaina billing dispute. The schedule also showed that, as of the end of 2011, nothing was owed on that loan. (See Ex. I at NYC-CHOPRA 000042.)

120.   The "Ln 18 Stmt" also listed that, as of year-end, there was a $25,000.00 amount owed as "Loans to Officer," and a $108,850.00 amount

owed for "Loans from Officer-MS & NS," that is, Mahendra Shah and Nayana Shah. (See Ex. I at NYC-CHOPRA 000042.)

121.    Jaina was required to disclose liabilities that were on their books as at the beginning and end of the tax year, but the $650,000.00 in "loans" Jaina allegedly owed V. Shah as of 2010 is not listed in the 2011 tax returns, even though other loans – such as the one I made to Jaina—were listed.

122.    Vipin testified that the amount of money he loaned Jaina increased over the years. In Jaina's 2012 Tax Returns, the "Ln 18 Stmt" lists a decrease in "Loans from Officer" from $25,000.00 to $10,000.00, but an increase in "Loans from Officer – M.S. & N.S." from $108,850.00 to $796,740.00. (See Ex. J, Jaina's 2012 Tax Return at NYC-CHOPRA 000058.)

123.    In addition, the Ln 18 Stmt lists a slew of new loans made by the following individuals: Gaurav Sharma; Rakesh Sanghavi; Dilip Mehta; Rupa S. Shah; Bipin Shah; Samarth; Sachin; Kamlesh; and Ketan Shah, as well as a Loan from "John Bricks, Inc." Other listed current liabilities are "Employee Loan;" "Infrastructure Payable;" "Insurance Payable;" and "AlanticCommunications Product." (See Ex. J at NYC-CHOPRA 000058.)

124.    These Schedule L, Line 18 liabilities totaled $1,587,637, but nowhere was there any reference to any loans made by Vipin Shah. (See Ex. J at NYC-CHOPRA 000058.)

125.    The only liabilities of the magnitude that V. Shah describes would

be reflected in loans that Jaina made to his V. Shah's spouse and Mahendra Shah, collectively.

126.   Meanwhile, the supporting statement for Jaina's 2012 Schedule L, line 20 liabilities states that Jaina had incurred during 2012 a liability to Citibank in the amount of $929,000.00—a reference to the $1 million line of credit Jaina insiders Chopra and Vipin obtained in 2012—and that the $348,731.00 loan from Ambe Sports Cards, Inc. had been paid down to $182,177.00. See Ex. I at NYC-CHOPRA 000059.)

127.   As for the 2013 tax year, Jaina listed its beginning of the year Schedule L, line 20 liabilities to be $1,111,177, that is, the sum of the year-end 2012 Citibank line of credit liability of $929,000.00 and the $182,177.00 left on the Ambe Sports Card, Inc. loan. (See Jaina's 2013 Tax Return, Ex. K at Shah_Ds-000234.) As of year-end 2013, that $1,111,177.00 is shown to be decreased by $120,397.00 to $990,780.00.

128.   In the 2013 return the Schedule L, Line 18 liabilities increased from $1,587,637.00 to $3,368,795.00, but unlike the Line 18 statements provided for 2011 and 2012, the 2013 statement did not itemize those liabilities – it simply identified them as "Loans from Officers & Others." (See Ex. K at Shah_Ds-000241.) No schedule itemizing the Schedule L, Line 20 Liabilities was included in the return,

129.   Jaina's 2014 return shows a $314,544.00 decrease in the amount

of Schedule L, Line 18 liabilities, that is, from $3,368,795.00 to $3,054,251.00.
(See Ex. L, Jaina's 2014 Tax Return, at NYC-CHOPRA 000379.)

130.   Unlike any of the prior returns, the 2014 return (which was
produced by both Chopra and the Shah Defendants) does not contain any
schedules itemizing any liabilities, even though Form 1120 specifically requires
such a schedule to be submitted with the return.

131.   We have asked Defendant Chopra, Chopra's counsel, the Shah
Defendants, and the Shah Defendant's former counsel, Anil Arora about this
and other schedules required to be submitted with the 2014 and 2015 tax
returns that are mysteriously missing from the Defendants' document
productions. A letter Philip J. Loree Jr. sent to Anil Arora on January 5, 2017
(copy attached as Ex. AA), summarizes these missing materials in a chart
attached to the letter and demands their production. All the defendants claim
to have produced complete copies of all the returns and have no meaningful
explanation for these significant deficiencies.

