UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

GEO-GROUP COMMUNICATIONS, INC.,

                             Plaintiff,                          Index No. 15-cv-01756 (KPF)

-v.-

RAVI CHOPRA; MAHENDRA SHAH; VIPIN
SHAH; 728 MELVILLE PETRO LLC; KEDIS
ENTERPRISES LLC; JMVD HILLSIDE LLC;
NYC TELECOMMUNICATIONS CORP.; and
SHALU SURI,

                             Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**PLAINTIFF GEO-GROUP'S COMBINED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Philip J. Loree Jr. (PL-2213)
LOREE & LOREE
830 Third Avenue
Fifth Floor
New York, New York 10022
(646) 253-0560
(516) 627-1720 (alt. phone)
PJL1@LoreeLawFirm.com

*Attorneys for Plaintiff Geo-Group
Communications, Inc.*

## TABLE OF CONTENTS

**PLAINTIFF GEO-GROUP'S COMBINED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** ........................................ 1

INTRODUCTION ................................................................................................. 1

FACTS ................................................................................................................ 2

    Cast of Characters (Including the Parties) ................................................... 2

    Defendant Mahendra Shah .......................................................................... 3

    Defendant Vipin Shah .................................................................................. 4

    Surajit Bose ................................................................................................. 6

    *Defendants Ravi Chopra and New York City Telecom* ............................... 9

THE DISPUTE BETWEEN GEO-GROUP AND JAINA ........................................ 15

THE FRAUDULENT TRANSFERS .................................................................... 18

THE LLC DEFENDANT TRANSFERS ............................................................... 19

JAINA'S TAX AND BANK STATEMENTS EVIDENCE THAT $4,231,993 IN CASH IS UNACCOUNTED FOR ...................................................................................... 21

EVEN IF DEFENDANTS' CONTENTIONS THAT THE 2014 TRANSFERS THAT IT CLAIMS WERE REPAYMENTS OF LOANS MADE TO JAINA IN 2014 WERE CORRECT, THEN THE AMOUNT OF UNACCOUNTED FOR CASH WOULD INCREASE TO $6,814,811 ....................................................................................................... 22

STANDARD OF REVIEW .................................................................................. 22

ARTICLE 10 OF NEW YORK'S DEBTOR AND CREDIT LAW ............................ 23

    Section 276 – Actual Fraudulent Conveyance ........................................... 26

TAX ESTOPPEL ............................................................................................... 27

ARGUMENT ..................................................................................................... 29

RAVI CHOPRA'S AND NYC TELECOM'S MOTIONS FOR SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THERE ARE GENUINE QUESTIONS OF MATERIAL FACT TO BE TRIED CONCERNING GEO-GROUP'S ACTUAL AND CONSTRUCTIVE FRAUDULENT CONVEYANCE CLAIMS AGAINST THOSE DEFENDANTS ................. 29

    A.    The NYC Telecom/Chopra Defendants are Not Entitled to Summary Judgment on Geo-Group's Actual Fraudulent Conveyance Claims ................................................. 29

    B.    There are Disputed Issues of Fact Concerning Geo-Group's Constructive Fraud Claims against Chopra/NYC Telecom ................................................................... 34

POINT II ........................................................................................................... 35

THE SHAHS ARE NOT ENTITLED TO SUMMARY JUDGMENT ....................... 35

A.    The Shahs are Not Entitled to Summary Judgment on their Constructive Fraud Claims 35

B.    There is no Basis for Summary Judgment on the Section 276 Claims Against the Shahs 36

CONCLUSION ................................................................................................................. 37

# TABLE OF AUTHORITIES

## CASES

*American Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*, 704 F.Supp.2d 177, 193-94 (E.D.N.Y.  2010) ............................................................................................................... 29

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ......................................................... 24

*Atlanta Shipping Corp., Inc. v. Chem. Bank* ...................................................................... 26, 27

*Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003) ............................... 23

*Fireman's Fund Ins. Co.*, 822 F.3d at 631 n.12 ........................................................................... 24

*First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc*., 871 F. Supp.2d 103, 118 (E.D.N.Y. 2012) ..................................................................................................................... 25

*HBE Leasing Corp. v. Frank*, 48 F.3d 623, 633 (2d Cir.1995) ................................................... 27

*ICC Chem. Corp. v. Nordic Tankers Trading A/S*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ................................................ 23

*In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983) ................................................................ 28, 29

*In re Sharp*, 403 F.3d 43, 53 (2d Cir. 2005) .................................................................... 26, 27, 28

*Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) .................................................... 23

*Mahoney-Buntzman v. Buntzman,* 12 N.Y.3d 415, 422 (2009) ................................................... 29

*Matter of Geo-Group Communications, Inc. v. Jaina Systems Network, Inc.* ............................. 17

*NEM Re Receivables, LLC v. Fortress Re*, Inc., 173 F. Supp. 3d 1, 5 (S.D.N.Y.) ...................... 23

*Pace v. Air & Liquid Sys. Corp*, 171 F. Supp. 3d 254, 262 (S.D.N.Y. 2016) .............................. 22

*Pashaian v. Eccelston Props.*, 88 F.3d 77, 85-86 (2d Cir. 1996) ................................................. 27

*Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) ...................................................... 23

*Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) ................................................................................................................. 24

# STATUTES

New York Debtor & Creditor Law § 273, 273-a, & 274 .............................................................. 24

NYDCL § 273 .................................................................................................................................. 25

NYDCL § 273-a ......................................................................................................................... passim

NYDCL § 274 .................................................................................................................................. 25

NYDCL § 276 .................................................................................................................................. 28

NYDCL Section 272(a) ................................................................................................................... 26

Philip J. Loree Jr. (PL-2213)
Loree & Loree
830 Third Avenue, 5th Floor
New York, New York 10022
(646) 253-0560
(516) 627-1720 (alt.)
(516) 941-6094 (mobile)

*Counsel for Plaintiff Geo-Group*
*Communications, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
GEO-GROUP COMMUNICATIONS, INC.,

                      Plaintiff,                  Index No. 15-cv-01756 (KPF)

-v.-

RAVI CHOPRA; MAHENDRA SHAH; VIPIN
SHAH; 728 MELVILLE PETRO LLC; KEDIS
ENTERPRISES LLC; JMVD HILLSIDE LLC;
NYC TELECOMMUNICATIONS CORP.; and
SHALU SURI,

                      Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**PLAINTIFF GEO-GROUP'S COMBINED MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 56(, Rule 56.1 of the Local Civil Rules of

United States District Courts for the Southern and Eastern Districts of New York, Rule 5 of this

Court's Individual Rules of Practice in Civil Cases, Plaintiff Geo-Group Communications, Inc.

("Geo-Group") respectfully submits this Combined Memorandum of Law in Opposition to the

Motions for Summary Judgment filed by Defendants Ravi Chopra ("Chopra" or "R. Chopra"),

NYC Telecmmunications Corp ("NYC Telecom"), Mahendra Shah ("M. Shah"), and Vipin Shah

("V. Shah") (collectively, the "Movants" or the "Defendants"). For the reasons stated below, there are genuine issues of material fact with respect to all of Geo-Groups claims against the Defendants. Accordingly, the motions should be denied.[1]

## FACTS

### *Cast of Characters (Including the Parties)*

Geo-Group Communications, Inc. ("Geo-Group") is a Delaware corporation with its principal place of business in California. (Certification of Govind Vanjani, executed on January 24, 2018 ("Vanjani Cert.") ¶ 6) Until a few years ago, Geo-Group was in the business of providing telecommunications services to customers. (Vanjani Cert. ¶ 6) These services included obtaining telephone minutes from one or more other telecommunications providers, and selling them to Geo-Group customers, who in turn would resell them to their own customers. (Vanjani Cert. ¶ 6)

Jaina Systems Network, Inc. ("Jaina"), is, according to the New York Department of State, a New York domestic stock corporation with its principal place of business in Williston Park, New York. Jaina was one of Geo-Group's customers. Since 2015 Jaina has, at least overtly, transacted little or no business, has no bank accounts in its name, and no other unencumbered assets having any meaningful value in New York, with two possible exceptions. (Vanjani ¶ 7)

First, according to Form 1120, Schedule L of Jaina's 2015 tax return (the most recent one we have), as of year-end 2015 Jaina reported accounts receivable in the amount of $2,213,217.00. (Vanjani Cert. ¶ 8, Ex. M at Shah_Ds-000273) Geo-Group does not know from whom these receivables are allegedly due, what their actual value is (if anything), whether they

---

[1] In its December 4, 2017 Order, this Court granted each party up to two pages in excess of their respective page limits. (See Dk. 192.) This brief is subject to a 37-page limit and complies with that limit.

