UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

GEO-GROUP COMMUNICATIONS, INC.,

                            Plaintiff,

                      v.

RAVI CHOPRA; NYC
TELECOMMUNICATIONS CORP.;
MAHENDRA SHAH; and VIPIN SHAH,

                         Defendants.

------------------------------------------------------X

15 Civ. 1756 (KPF)

OPINION AND ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  July 30, 2018

KATHERINE POLK FAILLA, District Judge[1]:

On July 10, 2014, Plaintiff Geo-Group Communications, Inc. ("Plaintiff" or "Geo-Group") obtained an arbitration award against Jaina Systems Network, Inc. ("Jaina"), and on April 3, 2015, Plaintiff obtained a judgment in New York State Supreme Court, New York County, confirming that award in the amount of $2,712,175.51. After Jaina failed to satisfy that judgment, Plaintiff's principal, Govind Vanjani, engaged with several agents and delegates of Jaina to discuss a settlement. When those conversations stalled, Vanjani began to follow the money; he now alleges that Defendants are the recipients or beneficiaries of a series of fraudulent conveyances.

After several attempts to plead viable claims, Plaintiff filed its Third Amended Complaint ("TAC") on February 22, 2016, based largely on Vanjani's

---

[1]    The Third Amended Complaint named Shalu Suri in the case caption, but dropped all claims against her. (Third Amended Complaint ("TAC") (Dkt. #105)) ¶ 19). Accordingly, the Clerk of Court is directed to terminate Suri as a party to this matter.

own analysis of Jaina's bank statements, and alleged actual and constructive

fraudulent conveyance under the New York Debtor and Creditor Law.

Following a motion to dismiss, Plaintiff's claims against Defendants Ravi

Chopra ("Chopra"), NYC Telecommunications Corp. ("NYC Telecom" and,

together with Chopra, the "Chopra Defendants"), Mahendra Shah ("M. Shah"),

and Vipin Shah ("V. Shah" and, together with M. Shah, the "Shah Defendants")

proceeded to discovery.  The record now before the Court demonstrates that

Plaintiff's claims against the Chopra Defendants and M. Shah fail as a matter

of law, but that genuine disputes of material fact preclude summary judgment

in favor of V. Shah.

**BACKGROUND**[2]

## A.    The Parties

Geo-Group is a telecommunications company that was in the business of

buying minutes from carriers and reselling those minutes to an array of

---

[2]    The facts recounted herein are drawn from the parties' submissions in connection with Defendants' motion.  In particular, the Court looks to the Local Rule 56.1 Statements filed by Chopra and NYC Telecom ("Chopra 56.1" (Dkt. #199)), V. Shah ("V. Shah 56.1" (Dkt. #202)), and M. Shah ("M. Shah 56.1" (Dkt. #209)), and Plaintiff's responses ("Pl. Chopra 56.1 Opp." (Dkt. #219); "Pl. M. Shah 56.1" and "Pl. V. Shah 56.1" (Dkt. #222)).  The parties have submitted numerous deposition transcripts, affidavits, certifications, and declarations, with voluminous exhibits attached thereto.  These documents will be referred to using the conventions "[Name] Dep.," "[Name] Decl.," and so forth.  For convenience, the Court will refer to Chopra's and NYC Telecom's moving brief as "Chopra Br." (Dkt. #194), to V. Shah's brief as "V. Shah Br." (Dkt. #201), to M. Shah's brief as "M. Shah Br." (Dkt. #207), to Plaintiff's consolidated opposition as "Pl. Opp." (Dkt. #220), to Chopra's and NYC Telecom's reply brief as "Chopra Reply" (Dkt. #230), to V. Shah's reply brief as "V. Shah Reply" (Dkt. #234), and to M. Shah's reply brief as "M. Shah Reply" (Dkt. #233).

Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein.  Where a fact stated in either party's Rule 56.1 Statement is supported by evidence and denied with merely a conclusory statement by the other party, the Court finds such facts to be true.  *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of

customers. (Vanjani Cert. ¶ 6). Non-party Jaina was a customer of Geo-Group. (*Id.* at ¶ 7).

Ravi Chopra is the President of NYC Telecom, a company that sells phone cards and phone card subscriber identification modules (or SIMs). (Chopra Decl. ¶¶ 1-3). NYC Telecom uses the trade name STI Phone Card Warehouse. (*Id.* at ¶ 1). Chopra is also the sole shareholder of non-party entity STI Consultants, which is the trade name for the corporation New York Main Street Consulting, Inc., and of which Jaina was a client. (*Id.* at ¶¶ 1, 4-5, 31). Mahendra Shah was a shareholder and the President of Jaina. (M. Shah Aff. ¶ 1). Vipin Shah is Mahendra Shah's brother; Vipin Shah's wife, Nayana Shah, was a Jaina shareholder; and Vipin Shah and his wife often transferred money to Jaina. (V. Shah Aff. ¶¶ 3-4).

**B.  Factual Background**

The parties do not dispute the fact of the arbitration between Plaintiff and Jaina; that it commenced on May 30, 2013; that Plaintiff prevailed in that proceeding on July 10, 2014; or that the award was confirmed by the Supreme Court, New York County, which issued judgment on April 3, 2015, in the amount of $2,712,175.51. (Chopra 56.1 ¶¶ 8-10).

The principal dispute among the parties remaining in this litigation concerns whether certain transfers from Jaina's accounts to various third

---

the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be submitted by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

parties were made to satisfy antecedent loan debts. Only one of these alleged loans was reduced to a writing; the loans were otherwise made pursuant to verbal agreements from private lenders. In consequence, the evidence of these loans rests entirely on testimony and affidavits from Jaina representatives and the third parties with which they transacted. Complicating matters further, two of the key witnesses to these loans — Jaina's CEO, Surajit Bose, and its accountant, Jagdish Alwani — are unavailable; Bose is believed to be living abroad and Alwani has passed away. Thus, while the parties have submitted bank records, and while these records verify the fact of the transactions, they do nothing to substantiate any party's explanation of why the transactions occurred. Accordingly, when reviewing the record before it, the Court remains mindful of the admonition that trial courts should not make credibility determinations to resolve a motion for summary judgment. *Soto* v. *Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017).

The TAC, and thus the parties' submissions in connection with the instant motion, centers on four groups of allegedly fraudulent transfers; the Court reviews each in turn.

### 1.    The Transfers to Robinson Brog

Plaintiff alleges that Jaina improperly transferred $1,350,000 to the law firm Robinson Brog Leinwand Greene Genovese & Gluck, P.C. ("Robinson Brog"), from February through October 2014. (TAC ¶¶ 23-26). Bank statements and wire transfer receipts reveal that from October 2013 through September 2014, Jaina received a series of cash infusions from the entities TD

Time and Vision Impex.[3]  (Chopra 56.1 ¶¶ 33-47; Siddiqi Decl., Ex. A-3–A-5 (wire transfer receipts), Ex. B-1–B-8 (bank statements)).  TD Time is owned by Surjeet Singh and conducts business in real estate and wholesale cell phones. (Chopra 56.1 ¶¶ 23-24).  Singh testified that Jaina's accountant, Jagdish Alwani, approached him to ask for a short-term loan to help Jaina get through a "financial crisis," and that Singh loaned Jaina $250,000 through a series of four transfers spanning October to December 2013.  (Singh Dep. 14:12-25, 30:2-31:21, 34:2-36:11; Siddiqi Decl., Ex. A-3–A-5).  Singh further testified that he expected to receive his money back in 90 days, as was customary for short-term loans in his line of business, but that he still had not been repaid at the time he testified in September 2017.  (Singh Dep. 36:12-37:13).