132.   Jaina's 2014 return also shows a $294,414.00 decrease in the
amount of Schedule L, Line 20 liabilities ("Mortgages, notes, bonds payable in 1
year or more") from $990,780.00 to $696,366.00. As in 2013, no schedule is
included with the return that purports to itemize these liabilities. (See Ex. L.)

133.   Nothing in the 2014 return suggests that Jaina accounted for the
Arbitration Award as a liability, even though it was made on July 10, 2014.

(See Ex. L.)

134.   Jaina's 2015 return, like its 2014 return, contains no schedules itemizing Line 18 liabilities, or anything else. It shows that Line 18 liabilities increased by $175,413.00, that is from $3,054,251.00 to $3,229,664.00. It also shows that its Line 20 liabilities did not increase or decrease during 2015, remaining at $696,366.00 at year-end 2015. (See Ex. M.)

135.   Nothing in the 2015 return suggests that Jaina accounted for the Judgment entered in April 2015 as a liability. (See Ex. M.)

136.   And nothing in the either of those returns lends any support to V. Shah's claim that Jaina owed him the $1,990,200.00 to $2,500,000.00 amounts that he has asserted Jaina owes him.

### JAINA'S TAX AND BANK STATEMENTS EVIDENCE THAT $4,231,993 IN CASH IS UNACCOUNTED FOR

137.   Using the data set forth in Jaina's 2014 Tax Return (copy attached as Ex. L), and their Capital One and Citibank bank statements for 2014 (copies annexed at Exs. CC & EE), Geo-Group has determined that there is at least $4,231,993.00 in cash that Jaina has not accounted for. (As set forth in Schedule K of its 2014 return, Jaina prepared its tax returns on an accrual basis (see Ex. L at NYC-CHOPRA 000377.)

138.   The analysis we used to reach that conclusion uses three key numbers:

42

    a.   Jaina's Sales for the 2014 Tax Year (less returns and allowance), as reported on its 2014 return, Form 1120, Line 1.c;

    b.   The Change in Receivables, which is the difference between (1) accounts receivable as reported at the beginning of Tax Year 2014 (Form 1120, Schedule L, Line 2.a(a)) and (2) accounts receivable as reported at the end of Tax Year (Form 1120, Schedule L, Line 2.a (c)); and

    c.   The total amount of money deposited into Jaina's Citibank and Capital One accounts during the 2014 Tax Year.

139.   Jaina's Total Gross Sales for 2014, according to its 2014 Tax Return is $39,044,012.00. (See Ex. L at NYC-CHOPRA 000375.)

140.   The Change in Receivables is $4,526,981.00 ($6,740,198 – $2,213,217.00). (See Ex. L at NYC-CHOPRA 000379.)

141.   I have added up all of the deposits shown in Jaina's 2014 Citibank bank statements (copies of which are attached as Ex. Z) and in Jaina's 2014 Capital One bank statements (copies of which are attached as Ex. BB).

142.   As reflected in the chart below, the total amount of money deposited into Jaina's Citibank and Capital One accounts during the 2014 Tax Year was $39,339,000.00:

| | | |
|---|---|---|
| Citibank Bank Deposits (Credits) | $ | 36,326,000.00 |
| Citibank Withdrawals (Debits) | $ | (36,338,000.00) |
| Difference between Citibank Deposits and Withdrawals | $ | (12,000.00) |
| Capital One Bank Deposits (Credits) | $ | 3,013,000.00 |
| Capital One Bank Withdrawals (Debits) | $ | (3,011,000.00) |
| Difference between Capital One Deposits and Withdrawals | $ | 2,000.00 |
| Total Bank Credits | $ | 39,339,000.00 |
| Total Bank Debits | $ | (39,349,000.00) |

143.   The total amount of cash Jaina should have received, as reflected on its 2014 Tax Returns, is the sum of the Jaina's Tax Year 2014 Sales ($39,044,012.00) and the Change in Receivables ($4,526,981.00) or $43,570,993.00.

144.   The reason the Change in Receivables is added to Sales is because where, as here, the receivable at the end of the year is less than that of the beginning of the year, and where, as here, Jaina's tax returns do not indicate any allowance for bad debt (Schedule L, Line 2.b), Jaina must have received cash in an amount equal to the decrease in the receivable. Otherwise there would be no reason for the receivable to decrease.