2

even still exist, or whether any attempts have been made to assign or collect them. (Vanjani Cert. ¶ 8)

Second, Defendants Mahendra and Vipin Shah have possession, custody and control of the software and hardware constituting Jaina's telecommunication network. According to Defendant Ravi Chopra that network may be worth $10,000,000.00 or more to a company who wanted to salvage, implement it, or integrate it into its own telecommunications network. According to Jaina's tax returns, its book value has been depreciated to $0.00 (zero). (Vanjani Cert. ¶ 9, Ex. M. Form 1120, Schedule L, Lines 10a & 10b).

*Defendant Mahendra Shah*

Defendant Mahendra B. Shah ("M. Shah") is a natural person who, until recently resided in Williston Park, New York, but now has moved to South Florida, near Tampa. (Vanjani Cert. ¶ 10)

At all relevant times, M. Shah was and is the person at Jaina with principal decision-making authority. M. Shah's official title at Jaina is apparently "President," but M. Shah has since 2002, when Jaina was formed, held himself out, and has continued to hold himself out, to the State of New York as the "chief executive officer" of Jaina by signing New York Department of State ("NYDOS") filings. (Vanjani Cert. ¶¶ 11-13, Exs. A & B; (Vanjani Cert., Ex. A at GCI-003778, GCI-003780, GCI-003781, GCI-003785.)

M. Shah is also a shareholder of Jaina, and currently claims to have a 25% interest in Jaina. (Vanjani Cert. ¶ 13, Ex. C, Transcript of the August 11, 2017 Deposition of Mahendra Shah (the "M. Shah Tr.") at 41-44) He also claims that there are three other shareholders, each of whom allegedly owns a 25% share: (a) Frank Vella ("F. Vella"); (b) Nayana Chandra Vipin Shah ("N. Shah"); and (c) Surajit Bose ("S. Bose" or "Surajit Bose"). (Vanjani Cert., ¶ 13)

M. Shah is also an owner (as is Defendant Vipin Shah Bhogilal Shah ("V. Shah")), and the President of, Neminath, Inc., which until very recently, owned the 235 Hillside Ave. property in which Jaina conducted its operations. (Vanjani Cert. ¶ 14) According to Defendant Vipin Shah's testimony, M. Shah owns 5% of Neminath, M. Shah's spouse Pooja Shah owns 45%, V. Shah owns 5%, and his spouse, Nayana Chandra Vipin Shah ("N. Shah"), owns 45%. (Vanjani Cert., ¶ 14, Ex. D, Transcript of the August 8, 2017 Deposition of Defendant Vipin Shah ("V. Shah Tr.") at 27, 29)

*Defendant Vipin Shah*

V. Shah is an individual who lives in Williston Park, New York. (Vanjani Cert. ¶ 17) V. Shah is M. Shah's brother and is married to N. Shah, who is, as discussed above, a shareholder and officer of Jaina, and who is claimed to have a 25% ownership interest in the company. (Vanjani ¶ 18)

V. Shah was in the phone card sector of the telecom industry since at least the 1990s and did business through a company named Ambe Sports Cards, Inc., which later became Ambe Phone Card. Inc. (See Ex. D, V. Shah Tr. at 17-19, 23.) He also owned and controlled a company named Ambe Telecommunications, Inc. ("Ambe Telecom"), which sold phone cards. (See Ex. D, V. Shah Tr. at 33-36.) He placed Ambe Telecom, into voluntary, Chapter 7 bankruptcy in November 2003, and a final decree discharging Ambe Telecom was entered in 2005. (Vanjani Cert. ¶ 19, Ex. D, V. Shah Tr. at 36-38; Ex. E, *In Re Ambe Telecommunications, Inc.*, No. 1-03-25119-ESS (E.D.N.Y. Bankr.) Docket Sheet)

The Ambe entities he owned and controlled sold phone cards to customers. (See Ex. D, V. Shah Tr. at 17-19.) V. Shah, a Jaina corporate insider, claims to have lent over the years an amount ranging from just less than $2,000,000.00 to $2,500,000.00, and was the beneficiary of more than $680,000.00 that Jaina—a company for which his brother was the principal decision

4

maker and his spouse a major shareholder—transferred to him in violation of Article 10 of the New York Debtor Creditor Law. (Vanjani ¶ 20)

In or about March 22, 2012, V. Shah falsely represented to Citibank, N.A. that he was the President of Jaina, and applied to Citibank for financing for Jaina in March 2012. The Citibank, N.A. term sheet for the financing in question is countersigned by a person who does not identify himself by name but claims to be Jaina's "President." (Vanjani Cert. ¶ 21 & Ex. D) Vipin Shah admitted that the signature is his and, contrary to the what the term sheet indicates, he was not the President of Jaina (Vanjani Cert. ¶ 21, Ex. D, V. Shah Tr. at 90-91. He thus falsely represented to Citibank that he was a representative of Jaina for purposes of obtaining a loan for Jaina. (Vanjani Cert. ¶ 21) Based on the Term Sheet, Citibank made a $1 million line of credit to Jaina. (Vanjani Cert. ¶ 21; Transcript of August 28, 2017 Deposition of Defendants R. Chopra and NYC Telecommunications, Inc. ("Chopra Vol I Tr.") at 58, 81-82, 83, 84-90, 101-05, 115-118; Vanjani Cert., Ex. D, V. Shah Tr. at 84-86, 88-98)

Five hundred thousand dollars ($500,000.00) of that loan was drawn down and deposited in Jaina's Citibank account on September 13, 2012. (Loree Cert., Ex. E, September 5, 2012 – October 5, 2012 Citibank Statement at GCI_Bank-000018) On the same day, a "withdrawal" (presumably in cash) was made in the amount of $460,000.00. (Loree Cert., Ex. E at GCI_Bank-000018) And five days later, on September 18, 2012, someone withdrew another $75,000.00. (Loree Cert., Ex. E at GCI_Bank-000018) The disposition of that cash is unknown.

Effective on March 21, 2012, one day before the date of the term sheet, Defendant V. Shah, in the purported capacity as an "individual of Jaina Systems Network, Inc." entered into a one-page, three-year-term loan agreement with Defendant Ravi Chopra in the capacity as an "individual of STI Consultants," which V. Shah signed in the lower-left hand corner as "Vipin

Shah, Jaina Systems Network, Inc." V. Shah admitted in his deposition that when he signed this document he was not an officer or director of Jaina. (Vanjani Cert. ¶ 22, Ex. D, Shah Tr. at 88-98) and, in any event, there is no dispute that he never was an officer or director of Jaina. (A copy of the Loan Agreement is attached as Ex. G to the Vanjani Cert.)

V. Shah is an extraordinarily close insider with a very substantial stake in Jaina. When Mahendra Shah and Surjit Bose started Jaina's telecom business in 2003 or 2004, they turned to Vipin for financing, who started by investing $100,000.00, and continued to invest more sums over time. While in his testimony Mr. V. Shah claimed not to be "involved with Jaina," he also testified, "But the thing is that when my brother [Mahendra] needed the money [for Jaina], when [Surajit] Bose need money [for Jaina], they always come to me." (Vanjani Cert. ¶ 23, Ex. D, V. Shah Tr. at 97)

*Surajit Bose*

Surajit Bose was, with M. Shah, a cofounder of Jaina. He was a shareholder of the company, who, according to the information Jaina filed in its Form 499 disclosure with the Federal Communications Commission (the "FCC"), held the title "Hon. Project Manager & Developments (Implementation)" and was listed as a "Chairman or other Senior Officer," whereas M. Shah was listed as "Chief Executive Officer" and N. Shah as "President or other Senior Officer." (Vanjani Cert. ¶ 26, Ex. F, V. Shah Dep. Ex. 8, FCC Form 499 Detailed Information, at GCI-2017 004284 & 4285)

During the period 2006 through 2008, S. Bose falsely held himself out to Mr. Vanjani and other members of the public as Jaina's CEO, and Jaina held him out as CEO on its website, which has since been taken down. (Vanjani Cert. ¶ 27)

The Defendants acknowledge that Surajit Bose was never the Chief Executive Officer or President, and that M. Shah, a U.S. Citizen, held that title "on paper," allegedly because S. Bose

was a Citizen of India who did not have resident alien status (but apparently had an L-1 Visa), and that the law precluded him from serving as the Chief Executive Officer or President of Jaina. (Vanjani Cert. ¶ 28)

We understand that S. Bose is not living in the U.S. anymore, and he has not been named a party in this action. He was not named a party because based on Mr. Vanjani's dealings with him, he had no reason to believe that he played a meaningful role in the defendants' efforts in this case to hinder, frustrate, and delay Geo-Group's attempts to collect its judgment. (Vanjani Cert. ¶ 29) If anything, he attempted in good faith to resolve the dispute with Geo-Group, but defendants M. Shah and R. Chopra deliberately and actively thwarted those attempts. (Vanjani Cert. ¶ 29)

All of the defendants have resorted to one or another version of the familiar, "It wasn't me, it was he or she" defense, especially when confronted with facts suggestive of fraudulent or other wrongful acts. Bose is generally the one blamed, but in a number of cases those accusations have been demonstrated to be objectively false. (Vanjani Cert. ¶ 30)

For example, M. Shah and his (now resigned) lawyer repeatedly claimed that it was S. Bose who made the wire transfers without the knowledge or consent of M. Shah and that M. Shah did not have the means to control him because he was the "CEO." But at his deposition, M. Shah admitted that although in earlier years S. Bose was given authority to perform banking transactions, Jaina took that authority away from him no later than early 2013, prior to the dates on which the transfers in this case were made. (Vanjani Cert., Ex. C, M. Shah Tr. at 229-30.)