Later, Singh entered into a transaction to buy wholesale cell phones from an individual named Dalip Kumar, who owned a company called Vision Impex. (Singh Dep. 17:10-25).  Kumar also knew Alwani and wanted to assist Jaina; when Kumar billed Singh for the cell phones, he requested that Singh pay the money he owed for the phones to Jaina directly.  (*Id.*).  Singh testified, and bank records confirm, that he made two transfers to Jaina in January 2014 to satisfy his payment to Vision Impex — one for $102,500 and one for $211,500. (*Id.* at 32:4-25, 39:25-43:21; Siddiqi Decl., Ex. A-2, C-3).

Kumar testified at his deposition that he lent money (through Vision Impex) to Jaina on other occasions.  (Kumar Dep. 13:6-8, 14:22-16:10).

---

[3]    Vision Impex has, at times, been transcribed in deposition transcripts as "Vision Impacts."  Based on the parties' submissions, the Court understands the company's name to be Vision Impex.

5

Kumar recalled that Alwani approached him and told him that Jaina was having financial troubles and needed money. (*Id.* at 28:1-18). Kumar testified that Jaina repaid those loans by sending money into an account held by the law firm Robinson Brog, which he had retained as counsel to Vision Impex. (*Id.* at 16:11-17:7). A. Mitchell Greene, a shareholder at Robinson Brog, averred that Robinson Brog had been retained by Vision Impex, and that the transfers identified in Paragraphs 23 to 26 of the TAC had been received in Robinson Brog's Interest on Lawyer Account on behalf of Vision Impex. (Greene Aff. ¶¶ 3-4). Bank statements reflect that in April, May, August, and September 2014, Vision Impex transferred a total of $938,450 to Jaina. (Siddiqi Decl., Ex. C-3). In total, by October 1, 2014, Jaina received $1,252,450 directly from Vision Impex or from Singh on behalf of Vision Impex.

Kumar testified that he charged interest in the amount of 1.5% per month on his loans to Jaina. (Kumar Dep. 41:4-12). From February 26, 2014, to October 1, 2014, Jaina transferred $1,350,000 to Robinson Brog. (Siddiqi Decl., Ex. C-3). On October 16, 2014, and on November 3, 2014, Vision Impex made additional transfers to Jaina, totaling approximately $200,000. (*Id.*). Kumar testified that these loans still have not been repaid. (*Id.* at 15:6-18).

Defendants are in agreement that the payments to Robinson Brog represent satisfactions of antecedent loans. At his deposition, Chopra testified that he helped to broker these loans; that he understood from either Bose or Alwani that Jaina had taken loans from TD Time and Vision Impex; and that those loans were repaid through payments to the law firm Robinson Brog.

6

(Chopra Dep. 153:25-155:18, 161:4-9).[4] Chopra disclaims any affiliation with Robinson Brog, and attorney Greene confirmed that, to the best of his knowledge, neither Chopra nor NYC Telecom had ever been clients of or indebted to Robinson Brog. (Chopra Decl. ¶¶ 11-14; Greene Decl. ¶ 5). M. Shah offers the same explanation for these transactions. (M. Shah 56.1 ¶ b).[5] Plaintiff admits that Alwani solicited loans from TD Time, but disputes that Vision Impex had any role in these loans; Plaintiff likewise admits the fact of the wire transfers from TD Time and Vision Impex, but disputes that they represent loans from these entities. (Pl. Chopra 56.1 Opp. ¶¶ 31-51). Plaintiff also disputes the role of Robinson Brog in the alleged loan repayments. (*Id.*). In particular, the TAC alleged that the payments to Robinson Brog were made at Chopra's direction to satisfy a debt Chopra owed to that firm. (TAC ¶¶ 24-26). There is nothing in the record that supports this assertion.

## 2.    The Transfers to the LLC Entities

The only one of the putative loans to be reduced to writing was the January 18, 2013 Commercial Loan Agreement ("CLA") between Sanjiv Chand on behalf of his company, Kedis Enterprises LLC ("Kedis"), and M. Shah on behalf of his company, Neminath, Inc. ("Neminath"). (M. Shah 56.1, Ex. 215). The CLA memorialized a $600,000 loan from Kedis to Neminath with 15% annual interest, and with a building Neminath owned in Williston Park, New

---

[4]    Despite Chopra's testimony, Kumar testified that Chopra was not involved in arranging the loans from TD Time and Vision Impex to Jaina, and that the only time he dealt with Chopra was when he was having trouble getting repaid. (Kumar Dep. 28:1-29:19).

[5]    M. Shah used a mix of lettered and numbered paragraphs in his Local Rule 56.1 Statement.

York, posted as collateral. (*Id.*). The loan was personally guaranteed by M. Shah, V. Shah, and their wives. (*Id.*). The mortgage was recorded with the Nassau County clerk. (*Id.*). A wire transfer receipt from Citizens Bank shows that on January 22, 2013, Kedis transferred $600,000 to Neminath. (Siddiqi Decl., Ex. C-18).

Chand stated in an affidavit that he understood that the money he loaned to Neminath would be used for Jaina's benefit. (Chand Aff. ¶ 6). Plaintiff fails to respond to Chopra's allegation that the transfer from Kedis to Neminath was a loan, and indeed admits that the money was to be used by Jaina. (Pl. Chopra 56.1 Opp. ¶¶ 80-81).[6] The parties agree that $570,000 ($600,000, less closing costs) was transferred from Neminath to Jaina between January 22, 2013, and February 6, 2013. (*Id.* at ¶ 82). Chand states that he understood that Jaina — and not Neminath — would repay this loan, and that he assigned Kedis's right to collect on the loan to the entities 728 Melville Petrol LLC ("Melville") and JMVD Hillside ("JMVD," and together with Kedis and Melville, the "LLC Entities"). (Chand Aff. ¶¶ 1-2, 9, 11). Chand asked Jaina to send the loan repayments to the LLC Entities directly, and he avers that the payments from Jaina to these entities that are recounted in Paragraphs 37 to 44 of the TAC were made in satisfaction of the debt incurred under the CLA. (*Id.* at ¶¶ 12-13). Chand also states that Kedis loaned $200,000 directly to

---

[6]    Because of a typographical error in Plaintiff's submission, the numbers after Paragraph 79 of Plaintiff's opposition to Chopra's Local Rule 56.1 Statement are off by one number. The Court endeavors to correct this problem when citing to Plaintiff's opposition, and will use the number of the corresponding paragraph in Chopra's statement.

Jaina on December 16, 2013. (*Id.* at ¶ 14). A wire transfer receipt confirms this. (Siddiqi Decl., Ex. C-18). Chand states that the transfers recounted at Paragraphs 51 and 52 of the TAC were made in satisfaction of this loan. (Chand Aff. ¶ 14).

Plaintiff alleges, and bank statements confirm, that: (i) in January 2014, Jaina made two transfers to Kedis, totaling $200,000; (ii) on August 13, 2014, Jaina transferred $200,000 to JMVD; and (iii) in October 2014, Jaina made a series of transfers totaling $460,000 to Melville. (TAC ¶¶ 37-44, 51-52; Siddiqi Decl., Ex. C-3). M. Shah states that these payments were made to satisfy loan debts. (M. Shah 56.1 ¶¶ e-g). Chopra supports this statement; he testified at his deposition that he was approached by Alwani, who was looking for financing for Neminath to use for the benefit of Jaina. (Chopra Dep. 45:19-52:23). Chopra testified that Jaina was chronically short on cash, and he was told that Jaina needed money quickly. (*Id.*). Chopra understood that because Neminath had a building to put up as collateral, Alwani and Bose decided to seek funding using Neminath that they could then transfer to Jaina. (*Id.*). Chopra helped arrange the loan with Chand and received a broker's fee. (*Id.* at 62:4-15, 77:21-24).