145.   Here, the total amount of bank deposits is less than the total amount of cash Jaina received.

146.   The difference between the total amount of cash Jaina received ($43,570,993.00) and the total amount of bank deposits ($39,339,000.00) is $4,231,993.00.

147.   This $4,231,993.00 is not accounted for anywhere in the tax returns. In the circumstances, we believe that it represents cash stolen by the defendants from Jaina during 2014. It also represents an amount in addition to the amounts Geo-Group believes were fraudulently transferred. Those amounts were transfers from money in Jaina's banks; here, by contrast, the money was never deposited in Jaina's bank accounts.

EVEN IF DEFENDANTS' CONTENTIONS THAT THE 2014 TRANSFERS THAT IT CLAIMS WERE REPAYMENTS OF LOANS MADE TO JAINA IN 2014 WERE CORRECT, THEN THE AMOUNT OF UNACCOUNTED FOR CASH WOULD INCREASE TO $6,814,811

148.   Defendants contend that the transfers were for discharge of antecedent debt, which, even if true, doesn't necessarily mean that they were not fraudulent transfers, a point we are covering in other papers in opposition to the motion.

149.   In a number of cases, defendants are contending that the transfers were repayment in 2014 in whole or in part of loans made to Jaina in 2014. The chart below summarizes the alleged loans we have determined fall into that category:

**[Remainder of Page Intentionally Left Blank]**

| Date | Alleged Creditor | Amount of Alleged Loan |
|---|---|---|
| January 8, 2014 | New York Main Street Consultants | $ 100,000.00 |
| January 22, 2014 | TD Time Inc. | $ 102,500.00 |
| January 29, 2014 | TD Time Inc. | $ 211,500.00 |
| March 28, 2014 | Surinder Malhotra | $ 250,000.00 |
| April 25, 2014 | Vision Impex Ltd | $ 249,100.00 |
| May 9, 2014 | Vision Impex Ltd | $ 201,450.00 |
| May 22, 2014 | Vision Impex Ltd | $ 198,500.00 |
| May 29, 2014 | Surinder Malhotra | $ 200,000.00 |
| August 13, 2014 | Vision Impex Ltd | $ 50,000.00 |
| August 22, 2014 | Vision Impex Ltd | $ 49,220.00 |
| September 23, 2014 | Vision Impex Ltd | $ 190,200.00 |
| October 16, 2014 | Vision Impex Ltd | $ 102,500.00 |
| October 22, 2014 | Gopaldas S. Parikh | $ 22,000.00 |
| October 23, 2014 | Dhamika Parikh | $ 18,000.00 |
| October 23, 2014 | Tricom | $ 182,500.00 |
| October 30, 2014 | Dhamika Parikh | $ 8,000.00 |
| October 30, 2014 | Tricom | $ 148,500.00 |
| November 3, 2014 | Vision Impex Ltd | $ 105,600.00 |
| November 24, 2014 | Jitendra Kumar | $ 100,000.00 |
| December 12, 2014 | Vision Impex Ltd | $ 50,000.00 |
| December 15, 2014 | Vision Impex Ltd | $ 43,248.00 |
| | **TOTAL: $** | **2,582,818.00** |

150.   To reach that conclusion I added Jaina's Sales ($39,044,012.00) to the Change in Receivables ($4,526,981.00) and added to that the $2,582,818.00 in loans, all of which amounts should have been deposited in Jaina's bank accounts. The sum of those amounts is $46,153,811.00.

151.   I then calculated the difference between that $46,153,811.00 sum

and Jaina's bank deposits for 2014 ($39,339,000.00), which I determined to be $6,814,811.00

152.   That sum represents the amount of money that should have been deposited into Jaina's bank account in 2014 if loans to Jaina in the amount of $2,582,818.00 were made to Jaina in 2014.

153.   Like the $4,526,981 shortfall discussed above earlier, this $6,814,811.00 shortfall represents amounts that Jaina should have deposited, but did not, and would be in addition to any amounts fraudulently transferred in 2014 from Jaina's bank accounts.

# [Remainder of Page Intentionally Left Blank]

154.  Pursuant to 28 U.S.C. § 1746, I certify and state, under penalty of perjury under the laws of the United States of America, that the forgoing is true and correct.

Executed on:  January 24, 2018
Danbury, Connecticut

Govind Vanjani

49