At the time the transfers in this case were made, wire transfers and other banking transactions using Jaina's Citibank account were made online through a Citibusiness account. Those transactions could not be done without the use of a "fob"—i.e., a device often attached to

a keychain that generates temporary, random passwords, which must be used to effect certain kinds of transactions, including transfers of money. (Vanjani Cert. ¶ 31, Ex. C, M. Shah Tr. at 228-32, 240-41, 244, 246-47.)

    As of 2013 and 2014, when the transfers were made, Jaina only had two fobs: one which M. Shah used for banking transactions, and another which N. Shah held as a backup for "emergencies" if and when M. Shah was not around or if he lost or misplaced his own fob. (Vanjani Cert., ¶ 33, Ex. C, M. Shah Tr. at 228-32, 240-41, 244, 246-47.)

    M. Shah testified that when S. Bose wanted to transfer money, Bose would advise M. Shah, and M. Shah would typically ask to whom the transfer was being made, and then let S. Bose borrow the fob to make the transfer. (Vanjani Cert. ¶ 34) He thus maintained the right to control each of the transfers, and, in a matter of speaking, by having control over the fob, he held the proverbial financial keys to the Jaina kingdom. (Vanjani Cert. ¶ 34, Ex. C, M. Shah Tr. at 228-32, 240-41, 244, 246-47.)

    In his summary judgment papers M. Shah admits to having exercised his financial control and authority over S. Bose very recently. Although at his deposition M. Shah testified that he had not spoken with S. Bose since 2015, he admitted in his summary judgment affidavit that S. Bose visited the 235 Hillside Avenue premises in May 2016, which Neminath now leases from Williston Park Realty LLC. According to M. Shah, "Bose returned in about May 2016 asking if he could take some computer hardware, so he could start a business with some other partner[,]" and that Bose "was upset M. Shah refused to hand over the requested computer hardware." (See Affidavit of M. Shah sworn to December 7, 2017, ¶10, Dk. 208 at 3 of 10.)

    The so-called "computer hardware" M. Shah is referring to is Jaina's telecommunications network, which consists not simply of hardware, but a combination of hardware, software and an

8

operating system that, together, allow a business the expertise, wherewithal and desire, to conduct a telecom business, which requires, among other things, the ability to interface and connect with the switches of telecom carriers throughout the world. At his deposition R. Chopra testified that he believes Jaina's telecom system would be worth about $10,000,000.00 to a business that had had the ability and desire to use it. (Transcript of August 29, 2017 Deposition of Defendants R. Chopra and NYC Telecommunications, Inc. ("Chopra Vol II Tr.") at 226-28) The book value of this asset, according to Jaina's 2015 tax return, is $0.00 (zero). (See Ex. M at Shah_Ds-000273, Jaina's 2015 tax return, Form 1120, Schedule L, Lines 10.a & 10.b.)

*Defendants Ravi Chopra and New York City Telecom*

Ravi Chopra is a functional equivalent of a Jaina insider who was constantly and continually involved in Jaina's affairs, claims to have lent hundreds of thousands of dollars to the company, arranged many highly questionable, transactions involving close friends or business associates (which involved three or even four parties), which he (and his friends and associates) claim are "loans," but which a jury could conclude were designed to evade tax authority or other government scrutiny. (Vanjani Cert. ¶ 37)

Ravi Chopra is the sole owner and operator of New York City, Telecommunications Corp., which does business under the name "STI Phone Card Warehouse," and, is the sole owner and operator of a number of other entities who do business under other names, including New York Main Street Consultants, Inc., a company that does business under the name of "STI Consultants."

Chopra, executed as "an individual of STI Consultants]", the one page loan purported agreement (the "Loan Agreement") with V. Shah, who signed the document as "an individual of

Jaina Systems Network, Inc.[,]" even though V. Shah was never an officer or director or shareholder of Jaina. (Vanjani Cert. ¶ 39, Ex. G)

As stated in the Loan Agreement, Chopra, on behalf of STI Consultants, "agree[d] to provide financial consulting service to Mr. Vipin Shah for financing through bank." In return, "Mr. Vipin Shah agree[d] to pay STI Consultants 4% of the financing or loan amount provided to Jaina Systems Network Inc located at Hillside Ave, New York for the loan arranged by STI Consultants." (Vanjani Cert. ¶ 40, Ex. G)

The Loan Agreement also stated that "Mr. Vipin Shah further agrees. . .[t]o pay STI Consultants 4% of all subsequent additional financing or loan amount obtained from banks or financial institutions initially arranged to Mr. Vipin Shah for the Jaina Systems Network, Inc. located at Hillside Ave., New York." V. Shah further agreed that "[T]his is an exclusive loan agreement which is good for three years unless replaced by a separate agreement and any changes of this agreement must be consent in writing signed by both parties." (Vanjani Cert. ¶ 41, Ex. G)

The Loan Agreement was effective March 21, 2012. (Vanjani Cert. ¶ 42) It was pursuant to this Loan Agreement, that Chopra assisted V. Shah in obtaining from Citibank a $1,000,000.00 line of credit for Jaina, the first $500,000.00 of which was, as discussed above, deposited into Citibank, with someone withdrawing $470,000.00 in cash that same day.

V. Shah obtained that loan for Jaina under false pretenses, Chopra was involved in that transaction, and Chopra knew that V. Shah was not an officer or director or shareholder of Jaina, let alone its President. (Vanjani Cert. ¶ 43)

Chopra has been listed by M. Shah and V. Shah in their bankruptcy filings as having a $200,000.00 claim against them as guarantors of Jaina's debt. (Vanjani Cert ¶ 44)

Chopra contacted Mr. Vanjani in September 2014 to discuss settlement on behalf of

Jaina, and we had five meetings for that purpose. (Vanjani Cert. ¶ 46) In his Certification, Mr.

Vanjani explains that during those meetings Chopra spoke with great authority, as one might for

one's own company. (Vanjani Cert. ¶ 46)

According to Mr. Vanjani, Chopra made three offers to him at the second meeting, the

third and highest being $1.6 million. Vanjani thought he had reached a deal with him for $1.6

million settlement payment, but he reneged on that and told me the settlement would have to be

on an instalment basis without any lump sum payment. That was unacceptable to me and despite

our efforts we were unable to reach a compromise. (Vanjani Cert. ¶ 48)

Vanjani also has a clear, and not particularly fond, memory of Chopra becoming angry

with him and, when he would not accept what Vanjani was offering, he was offering, he

exclaimed in a threatening voice: "You'll never get a penny out of this." (Vanjani Cert. ¶ 48)

At the time, and since then, it struck Vanjani that there is, at least in his experience, no

rational explanation for someone to become so emotionally involved in a settlement negotiation,

and make a threat like that, unless the person has a significant personal or financial stake in the

matter. (Vanjani Cert. ¶ 49)

Ravi and the Shah Defendants insist that R. Chopra never became a shareholder in Jaina,

and S. Bose made the same statement in a December 2014 email, but there are circumstances

suggesting otherwise. ((Vanjani Cert. ¶ 50)

First, in one of S. Bose's emails, S. Bose explains that Frank Vella, left the company in

2011 and Jaina never paid him any "compensation or returns." (Vanjani Cert. ¶ 51, Ex. H, S.