Plaintiff disputes that the payments from Jaina to Kedis were made in satisfaction of existing loan debts. (*See, e.g.*, Pl. Chopra 56.1 Opp. ¶ 83). Plaintiff points to Neminath's 2014, 2015, and 2016 tax returns (submitted to the Court in connection with earlier motion practice) that show an outstanding $600,000 loan receivable due and owing from Jaina even after these transfers

were made.  (*Id.*; *see also* Dkt. #180-3, 180-4, 180-5).  Jaina's 2014 and 2015

tax returns show liabilities in excess of $600,000, but do not itemize to whom

those liabilities are owed.  (Vanjani Cert., Ex. L-M).

### 3.    The Transfers to Chopra-Owned Entities

Entities owned and controlled by Ravi Chopra also transferred money to

Jaina.  In January 2013, STI Consultants issued checks worth $29,500 to

Jaina, and in January 2014, STI Consultants wired $100,000 to Jaina.

(Chopra Decl., Ex. A-C).  Copies of checks, wire transfer receipts, and Jaina's

bank statements confirm these transfers.  (*Id.*; Siddiqi Decl., Ex. C-3).  In total,

STI Consultants transferred $129,500 to Jaina.

In January, September, and October 2014, Jaina made a series of

transfers to STI Consultants.  (*See* Siddiqi Decl., Ex. C-3).  Chopra states in his

Declaration and testified at his deposition that Jaina only repaid $109,000.

(Chopra Decl. ¶ 27; Chopra Dep. 293:3-15).  The Court's review of Jaina's bank

statements reveals that Jaina transferred more than $109,000 (even

accounting for alleged transfers that the parties agree did not occur or were

subsequently reversed); at the very least, the bank statements show that Jaina

transferred no less than $109,000 to STI Consultants in 2014.  (*See* Siddiqi

Decl., Ex. C-3).

Chopra's company, Defendant NYC Telecom, also transferred money to

Jaina.  In January 2013, NYC Telecom issued a check for $25,000 to Jaina,

and in November 2013, it issued checks worth $145,088 to Jaina.  (Chopra

Decl., Ex. F-H).[7] In 2014, NYC Telecom engaged in two transactions to sell merchandise to an entity called Tricom International, LLC ("Tricom"). (*Id.* at ¶¶ 36-37). Invoices show that on September 24, 2014, NYC Telecom billed Tricom $182,500 for cell phones and SIM cards, and that on October 2, 2014, NYC Telecom billed Tricom $148,500 for SIM cards and calling cards. (*Id.* at Ex. I-J). Chopra states in his Declaration that he asked Tricom to wire its payments for the merchandise directly to Jaina. (*Id.* at ¶ 38).

Charan Narang, Tricom's manager, states in his Declaration that Chopra asked him to send his payments for the merchandise to Jaina instead of to NYC Telecom; Narang understood that those transfers would discharge Tricom's debt to NYC Telecom, and that Jaina would thereafter be indebted to NYC Telecom, not to Tricom. (Narang Decl. ¶ 9). Attached to the Narang Declaration are two wire transfer receipts — one is dated October 23, 2014, and shows a transfer of $182,500 from Tricom to Jaina; the other is dated October 30, 2014, and shows a transfer of $148,500 from Tricom to Jaina. (*Id.* at Ex. C-D). Jaina's bank statements reflect it received these transfers from Tricom. (Siddiqi Decl., Ex. C-3). In total, Jaina received $501,088 directly from NYC Telecom or from Tricom on behalf of NYC Telecom.

According to Jaina's bank statements, Jaina transferred a total of $406,000 to NYC Telecom from October to December, 2014. (Siddiqi Decl., Ex. C-3). Chopra testified at his deposition that he caused NYC Telecom to give

---

[7]     Chopra's Declaration says that one of these transfers occurred in January 2014, but the checks attached as exhibits to the Declaration are dated January and November 2013.

this money to Jaina as a loan, and that Jaina still owed him about $100,000

on that loan. (Chopra Dep. 297:12-298:15). Plaintiff disputes that these

payments to STI Consultants and NYC Telecom were meant to satisfy existing

debts; in particular, Plaintiff notes the absence of writings reflecting the alleged

loans from Chopra's companies to Jaina. (Pl. Chopra 56.1 Opp. ¶¶ 58-77).[8] M.

Shah states that these payments were made to satisfy antecedent loan debts.

(M. Shah 56.1 ¶¶ c-d).

### 4.  The Transfers to Defendant Vipin Shah

Finally, the record reflects that V. Shah, whose brother and wife were

Jaina shareholders, transferred large sums of money from his and his wife's

bank accounts to Jaina over the years. V. Shah attaches to his Local Rule 56.1

Statement copies of checks and transaction receipts showing transfers from his

accounts to Jaina, often in the tens or hundreds of thousands of dollars. (*See*

V. Shah 56.1, Ex. 301). V. Shah also attaches documentation of a $249,500

line of credit that he and his wife took out on their home on August 28, 2012,

through Capital One Bank, as well as Capital One Bank account records

showing that he drew down the full amount of the credit line on September 5,

2012, and withdrew $260,000 from his account the next day. (*Id.* at Ex. 302-

303). The appended documents also include receipts showing that the

$260,000 was transferred to Jaina. (*Id.*). V. Shah contends that he transferred

nearly $2,000,000 to Jaina from 2010 to 2014. (*Id.* at Ex. 301).

---

[8]     Plaintiff also disputes the validity of the invoices to Tricom, but Plaintiff's objection is
facially implausible, and the Court rejects it out of hand. (*See* Pl. Chopra 56.1 Opp.
¶ 74).

Plaintiff alleges that Jaina transferred $685,603 to V. Shah between June 2013 and December 2014. (Vanjani Cert. ¶¶ 104-05). The Chopra Defendants' submissions do not address these transfers, as there is no allegation that they had any involvement in them. M. Shah, like V. Shah, contends that the transfers from Jaina to V. Shah were made to satisfy antecedent loan debts. (M. Shah 56.1 ¶ h).

## C. Procedural Background

The parties commenced discovery in this matter on September 14, 2016, but discovery was stayed on January 27, 2017, in light of the Shah Defendants' bankruptcy filings. (Dkt. #139, 158). The stay was lifted on July 25, 2017, after the Court learned that the Bankruptcy Court would allow this litigation to proceed. (*See* Dkt. #172). During a conference with the Court on July 25, 2017, the Shah Defendants' counsel requested leave to withdraw and, following an *ex parte* discussion with counsel and the Shah Defendants, the Court found that there were sufficient grounds to grant counsel's applications, and the Shah Defendants have since proceeded *pro se*.

Following the close of fact discovery, Chopra and NYC Telecom filed a joint motion for summary judgment on December 4, 2017 (Dkt. #193-199); V. Shah filed his motion for summary judgment on December 11, 2017 (Dkt. #200-202); and M. Shah filed his motion for summary judgment on December 14, 2017 (Dkt. #207-209). Plaintiff filed a consolidated response on January 30, 2018 (Dkt. #218-222). Chopra and NYC Telecom filed reply papers on February 28, 2018 (Dkt. #230-232); V. Shah filed a reply brief on

March 14, 2018 (Dkt. #234-235); and M. Shah filed a reply brief on March 15, 2018 (Dkt. #233).

**DISCUSSION**

**A.    Applicable Law**

**1.    Motions for Summary Judgment Under Federal Rule of Civil Procedure 56(a)**

Under Rule 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (internal quotation marks and citation omitted), and a fact is material if it "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248. The movant may discharge its burden by establishing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. In reviewing a motion for summary judgment, "a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor." *Jeffreys* v. *City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). Even so, the nonmoving party may not defeat summary judgment through a mere "show[ing] that there is some metaphysical

doubt as to the material facts[,]" and must instead "come forward with specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co., Ltd.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation marks and citation omitted). Rather, the nonmoving party "must set forth specific facts showing a genuine issue for trial[,]" and may not rely on "mere allegations or denials[.]" *Anderson*, 477 U.S. at 248.