Bose 12/28/2014 email to Vanjani at NYC CHOPRA 000325)

Second, R. Chopra is in the Phone Card sector of the Telecom industry, is knowledgeable about it, and perhaps most importantly, is very interested in it. In his deposition testimony he testified almost animatedly about how great Jaina's telecom infrastructure was and how valuable he thinks it is. (Vanjani Cert. ¶ 51; Chopra Vol. 1 Tr. at 145-48; Chopra Vol. II Tr. at 225-28)

That he apparently wants to have a piece of that—even now—lends some support to the reasons he lent Jaina so much money, why he was angry at Vanjani during the settlement negotiations, why he was even involved in the settlement negotiations in the first place, and why he went to such great lengths to hinder or delay Geo-Group's efforts to collect on the Award by having his spouse, Shalu Suri, incorporate in New York a company named "Geo-Group Communications, Inc." to attempt to thwart Geo-Group's efforts to obtain a license to do business in New York. (Vanjani Cert. ¶ 52)

Chopra prefaced his discussion of Jaina's infrastructure by remarking that, "[i]f If Geo was not there, then definitely they [Jaina] would have a 2 to $4 million business line [of credit]." (Chopra Vol. I Tr. at 145-46) When asked what he meant by that he said that with the Geo-Group litigation pending, the banks would not lend the money. (Chopra Vol. I Tr. at 146) "And the Jaina," he explained, "when you see as a telecom guy, that looked like a $10 million infrastructure if you want to go build it. It's not like a small company." (Chopra Vol. I Tr. at 146) "But the infrastructure," he continued, "which is the building in the time frame, like maybe 7, 8, 10-year, 15 year, that is more than $10 million worth, the network. So that was the beauty of the, you know, because I know also telecom and I know financing." (Chopra Vol. I Tr. at 146)

"So you can feel like," Chopra testified, "this guy [Jaina] is not going anywhere because whey they have this much infrastructure, they are not small[,]" Chopra explained, "[t]hey are a large telecom company. An Indian American large telecom company as by my eyes." (Chopra

Vol I Tr. at 146) When asked if there could be some long term opportunities with Jaina, he

agreed. (Chopra Vol. I Tr. at 146-47)

 Chopra also revealed that Jaina allegedly owes him commission on consulting services

NYC Telecom and STI Consulting had provided Jaina, and that his goal in being so involved

with Jaina was to ultimately obtain a $4 million business line of credit for them, and that he had

been promised significant remuneration if he succeeded in that goal. (Chopra Vol I Tr. at 146-

48) He testified that Jaina told him that once he was able to get them a $4 million line of credit

from the bank, "he would get something big." (Chopra Vol. I Tr. at 147) "And our goal And our

goal was, you know, if we get $4 million line for them, this guy. So I can make at least around

about $200,000 commission. So my goal was that." (Chopra Vol. I Tr. at 148)

 But there was more. Chopra said there was "also – the other attraction they are giving the

Jaina, because they say we are launching the mobile phone, So that was a big attraction, the

prepaid card that they are launching. So that, they are giving me because they say we can do a lot

of business with NYC in the future if we start this." (Chopra Vol. I Tr. at 148)

 As respects why Geo-Group was attempting to obtain a license to do business in New

York in the fall of 2014, Geo-Group had advised the New York confirmation court of its intent to

do that as a way to neutralize Jaina's argument that somehow New York's so-called "door

closing" statute barred Geo-Group, which was not licensed to do business in New York at the

time  (and wasn't required to be), from confirming and enforcing an award in a New York court,

even though the award arose out of a contract evidencing transactions in interstate commerce.

(Vanjani Cert. ¶ 53)

While ultimately Geo-Group was able to obtain a license to do business in New York, it had to do it under a fictitious name, and Chopra's and Shalu Suri's fraudulent ruse thus caused additional delay. (Vanjani Cert. ¶ 53)

Another circumstance that casts real doubt on the Defendants' contentions about who the shareholders of Jaina are, and whether Ravi is one is what Jaina's tax returns show. Internal Revenue Service ("IRS") Form 1120, Schedule K, line 4.b queries whether "any individual or estate own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote?" and states "If 'Yes,' complete Part II of Schedule G Form 1120[,]" which requires the taxpayer to identify each "individual or estate" that holds such ownership and voting interests in the company. (See Vanjani Cert. ¶ 54, Ex. I, Jaina's 2011 Tax Return, Form 1120, Schedule K., line 4.b at NYC-CHOPRA 000031; Vanjani Cert, Ex. I, Jaina's 2011 Tax Return, Form 1120, Schedule G, Part II, at NYC-CHOPRA 000035; Vanjani Cert., Ex. J, Jaina's 2012 Tax Return, Form 1120, Schedule K., line 4.b at NYC-CHOPRA 000047; Vanjani Cert, Ex. J, Jaina's 2012 Tax Return, Form 1120, Schedule G, Part II, at NYC-CHOPRA 000051.)

For the 2011 and 2012 tax years, Mahendra Shah signed tax returns answering "Yes" to the Schedule K, line 4.b query and identifying in Schedule G, Part II of those returns M. Shah, N. Shah, F. Vella, and S. Bose as individuals who "own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote[,]" and disclosed each of their ownership interests in Jaina to be 25%. (Vanjani Cert. ¶ 55)

But in its 2013, 2014, and 2015 tax returns, Jaina answered the Schedule K, line 4.b query "No," and by doing so, was able to evade its obligation to disclose the identity of the

persons who had 20% or more of the total voting power of all classes of Jaina's stock. (See Vanjani Cert. ¶ 56; Exs. K, L, & M.)

M. Shah's and the other defendants' continuing insistence that the ownership of Jaina did not change after 2012 is not only inconsistent with those 2013 through 2015 returns, but also irreconcilable with them. Even if the number and identity of the shareholders remained the same during that period, but there was a change in the allocation of voting rights, then the answer to the Schedule K, line 4.b query would have to be "Yes," as it was in 2011 and 2012. The only difference, if any, would be that fewer than four shareholders would need to be disclosed in Schedule G, Part II. (Vanjani ¶

V. Shah and M. Shah have both characterized Mr. Chopra as playing multiple, and important roles in his dealings with Jaina. V. Shah characterized him as a "broker, consultant and lender," who also happened to be in the Phone Card business, and who had done business with V. Shah, who has known him for many years. (See Vanjani Cert. ¶ 60, Ex. D, V. Shah Tr. at 72, 75, 76.) As M. Shah described Chopra's role at his deposition, "Chopra used to lend, he was a loan broker, lender, as well as consultant[]" (see Ex. C, M. Shah Tr. at 222-23), and in M. Shah's affidavit in support of his summary judgment motion, "Chopra was a lender, a finance broker and a negotiator for [Jaina]." (See Affidavit of M. Shah, sworn to December 7, 2017, Dk. 208 at 4 of 10.)

## THE DISPUTE BETWEEN GEO-GROUP AND JAINA

The historical facts concerning the dispute between Geo-Group and Jaina are recounted in some detail in the Vanjani Cert. at ¶¶ 62-93. On or about September 26, 2006 Geo-Group and Jaina entered into a Telecommunications Service Agreement (the "Telecommunications Agreement"), which governed the commercial and legal relationship between them. (Vanjani

Cert. at ¶ 62 & Ex. N.)  The Telecommunications Agreement contained a broad arbitration agreement (the "Arbitration Agreement").

A dispute arose between Jaina and Geo-Group over Geo-Group's bills to Jaina. Beginning on December 16, 2010, S. Bose, holding himself out as Jaina's Chief Executive Officer, forwarded to Geo-Group's President, Govind Vanjani, several email communications evidencing Jaina's acknowledgment of the existence of a sum certain of undisputed debt Jaina owes to Geo-Group. (Vanjani Cert. ¶ 73)

On May 30, 2013 Geo-Group demanded, under the auspices of JAMS, arbitration against Jaina, seeking, among other relief, damages in the amount of $1,507,922.96, that is, the full amount of Geo-Group's October 2008 final invoice. JAMS appointed Hon. William I. Cowin (ret.), a retired former Massachusetts Appeals Court judge (the "Arbitrator"), to serve as the arbitrator.

On July 10, 2014 the Arbitrator granted Geo-Group's motion for summary disposition "and award[ed] [Geo-Group] the principal sum of $1,249, 654." (See Ex. O, Award.) The Arbitrator found, based on the email correspondence between Vanjani and Bose, that the undisputed amount was $1,249, 654, not the $1,507,922.96 balance due set forth in Geo-Group's October 2008 final invoice. (Vanjani Cert. ¶ 82, Ex. O) The Award also required Jaina to pay Geo-Group interest at the rate of one-percent (1%) per month, compounded monthly from October 8, 2008, the date of Jaina's breach of contract. (Vanjani Cert. ¶¶ 82-83, Ex. O)

On or about July 16, 2014 Geo-Group commenced a special proceeding in New York Supreme Court, New York County, to confirm the Award. Vanjani Cert. ¶ 85)

In the meantime, Jaina retained Attorney Joseph P. Goldberg, Esq of Hodgson Russ LLP to assist Attorney Edward Troy, Esq., Jaina's arbitration counsel, in making three failed attempts

to overturn the Award: (a) a motion for reconsideration, which was made on July 24 and August 8, 2014, and denied on August 18, 2014; (b) a motion made to JAMS, the arbitration provider, to disqualify the Arbitrator, made on September 2, 2014 and denied on September 24, 2014; and (c) a motion to vacate the Award under Article 7511 of the CPLR, which was made on September 5, 2015 and denied by the court below on December 2, 2014. (Vanjani Cert. ¶ 86) (Copies of the decisions denying each of these applications are attached as Exs. R, S, & T to the Vanjani Cert.)