Defendants Mahendra Shah and Vipin Shah have, at times, been represented by counsel in this case, but have been proceeding *pro se* since July 2017, and have filed their motions for summary judgment without the assistance of counsel. The Court will, as it must, liberally read the Shah Defendants' submissions "to raise the strongest arguments they suggest." *Triestman* v. *Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (quoting *Pabon* v. *Wright*, 459 F.3d 241, 248 (2d Cir. 2006)).

### 2.     Fraudulent Conveyance Under Article 10 of the NYDCL

The Court has twice set forth the law that governs this case in prior Opinions, and proceeds to do so a third time. Article 10 of the New York Debtor and Creditor Law (the "NYDCL"), which comprises sections 270 to 281 of the statute, provides a "set of legal rather than equitable doctrines, whose purpose is not to provide equal distribution of a debtor's estate among creditors, but to aid specific creditors who have been defrauded by the transfer of a debtor's property." *HBE Leasing Corp.* v. *Frank*, 48 F.3d 623, 634 (2d Cir. 1995). Plaintiff's TAC raises claims under sections 273, 273-a, 274, and 276 of the NYDCL. The purpose of these statutes is to recover money or property that

has been fraudulently conveyed by permitting a creditor to set aside the conveyance.  N.Y. Debt. & Cred. L. § 278.  However, a creditor may not recover against "a purchaser for fair consideration without knowledge of the fraud at the time of the purchase."  *Id.*

### a.  Constructive Fraud Under §§ 273, 273-a, and 274

Section 273 provides that "[e]very conveyance made … by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made … without a fair consideration."  Insolvency is presumed if a conveyance is made without fair consideration, and the burden rests with the transferee to rebut the presumption.  *United States* v. *Watts*, 786 F.3d 152, 165 (2d Cir. 2015).  "A debtor is considered insolvent when the 'present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.'"  *Id.* at 164 (quoting N.Y. Debt. & Cred. L. § 271).

Section 273-a creates an analogue that applies to conveyances made by defendants in legal proceedings.  It provides:

> Every conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after the final judgment for the plaintiff, the defendant fails to satisfy the judgment.

Section 274 imposes liability for a conveyance "made without fair consideration when the person making it is engaged or is about to engage in a business or

transaction" that leaves the transferor with "unreasonably small capital" on hand. Such a conveyance "is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to [the transferor's] actual intent." N.Y. Debt. & Cred. L. § 274.

Sections 273, 273-a, and 274 all ask whether the transfer was made for "fair consideration." Under section 272, fair consideration is found when the transferor, (i) in good faith, (ii) receives "fair equivalent" property or the discharge of an equivalent antecedent debt. N.Y. Debt. & Cred. L. § 272; *see also In re Sharp Int'l Corp.*, 403 F.3d 43, 53-54 (2d Cir. 2005) ("The fair consideration test is profitably analyzed as follows: [i] the recipient of the debtor's property must either (a) convey property in exchange or (b) discharge an antecedent debt in exchange; and [ii] such exchange must be a fair equivalent of the property received; and [iii] such exchange must be in good faith." (citation, internal quotation marks, and brackets omitted)). A lack of good faith can be established by one of the following factors: "(i) a lack of honest belief in the propriety of the transfer in question; (ii) an intent to take unconscionable advantage of others; or (iii) an intent to, or knowledge of the fact that the activities in question will hinder, delay, or defraud others." *Geo-Grp. Commc'ns, Inc.* v. *Chopra*, No. 15 Civ. 1756 (KPF), 2016 WL 4098552, at *3 (S.D.N.Y. July 27, 2016) (quoting *Staudinger+Franke GMBH* v. *Casey*, No. 13 Civ. 6124 (JGK), 2015 WL 3561409, at *10 (S.D.N.Y. June 8, 2015)). However, courts have recognized the tension of a statutory scheme that requires good

faith while imposing liability without regard to intent.  *In re Sharp*, 403 F.3d at 54.

A preferential repayment of an antecedent debt is not a fraudulent conveyance, regardless of "whether or not it prejudices other creditors, because the basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy *some* of its creditors; it normally does not try to choose among them."  *HBE Leasing*, 48 F.3d at 634.  However, payments of pre-existing loan debts will *not* constitute fair consideration where those payments are made "to a debtor corporation's shareholders, officers, or directors[.]"  *Id.*[9]

Liability under sections 273, 273-a, and 274 may be imposed on a party "who assisted in the fraudulent conveyance where the defendant was itself a transferee of the assets or a beneficiary of the conveyance."  *Amusement Indus., Inc.* v. *Midland Ave. Assocs., LLC*, 820 F. Supp. 2d 510, 533 (S.D.N.Y. 2011).  That said, there is no liability for aiding and abetting a fraudulent conveyance, nor is there constructive fraud liability for a transferor of funds.  *Id.*  Finally, the Court has explained twice before that "the weight of the case law suggests that while the heightened pleading standard of Rule 9(b) applies to claims of actual fraud under § 276, it does not govern claims for constructive fraudulent transfer under §§ 273, 273-a, or 274."  *Geo-Grp. Commc'ns, Inc.*, 2016 WL

---

[9]    Plaintiff reads the Court's prior Opinion in this case to confine the operation of the corporate insider exception to the antecedent debt rule to section 273 only.  (Pl. Opp. 26).  The Court meant no such thing:  The law of fair consideration under section 272 — including the antecedent debt rule and the corporate insider exception — applies with equal force to claims under sections 273, 273-a, and 274.  *See Atlanta Shipping Corp., Inc.* v. *Chem. Bank*, 818 F.2d 240, 248-49 (2d Cir. 1987).

4098552, at *4 (citing *Geo-Grp. Commc'ns, Inc.* v. *Chopra*, No. 15 Civ. 1756 (KPF), 2016 WL 390089, at *5 (S.D.N.Y. Feb. 1, 2016) (collecting cases)).

### b. Actual Fraud Under § 276

Section 276 states that "[e]very conveyance made ... with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." Unlike the constructive fraud statutes, section 276's prohibition on actual fraud centers on the transferor's intent and does not have any requirement regarding consideration or insolvency. Thus, "a cause of action [under section 276] may lie even where fair consideration was paid and where the debtor remains solvent." *Amusement Indus.*, 820 F. Supp. 2d at 530 (internal quotation marks and citation omitted). Proof of intent to defraud is rare and, thus, courts have held that

> creditors may rely on "badges of fraud" to establish an inference of fraudulent intent. Factors that are considered "badges of fraud" are [i] a close relationship between the parties to the transaction, [ii] a secret and hasty transfer not in the usual course of business, [iii] inadequacy of consideration, [iv] the transferor's knowledge of the creditor's claim and his inability to pay it, [v] the use of dummies or fictitious parties, and [vi] the retention of control of the property by the transferor after the conveyance.

*Id.*; *see also In re Sharp*, 403 F.3d at 56 ("Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to support his case, *i.e.*, circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." (citation omitted)).

19

**B.    Analysis**

**1.    Chopra and NYC Telecom's Motion for Summary Judgment Is Granted**

**a.    The Robinson Brog Transfers**

In the TAC, Plaintiff alleges that the transfers made to Robinson Brog were made to or for the benefit of Chopra.  (TAC ¶¶ 23-36).  Specifically, Plaintiff alleged that these were functionally transfers to Chopra in satisfaction of a debt that he owed to that firm.  (*Id.* at ¶¶ 24-25).  The record does not support these allegations, and, indeed, is insufficient even to raise a genuine dispute of fact in their regard.