On October 15, 2014, the Court in the confirmation proceeding held oral argument on the parties' competing motions to confirm and vacate the Award. (Vanjani Cert. ¶ 87, Ex. U)

On December 8, 2014 the Court in the confirmation proceeding entered an Order granting Geo-Group's motion to confirm the Award and denying Jaina's motion to vacate. (Vanjani Cert. ¶ 88, Ex. V)

The Court in the confirmation proceeding entered Judgment on April 3, 2015, a copy of which is attached to the Vanjani Cert. as Ex. W.

The Judgment awarded Geo-Group $2,712,175.51, which represents: (a) the $1,249,654 principal sum; plus (b) pre-judgment interest in the amount of $1,461,986.51; plus (c) $535.00 in costs and disbursements. The Judgment has been accruing interest at the New York statutory rate of 9% per annum since its entry on April 3, 2015. (Vanjani Cert., Ex. W) We understand that, as of January 22, 2018, the value of the Judgment, including post-judgment interest is $3,388,956.18.

Jaina also unsuccessfully attempted to appeal the Judgment, but on November 29, 2016 the Appellate Division, First Department affirmed the Judgment. *See Matter of Geo-Group Communications, Inc. v. Jaina Systems Network, Inc.*, 144 A.D.3d 598 (2016). Jaina never

sought to obtain to leave to appeal to the New York Court of Appeals, and the time to do so has long past. Jaina has never paid any portion of the Judgment and Geo-Groups attempts to collect it have been unsuccessful.

## THE FRAUDULENT TRANSFERS

Beginning in 2013 and increasing very substantially after the Arbitration Award was made on July 10, 2014 and the confirmation proceeding was commenced on July 20, 2014. The transfers themselves are detailed in chart form in Geo-Group's Third Amended Complaint (the "TAC"), Dk. 105. The transfers are documented in the Jaina's Citibank bank statements for 2013 and 2014, copies of which are attached as Exs CC and Z to the Vanjani Cert.

There is no dispute about whether the transfers took place, although both V. Shah and Chopra/NYC Telecom have both identified a couple of minor  typographical or transcription errors based on their own reviews of the bank statements, which Geo-Group does not dispute, although in the case of V. Shah the typographical error is offset by evidence adduced in discovery showing that M. Shah made several additional payments to his brother by check in the period from July to December 2014.

When we prepared Geo-Group's Third Amended Complaint (the "TAC") (Dk. 105 at 59), we believed that the total amount transferred by Jaina to V_Shah by wire was $760,603.00. But as explained in the Vanjani Cert., we have determined, however, that those two entries were erroneous. A revised chart set forth in the Vanjani Cert. corrects the mistake and shows a total of $685,603.00 was wired to V. Shah during the period June 5, 2013 and November 26, 2014. (Vanjani Cert. ¶¶ 104-05)

But discovery has shown that Jaina made, by checks signed by M. Shah, additional payments to V. Shah in the amount of at least $140,079.00. M. Shah produced Citibank Bank statements for 2014 that evidence that Jaina paid a total of $ $848,183.68 in checks in 2014.

Jaina did not make any payments by check in 2014 until June of that year and the amount of those payments spiked during the period from July through November 2014, that is, the period during which the Arbitration Award was made (July 10, 2014), the Confirmation Proceeding was commenced (July 20, 2014), Jaina was aggressively challenging the Award, Chopra was conducting settlement negotiations on behalf of Jaina, and Chopra's spouse Shalu Suri incorporated in New York a company named Geo-Group Communications, Inc., which she licensed with the New York Secretary of State in an attempt orchestrated by Chopra to hinder or delay enforcement of the Award. (Vanjani Cert. ¶ 108)

Paragraph 109 of the Vanjani Cert. contains a chart (Figure 1), prepared from the underlying data he analyzed, which indicates the amounts of payments by check made by Jaina in 2014 and the bank statement periods in which Citibank paid those checks. It contains Bates Number references showing showing where the data supporting the numbers in the chart appears in the 2014 Citibank bank statements produced by M. Shah, copies of which are attached as Ex. Z to the Vanjani Cert.

### THE LLC DEFENDANT TRANSFERS

Jaina's bank statements show that, in July 2014 transfers were made from Jaina to 728 Melville: Petro LLC ("728 Melville") and JMVD Hillside, LLC.  JMVD Hillside in the total amount of $660,000.00, not long after Geo-Group commenced the arbitration-award confirmation proceedings against Jaina in July 2014. (Vanjani Cert., Ex. Z; TAC at ¶¶ 37 & 44)

On February 22, 2016, Geo-Group filed its Third Amended Complaint (Dk. 105), which included claims against 728 Melville and JMVD Hillside.  On March 30, 2016, the LLC Defendants moved to dismiss this action. Mr. Chand submitted his Third Affidavit (Dk. 175-4.) in support of that motion, which disclosed for the first time that Kedis had entered into a Commercial Loan Agreement with Neminath, and had borrowed $600,000 from Kedis, which Neminath, in turn, lent to Jaina. Chand claimed in his affidavit that Jaina's payment to two of the LLC Defendants "discharged" Jaina's "antecedent" debt to Neminath back in August and October 2014, and Neminath's debt to Kedis.

But Neminath's tax returns through its 2014 Tax Year contradict that assertion. (Copies of Neminaths 2012 through 2016 tax returns, which Neminath produced to us in response to a document subpoena are attached as Exhibits A, B, C, D, & E of the Certification of Philip J. Loree Jr. in Opposition to Motion to Quash Williston Park Realty LLC Subpoena, executed on September 22, 2017 (Dk. 180) (the "September 22, 2017 Loree Cert.").)

Neminath's tax returns show that Neminath carried the $600,000.00 debt to Kedis as a liability (loan payable) and the corresponding $600,000.00 debt Jaina owed it as an asset (loan receivable from Jaina) on its 2012 through 2014 tax returns (each of which reflected Neminath's April 1 – March 31 Fiscal Year). (See Ex. A at Neminath Tax Returns – 000011-12; Ex. B at Neminath Tax Returns – 000018; Ex. C at Neminath Tax Returns – 000029, 000035-36.) (See Dk. 180, September 22, 2017 Loree Cert. ¶¶ 7-38)

Thus, according to Jaina's bank statements, and Neminath's tax returns, concerning the August and October 2014 transfers of funds to the LLC Defendants by Jaina: $660,000.00 was transferred to the LLC Defendants without Jaina receiving anything whatsoever in exchange for

that money. The LLC Defendants got the cash, Jaina received no discharge of liability from Neminath, and Neminath received no discharge of liability from the LLC Defendants.

About one year before declaring bankruptcy, M. Shah, acting as President of Neminath, sold the 235 Hillside Avenue premises to Williston Park Realty, LLC for $425,000.00 and a discharge of Neminath's obligation to Kedis. M. Shah testified that the purpose of selling the property was "[b]ecause we wanted to paid off Jaina's debit, some of the lenders, you know, so that's the reason that we sold it." M. Shah also explained in some detail how the $425,000 cash was distributed by escrow: (a) V. Shah used $200,000.00 to pay back a lender from whom he had borrowed money; (b) $60,000.00 was paid as advance rent for use of the building; (c) $60,000.00 or $61,000.00 was used to pay off a debt Neminath owed; (d) $60,000 was paid to Sanjiv Chand for interest past due on the $600,000.00 loan (which was discharged by the sale); (e) closing costs were paid; and (f) the balance remained in escrow. (September 22, Loree Cert., Ex. G; M. Shah Dep at 34-35) (See September 22, 2017 Loree Cert. at ¶¶ 7 – 38)

While M. Shah's deposition testimony contradicts the assertions that Mr. Chand has made in these proceeding the truth of that testimony is corroborated by Neminath's 2015 tax return. Form 4797 of Neminath's Tax returns for 2015 Tax Year (ending March 31, 2016) show the sales of the "building" – that is the amount of $1,025,000.

### JAINA'S TAX AND BANK STATEMENTS EVIDENCE THAT $4,231,993 IN CASH IS UNACCOUNTED FOR

Using the data set forth in Jaina's 2014 Tax Return (Vanjani Cert., Ex. L), and their Capital One and Citibank bank statements for 2014 (Vanjani Cert., Ex. CC & EE), Geo-Group has determined that there is at least $4,231,993.00 in cash that Jaina has not accounted for. (As set forth in Schedule K of its 2014 return, Jaina prepared its tax returns on an accrual basis (see

Vanjani Cert., Ex. L at NYC-CHOPRA 000377.) Vanjani's analysis, which he describes step-by-step in paragraphs, calculates the difference between cash received and cash deposited.