New York's fraudulent conveyance statutes do not provide a remedy against one who merely aids, abets, or otherwise assists in a challenged transfer or even against the transferor himself.  *Amusement Indus.*, 820 F. Supp. 2d at 527, 532-33.  These statutes are, instead, designed to provide a cause of action against the recipient of a debtor's funds to enable a creditor to claw back improper transfers and restore assets that otherwise would have been available to satisfy a judgment or debt.  *See id.* at 528.  Accordingly, a party may not be held liable in constructive or intentional fraud for a transfer in which he did not participate as either a transferee or a beneficiary.  *Id.* at 527.

Chopra's testimony, corroborated by the declaration submitted by A. Mitchell Greene, a shareholder at Robinson Brog, establishes that Chopra never had any relationship with or indebtedness to Robinson Brog.  (Chopra Decl. ¶¶ 11-14; Chopra Dep. 154:20-155:2; Greene Decl. ¶ 5).  Plaintiff admits

that it has no knowledge of a relationship between either Chopra or NYC Telecom and Robinson Brog, and that it does not have any information showing that Chopra or NYC Telecom has ever been indebted to Robinson Brog. (Pl. Chopra 56.1 Opp. ¶¶ 18-21). Chopra testified that he helped broker the loans from TD Time and Vision Impex to Jaina, and that he understood that those loans were repaid through transfers to Robinson Brog (*see* Chopra Dep. 153:25-155:18, 161:4-9), while Kumar's and Singh's deposition testimony shows that Chopra did not have any ownership stake or other interest in either Vision Impex or TD Time (*see* Kumar Dep. 8:12-9:25 (testifying that he has not conducted business with Chopra since the 1990s); Singh Dep. 10:11-20 (testifying that he did not meet Chopra until 2017)). And since Plaintiff admits that it has no information to suggest that Chopra has any ownership interest in TD Time or Vision Impex (Pl. Chopra 56.1 Opp. ¶¶ 25-26, 29-30), there is no evidence in the record suggesting that Chopra received the funds transferred to Robinson Brog.

Undaunted, Plaintiff argues in its opposition brief that Chopra made admissions about having an "economic stake" in Jaina that preclude the entry of summary judgment, and that in any event, "there is sufficient evidence in the record that he participated in [the transfers]." (Pl. Opp. 34). Taking the latter point first, it is well-settled that a mere participant in a transaction is not properly a defendant in a constructive fraud claim. *See*, *e.g.*, *BBCN Bank* v. *12th Ave. Rest. Grp. Inc.*, 55 N.Y.S.3d 225, 226 (1st Dep't 2017) ("[T]here is no cause of action for aiding and abetting a fraudulent conveyance against a

person … who is alleged merely to have assisted in effecting the transfer, in a professional capacity, and who is not alleged to have been a transferee of the assets or to have benefitted from the transaction."). Once again, fraudulent conveyance statutes are aimed at the improperly-transferred funds, not at the alleged malefactors who made the transfer. *Amusement Indus.*, 820 F. Supp. 2d at 527 ("[T]he transferor of the property — that is, the debtor — is not the proper defendant in a fraudulent conveyance claim."). Moreover, it is not enough that Chopra had a generalized interest in Jaina's financial stability or that he stood to benefit, even handsomely, from potential future business he could do with Jaina if it could remain a going concern. *See Roselink Invrs., L.L.C.* v. *Shenkman*, 386 F. Supp. 2d 209, 227 (S.D.N.Y. 2004) (holding that third party to a challenged transaction was not a beneficiary simply because he would have suffered damage from the debtor's further financial woes).

On these facts, there is no genuine dispute regarding Chopra's involvement in these transfers, and the Court therefore finds that Chopra is entitled to judgment as a matter of law on Plaintiff's claims based on the transfers to Robinson Brog. Even if it could be said that Chopra stood to benefit from Jaina's transfers to Robinson Brog — and for the avoidance of any doubt about these transfers — the Court considers whether the transfers to Robinson Brog (i) were repayments of an antecedent debt, which would render the transfers supported by fair consideration and, consequently, not voidable under sections 273, 273-a, or 274, and (ii) were not made with an intent to hinder, delay, or defraud sufficient to hold Chopra liable under section 276.

It is well-settled that a payment made in "satisfaction of a preexisting debt qualifies as fair consideration for a transfer of property[.]" *Pashian* v. *Eccelston Props., Ltd.*, 88 F.3d 77, 86 (2d Cir. 1996). Plaintiff does not dispute this legal principle. (Pl. Opp. 25). Documentary evidence and the testimony of Surjeet Singh and Dalip Kumar make plain that Singh and Kumar made loans to Jaina through the entities TD Time and Vision Impex because Jaina was in need of short-term capital infusions, and that each believed those loans would be repaid in a timely fashion. (Siddiqi Decl., Ex. A-3–A-5 (wire transfer receipts); *id.* at Ex. B-1–B-8 (bank statements); Singh Dep. 14:12-25, 30:2-31:21, 34:2-36:11 (testifying that he loaned money to Jaina and expected to be paid back); Kumar Dep. 14:11-17:7 (testifying that he loaned money to Jaina and that he asked Jaina to send loan payments to his attorneys)). Singh testified that Alwani, Jaina's accountant, asked that he loan money to Jaina (Singh Dep. 14:6-16:17), and Plaintiff admits this fact (Pl. Chopra 56.1 Opp. ¶ 32). Kumar similarly testified that Alwani approached him to ask for a loan. (Kumar Dep. 28:1-18). Greene's declaration establishes that Robinson Brog served as counsel to Vision Impex, and that the firm accepted certain transfers of money from Jaina into its Interest on Lawyer Account on behalf of Vision Impex. (Kumar Dep. 16:11-17:7; Greene Decl. ¶¶ 3-4).

Plaintiff's conclusory denials are unavailing. In large measure, this is because Plaintiff can cite only the absence of evidence: Plaintiff points out that these loans were not memorialized in writing; that the loans are not reflected in Jaina's tax returns; and that the Shah Defendants' submissions in personal

bankruptcy proceedings do not make any mention of outstanding debts to Singh, TD Time, Kumar, or Vision Impex, even though Singh and Kumar testified that Jaina still owes them money and even though the Shahs purport to have personally guaranteed these loans. (*E.g.*, Pl. Chopra 56.1 Opp. at ¶ 34). Significantly, however, every witness to be asked about these payments substantiated, under oath, what the documents show: Jaina received a total of $1,252,450 from Kumar or from Singh on Kumar's behalf; Jaina was charged a substantial interest rate; and thereafter Jaina paid $1,350,000 into an account belonging to Kumar's attorney, as Kumar had directed Jaina to do.[10] On this record, there can be no genuine dispute that the payments to Robinson Brog were supported by fair consideration sufficient to preclude Chopra's liability under sections 273, 273-a, and 274.

There is likewise no basis to hold Chopra liable under section 276 for actual fraud. Plaintiff argues that Chopra's supposed economic interest in Jaina suggests that there was a close relationship indicative of an improper purpose behind these transactions, but this also fails. (Pl. Opp. 30-32). Plaintiff is correct that Chopra's deposition testimony suggests that he wanted to see Jaina thrive and thought he could benefit from future business partnerships with Jaina if the cloud of Plaintiff's judgment went away and if

---

[10]     Plaintiff also cites as evidence Singh's testimony that his loans were not repaid (*e.g.*, Pl. Chopra 56.1 Opp. ¶ 34), but Plaintiff's misses the mark here. Singh testified that the initial $250,000 that he gave to Jaina was not repaid; he did not say that the money he gave to Jaina on behalf of Kumar and Vision Impex was not repaid to Kumar. (*See* Singh Dep. 36:12-37:13). Singh's testimony on this point has no bearing on whether the payments to Robinson Brog were made in satisfaction of antecedent debts Jaina owed to Kumar and Vision Impex.