EVEN IF DEFENDANTS' CONTENTIONS THAT THE 2014 TRANSFERS THAT IT CLAIMS WERE REPAYMENTS OF LOANS MADE TO JAINA IN 2014 WERE CORRECT, THEN THE AMOUNT OF UNACCOUNTED FOR CASH WOULD INCREASE TO $6,814,811

In paragraphs 148 to 153 of his Certification, Mr Vanjani walks the reader through a simple analysis similar to the one above, which determines the amount of money that should have been deposited into Jaina's bank account in 2014 if loans to Jaina in the amount of $2,582,818.00 were made to Jaina in 2014. The $2,582,818.00 represents the amount of money that Defendants contend was a loan made in 2014. He demonstrates that even if Defendants are correct that payments made by third parties to Jaina in 2014 in the amount of $2,582,818.00 represented loans, then, according to Jaina's tax returns and bank statements, there is $6,814,811.00 in cash for which Jaina cannot account.

Like the $4,526,981 shortfall discussed above, this $6,814,811.00 shortfall represents amounts that Jaina should have deposited, but did not, and it would be in addition to any amounts fraudulently transferred in 2014 from Jaina's bank accounts. (Vanjani Cert. ¶ 153)

STANDARD OF REVIEW

Rule 56(a) requires a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).19 "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Pace v. Air & Liquid Sys. Corp*, 171 F. Supp. 3d 254, 262 (S.D.N.Y. 2016) (quoting *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003)).

Thus, "[a] motion for summary judgment may properly be granted ... only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)). In determining whether summary judgment is merited, "[t]he role of a court ... is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *NEM Re Receivables, LLC v. Fortress Re*, Inc., 173 F. Supp. 3d 1, 5 (S.D.N.Y.) (internal quotation mark and citation omitted), reconsideration denied, 187 F. Supp. 3d 390 (S.D.N.Y. 2016).

A party moving for summary judgment "bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" *ICC Chem. Corp. v. Nordic Tankers Trading A/S*, 186 F. Supp. 3d 296, 301 (S.D.N.Y. 2016) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "[A] fact is material if it 'might affect the outcome of the suit under the governing law.'" *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A "genuine dispute" is one concerning which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Fireman's Fund Ins. Co.*, 822 F.3d at 631 n.12 (quoting *Anderson*, 477 U.S. at 248).

### ARTICLE 10 OF NEW YORK'S DEBTOR AND CREDIT LAW

As the Court discussed in its February 1, 2016, and July 27, 2016 opinions on the motions to dismiss (Dk. 102 at 6-11 of 24; Dk. 134 at 6-9 of 24), the New York Debtor and Creditor Law ("NYDCL") establishes two different bases on which a creditor may recover

fraudulently conveyed property (or damages where that property is money): (a) constructive

fraud; and (b) actual fraud. The NYDCL fraudulent conveyance remedies are available against

not only transferees of assets, but also persons who participated in and benefited from a transfer.

*See Federal Deposit Ins. Corp. v. Porco*, 75 N.Y.2d 840, 842 (1990) (Mem.).

As pertinent here, the NYDCL provides three different statutory grounds for establishing

a constructively fraudulent conveyance: Sections 273, 273-a, and 274. New York Debtor &

Creditor Law § 273, 273-a, & 274. Section 273-a provides relief for constructive fraudulent

conveyances made during the period that an action for money damages is pending, and

continuing after entry of judgment:

> [e]very conveyance made without fair consideration when the person making it is a
> defendant in an action for money damages or a judgment in such an action has been
> docketed against him is fraudulent as to the plaintiff in that action without regard to the
> actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails
> to satisfy the judgment.

NYDCL § 273-a.

Section 273-a applies to arbitration proceedings seeking money damages. See February 1,

2016 Opinion & Order, Dk. at 18 of 24; *First Keystone Consultants, Inc. v. Schlesinger Elec.*

*Contractors, Inc.*, 871 F. Supp.2d 103, 118 (E.D.N.Y. 2012).

NYDCL Section 273 governs assets transfers by debtors who are insolvent or will

become insolvent because of them: "[e]very conveyance made ... by a person who is or will be

thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the

conveyance is made or the obligation is incurred without a fair consideration." NYDCL § 273.

NYDCL Section 274 provides for relief when a transferor "is engaged or is about to

engage in a business or transaction for which the property remaining in [its] hands after the

conveyance is an unreasonably small capital[,]" and deems such a transfer to be "fraudulent as to

creditors and as to other persons who become creditors during the continuance of such business or such transaction." NYDCL § 274.

Section 274 does not require a showing that the transfer of assets rendered the debtor insolvent. All that is required is a showing that after the conveyance the debtor was left with an "unreasonably small capital" "for its then-current or immediately pending business." July 27, 2016 Opinion and Order, Dk. 134 at 9 of 24.

Common to all three NYDCL constructive fraud provisions is the requirement that the "conveyance" be "made without fair consideration." *See* NYDCL §§ 273, 273-a, 274. *Atlanta Shipping Corp., Inc. v. Chem. Bank*, 818 F.2d 240, 248 (2d Cir.1987); *In re Sharp*, 403 F.3d 43, 53 (2d Cir. 2005).

NYDCL Section 272(a) defines "fair consideration" as existing "when the transferor, (i) in good faith, (ii) receives 'fair equivalent' property or a similarly equivalent antecedent debt is discharged." July 27 Opinion & Order at 7 of 24. "The fair consideration test is profitably analyzed as follows: [i] the recipient of the debtor's property must either (a) convey property in exchange or (b) discharge an antecedent debt in exchange; and [ii] such exchange must be a fair equivalent of the property received; and [iii] such exchange must be in good faith." *In re Sharp Int'l Corp.*, 403 F.3d 43, 53-54 (2d Cir. 2005) (citation and quotation omitted).

To show a lack of good faith, a conveyance-challenger must prove at least one of the following: "(i) a lack of honest belief in the propriety of the transaction; (ii) an intent to take unconsionable advantage advantage of others; or (iii) an intent to, or knowledge of the fact that the activities in question will, hinder, delay, or defraud others." July 27, 2016 Opinion & Order, Dk. 134 at 7-8 of 24.

A lack of good faith will generally preclude a finding of fair consideration, but there is an

exception to this rule, and an equally important exception to the exception.  The exception is that a transfer made in satisfaction of an preexisting debt will ordinarily be deemed made for fair consideration, even if the transfer was made in apparent bad faith. *Pashaian v. Eccelston Props.*, 88 F.3d 77, 85-86 (2d Cir. 1996); July 27, 2016 Opinion & Order, Dk. 134, at 8 of 24.

The exception-to-the-exception is that: "[R]epayment of an antecedent debt constitutes fair consideration unless the transferee is an officer, director, or major shareholder of the transferor." *Atlanta Shipping Corp. v. Chem. Bank*, 818 F.2d 240, 249 (2d Cir. 1987); accord *In Re Sharp Int'l Corp.*, 403 F.3d at 54;*HBE Leasing Corp. v. Frank*, 48 F.3d 623, 633 (2d Cir.1995) We refer to that rule as the "Insider Antecedent Debt Exception."

The Court's July 27 Opinion & Order recognized the Insider Antecedent Debt Rule, but apparently confined it to only to Section 273 claims, presumably because some district and bankruptcy courts have explained: "'transfers from an insolvent corporation to an officer, director or major shareholder of that corporation are per se violative of the good faith requirement." (See Dk. 134, July 27, 2016 Opinion & Order at 8 of 24 & 18-22 of 24.)

The Second Circuit cases cited above, however, have not limited the scope of the Insider Antecedent Debt Exception to Section 273 claims. For example, in *Atlanta Shipping*, the Court explained the  Insider Antecedent Debt rule in the context of a discussion of the plaintiffs' claims under Section 273-a, as well as Section 273, 274, and 275, each of which are subject to the same requirement of "fair consideration," which the court described to be an "essential element" of each of those constructive fraud claims. *See* 818 F.2d at 248-49. *See, e.g., In Re Sharp Int'l Corp.*, 403 F.3d at 54; *HBE Leasing*, 48 F.3d at 633.

### *Section 276 – Actual Fraudulent Conveyance*

Sections 273, 273-a, and 274 governing constructively fraudulent conveyances turn on

the presence of absence of fair consideration but do not require any showing of intent, while

Section 276 imposes no requirement that a transaction lack fair consideration, it requires that a

conveyance was made with intent "to hinder, delay, or defraud either present or future creditors."

NYDCL § 276 "[e]very conveyance made and every obligation incurred with actual intent, as

distinguished from intent presumed in law, to hinder, dely, or defraud either present or future

creditors, is fraudulent as to both present and future creditors."