Jaina could become financially stable. (*See id.* at 30). Plaintiff makes much of evidence that Chopra tried to negotiate a settlement with Plaintiff on Jaina's behalf and may have tried to frustrate Plaintiff's efforts to confirm the arbitral award (*id.* at 31); but even if this evidence suggests a close relationship between Chopra and Jaina, there is nothing else in the record to suggest that Jaina acted with a fraudulent purpose to transfer money to Robinson Brog. Specifically, the record does *not* suggest that these transfers were made outside the normal course of business (indeed, the record shows that Jaina was constantly taking and repaying loans), that there was insufficient consideration for these payments, that the payments were made through dummy entities, or that Jaina retained control over the funds after it was transferred to Robinson Brog. The Court holds that there is no basis on which to hold Chopra liable for actual fraud under section 276.

**b.      The STI Consultants and NYC Telecom Transfers**

Because Chopra is the sole shareholder of STI Consultants and NYC Telecom (Chopra Decl. ¶¶ 2, 4), he can be said to have benefitted from Jaina's transfers to these entities. That said, Plaintiff's claims against Chopra and NYC Telecom fail as a matter of law. Chopra and M. Shah claim that these payments were made to satisfy antecedent debts. (Chopra Decl. ¶¶ 27-28, 42; M. Shah 56.1 ¶¶ c-d). Chopra's testimony reflects that he often brokered loans for Jaina because Jaina was in constant need of short-term financing and had trouble obtaining that financing from banks. In response, Plaintiff denies the

existence of these loans because they were not memorialized in writing and are not reflected on Jaina's tax returns. (Pl. Chopra 56.1 Opp. ¶¶ 58-63, 70-77).

The amounts of money sent from STI Consultants and NYC Telecom to Jaina are circumstantial evidence of the existence and repayment of loans: *First*, Jaina received $129,500 from STI Consultants, and Chopra's testimony (corroborated by Jaina's bank records) was that Jaina repaid at least $109,000. (Chopra Dep. 290:21-294:12; Siddiqi Decl., Ex. C-3). *Second*, NYC Telecom (or Tricom, on NYC Telecom's behalf) transferred $501,088 to Jaina; documents and the declaration of Charan Narang corroborate Chopra's testimony that Chopra arranged for Tricom to pay for merchandise through direct payments to Jaina, which payments were meant to leave Jaina indebted to NYC Telecom. (Siddiqi Decl., Ex. C-3; Narang Decl. ¶¶ 7-9; *id.* at Ex. A-B (invoices); Chopra Dep. 287:2-288:22). Chopra's testimony and Jaina's bank records reflect that Jaina repaid $406,000, and has about $100,000 outstanding. (Chopra Dep. 296:13-298:9; Siddiqi Decl., Ex. C-3).

Plaintiff questions the validity of the Tricom invoices — Plaintiff argues that it is suspicious that the first invoice references the total amount of Tricom's order even though the second invoice had not been issued yet — but Plaintiff's conjecture is refuted by Chopra's supplemental declaration and the invoices themselves. The invoices each note the total amount due on that invoice as well as a running "job total balance" for the entire order. (Narang Decl., Ex. A-B). That NYC Telecom had yet to issue future invoices on the order does not suggest the inaccuracy of any individual invoice. Chopra's

supplemental declaration explains that NYC Telecom's billing software is designed to show the total amount outstanding from a customer even if the individual invoice charges the customer for less than the full amount due. (Chopra Supp. Decl. ¶ 4). Even though the Court is bound to view the evidence in the light most favorable to Plaintiff, conclusory denials do not a triable issue make.

Finally, the Court finds that the record does not support Plaintiff's contention that Chopra was a Jaina shareholder, which would render the transfers to entities he controls transfers to a corporate insider in bad faith. (*See* Pl. Opp. 11-12). Plaintiff concedes that the Shah Defendants and Chopra say Chopra was never a Jaina shareholder. (*Id.* at 11). In rebuttal, Plaintiff cites evidence that Jaina lost one of its shareholders in 2011, and that Jaina's 2013, 2014, and 2015 tax returns do not list Jaina's shareholders by name. (*Id.* at 11-15). It is bridge too far to present evidence that Jaina lost one shareholder and then extrapolate from that evidence that (i) Jaina later gained a shareholder and (ii) Chopra was that new shareholder. Plaintiff's allegations are little more than conjecture and do not raise a triable issue of fact. The record before the Court is such that no reasonable jury could find a lack of fair consideration for the transfers from Jaina to STI Consultants and NYC Telecom. These transfers are not constructively fraudulent under sections 273, 273-a, or 274.

Plaintiff's actual fraud claim under section 276 presents a somewhat closer question. Plaintiff argues that the payments to STI Consultants and

NYC Telecom were made with the goal of hindering or delaying Plaintiff's ability to collect on the state-court judgment. (Pl. Opp. 29-33). As discussed above, Plaintiff emphasizes that Chopra wanted to see Jaina succeed financially and suggests that Chopra "needed the Geo-Group law[]suit to go away" — to the point of trying to broker a settlement between Plaintiff and Jaina in 2015. (*Id.* at 30-31). Plaintiff also argues that the timing of the challenged transfers is suspect because they "picked up quite dramatically just prior to and after the July 10, 2014 arbitration award." (*Id.* at 31).

Even though a close relationship between the parties to the transaction and suspect timing are indicia of fraud, the Court does not find these points to be persuasive on the facts of this case. Plaintiff repaid the loans to STI Consultants and NYC Telecom after the arbitral award was handed down, but the debts to STI Consultants and NYC Telecom were partially incurred before the award. That Jaina continued to incur debts to these entities and repaid them after the award does not vitiate the existence of fair consideration for an antecedent debt. As the Court has previously observed, Jaina was in constant need of short-term loans — it was very much in the normal course of Jaina's business to take loans from private lenders and repay them, to the extent it could — and Chopra testified that he often worked with Jaina to secure such financing. Moreover, there is no indication that these transfers were made hastily after the award — indeed, the repayments began before the award and continued for several months thereafter — or that Jaina retained control over the money after it was transferred to STI Consultants or NYC Telecom. The

28

Court finds that the badges of fraud are, in this regard, equivocal at best. On this record, the Court concludes that no reasonable jury could find Chopra liable under section 276 for actual fraud based on the transfers for STI Consultants and NYC Telecom.[11] *See Kim* v. *Ji Sung Yoo*, No. 15 Civ. 3110 (RWS), — F. Supp. 3d —, 2018 WL 1871177, at *15 (S.D.N.Y. Apr. 18, 2018) (holding that transfer was not made with fraudulent intent where debtor transferred an interest in real estate to a family member without consideration, but where the transfer was "not made in secret and no evidence adduced indicated the transfer was performed in a hasty or otherwise unusual way"); *cf.* *Staudinger+Franke*, 2015 WL 3561409, at *15 (denying summary judgment where insolvent debtor hastily conveyed assets to an entity with which it had a close relationship and retained control over the assets following the transfer).