Because proving actual intent is difficult, perhaps especially in the fraudulent

conveyance context, the intent may be infered from circumstantial evidence of such intent,

known as the "badges of fraud."  These include:

> [i] a close relationship   between the parties to the transaction, [ii] a secret and hasty
> transfer not in the usual course of business, [iii] inadequacy of consideration, [iv] the
> transferor's knowledge of the creditor's claim and his or her inability to pay it, [v] the use
> of dummies or fictitious parties, and [vi] retention of control of the property by the
> transferor after the conveyance.

Opinion & Order dated July 27, 2016, Dk. 134 at 9-10 of 24 (quotation omitted); *see, e.g.*, *In re*

*Sharp*, 403 F.3d at 56; *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983).

In addition to the badges of fraud quoted in the Court's July 27, 2016 Opinion and Order (Dk.

134 at 9-10 of 24), others include: "(1) the existence or cumulative effect of a pattern or series of

transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or

threat of suits by creditors;" and (2) "the general chronology of the events and transactions under

inquiry." *See Sullivan v. Kodsi*, 373 F. Supp. 2d 302, 306-07 (S.D.N.Y. 2005) (quoting *In re Kaiser,* 722

F.2d 1574, 1582-83 (2d Cir.1983) (quotation omitted)).

## TAX ESTOPPEL

Discovery has revealed several examples of how the Defendants assertions in support of their

motions for summary judgment are contradicted by Jaina's tax returns, which were signed by Defendant

Mahendra Shah, Jaina's President, and the person who held himself out to the New York Department of

State as the "the principal decision maker" of Jaina.  (See Vanjani Cert., ¶¶ 10-11 & Ex. A at GCI-003781). He signed those returns under "penalties of perjury." (See Vanjani Cert. ¶¶ 55-56 & Exs. I, J, K, L, & M; Vanjani Cert., Ex. C, M. Shah Tr. at 157, 158.)

Discovery and investigation has also shown that the assertions that Neminath made in its tax returns, which were also signed under penalty of perjury by Mahendra Shah, also squarely contradicts the Defendants' assertions that $660,000.00 in payments that Jaina made to entities owned by Sanjiv Chand were made in satisfaction of a loan that one of Sanjiv Chand's entities made to Neminath. Contrary to the Third Affidavit of Sanjiv Chand on which the Defendants so heavily rely in contending that no material issues of fact exist about this $660,000 in transferred funds, the payment to the Chand entities did not discharge Neminath's obligation to Kedis, or even discharge Jaina from the $600,000.00 loan Neminath made it (which was not written off until just recently). It means that $660,000.00 was transferred to Chand in exchange for nothing. (Loree September 22, 2017 Cert. ¶¶ 7-38)

Under New York law, "[a] party to litigation may not take a position contrary to a position taken in an income tax return." *Mahoney-Buntzman v. Buntzman,* 12 N.Y.3d 415, 422 (2009); *see, e.g.*, *American Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*, 704 F.Supp.2d 177, 193-94 (E.D.N.Y. 2010) (classifying this tax estoppel rule falling within the rubric of judicial estoppel, and citing cases). "We cannot," said New York's highest court in *Mahoney-Buntzman*t, "as a matter of policy, permit parties to assert positions in legal proceedings that are contrary to declarations made under the penalty of perjury on income tax returns. " *Id*.

The contradictions between what Jaina reported in its tax returns and what Mahendra, and the other defendants say (or suggest) are "undisputed" material facts entitling them to summary judgment, demonstrate, at the very least, genuine issues of fact requiring a trial. Those inconsistencies not only prevent M. Shah from obtaining summary judgment but will preclude him from making at trial most or all of the assertions he makes in this motion.

ARGUMENT

POINT I

RAVI CHOPRA'S AND NYC TELECOM'S MOTIONS FOR SUMMARY
JUDGMENT SHOULD BE DENIED BECAUSE THERE ARE GENUINE
QUESTIONS OF MATERIAL FACT TO BE TRIED CONCERNING GEO-
GROUP'S ACTUAL AND CONSTRUCTIVE FRAUDULENT CONVEYANCE
CLAIMS AGAINST THOSE DEFENDANTS

A.    The NYC Telecom/Chopra Defendants are Not Entitled to Summary Judgment on
      Geo-Group's Actual Fraudulent Conveyance Claims

The Chopra Defendants' motions for summary judgment are predicated almost entirely

on his assertions that the payments made to NYC Telecom and STI Consultants were simply

payments in discharge of antecedent debt and thus not violative of NYDCL Article 10. And

while they deny intent to hinder, delay, or defraud Geo-Group within the meaning of NYDCL

Section 276, those denials simply ignore what evidence shows, including evidence establishing

badges of fraud from which, in conjunction with other evidence in the record, a jury could easily

conclude that Chopra and New York Telecom participated in, and benefited from transfers of

Jaina's assets to Robinson Blog, the Chand entities, STI Consultants, and NYC Telecom, and did

so with the intent to hinder, delay, or defraud Geo-Group's attempt to enforce its judgment.

The Chopra Defendants' almost exclusive focus on whether the transfers at issue were

supported by fair consideration does little or nothing to advance their goal of summary judgment

on Geo-Group's Section 276 claims. Even were the Court were to find that there was no genuine

issue of material fact for trial concerning the existence of a fair consideration, a lack of fair

consideration is not a required element of a Section 276 claim. *HBE Leasing*, 48 F.3d at 633-34

Chopra's intent to hinder, delay, or defraud Geo-Group's efforts to collect the judgment

are demonstrated not only by circumstantial, but direct evidence of  intent to hinder, delay or

defraud Geo-Group:

29

1.  He testified that he thought Jaina was well-positioned in the telecom market and had excellent telecom infrastructure, and that with a $4 million or so commercial credit line, it could be very successful and highly respected in the market. (Chopra Vol I Tr. at 145-48; Chopra Vol. II Tr,. at 225-28)

2.  It was his goal, and the goal of Jaina, for him to procure that $4 million business line of credit for Jaina. (Chopra Vol I Tr. at 145-48; Chopra Vol. II Tr. at 225-28)

3.  He believed that were he successful he would obtain a $200,000.00 commission as well as "something big" from Jaina as additional compensation. (Chopra Vol I Tr. at 145-48; Chopra Vol. II Tr,. at 225-28)

4.   In addition, with Jaina going into the phone market – which NYC Telecom was already in—additional opportunities for a NYC Telecom would arise because Jaina told him that he hand-held

5.  The "other attraction" Jaina provided was that "they say we [Jaina] are launching the mobile phone. So that was a big attraction the prepaid card they are launching. So they are giving me that because they say we can do a lot of business with NYC in the future if we start this." (Chopra Vol. I)

6.  As he saw it, the one thing that was keeping him from achieving these impressive financial goals was the Geo-Group law suit. He was well aware of the existence of the Geo-Group arbitration and litigation and saw it as the reason he could not yet obtain that business line of credit for Jaina. (Chopra Vol I Tr. at 145-48, 151-52; Chopra Vol. II Tr. at 225-28)

Chopra needed the Geo-Group law suit to go away, and apparently, Jaina didn't have the wherewithal to make that happen, or were simply too stubborn or parsimonious to do so. Chopra, who appears to have at least as big a stake in Jaina as anyone else, attempted to settle the case on behalf of Jaina, but despite Mr. Vanjani's best efforts to make a settlement happen, Jaina apparently could not come up with the cash for a lump sum payment. That made Chopra angrily lash out at Mr. Vanjani.

 It was shortly after October  2014, when the confirmation case was argued in New York State Court, that Geo-Group discovered that Chopra's spouse had created a dummy corporation in New York under Geo-Group Communications, Inc. Chopra knew that Geo-Group was, at the same time trying to obtain a license to do business in New York that it didn't need (and never needed) so that it could neutralize Jaina's misplaced defense to confirmation of the award.  (See Chopra Vol I Tr. at 193-97.) In fact, he admits that he had Court papers with him from the confirmation proceeding that he discussed with his spouse, Shalu Suri, who supposedly decided to use the name because she liked it. (Chopra Vol I Tr. at 193-97.)

The transfers in general picked up quite dramatically just prior to and after the July 10, 2014 arbitration award. With the exception of $10,000.00 transferred to STI Consulting, all of the transfers to the Chopra controlled entities, NYC Telecom and STI Consulting, were made after July 10, 2014, and all $400,000.00 to NYC Telecom was transferred during the period between oral argument and the entry of the state court order confirming the award. (TAC at ¶¶ 31 and 37.

The payments of $660, 000.00 which arose out of the Neminath loan Chopra brokered from his friend or associate of 5 or 10 years, were all made after the award. And the Chand Third Affidavit claiming those payments were in discharge of a Neminath's loan has been discredited

by Neminath's tax returns and M. Shah's own testimony. It is strange that Chopra and NYC are depending on that affidavit in support of summary judgment given the other evidence in the record that contradicts it.