---

[11] To the extent that Plaintiff seeks to hold Chopra or NYC Telecom liable for Jaina's transfers to Kedis, Melville, or Hillside, Chopra and NYC Telecom are entitled to judgment as a matter of law on those claims. The TAC alleges that Jaina made these transfers "at the direction or request of Mr. Chopra" (TAC ¶¶ 37, 41, 44, 48, 51, 57), but the law is clear, as Chopra notes in his moving brief, that New York's fraudulent conveyance statutes do not give a creditor a cause of action against "third parties who aided the debtor's transfer[.]" *Geren* v. *Quantum Chem. Corp.*, 832 F. Supp. 728, 737 (S.D.N.Y. 1993). To be sure, Chopra testified that he brokered the loan from Kedis to Neminath and received a fee for his services. (Chopra Dep. 75:8-77:24). But the record does not indicate that Chopra or NYC Telecom benefitted from the transfers from Jaina to Kedis, Melville, or Hillside. Plaintiff's argument that Chopra had a generalized interest in Jaina's financial stability does not suffice to show a benefit. *See Roselink Invrs., L.L.C.* v. *Shenkman*, 386 F. Supp. 2d 209, 227 (S.D.N.Y. 2004) (holding that third party to a challenged transaction was not a beneficiary simply because he would have suffered damages from the debtor's further financial woes). Because Plaintiff cannot show that Chopra or NYC Telecom participated in the transfers to Kedis, Melville, or Hillside as a transferee or beneficiary, and because this is an essential element of Plaintiff's case on which it will bear the burden of proof at trial, *Amusement Indus., Inc.* v. *Midland Ave. Assocs., LLC*, 820 F. Supp. 2d 510, 527 (S.D.N.Y. 2011), Chopra and NYC Telecom are entitled to summary judgment on Plaintiff's claims based on these transfers, *see Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322-23 (1986).

## 2. The Shah Defendants' Motions for Summary Judgment Are Granted in Part and Denied in Part

In resolving the Shah Defendants' tandem motions for summary judgment, the Court begins again with the proposition that New York's fraudulent conveyance statutes do not provide a remedy against one who merely assists in a challenged transfer, or against the transferor himself where those participants are not alleged to be either a transferee or beneficiary of the transaction. *Amusement Indus.*, 820 F. Supp. 2d at 527-28. The Shah Defendants are *pro se*, and they have each submitted one-page moving briefs that either do not address this issue or do so in conclusory fashion. (*See* M. Shah Br.; V. Shah Br.). That said, the Court liberally construes their submissions to raise the strongest arguments in favor of summary judgment that they suggest, though the Court does this with appropriate regard for its countervailing obligation to read the record in the light most favorable to the non-movant. The Shah Defendants' status as transferees or beneficiaries of the transfers alleged in the TAC is an essential element of Plaintiff's claims on which Plaintiff will bear the burden of proof at trial, and accordingly, summary judgment is appropriate if the Shah Defendants have shown that Plaintiff "fails to make a showing sufficient to establish" that M. Shah or V. Shah were either transferees or beneficiaries of the transfers. *Celotex*, 477 U.S. at 322-23.

### a. M. Shah's Motion for Summary Judgment Is Granted

M. Shah was a 25% shareholder in and the President of Jaina. (M. Shah Aff. ¶¶ 1, 11(b)). He argues in his moving brief that the TAC "does not contain a single allegation to the effect that [he] was a beneficiary or transferee" and

"alleges, at most, that [he] aided and abetted the transfers[.]" (M. Shah Br.).
And, indeed, M. Shah is correct. The TAC makes ample allegations that
Chopra, V. Shah, and the LLC Entities (the latter of which are former
Defendants in this action) benefitted from the challenged transfers but,
notably, makes no such allegation as to M. Shah. (*See, e.g.*, TAC ¶¶ 25, 28, 33,
71-72, 75, 80, 84, 91). Plaintiff states in the TAC that M. Shah "knew or
should have known" that: (i) the transfers were not made to satisfy existing
debts; (ii) the transfers were made for the benefit of Chopra or V. Shah and V.
Shah's wife; (iii) Jaina was a defendant in an arbitration at the time of the
transfers; and (iv) the transfers were not made in good faith because they were
made at Chopra's direction, served no legitimate purpose, and depleted assets
that could have satisfied Plaintiff's judgment. (*Id.* at ¶¶ 90-93). The TAC
alleges that, in consequence, M. Shah is personally liable for all of the
challenged transfers. (*Id.* at ¶¶ 96, 108). Plaintiff's allegations bespeak a
misapprehension of New York's fraudulent conveyance statutes. As the Court
has said before, these statutes do not provide a remedy against the transferor
or against one who orchestrates fraudulent transfers without being either a
beneficiary or transferee thereof. *BBCN Bank*, 55 N.Y.S.3d at 226. On its face,
the TAC does not allege that M. Shah was either of these things.

Moreover, the Court does not understand the factual record to support a
finding that M. Shah personally benefitted from the challenged transfers.
Though the Court is not swayed by M. Shah's self-serving statements in his
deposition or in his moving brief, the record does not reflect that M. Shah was

himself the recipient of any funds transferred to Robinson Brog, STI Consultants, NYC Telecom, the LLC Entities, or V. Shah, or that any funds were subsequently given to him by these transferees. Nor does the record show that any of these transfers was made to satisfy personal debts or expenses that M. Shah owed, thereby affording him an indirect financial benefit.

For its part, Plaintiff argues that M. Shah was "motivated by [his] stake in Jaina to try to frustrate [Plaintiff] from enforcing its judgment." (Pl. Opp. 35). Plaintiff contends in its opposition to M. Shah's Local Rule 56.1 Statement that M. Shah benefitted from the transfers because they "[gave] Jaina time to secret assets[,]" and Plaintiff presents evidence, including in the lengthy Vanjani Certification, suggesting that millions of dollars have, simply, gone missing from Jaina's books. (Pl. M. Shah 56.1 Opp. ¶ a; Vanjani Cert. ¶¶ 148-53).[12]

Plaintiff focuses on Chopra's testimony to argue that M. Shah benefitted from the transfers because he (M. Shah) stood to gain from the business ventures in which Jaina could engage, including getting a substantial line of credit, if only Plaintiff's judgment would go away. (Pl. M. Shah 56.1 Opp. ¶ a). Plaintiff also points to Chopra's and M. Shah's alleged efforts to thwart a settlement between Plaintiff and Jaina as evidence of a desire to avoid paying

---

[12] M. Shah used a mix of lettered and numbered paragraphs in his Local Rule 56.1 Statement, and Plaintiff assigned its own numbers to M. Shah's statement when it prepared its opposition. Because the Court cites to M. Shah's Local Rule 56.1 Statement using the letters and numbers he assigned to his paragraphs, the Court continues to use those reference points when referring to Plaintiff's corresponding opposition statement.

on the judgment and to deliver Jaina to more prosperous financial times. (*Id.*).

Giving appropriate credence to Plaintiff's arguments, it remains unclear how

M. Shah's arguably nefarious motives could demonstrate that he benefitted

from the transfers at issue here. Assuming that M. Shah, *qua* Jaina

shareholder, wanted Jaina to succeed and wanted Plaintiff's judgment to go

away, the transfers only diminished Jaina's assets and did nothing to relieve

Jaina of its obligation to satisfy a judgment that continued to loom large. And

thus, from that vantage point, the transfers *harmed* M. Shah. In effect,

Plaintiff appears to argue that Jaina's officers looted the company to the point

of insolvency to avoid Plaintiff's judgment. Once again, even assuming this is

true, it does little to elucidate how M. Shah personally benefitted from the

transfers at issue in this action. Accordingly, the Court finds that Plaintiff

cannot prove this essential element of its claims against M. Shah, and that M.

Shah is thus entitled to summary judgment on Plaintiff's actual and

constructive fraud claims.