Even if certain of the transfers were bona fide loans, the timing of the transactions suggests that Chopra, knowing that the end was drawing near, and ensuring that his own friends and associates would get their money rather than Geo-Group. That was both a benefit to Chopra, whose relationships with local lenders would improve and a detriment to Geo-Groups, whom Chopra saw as a bar to his future financial success.

More circumstantial evidence of fraud can be gleaned by Jaina's unusually aggressive attempt to oppose confirmation of the arbitration award when there were no real grounds to do so, and its hiring of an additional, new lawyer to help make that happen. Still more can be found in how M. Shah thwarted S. Bose's attempt to settle the case by threatening to cut off Jaina's power. (Vanjani Cert. at ¶¶ 94-103)

The evidence of their being at least four million dollars in cash missing from Jaina's coffers (or at least not accounted for in them) is also very suggestive of fraud. The circumstantial evidence suggests that, in addition to the transfers that are the subject of this case, that cash has mysteriously disappeared. All the witnesses, of course, profess to know nothing about this.

The Robinson Brog transfers provide additional circumstantial evidence of fraud. As explained in our response to Chopra's 56.1 Statement, the testimony by TD Time that it loaned funds to Jaina on behalf of Vision Impex made little economic sense since Jaina already owed TD Time a lot of money. (Singh Tr. at 60) If that payment by TD Time hadn't been credited to Vision Impex, then a substantial portion of the Robinson Brog payments could not be attributed to antecedent loans.

The Robinson Brog transfers are rather strange. On the one hand it seems plausible that Vision Impex has an attorney-client relationship with Mitchell Greene that includes Robinson Brog using money deposited into escrow accounts to help clients purchase distressed assets. But why in this case was it so important that some $1,350,000.00 in funds be remitted to Jaina with the instructions for Jaina to pay back all of the funds to Robinson Brog?

Also indicative of an unusual transaction is how payments from Tricom to Jaina have been transformed into a loan to NYC Telecom from Jaina. The Tricom witness, Mr. Narang has submitted what purport to be two invoices for cell phones which are supposed to total $331,000.00. He submits two invoices to substantiate his debt to NYC Telecom. One is in the amount of $182,500.00 and is dated September 24, 2014. The other is for $148,500.00 and is dated October 2, 2014. (See Narang Dec., Exs 1 & 2.) But in the first invoice, the number that appears for "Job Balance" is $331,000.00. That number also appears in the second invoice, where it really does represent the balance. One would expect the balance of the first invoice to be $182,500, as it would be in any other invoice. Even if the parties knew in advance that there would be two purchases of cell phones totaling $331,000.00, it would still make no sense for the "Job Balance" to be $331,000 on either invoice. Instead the Job Balance in the first invoice would be the amount of the second invoice and the second invoice job balance would be zero.

To make things worse, Chopra never previously produced these invoices.

That Chopra has a "close relationship" with Jaina is subsumed in much of what we've already said, but in addition, V. Shah and M. Shah have both characterized Mr. Chopra as playing multiple, and important roles in his dealings with Jaina. (See Vanjani Cert. ¶ 60, Ex. D, V. Shah Tr. at 72, 75, 76; see Vanjani Cert., Ex. C, M. Shah Tr. at 222-23; Affidavit of M. Shah, sworn to December 7, 2017, Dk. 208 at 4 of 10.)

Also indicative of the close relationship between Chopra and M. Shah and V. Shah is the lengths to which M. Shah in the particular has taken it on himself to stress in capital letters anything that he believes might advance Chopra's case. And both were careful in their depositions in an attempt to avoid harming his case.

Finally, there is a global question of fact that exists in this case as to "fair consideration." While not required to establish liability under Section 276, an absence of fair consideration is a badge of fraud. As discussed in the fact section and in Mr. Vanjani's certification, there is a fundamental conflict between Jaina's tax returns and the Defendants arguments that all of these unusual transactions were simply antecedent loans: They are not reflected in Jaina's 2013 through 2015 tax returns, even though the returns require them to be itemized.  (See Vanjani Cert. ¶¶ 114-136.

Finally, there is no dispute that none of these alleged loans are documented, apart from the Commercial Loan Agreement.

B.     There are Disputed Issues of Fact Concerning Geo-Group's Constructive Fraud
         Claims against Chopra/NYC Telecom

Geo-Group's response to the Rule 56.1 Statement of Chopra and NYC Telecom addresses the many questions of fact precluding summary judgment, including the issues of fact concerning solvency and fair consideration. As noted above, however, the absence of any record of these "loans" made on the tax returns precludes summary judgment on those claims.

Chopra's admissions about his economic stake and motives precludes summary judgment on the issue of whether he benefited from the transfers, and the there is sufficient evidence to show that he participated in them.

<u>POINT II</u>

THE SHAHS ARE NOT ENTITLED TO SUMMARY JUDGMENT

A.    The Shahs are Not Entitled to Summary Judgment on their Constructive Fraud
       Claims

The Shah's are proceeding pro se and their summary judgment motions do not establish

that all or even some of the material facts pertinent to Geo-Group's claims are undisputed. Their

motions mainly make assertions that contradict with Geo-Group's assertions. Many of these

assertions are conclusory.

While the Shahs do not appear to meet their burden on their motions, we   nevertheless

address why they are not entitled to summary judgment. First, to the extent they say that the

transfers are antecedent loans, those statements are inconsistent with Jaina's tax returns. That

means Mahendra is estopped from making them at all, and the contradictions create questions of

fact for the other Defendants.

Second as respects Mahendra's Shah's claim that he was not involved in the transfers or

that somehow he had no control over Surajit Bose's wire transfers, they are controverted by his

deposition testimony concerning his control over the "fob" he used to make wire transfers, or to

authorize Bose to make them. Bose had no fob during the period the transfers were made.

(Vanjani Cert., ¶¶ 32-34) He participated in all the transactions.

Third, the same issues of material fact that concern the constructive fraud claims against

Chopra are also questions of fact as respects M. Shah, who is being held responsible for his

participation and benefit he received from those transactions. Both Chopra and M. Shah were

motivated by their stake in Jaina to try to frustrate Geo-Group from enforcing its judgment. That

Shah has now asserted ownership of Jaina's infrastructure, refusing to let Bose have it, is

evidence of Mahendra's substantial stake in Jaina.

35

Fourth, issues of material fact concerning insolvency or insufficient capital are addressed in our response to Chopra/NYC Telecom's Rule 56.1 Statement.

Fifth, as respects V. Shah's claims, he is not only the family member of a Jaina officer and substantial shareholder, but N. Shah was made an officer and shareholder in consideration for money V/ Shah had lent in the early days of Jaina, so he is the functional equivalent of an officer or director of the company. Given that Jaina was insolvent or left without sufficient capital by the transactions, that means that there is, as a matter of law, unfair consideration for the so-called loans.

Sixth, even if there were no material questions of fact about insolvency or inadequate capital, the payments to V. Shah occurred after the arbitration was commenced, and, given the special circumstances concerning V. Shah's spouse, those loans should be considered to be lacking in consideration as a matter of law. That is also all the more so in terms of V. Shah having held himself out as the President of Jaina.

B.     There is no Basis for Summary Judgment on the Section 276 Claims Against the Shahs

There are several badges of fraud that apply to the Shahs in addition to those discussed in the section concerning the Section 276 Claims against NYC Telecom/Chopra, which we won't repeat here.

First, there is undoubtedly a close relationship between V. Shah and M. Shah, V. Shah and Jaina. (Vanjani Cert. at ¶¶ 17-25).

Second, the timing of the payments by check Shah made to V. Shah and others was very suspicious. Not all of the checks have been produced, and the additional payments increased substantially after the Award was made. (Vanjani Cert. at ¶¶ 108-13)

Third, there are questions of facts about consideration because none of the alleged loans was in writing and the loans were not reported in the tax returns. (Vanjani Cert. ¶¶ 115-36) .

Fourth, V. Shah was involved in the fraudulent obtaining of the Citibank loan, along with R. Chopra, and the suspicious disappearance of $470,000.00 in cash on the day the first $500,000.00 of the loan was deposited. (Loree Cert., Ex. E at GCI_Bank-000018.)

CONCLUSION

For all of the foregoing reasons, the Court should deny the Defendants' motions for summary judgment in their entirety.

Dated: New York, New York
       January 31, 2018

By:   /s/ Philip J. Loree Jr.
      Philip J. Loree Jr. (PL-2213)
      830 Third Avenue, 5th Floor
      New York, New York 10022
      (646) 253-0560
      (516) 627-1720 (alt.)
      (516) 941-6094 (mobile)
      PJL1@LoreeLawFirm.com

      *Counsel for Plaintiff Geo-Group
      Communications, Inc.*

To:   All Counsel of Record and Parties as set
      forth in the attached Certificate of
      Service

37