### b. V. Shah's Motion for Summary Judgment Is Denied

By contrast, Plaintiff alleges that V. Shah improperly received at least

$685,603 from Jaina during the pendency of the arbitration and after the

award was issued, and Jaina's bank records confirm these transfers. (Vanjani

Cert. ¶¶ 104-05; Siddiqi Decl., Ex. C-3).[13] V. Shah was thus a transferee and a

---

[13] The TAC alleged that V. Shah received $760,603 from Jaina, but Plaintiff agrees with V. Shah that certain of the alleged transfers were not received by him, and Plaintiff notes in its brief that the correct amount of transfers from Jaina to V. Shah from June 5, 2013, to November 26, 2014, is $685,603. (Pl. Opp. 18). Plaintiff adds, however, that discovery has revealed transfers about which Plaintiff was unaware at the

beneficiary of the challenged transactions. V. Shah alleges that over the years he and his wife (who was a Jaina shareholder) loaned $1,990,200 to Jaina. (V. Shah 56.1 ¶ 1). V. Shah argues that the payments from Jaina were made in satisfaction of these antecedent debts (V. Shah Br.) and, indeed, documents V. Shah submitted in connection with this motion show a revolving door of payments between Jaina and V. Shah (*see* V. Shah 56.1, Ex. 301). As one example, V. Shah alleges that he took out a $249,000 line of credit against his house and loaned $260,000 to Jaina shortly thereafter. (V. Shah 56.1 ¶ 3). Documents in the record show that V. Shah took out a home equity line of credit on August 28, 2012, and that he drew down on this loan on September 5, 2012, and transferred $260,000 to Jaina that same day. (*Id.* at Ex. 302-303). V. Shah argues that the $4,400 monthly payments from Jaina to him — which are reflected in Jaina's bank records — were made to satisfy his monthly home loan payments. (*Id.* at ¶¶ 4-5).

In this regard, V. Shah's own testimony complicates the Court's analysis. He testified that he loaned roughly $2,500,000 to Jaina over the years, and that none of it had been paid back. (V. Shah Dep. 39:15-40:5). To use his words: "It was one-way traffic." (*Id.* at 40:8). Later, he indicated that certain short-term loans he made had been paid back; however, his testimony indicated that he would often re-issue those short-term loans soon after they

---

time the TAC was drafted. Plaintiff alleges that the total amount of transfers of which it is now aware is $848,183.68.

were repaid, and that those subsequent loans had not been paid back. (*Id.* at 48:21-52:21).

But even if there is evidence in the record to suggest that Jaina's payments to V. Shah were made in satisfaction of an antecedent debt owed to him — and, to be clear, there is — the Court is struck by the lack of documentary evidence (aside from the home loan), declarations, and/or depositions from disinterested parties to corroborate the fact of these loans from V. Shah to Jaina.  The other loan transactions considered by the Court were substantiated by documents and testimony from third parties who corroborated the timing and amount of certain challenged transfers, and who testified that they were loans or payments made on behalf of others who intended those payments to be loans.  Moreover, the other transactions were supported by circumstantial evidence, insofar as the amounts of the payments from Jaina to the third parties roughly matched the amounts alleged to be loans, and where the amounts did not match, witness testimony was often available to explain the discrepancies.  Here, the Shah Defendants say that the transfers from V. Shah to Jaina were loans; the Court takes them at their word and appreciates that they are in a better position than Plaintiff to know the purpose of the contested transactions.  But the record is muddied by V. Shah's conflicting testimony, and, what is more, the loans are not substantiated by testimony from third-party witnesses, nor do the amounts of money exchanged indicate that the payments were loans and not, for example, capital contributions or investments.  The Court believes that the Shah Defendants'

self-serving contention that the transfers to V. Shah were made to satisfy antecedent debts "give[s] rise to a credibility question that falls squarely in the province of the jury." *Corbett* v. *City of N.Y.*, No. 15 Civ. 9214 (GHW), 2017 WL 3207783, at *11 (S.D.N.Y. July 27, 2017). On this record, the Court cannot decide whether the contested transfers were given for fair consideration.

Jaina's insolvency is an essential element of Plaintiff's section 273 claim, and under New York law insolvency is presumed where transfers are not made for fair consideration, such that the burden of overcoming that presumption is put on the transferee. *Watts*, 786 F.3d at 165. Plaintiff alleges in the TAC that the transfers to V. Shah began on June 5, 2013, and continued through December 26, 2014. (TAC ¶ 59). Bank records reflect that Jaina's balance at Capital One Bank fluctuated significantly throughout 2014, but that by the end of August 2014 Jaina had a balance of $1.55, and by the end of October 2014 the account had a balance of $0.00. (Vanjani Cert., Ex. BB). Jaina's Citibank account also had a fluctuating balance throughout 2014, and by January 8, 2015, the account had a negative balance. (*Id.* at Ex. Z). In general, Jaina's bank records show that significant amounts of money would pass through Jaina's accounts each month, but that Jaina's ending balance was often low relative to those amounts. (*Id.* at Ex. Z, BB). By M. Shah's own telling, Jaina experienced a "severe cash crunch," which put it into a "downward spiral" that ultimately led to Jaina's "demise[.]" (M. Shah Aff. ¶¶ 4-7).

There is some indication in the record that Jaina possessed computer hardware of some value (*see, e.g.*, M. Shah Aff. ¶ 10), but the Court does not have enough information to know if these assets in fact belonged to Jaina or were of sufficient value to render Jaina solvent. Because the transfers to V. Shah continued up until the point when Jaina's two bank accounts — the two of which the Court has been made aware — had no money, the Court finds that there is a genuine dispute of fact regarding Jaina's solvency. The Court likewise believes there to be a genuine dispute over whether the conveyances to V. Shah left Jaina with unreasonably small capital on hand, as is required for liability under section 274. And Jaina was plainly a defendant in an action for money damages during the relevant time period. Accordingly, Plaintiff's claims against V. Shah under sections 274, 273-a, and 274 survive.

Plaintiff's section 276 claim against V. Shah also survives. A claim for actual fraud under section 276 may stand without regard to fair consideration. Thus, it matters not whether the payments to V. Shah were made in satisfaction of an existing debt — if they were made with sufficient "badges of fraud" to give rise to an inference of fraudulent intent. *In re Sharp*, 403 F.3d at 56. The Court is mindful that Plaintiff must show the existence of badges of fraud by clear and convincing evidence, *McCombs*, 30 F.3d at 328, and finds that it has. As the Court recognized in a prior Opinion: "A close familial relationship between transferor and transferee is a well-recognized indicator of potential fraud." *Geo-Grp. Commc'ns*, 2016 WL 4098552, at *10 (citing cases). Of the four Jaina shareholders, one is V. Shah's wife, Nayana Shah, and

another is his brother, M. Shah. (M. Shah Aff. ¶ 1). V. Shah put up his own home as collateral to raise money to loan to Jaina, and he submits that he loaned over $1,000,000 of his own personal wealth to Jaina. (V. Shah 56.1 ¶¶ 1, 3-5). There is no evidence in the record that these transfers were made hastily or in secret, but there is a question as to the adequacy of consideration. Moreover, the transferor knew about Plaintiff's potential or actual claim against it and that it would have trouble paying it. And given the close familial ties between Jaina and V. Shah, the Court believes there to be a question about whether Jaina retained control over the money after it was transferred to V. Shah. Finally, there is evidence of a consistent flow of money between V. Shah and Jaina, and the Court believes this to raise a triable issue over whether Jaina could easily take back the money it transferred to V. Shah. Accordingly, the Court denies V. Shah's motion for summary judgment.

## CONCLUSION

For the foregoing reasons, Chopra's and NYC Telecom's motion for summary judgment is GRANTED; M. Shah's motion for summary judgment is GRANTED; and V. Shah's motion for summary judgment is DENIED. The Clerk of Court is directed to terminate Ravi Chopra, NYC Telecommunications Corp., and M. Shah as parties to this matter, and is further directed to terminate the motion at Docket Entry 193.

Plaintiff and V. Shah are directed to appear for a conference with the Court on **Friday, August 17, 2018, at 10:00 a.m. in Courtroom 618 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007**, to discuss setting a trial date.

    SO ORDERED.

Dated:     July 30, 2018
          New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge


*A copy of this Order was mailed by Chambers to*:
Mahendra Shah
30 Liberty Way, Apt. 8
Palm Harbor, FL 34684

Vipin Shah
35 Smith Place
Williston Park, NY 1159