UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
GEO-GROUP COMMUNICATIONS, INC.,

                   Plaintiff,                Index No. 15-cv-01756 (KPF)

-v.-

RAVI CHOPRA; MAHENDRA SHAH; VIPIN
SHAH; 728 MELVILLE PETRO LLC; KEDIS
ENTERPRISES LLC; JMVD HILLSIDE LLC;
NYC TELECOMMUNICATIONS CORP.; and
SHALU SURI,

                   Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

DECLARATION OF GOVIND VANJANI
EXECUTED ON OCTOBER 4, 2019

      Pursuant to 28 U.S.C. § 1746, I, Govind Vanjani, certify, state and declare

under penalties of perjury as follows:

      1.      I am President and co-founder of Plaintiff Geo-Group Communications,

Inc. ("Geo-Group"), a corporation organized and existing under the laws of the State of

Delaware, which has its principal place of business in Commerce, California. The

company was founded in 1998, and I have held the position of President since 2000.

INTRODUCTION

      2.      I submit this Declaration in support of Geo-Group's motion (the "Motion"

or "Motion to Reopen") for an order, pursuant to Fed. R. Civ. P. 15(a), (c), & (d); Fed. R.

Civ. P. 20(a)(2) & (3); Fed. R. Civ. P.  21; Fed. R. Civ. P. 54(b); and the Court's inherent

power:

      a.      Reopening pursuant to Fed. R. Civ. P. 54(b) the case against

dismissed defendants 728 Melville Petro LLC ("728 Melville"), Kedis Enterprises

LLC ("Kedis"), JMVD Hillside LLC ("Hillside"), and Mahendra Shah ("M. Shah");

  b.  Granting Geo-Group leave to join Sanjiv Chand to this action, and assert against him claims for actual and constructive fraudulent conveyance, and fraud on the court arising from false statements made in paragraphs 10, 11, and 13 of Mr Chand's Third Affidavit (Dk. 115-1) (the "False Statements");

  c.  Granting Geo-Group leave to file and serve an amended and supplemental complaint asserting against dismissed defendants Hillside, Kedis, and 728 Melville claims for actual and constructive fraudulent conveyance;

  d.  Granting Geo-Group leave to file and serve an amended and supplemental complaint asserting against dismissed defendant Mahendra Shah claims for actual fraudulent conveyance arising out of the $660,000 in transfers (the "Transfers") Jaina made to, or for the benefit of, Hillside, Kedis, Sanjiv Chand, and 728 Melville, and also for his own benefit;

  e.  Granting Geo-Group leave to file and serve an amended and supplemental complaint asserting against Sanjiv Chand claims for actual fraudulent transfers arising out of the Transfers, and for fraud on the Court and Geo-Group arising out of the False Statements; and

  f.  For any other appropriate relief that the Court may deem warranted.

3.  Except where I indicate otherwise, I have personal knowledge of the facts set forth in this Declaration. That personal knowledge is based on: (a) my very extensive first-hand involvement as the person at Geo-Group with principal, day-to-

day responsible for Geo-Group's contractual relationship with Jaina, and for all in-person, written and telephonic communications with Jaina; (b) my extensive, first-hand involvement in the underlying arbitration and litigation proceedings against Jaina, which resulted in an April 2015 confirmation judgment entered against Jaina, which was affirmed by the New York Supreme Court, Appellate Division, First Department on November 29, 2016; (c) my extensive, personal involvement in Geo-Group's efforts to settle the dispute with Jaina both before and after the judgment was entered; and (d) my extensive, personal involvement as the person at Geo-Group with responsibility for this litigation, which includes, among many other things, working closely and coordinating litigation efforts, fact-finding, investigation, and strategy with Geo-Group's lead counsel, Philip J. Loree Jr., of Loree & Loree; attending all depositions and testifying at my own (as both an individual and a corporate representative of Geo-Group); and attending Court conferences.

4.     Attached as Exhibit 58 is a list of the Exhibits attached to this Declaration.

## SUMMARY OF KEY FACTS

5.     This motion seeks to reopen the case against the LLC Defendants—Kedis, Hillside, 728 Melville, and Mahendra Shah. It arises out of false statements under oath that Sanjiv Chand, the person who directly or indirectly owns or controls the LLC Defendants (and numerous other LLCs and other business entities that do business in New York City and Long Island), made to this Court in what turned out to be a successful bid to dismiss the case.

6.     Those false statements portrayed as payment of an antecedent debt a total of $660,000 in payments Jaina Systems Network, Inc. ("Jaina'") made to LLC

Defendants 728 Melville and Kedis in August and October 2014, after Geo-Group obtained on July 10, 2014 an $1,249,654 (plus interest) arbitration award against Jaina, and after Geo-Group commenced on July 20, 2014 proceedings in New York State Supreme Court to confirm the award.

7.      The alleged antecedent debt was a $600,000 loan Kedis had made to Neminath, Inc. ("Neminath") at 15% interest per annum pursuant to a Commercial Loan Agreement. According to Mr. Chand, Kedis loaned $600,000 to Neminath, which, at the time was owned and controlled by its President, Mahendra Shah, Mahendra Shah's spouse, Pooja Shah, Defendant Vipin Shah, and, his spouse, Nayana Shah. Kedis paid $600,000 to Neminath pursuant to the Commercial Loan Agreement. Shortly thereafter Neminath transferred $530,000 to Jaina (Chand claims it was $570,000, but Jaina's and Neminath's bank statements do not bear that assertion out).

8.      In support of the LLC Defendants' motion to dismiss the Third Amended Complaint, Mr. Chand submitted an affidavit that made the following three material, false statements, each of which were intended to deceive Geo-Group and the Court about the nature and purpose of the transfers Jaina made to the LLC Defendants:

       a.      Paragraph 10 of Sanjiv Chand's Third Affidavit: "All of the transfers from Jaina to JMVD, and all of the transfers from Jaina to Melville that are referenced in paragraphs 37 to 50 of [Geo-Group's] Third Amended Complaint ("TAC") were carried out in order to satisfy Jaina's debt to Kedis." (Ex. 1, Chand Third Aff. at ¶ 10)

       b.      Paragraph 11 of Sanjiv Chand's Third Affidavit: "As the president

4

and owner of Kedis, I assigned Kedis' right to receive the payments referenced in paragraphs 37 and 44 of the TAC, which were repayments toward the $600,000 loan made under the [Commercial Loan] Agreement, to JMVD and Melville." (emphasis added) (Ex. 1, Chand Third Aff. at ¶ 11)

      c.     Paragraph 13 of Sanjiv Chand's Third Affidavit: "Jaina's payments to JMVD and Melville as described in paragraphs 37 and 44 of the TAC were made in satisfaction of an antecedent debt, which Jaina paid in order to satisfy the debt to Kedis under the [Commercial Loan] Agreement." (Ex. 1, Chand Third Aff. at ¶ 13)

9.     But, as demonstrated below, Jaina's payment of $660,000 did not discharge Neminath's debt to Kedis and did not discharge any debt Jaina owed to Neminath. Rather the facts show that: (a) in August and October 2014 Jaina transferred $660,000 to or for the benefit of Mr. Chand and/or the LLC Defendants in exchange for no consideration whatsoever, let alone anything of fair, equivalent value; (b) on January 14, 2016, Neminath sold its largest asset, the 235 Hillside Avenue, Williston Park, New York property for $1,025,000, $600,000 of which represented a reduction in the $1,025,000 sale price in exchange for Neminath's release from its outstanding obligations to Kedis under the Commercial Loan Agreement; and (c) during the period January 2013 through January 2016, Neminath paid a total of $285,000 in interest to or for the benefit of Kedis.

10.     Thus, in exchange for Kedis's loan of $600,000 to Neminath at 15% interest per annum for a period of three years, the LLC entities and/or Mr. Chand received consideration in the total amount of $1,545,000:

| Period (From-To) | | Amount paid by Jaina Systems Network, Inc. | Principal Paid by Neminath, Inc. | Interest Paid by Neminath, Inc. | Total |
|---|---|---|---|---|---|
| 8/13/2014 | 10/29/2014 | $    660,000.00 | | | |
| 1/14/2016 | 1/14/2016 | | $    600,000.00 | | |
| 1/18/2013 | 1/31/2016 | | | $    285,000.00 | |
| | | | | Total Payments by Jaina and Neminath to LLC Entities/S. Chand | $    1,545,000.00 |

*Figure 1: Payments Made to or for the Benefit of LLC Entities and Mr. Chand*

11.     I detail this series of transactions below and show how they are confirmed by Mahendra Shah's testimony, Mr. Chand's Third Affidavit, Jaina's Bank Statements, Neminath's Bank Statements, Neminath's tax returns, CPA Mr. Andrew Boses' notes, and other documents. I also explain that Neminath CPA Andrew Bose has confirmed in writing that Neminath paid $885,000 to or for the benefit of Kedis to satisfy Neminath's obligation under the Commercial Loan Agreement, and that Mahendra Shah and Vipin Shah confirmed to him the accuracy of this information.

12.     The evidence shows that the $660,000 Jaina paid the LLC Defendants was both an actual and constructive fraudulent transfer. Contrary to Mr. Chand's sworn statements, Jaina's transfer of $660,000 to or for the benefit of the LLC Defendants was most definitely *not* a discharge of an antecedent debt. For the evidence shows conclusively that the $660,000 transfer did not discharge Neminath's debt to Kedis and did not discharge Jaina's debt to Neminath.

13.     The only consideration to which Kedis and the other LLC Defendants were entitled to under the Commercial Loan Agreement was $600,000 in principal and

three-years of interest at 15% per annum, that is, $270,000 ($90,000 per year multiplied by three years). But Kedis received from Neminath the benefit of $885,000—$15,000 more than it was entitled to the Commercial Loan Agreement. And, on top of all that, the LLC Entities received an additional $660,000 from Jaina for which Jaina received no benefit whatsoever, let alone any fair value exchange.

14.     Because the transfers were made after  Geo-Group obtained the favorable arbitration award on July 10, 2014, after Geo-Group commenced proceedings in New York State Supreme Court, New York County to confirm the award, and because the transfers were not made in satisfaction of an antecedent debt, they were, at the very least, constructively fraudulent as a matter of law.

15.     They also constituted, for the reasons discussed below, actual fraudulent transfers, and their actually fraudulent nature is demonstrated by, among other things, Mr. Chand's and Mahendra's Shah's attempts to actively conceal them by lying to the Court.

BACKGROUND

16.     I discussed in my January 24, 2018 Certification in Opposition to Defendants' motions for summary judgment (the "Summary Judgment Certification") the events that led up to this action. (Dk. 218 at ¶¶ 62-103)

17.     I also discussed in my Summary Judgment Certification the principal persons involved, including Defendant Vipin Shah ("V. Shah"); V. Shah's brother and Jaina Systems Network, Inc. ("Jaina")'s CEO and President, Mahendra Shah ("M. Shah"); V. Shah's spouse, Nayana Chandra Vipin Shah ("N. Shah"), who is a major shareholder of Jaina and an officer of Jaina; Mahendra Shah ("M. Shah"); Surajit

Bose; Geo-Group Communications, Inc. ("Geo-Group"); Jaina; the V. Shah, N. Shah, and N. Shah family business, Neminath, Inc. ("Neminath"); and the Jaina Entities, Jaina Infrastructure Inc., a New York Domestic Business Corporation (New York Department of State ID No. 3720760) ("Jaina Infrastructure"); Jaina Call India, Inc., a New York Domestic Business Corporation (New York Department of State ID No. 3403880) ("Jaina Call India"); Jaina Realty Inc., a New York Domestic Business Corporation (New York Department of State ID No. 3720719) ("Jaina Realty"); and Ipsita Telecom Services, Inc., a New York Domestic Business Corporation (New York Department of State ID No. 3757308) ("Ipsita Telecom"). (See Dk. 218 at ¶¶ 6-36.)

18.    Rather than repeating in full that background in this Declaration, I incorporate it as part of this Declaration, and focus on the facts pertinent to the Motion.

### JAINA'S TRANSFER OF $660,000 TO THE LLC DEFENDANTS

19.    The facts pertinent to the Motion to Reopen arise out of and relate to certain transfers made by Jaina Systems Network, Inc. ("Jaina") to certain LLC entities owned and controlled by one Sanjiv Chand. As alleged in Geo-Group's Third Amended Complaint (Dk 105 at ¶¶ 20-22), those LLC entities are: 728 Melville Petro LLC ("728 Melville"), Kedis Enterprises LLC ("Kedis"), and JMVD Hillside LLC ("Hillside"). I refer to them collectively as the "LLC Defendants."

20.    Each of these entities is owned or controlled by Sanjiv Chand, as set forth in Mr. Chand's Third Affidavit (Dk. 115-1), a copy of which is attached as Exhibit 1.)

21.    According to New York State Department of State records available on

line, each of these entities is organized under the laws of the State of New York and has its principal place of business at 1414 Hillside Avenue, New Hyde Park, New York, which, upon information and belief, is a property owned, directly or indirectly, by Sanjiv Chand or one of his business entities. (See Exs. 15, 19, 20, & 21.)

22.     As set forth in Geo-Group's Third Amended Complaint (Dk 105 at ¶ 44), on or about August 13, 2014, just over a month after the arbitration award against Jaina was made, and a few weeks after Geo-Group commenced proceedings in New York State Supreme Court to confirm the award (the "Confirmation Proceedings"), Jaina transferred $200,000 to Hillside.

23.     Hillside was formed on August 6, 2014, just one week before the $200,000 transfer was made to it. (See Ex. 21, New York Department of State online information form for Hillside.)

24.     That $200,000 transfer is evidenced in Ex. 35, Jaina's 2014 Citibank Bank Statements, at Shah_Ds-000184.

25.     The wire transfer records produced by Citibank in response to Geo-Group's subpoena show that V. Shah's spouse, N. Shah, an officer of Jaina, and a shareholder of both Jaina and Neminath, approved the August 13, 2014 wire transfer. (See Ex. 16, Citibank Wire Transfer information excerpt, at Citibank 001336.)

26.     As set forth in the Third Amended Complaint (Dk. 105 at ¶ 37), during a period of just under two weeks in October 2014, a few months after the Award was made on July 10, 2014, and about one-and-one-half months after Geo-Group commenced the Confirmation proceedings, Jaina, with the knowledge and consent of Jaina's President, Defendant M. Shah, made the following transfers of funds, totaling

$460,000.00, to 728 Melville:

|  | Amount of Transfer | Date of Transfer |
|---|---|---|
|  | $140,000.00 | 10/16/2014 |
|  | $60,000.00 | 10/17/2014 |
|  | $80,000.00 | 10/22/2014 |
|  | $80,000.00 | 10/23/2014 |
|  | $100,000.00 | 10/29/2014 |
| Total: | $460,000.00 |  |

27.    These transfers to 728 Melville are evidenced by Exhibit 35, Jaina's 2014 Citibank Bank Statements, at Shah_Ds-000192-193.

28.    The wire transfer records produced by Citibank in response to Geo-Group's subpoena show that Mahendra Shah approved $360,000 of the transfers made to 728 Melville, and that Nayana Shah approved the $100,000 transfer made on October 29, 2014. (See Ex. 17, Citibank Wire Transfer information excerpt, at Citibank 001348-50.)

29.    728 Melville was formed on October 1, 2014, only 15 days before the $460,000 was transferred to it.

THE CHAND THIRD AFFIDAVIT

30.    Geo-Group filed its Third Amended Complaint (Dk. 105) on February 22, 2016. The LLC Defendants moved to dismiss on March 30, 2016. (See Dk. 114)

31.    In support of that motion, Sanjiv Chand filed his Third Affidavit (Dk. 115-1) (the "Chand Third Affidavit") was filed on March 30, 2016 (but was not otherwise dated). A copy of the Chand Third Affidavit is attached as Ex. 1.

32.     The closing paragraphs of the Chand Third Affidavit state: "I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false I am subject to punishment." (Ex. 1, Chand Dk 105-1 at 4 of 4)

33.     The Chand Third Affidavit certifies that Mr. Chand is "the Chief Executive Officer of Kedis Enterprises LLC ("Kedis") and JMVD Hillside ("JMVD")[,]" and that "728 Melville Petro LLC ("Melville") is managed by Jessie Gupta, my sister-in-law, and is family-owned." (Ex. 1, Chand Third Aff. at ¶¶ 1-2)

34.     According to the Chand Third Affidavit, "[o]n January 18, 2013, on behalf of Kedis, [Mr. Chand] signed a Commercial Loan Agreement ("Agreement") with Neminath[,]" and that "Mahendra Shah, on behalf of Neminath, also signed the Agreement."

35.     The Chand Third Affidavit states that Mr. Chand "understood that the money loaned [by Kedis to Neminath] under the Agreement was to be used for the benefit of Jaina."  (Ex. 1, Chand Third Aff. at ¶ 6)

36.     Mr. Chand certified that "[a]t the time I entered into the Agreement, I understood that Jaina would ultimately be responsible for repaying the Loan because it was made for Jaina's benefit." (Ex. 1, Chand Third Aff. at ¶ 6)

37.     He certified: "[o]n January 22, 2013, and pursuant to the Agreement, Kedis transferred $600,000 to Neminath, and such monies were deposited into Neminath's account for the benefit of Jaina." (Ex. 1, Chand Third Aff. at ¶ 8)

38.     According to Chand "[s]ubstantially all of these funds—$570,000 after

11

loan costs totaling $30,000—were then transferred from Neminath to Jaina from January 22, 2013 through February 6, 2013." (Ex. 1, Chand Third Aff. at ¶ 8)

39.     "During all relevant times," restated Chand, "I understood that the $570,000 conveyance from Kedis to Neminath and ultimately to Jaina was to be repaid by Jaina." (Ex. 1, Chand Third Aff. at ¶ 9)

40.     "All of the transfers from Jaina to JMVD," said Chand, "and all of the transfers from Jaina to Melville that are referenced in paragraphs 37 to 50 of Geo-Group Communications Inc.'s ("GCI") Third Amended Complaint ("TAC") were carried out in order to satisfy Jaina's debt to Kedis." (Ex. 1, Chand Third Aff. at ¶ 10)

41.     Mr. Chand also said that "[a]s the president and owner of Kedis, I assigned Kedis' right to receive the payments referenced in paragraphs 37 and 44 of the TAC, which were repayments toward the $600,000 loan made under the Agreement, to JMVD and Melville." (Ex. 1, Chand Third Aff. at ¶ 11)

42.     "On behalf of Kedis," Chand certified, "I asked that funds Jaina owed to Kedis be transferred to JMVD and Melville instead of Kedis. I did so because Kedis intended to make transfers in these amounts to JMVD and Melville regardless[,]" and "[b]y having Jaina transfer the funds in this manner, it saved me the trouble of transferring funds from Jaina to Kedis and then from Kedis to either JMVD or Melville." (Ex. 1, Chand Third Aff. at ¶ 12)

43.     "Jaina's payments to JMVD and Melville as described in paragraphs 37 and 44 of the TAC[,]" concluded Chand, "were made in satisfaction of an antecedent debt, which Jaina paid in order to satisfy the debt to Kedis under the Agreement." (Ex. 1, Chand Third Aff. at ¶ 13)

SANJIV CHAND'S THIRD AFFIDAVIT (FILED MARCH 31, 2016) CONTAINS FALSE
STATEMENTS THAT ARE MATERIAL TO THIS CASE

44.     Neminath's 2012, 2013, 2014, 2015, Tax Returns; Mahendra Shah's

deposition testimony; documents recently produced by Neminath's CPA, Mr. Andrew

Bose; Mr. Bose CPA's email confirming our understanding of what the documents he

produced show about the payment of the $600,000 loan; Neminath's bank statements,

and other documents, demonstrate that Mr. Chand's Third Affidavit contain false

statements that are material to the question whether the  $660,000 in transfers to the

LLC Defendants were constructively and actually fraudulent, and whether Sanjiv

Chand and Mahendra Shah are guilty of, and should be held liable for, having

engaged in and benefited from an actual fraudulent conveyance. The evidence shows:

a.     On or about January 18, 2013, Neminath entered into a

Commercial Loan Agreement with Kedis under which Kedis under which Kedis

agreed to loan Neminath $600,000.00. (A copy of the Commercial Loan

Agreement is attached as Ex. 4.) The Commercial Loan Agreement is a contract

that is solely between Neminath and Kedis. (See Ex. 4 at GCI Post-Bnkr-Prod –

000341, GCI Post-Bnkr-Prod – 000342, GCI_Post-Bnkr-Prod – 000355.) The

Commercial Loan Agreement provides that Kedis "agrees to make loans to

[Neminath] in the amount US$600.000.00." (See Ex. 4, GCI_Post-Bnkr-Prod –

000342, § 1.1.) It states that "[i]nterest shall accrue on all obligations at an

interest rate (the "Interest Rate") of fifteen (15%) percent per annum." (See Ex.

4,  GCI_Post-Bnkr-Prod - 000343, § 1.4.)

b.     It has a "Maturity Date" of April 9, 2014, on which "the Borrower

shall. . . repay to Lender the full amount of principal and interest owing by the

Borrower hereunder. together with any fees and all other amounts owing by the

Borrower to Lender." (See Ex. A, GCI_Post-Bnkr-Prod - 000342, § 1.1.)

      c.      Neminath's owners Mahendra Shah, Vipin Shah, Pooja Shah (Mahendra's spouse), and Nayana Shah (Vipin's spouse), each "agreed to" the Commercial Loan Agreement and "accepted" it "as guarantor."  (Ex. 4 at GCI_Post-Bnkr-Prod – 000356-58)

      d.      On the same day Neminath entered into the Commercial Loan Agreement with Kedis, Neminath entered into a Mortgage, Security Agreement and Assignment of Leases and Rents Agreement between Kedis and Neminath (the "Mortgage and Security Agreement"), which grants Kedis a mortgage on Neminath's 235 Hillside Avenue, Williston Park, New York property, for purposes of securing the loan Kedis made Neminath pursuant to the Commercial Loan Agreement.

      e.      A copy of the Mortgage and Security Agreement is attached as Ex. 5 (GCI_Post-Bnkr-Prod – 000607 – 628).  Mr. Chand's Third Affidavit makes no mention of the Mortgage and Security Agreement and neither the LLC Defendants, or any of the other Defendants, including Ravi Chopra, M. Shah, or V. Shah, ever produced a copy of Mortgage and Security Agreement, or even disclosed that such an agreement existed.

      f.      On January 22, 2013, Kedis transferred $600,000 to Neminath pursuant to the Commercial Loan Agreement. (See Ex. 6, Neminath January 9, 2013 - February 7, 2013 HSBC Bank Statement.)

      g.      On March 15, 2013, Kedis filed copies of the Commercial Loan Agreement and the Mortgage and Security Agreement with the Nassau County

Clerk's Office for purposes of perfecting Kedis's security interest in Neminath's 235 Hillside Avenue, Williston Park, New York, property.

h.      According to Neminath's and Jaina's bank statements, during the period January 22, 2013 to February 6, 2013, Neminath transferred $530,000 to Jaina pursuant to the Commercial Loan Agreement. (See Ex. 6) I personally reconciled these payments against Jaina's Capital One and Citibank bank statements for the pertinent period and confirmed that Jaina received only $530,000.

i.      Mr. Chand claims that Neminath transferred $570,000 to Jaina during this same period, but he includes in his computation a $40,000 direct funds transfer entry in the Neminath HSBC bank statements that does not identify the payee. I attempted to determine from the Jaina Capital One and Citibank Statements whether Jaina received that payment and can confirm that it does not appear in those or any other Jaina bank statement that any one has produced.

j.      During the period from March 31, 2013 until March 31, 2016, by which date the loan to Kedis was satisfied by Neminath's January 14, 2016 sale of the 235 Hillside Avenue property to Williston Park Realty LLC, Neminath reported on its federal tax returns a $600,000.00 loan from Kedis Enterprises.

k.      During that same period Neminath paid to Kedis $285,000 representing the 15% per annum interest on the loan, usually in monthly installments of $7,500. Mahendra Shah testified that $60,000 of the $285,000 in interest was paid to Mr. Chand from the escrow account into which a portion

of the cash amount of the sale was paid. (Ex. 7, M. Shah Tr. at 34) (The sale itself is discussed in more detail below)

l.      During Neminath's fiscal year ended March 31, 2013, Neminath recorded on Form 1120, Line 18, interest paid or accrued in the amount of $15,000, representing two monthly payments of interest on the $600,000 loan to Kedis at 15% per annum (i.e., $7,500 per month). (See Ex. 8, Neminath 2012 Tax Return, at Neminath Tax Returns – 000001.)

m.      For each of Neminath's fiscal years ended March 31, 2014, March 31, 2015, and March 31, 2016, Neminath recorded on Form 1120, Line 18, interest paid or accrued in the amount of $90,000, representing one year's interest on the $600,000 Kedis loan at 15% per annum for the fiscal year ended March 31, 2014, one year's interest at 15% per annum for the fiscal year ended March 31, 2015, and one year's interest at 15% per annum for the fiscal year ended March 31, 2016. (See Ex. 9, Neminath 2013 Tax Return, at Neminath Tax Returns – 000014; Ex.10, Neminath 2014 Tax Return, at Neminath Tax Returns – 000025; and Ex. 11, Neminath's 2015 Tax Return, at Neminath Tax Returns - 000038.)

n.      During the period from March 31, 2013 until March 31, 2016, Neminath reported on its federal tax returns a $600,000 loan to Jaina. As of March 31, 2016, after the sale of the 235 Hillside Avenue, Williston Park, New York property, Neminath wrote off its loan to Jaina as "bad debt."

o.      Mr. Andrew Bose, Neminath's CPA, confirmed to Geo-Group in writing to Geo-Group that "[t]he following is a summary of the $600,000 loan

Kedis Enterprises, LLC made to Neminath, Inc. in or about January 2013, for interest of 15% per annum:"

| Tax Year | Period | Loan Amount on Neminath's Books | Interest Paid to Kedis |
|---|---|---|---|
| 2012 | April 1, 2012 - March 31, 2013 | $ 600,000.00 | $ 15,000.00 |
| 2013 | April 1, 2013 - March 31, 2014 | $ 600,000.00 | $ 90,000.00 |
| 2014 | April 1, 2014 - March 31, 2015 | $ 600,000.00 | $ 90,000.00 |
| 2015 | April 1, 2015 - March 31, 2016 | $ - | $ 90,000.00 |

(See Email correspondence between Mr. Andrew Bose, CPA and Philip J. Loree Jr., a copy of which is annexed as Ex. 13, Dk. 268-1 at 3 of 11.)

45.     The $600,000.00 Kedis made to Neminath was not discharged or satisfied by Jaina's transfer of a total of $660,000 to Hillside (on August 13, 2014) and 728 Melville (during the period October 16, 2014 to October 29, 2014). It was not discharged until Neminath, in a sale orchestrated by Sanjiv Chand, sold a $1,025,000 property to Williston Park Realty LLC for $425,000 plus a discharge of the $600,000 loan Neminath owed Kedis pursuant to the Commercial Loan Agreement. Jaina therefore transferred $660,000 to the LLC Defendants in exchange for nothing whatsoever, a classic fraudulent transfer that Geo-Group should permitted to recover from the three LLC Defendants, Mr. Chand himself, and Mahendra Shah.

46.     Mr. Chand's Third Affidavit therefore contains the following materially false statements, which were willfully made with the intent to mislead and deceive the Court:

a.     Paragraph 10 of Sanjiv Chand's Third Affidavit: "All of the transfers from Jaina to JMVD, and all of the transfers from Jaina to Melville that are referenced in paragraphs 37 to 50 of [Geo-Group's] Third Amended Complaint ("TAC") were carried out in order to satisfy Jaina's debt to Kedis."

17

(Ex. 1, Chand Third Aff. at ¶ 10)

b.      Paragraph 11 of Sanjiv Chand's Third Affidavit: "As the president and owner of Kedis, I assigned Kedis' right to receive the payments referenced in paragraphs 37 and 44 of the TAC, *which were repayments toward the $600,000 loan made under the [Commercial Loan] Agreement*, to JMVD and Melville." (emphasis added) (Ex. 1, Chand Third Aff. at ¶ 11)

c.      Paragraph 13 of Sanjiv Chand's Third Affidavit: "Jaina's payments to JMVD and Melville as described in paragraphs 37 and 44 of the TAC were made in satisfaction of an antecedent debt, which Jaina paid in order to satisfy the debt to Kedis under the [Commercial Loan] Agreement." (Ex. 1, Chand Third Aff. at ¶ 13)

**NEMINATH'S TAX RETURNS SHOW THAT THE NEMINATH KEDIS LOAN WAS NOT DISCHARGED UNTIL NEMINATH SOLD THE 235 HILLSIDE AVENUE, WILLISTON PARK, NEW YORK PROPERTY ON JANUARY 14, 2016**

47.      Neminath's tax or fiscal year runs from April 1 of year X until March 31 of year X + 1. When I identify a Neminath tax return by a particular year, I mean the year in which the tax or fiscal year covered by that tax return incepts. Thus, for example, Neminath's 2015 tax return refers to Neminath's tax return for the period April 1, 2015 through March 31, 2016.

48.      Copies of Neminath's federal tax returns for 2012, 2013, 2014, 2015, and 2016 are attached as Exs 8-12 as follows:

a.      Neminath's 2012 return: Ex. 8;

b.      Neminath's 2013 return: Ex. 9;

     c.     Neminath's 2014 return: Ex.10;

     d.     Neminath's 2015 return: Ex. 11; and

     e.     Neminath's 2016 return: Ex. 12.

49.     Schedule L, Line 21 of Neminath's federal tax returns, entitled "Other liability (attach statement)," required Neminath to make an entry for "other liabilities" as of: (a) the "Beginning of the tax year"; and (b) the "End of the tax year." It also required Neminath to attach a statement itemizing those liabilities, and showing the amount as of the beginning, and as of the end, of the pertinent tax year.

50.     For each of Neminath's 2012 through 2016 tax years, Neminath provided the information required by Schedule L, Line 21 on each of its tax returns. Neminath also included a Schedule L, Line 21 statement for its 2012 and 2014 returns that identified the $600,000 loan as a "loan payable private." The only Schedule L, Line 21 liability it reported during the tax years 2012 through 2016 was the $600,000 loan that Kedis made to it in January 2013 pursuant to the Commercial Loan Agreement. (See Ex. 8 at Neminath Tax Returns – 000005, Neminath Tax Returns – 000012; Ex. 9 at Neminath Tax Returns – 000018; Ex. 10 at Neminath Tax Returns – 000029, Neminath Tax Returns – 000036; Ex. 11 at Neminath Tax Returns – 000042; Ex 12 at Neminath Tax Returns – 000049, Neminath Tax Returns – 000055.)

51.     Schedule L, line 14 of Neminath's federal tax returns, entitled "Other assets (attach statement)" required Neminath to make an entry for "Other assets" as of: (a) the "Beginning of the tax year"; and (b) the "End of the tax year."  It also required Neminath to attach a statement itemizing those "Other assets," and showing them as of the beginning, and as of the end, of each pertinent tax year. (See, e.g., Ex.

8 at Neminath Tax Returns – 000005, Neminath Tax Returns – 000011.)

52.     For each of Neminath's 2012 through 2016 tax years, Neminath reported the information required by Schedule L, Line 14 on each of its tax returns, reporting an asset in the amount of $600,000.. For its 2012, 2014, and 2016 returns, Neminath submitted with its return a Schedule L, Line 14 *statement* (i.e., a separate schedule attached to the tax return), which specifically identified the $600,000 asset as "Loan Receivable – Jaina Systems Inc." Thus, the only Schedule L, Line 14 asset it reported during the tax years 2012 through 2016 was the $600,000 Neminath loaned Jaina, using the loan proceeds from the loan Kedis made to Neminath pursuant to the Commercial Loan Agreement. (See Ex. 8 at Neminath Tax Returns – 000005, Neminath Tax Returns – 000011; Ex. 9 at Neminath Tax Returns – 000018; Ex. 10 at Neminath Tax Returns – 000029, Neminath Tax Returns - 000035; Ex. 11 at Neminath Tax Returns – 000042; Ex 12 at Neminath Tax Returns – 000049, Neminath Tax Returns - 000054.)

53.     I have prepared a chart entitled "$600,000 Loan as Shown in Neminath's Tax Returns," which, among other things, shows that Neminath first reported the $600,000 loan Kedis made to it as a $600,000 liability beginning in Neminath's tax year 2012; continued to report it as a liability at the beginning and end of the tax years 2013 and 2014; reported it as a $600,000 liability in the beginning of the 2015 tax year (as of April 1, 2015) and at the end of the 2015 tax year (as of March 31, 2016); but showed that it was no longer payable as of April 1, 2016, by which time Neminath sold its 235 Hillside Avenue property. (See Ex. 28.)

54.     The chart (Ex. 28) further shows, among other things, that as of the beginning of Neminath's 2012 tax year (April 1, 2012), Neminath reported $0.00 for

Line 14 ("Other assets"). As of March 31, 2013—by which time Kedis had transferred to Neminath $600,000 in loan proceeds pursuant to the Commercial Loan Agreement, and by which time Neminath had loaned $530,000 of that $600,000 to Jaina— Neminath reported a $600,000 Schedule L, Line 14 "Other asset," which it described as "Loan Receivable – Jaina Systems Inc." (Ex. 8 at Neminath Tax Returns – 000005, Neminath Tax Returns – 000011)

55.     Neminath continued to report that $600,000 loan receivable as a Schedule L, Line 14 "Other asset" as of the beginning and end of Neminath's 2013 and 2014 tax years (April 1, 2013 – March 31, 2014 and April 1, 2014 – March 31, 2015)). (See Ex. 9 at Neminath Tax Returns – 000018; Ex. 10 at Neminath Tax Returns – 000029, Neminath Tax Returns – 000035.)

56.     Neminath also continued to report that $600,000 loan receivable as a Schedule L, Line 14 "Other asset" as of the beginning and end of Neminath's 2015 tax year (April 1, 2015 – March 31, 2016). But as set forth in Schedule L, Line 2.b, and Form 1120, Line 15 "(Bad debt)," Neminath, as of March 31, 2016, wrote off the $600,000 Jaina owed it. (See Ex. 11 at Neminath Tax Returns – 000042 & 000038.) That write-off, and the corresponding loan receivable asset, was also reflected in Neminath's 2016 tax return, which, consistent with Neminath's 2015 tax return, showed that, by April 1, 2016, the loan had been written off. (See Ex. 12 at Neminath Tax Returns – 000049, Schedule L, lines 2.b & 14; Neminath Tax Returns – 000055; see also Ex. 12 at Neminath Tax Returns – 000045, Line 15.)

57.     As discussed above, Neminath's accountant Mr. Andrew Bose has confirmed in writing that the Neminath tax returns and other documents he has produced show that the following chart accurately summarizes "the $600,000 loan

Kedis Enterprises, LLC made to Neminath, Inc. in or about January 2013, for interest of 15% per annum:"

| Tax Year | Period | Loan Amount on Neminath's Books | Interest Paid to Kedis |
|---|---|---|---|
| 2012 | April 1, 2012 – March 31, 2013 | $ 600,000.00 | $ 15,000.00 |
| 2013 | April 1, 2013 – March 31, 2014 | $ 600,000.00 | $ 90,000.00 |
| 2014 | April 1, 2014 – March 31, 2015 | $ 600,000.00 | $ 90,000.00 |
| 2015 | April 1, 2015 – March 31, 2016 | $ - | $ 90,000.00 |

(See Ex. 13, Dk. 268-1 at 3 of 11.)

ON OR ABOUT JANUARY 14, 2016 NEMINATH SOLD ITS 235 HILLSIDE AVENUE PROPERTY FOR $1,025,000

$425,000 OF THE $1,025,000 WAS PAID IN CASH TO NEMINATH

THE $600,000 SUBTRACTION REPRESENTS PAYMENT BY NEMINATH OF THE $600,000 LOAN KEDIS ENTERPRISES MADE TO NEMINATH

58.     The evidence demonstrates that during Neminath's 2015 tax year (April 1, 2015 – March 31, 2016) Neminath sold the 235 Hillside Avenue, Williston Park, New York property for $1,025,000 and that the $600,000 loan to Kedis was paid at that time.

59.     Neminath's 2015 federal tax return included Form 4797, entitled "Sales of Business Property." (Ex. 11 at Neminath Tax Returns – 000043) Neminath completed Part I of Form 4797, which is entitled "Sales or Exchanges of Property Used in a Trade or Business and Involuntary Conversions From Other Than Casualty or Theft—Most Property Held More Than 1 Year."  (Ex. 11 at Neminath Tax Returns – 000043)

60.     In Form 4797, Part I, Line 2, Neminath reported that it had sold a "Building" for a "Gross sales price" of $1,025,000. The "Depreciation allowed or allowable since acquisition" was reported to be $149,900. The "Cost or other basis,

22

plus improvements and expense of sale" was reported to be $419,500. The "Gain or (loss)" was reported to be $755,400, that is, (($1,025,000 (gross sales price) + $149,900 (depreciation)) - $419,500 (cost basis)). (Ex. 11 at Neminath Tax Returns – 000043) These details are summarized in the chart attached as Ex. 28.

61.     At his August 11, 2017 deposition, Mahendra Shah testified that Neminath sold the 235 Hillside Avenue, Williston Park, New York property for $1,025,000:  (a) $600,000 of which represented a reduction in the $1,025,000 sale price in exchange for Neminath's release from its outstanding obligations to Kedis under the Commercial Loan Agreement; and (b) $425,000 of which represented the difference between the $1,025,000 gross sale price and $600,000, the value of Kedis' discharge of Neminath's obligation to pay the $600,000 loan Kedis made to Neminath pursuant to the Commercial Loan Agreement. (See Ex. 7, M. Shah Dep. at 31-39.)

62.     Mahendra Shah testified that the 235 Hillside Avenue, Williston Park, New York property was sold to Sanjiv Chand or an entity owned or controlled by Sanjiv Chand. (Ex. 7, M. Shah Tr. at 31-32)

63.     The $425,000 paid to Neminath was deposited in attorney' Edward Troy's escrow account. (See Ex. 7, M. Shah Dep at 34-39.)

64.     The purpose of selling the property was "[b]ecause we wanted to paid off Jaina's debt, some of the lenders, you know, so that's the reason that we sold it." (Ex. 7, M. Shah Tr. at 34-35)

65.     M. Shah explained in some detail how the $425,000 cash was distributed by escrow and testified that $60,000 was paid to Sanjiv Chand for interest past due on the $600,000 loan (which was discharged by the sale). (Ex. 7, M. Shah Dep. at 34-35)

66.     The $1,025,000 sale price of the 235 Hillside Avenue, Williston Park, New York property was slightly lower than the market value of the property as contemplated by the Commercial Loan Agreement. The Commercial Loan Agreement (which was signed by both Sanjiv Chand and M. Shah, and accepted as guarantor by Vipin Shah, M. Shah, and their spouses, N. Shah and Pooja Shah) set the maximum loan amount at 50% of the property's assessed value: "The ratio of the maximum principal balance available hereunder to the then appraised value of the Borrower Financed Premises must not exceed 50% throughout the duration of the Facility." (See Ex. 4, Commercial Loan Agreement, Financial Covenants, § 3.6(c), GCI Post-Bnkr-Prod – 000348.)

67.     Since Kedis agreed to and did loan $600,000 to Neminath under the Commercial Loan Agreement, Kedis considered the value of the 235 Hillside Avenue property to be at least $1,200,000— $175,000 more than the gross sale price of the property.

68.     Neminath's CPA, Andrew Bose, has confirmed that documents he produced, including his own notes, show that the 235 Hillside Avenue, Williston Park, New York Property was sold for $1,025,000, $600,000 of which represented Kedis' discharge of the $600,000 loan Kedis made to Neminath. (See Ex. 13 at 3-4 of 11.)

69.     One of these documents is "a one-page copy of notes [Mr. A. Bose] took based on a conversation [he] had on June 6, 2016 with Vipin Shah concerning Neminath's fiscal year ending March 31, 2016. . . [the "Notes"]" (Ex. 13, Dk. 268-1 at 4 of 11) A copy of the Notes is attached as Ex. 14 to this Certification.

70.     CPA Mr. A. Bose confirmed that "Vipin Shah provided [CPA Mr. A. Bose]

with the information [CPA Mr. A Bose] recorded in the Notes." (See Ex. 13, Dk. 268-1 at 3 of 11 & Ex. 14.)

71.    CPA Mr. A. Bose confirmed that he "used the information provided by Vipin Shah to confirm that the information set forth in Neminath's federal tax return for the 2015 tax year (April 1, 2015 – March 31, 2016) was accurate." (See Ex. 13, Dk. 268-1 at 3 of 11 & Ex. 14.)

72.    CPA Mr. A. Bose confirmed that "Mahendra Shah approved [by email] Neminath's federal tax return for the 2015 tax year on June 8, 2016 [even though he signed the return on June 1, 2016]." (See Ex. 13, Dk. 268-1 at 3 of 11 & Ex. 14.)

73.    CPA Mr. A. Bose confirmed that "[t]he Notes refer to a 'building sale.'" The "building sale" referred to in the Notes is the sale of Neminath's 235 Hillside Avenue, Williston Park, New York 11596 property." (See Ex. 13, Dk. 268-1 at 3 of 11 & Ex. 14.)

74.    CPA Mr. A. Bose confirmed that "[t]he Notes show that the sale price of the property was $1,025,000. The Notes also show that $600,000 was subtracted from the $1,025,000 sale price. The $600,000 subtraction represents payment by Neminath of the $600,000 loan Kedis Enterprises LLC made to Neminath. Like all of the other information set forth in the Notes, [he] obtained the information set forth in this paragraph 13. from Vipin Shah, who provided it to [him] on June 6, 2016. Mr. Mahendra Shah, as previously mentioned, confirmed the accuracy of this, and other information reflected on Neminath's federal tax return for the 2015 tax year (April 1, 2015 – March 31, 2016), by approving the 2015 tax return on June 8, 2016." (See Ex.13, Dk. 268-1 at 3-4 of 11 & Ex. 14.)

SANJIV CHAND ORCHESTRATED THE SALE OF 235 HILLSIDE AVENUE, WHICH
TOOK PLACE ON JANUARY 14, 2016.

HE SIGNED HIS THIRD AFFIDAVIT ON OR ABOUT MARCH 31, 2016.

75.     S. Chand signed his Third Affidavit on (or perhaps a short period before)
March 31, 2016, the date on which it is filed (the affidavit, though apparently prepared
by the New York City office of a fairly large, Philadelphia-based law firm, bears no date
other than the date on which it was filed). By the time he signed the Affidavit, Mr.
Chand had, as set forth below, arranged for the January 14, 2016 sale of the 235
Hillside Avenue, Williston Park, New York property for $1,025,000, to be paid by: (a)
Kedis granting Neminath a discharge of the $600,000 loan Kedis made it; and (b) the
payment of $425,000 cash to Neminath. Mr. Chand made no mention whatsoever of
these facts in his affidavit and, for good reason—they expose as false his sworn
statements that the $660,000 that Jaina paid to Neminath were payments in
discharge of an antecedent debt.

76.     At his August 11, 2017 deposition, M. Shah testified that Neminath had
sold the 235 Hillside Avenue, Williston, New York property to Sanjiv Chand or a
business entity owned or controlled by Sanjiv Chand:

> Q. . . . . Did Neminath own the premises at 235
> Hillside Avenue?
> A. Yeah. Yeah.
> Q. In Williston Park, New York?
> A. Yeah.
> Q. Does Neminath still own those premises?
> A. No.
> Q. No. Who owns them now?
> A. I think San Chandani his name.
> Q. Sam whom?
> A. San Chandani or Sanjiv Chandani.

Q. Oh, Sanjiv Chand?

A. Chand, yeah, Chand.

Q. Okay. He owns them.

Does he own them through a realty company

or --

A. Something, you know, like that.

Q. Like an LLC?

A. I didn't remember the exact name, but he

has-yeah.

Q. Okay. So whatever company owns it, it's a company that Sanjiv
Chand owns in whole or in part; correct?

A. Yeah.

Q. Okay. Right. Now, when did he acquire -- when did

Sanjiv Chand acquire those premises?

A. I - I think January or February of 2000- '16 or '15, I don't remember.
One second. I think it happened in 2016, February.

. . . .

Q. . . . So Neminath, I guess, sold to Mr. Chand's company --

A. Um-hum (affirmative).

Q. .. these -- the premises?

A. Um-hum (affirmative).

(Ex. 7, M. Shah Tr. at 31-32)

77.    The deed Neminath gave for the sale of the property was dated January

14, 2016 and filed with the Nassau County Clerk's Office on February 23, 2016. (Ex.

18 at GCI Post-Bnkr-Prod – 000067 & 68) It conveyed the 235 Hillside Avenue,

Williston Park, New York property to Williston Park Realty,  LLC, whose address was

listed on the deed as "1414 Hillside Avenue[,] New Hyde Park[.]" 1414 Hillside Avenue,

New Hyde Park, New York 11040, is Kedis's business address (Ex. 4, Commercial Loan

Agreement, GCI_Post-Bnkr-Prod – 000341, 000342, & 000354), as well as the address

of 728 Melville and Hillside. (Exs. 19-21)

78.    According to the contract of sale, the property was sold to Williston Park

27

Realty, LLC, a company having the same address as the Chand owned-and-controlled LLC Defendants: 1414 Hillside Avenue, New Hyde Park. (Ex. 22 at WPR000085)

79.    Several months later, by Bargain and Sale Deed dated October 11, 2016, "Williston Park Realty LLC, having an office address of 1414 Hillside Avenue, New Hyde Park, New York 11040," conveyed the property to "Williston Park Realty LLC, having an address at 1 Harnat Court, Hicksville, New York, 11801." (Ex. 23 at WPR 000204-05) That deed was filed in the Nassau County Clerk's Office on November 9, 2016. (Ex. 23 at WPR 000203)

80.    Geo-Group's deposition of Williston Park Realty LLC exposes the deceptive nature of the transaction Neminath entered into with Sanjiv Chand and Kedis. Ms. Maria Ramirez, testifying as a Fed. R. Civ. P. 30(b)(6) witness for Williston Park Realty, LLC, attempted to portray the transaction as one in which Sanjiv Chand had no economic interest or meaningful involvement in, but her testimony shows that Mr. Chand orchestrated the entire transaction, and that she was not even privy to the details of the transaction negotiated between Mr. Chand and Neminath. The testimony shows also that Mr. Chand retains control over the property conveyed and does nothing to rebut M. Shah's testimony, the Neminath tax returns, Mr. Andrew Bose's Notes, and the other documents that show that the 235 Hillside Avenue, Williston Park, New York property was sold by Neminath for $1,025,000, $600,000 of which represented Kedis' discharge of the $600,000 loan it made to Neminath pursuant to the Commercial Loan Agreement.

81.    Ms. Ramirez's testimony, and the documents she produced, show, among other things, that:

a.      Ms. Ramirez has a close business and social relationship with Mr. Chand, who was her former employer, and who sold her first delicatessen business;

b.      She considers Mr. Chand to be her "business advisor." (Ex. 24, Ramirez Tr. at 29)

c.      Mr. Chand approached her with an opportunity to purchase the 235 Hillside Avenue for $425,000, i.e., at a fraction of the $1,200,000.00 value of that property contemplated by the Commercial Loan Agreement (See Ex. 24, Ramirez Tr. at 29; Ex. 4, Commercial Loan Agreement, Financial Covenants, § 3.6(c), GCI_Post-Bnkr-Prod – 000047-48);

d.      Mr. Chand negotiated the terms of the sale with Neminath prior to Mr. Chand offering Ms. Ramirez the opportunity to purchase the property (Ex. 24, Ramirez Tr. at 52);

e.      Ms. Ramirez was not present for the negotiations between Mr. Chand and Neminath, and has no knowledge of what was discussed or agreed at those negotiations (Ex. 24, Ramirez Tr. at 50, 52);

f.      Edward Troy, an attorney who represents Sanjiv Chand, and represented Jaina against Geo-Group, reporting to Mahendra Shah, represented Ms. Ramirez, acted as escrow agent, and apparently represented Neminath and Mr. Chand in connection with the transaction (Ex. 24, Ramirez Tr. at 33-35; see Ex. 7, M. Shah Tr. at 36);

g.      Not only Mr. Chand, but his sister-in-law, and sometimes

business partner/associate Jesse Gupta, attended the closing, along with Ms. Ramirez, Mahendra Shah, Vipin Shah, and Mr. Troy, attended the closing;

h.    While Ms. Ramirez claims that she is the sole owner of Williston Park Realty LLC, the New York Combined Real Estate Transfer Tax Return, contrary to New York State Form TP-584 Instructions (TP-584-I) does not provide the disclosures that single-member LLCs are required to make, and identifies Williston Park Realty LLC as an entity "other" than a single-member LLC, which suggests that, contrary to Ms. Ramirez's testimony, Williston Park Realty LLC may not be a single member LLC and that one or more other individuals (including Mr. Chand or an entity owned and controlled by him) may be members of Williston Park Realty LLC;

i.    Mr. Chand, through Kedis, retained control over the future sale of the property because Kedis did not prepare and record a simple form discharging the mortgage of record; and

j.    Because Mr. Chand or Kedis did not prepare, execute, and record a discharge of mortgage, Williston Park Realty, LLC's title insurer issued a policy that "excepts Mortgage made by Neminath Inc., to Kedis Enterprises LLC dated 1/18/2013 in the amount of $600,000.00 recorded 3/15/2013 in Liber 38434 page 724." (Ex. 24 at WPR 000140)

MS. RAMIREZ'S TESTIMONY

82.    Ms. Ramirez testified that she is the sole owner, manager, and member of Williston Park Realty LLC. (Ex. 24, Ramirez Tr. at 48) Ms. Ramirez got her start in the deli business. In or about 2004 or 2005 she worked at a Deli owned by one Laddi

30

Singh. It was during her time there that she met Sanjiv Chand, who frequently visited Mr. Laddi Singh's deli and apparently was a "business partner" of Laddi Singh. (Ex. 24, Ramirez Tr. at 17-19)

83.    Ms. Ramirez is also a friend of Jesse Gupta, who is Sanjiv Chand's sister-in-law.  She says she met Chand's sister-in-law Ms. Gupta because Ms. Gupta worked in a deli that was apparently nearby Mr. Singh's deli, where Ms. Ramirez originally worked. (Ex. 24, Ramirez Tr. at 45-46)

84.    In or about 2008 she began working at "Al's Deli" in New York City, which Sanjiv Chand owned. (Ex. 24, Ramirez Tr. at 19) In or about 2010 she bought the deli from Mr. Chand, owns 100% of the business, and has no other business partners or co-owners. (Ex. 24, Ramirez Tr. at 24-25)

85.    According to Ms. Ramirez Mr. Chand is a "friend" and "business advisor." (Ex. 24, Ramirez Tr. at 29) As a "business advisor," one of the things Mr. Chand "advised" her on was her purchase of Al's Deli, which Mr. Chand sold to her. (Ex. 24, Ramírez Tr. at 30)

86.    In or about October 2015, Mr. Chand approached her and suggested she purchase the property. (Ex. 24, Ramirez Tr. at 27, 29, 32, 36) According to Ms. Ramirez, "they were selling the property and for a very good price, and Mr. Chand is my business advisor, for me, so I took it, I trust him, and I think it was a good deal." (Ex. 24, Ramirez Tr. at 29; see also Ramirez Tr. at 31-32). She does not remember anything else about any conversations she had with Mr. Chand about the property. (Ex. 24, Ramirez Tr. at 35)

87.    It is not surprising that Ms. Ramirez thought the property was selling for

a "good price," because she testified that Mr. Chand told her that she could purchase the property in exchange for *$425,000*. (Ex. 24, Ramirez Tr. at 51-52) Mr. Chand owns and controls Kedis, and, as previously discussed, under the terms of the Commercial Loan Agreement, Kedis loaned Neminath $600,000 based on Neminath's 235 Hillside Ave., Williston Park, New York property having a value of at least $1,200,000. (Ex. 4 at GCI Post-Bnkr-Prod – 000342-43, 000347-48)

88.     After Ms. Ramirez decided to follow Mr. Chand's business advice and purchase the 235 Hillside Avenue property for $425,000.00, she retained a certified public accountant ("CPA"), Prakash Chavda, who helped her form Williston Park Realty, LLC.  (Ex. 24, Ramirez Tr. at 46-47) Mr. Chavda also does accounting work for Ms. Ramirez's deli. (Ex. 24, Ramirez Tr. at 43-44) Mr. Chand's sister-in-law recommended that Ms. Ramirez hire Mr. Chavda to do that accounting work. (Ex. 24, Ramirez Tr. at 45)

89.     Mr. Chavda has done work for at least one entity owned and controlled by Mr. Chand. He filed the articles of organization of Hillside. (See Ex. 15, Articles of Organization JMVD Hillside LLC.)

90.     Ms. Ramirez also hired a lawyer to represent her. For that purpose she hired attorney Edward Troy, whom she originally met at one of Mr. Chand's parties. Mr. Troy, Ms. Ramirez testified, was one of Mr. Chand's "friends" and "lawyers." (Ex. 24, Ramirez Tr. at 33-34) She claims that upon learning from Mr. Chand about the opportunity to purchase the property she "just called" Mr. Troy. (Ex. 24, Ramirez Tr. at 35)

91.     Mr. Troy has a close professional relationship not only with Sanjiv

Chand, but also Mahendra Shah, who was President of both Neminath and Jaina. Mr. Troy represented Jaina in the arbitration against Geo-Group; the arbitration award confirmation proceedings in Supreme Court, New York County; Jaina's unsuccessful appeal to the Appellate Division, First Department of the judgment confirming the award; and in a separate, unsuccessful, but highly obstructive lawsuit Jaina brought against Geo-Group's attorney, Norman Solovay, which sought to block Geo-Group from using Jaina's Citibank bank statements in this lawsuit.

92.    When Mr. Troy represented Jaina, his "principal contact" was Jaina's and Neminath's President, Mahendra Shah. In a July 17, 2014 email Mr. Troy sent to Norman Solovay, who represented Geo-Group in the arbitration, Mr. Troy explained that his "principal contact with Jaina has been hospitalized for a couple of weeks." (Ex. 27) Mahendra Shah testified that "[i]n 2014, I had a stent also in my heart. July 11, 2014." (Ex. 7, M. Shah Tr. at 186; see also M. Shah Tr. at 240-41 ("I got the stent in. . . 11th of July, 2014, because of all these projects. . . .")) Presumably, the principal contact Mr. Troy was referring to in his email was Mahendra Shah, who, by his own account, was having heart surgery in or about July 11, 2014, and who, according to Mr. Troy's July 17, 2014 email, would probably be released from the hospital on or about Monday, July 20, 2014, a little over a week after he had the stent installed. (Ex. 7, M. Shah Tr. at 186, 240-241; Ex. 27)

93.    Ms, Ramirez claims that she "just called" Mr. Troy once Mr. Chand suggested that she purchase the property. (Ex. 24, Ramirez Tr. at 35) But given the close relationships between and among Mr. Troy, Sanjiv Chand, and Mahendra Shah, it is more likely that Mr. Chand suggested that she contact Mr. Troy.

94.    After she engaged her attorney, Mr. Troy, Ms. Ramirez simply attended

the closing, signed the pertinent documents and bought the property for what she

apparently believed was the sum of $425,000. (Ex. 24, Ramirez Tr. at 51-52)

95.     She testified she was not involved in whatever negotiations took place

between Mr. Chand, Mahendra Shah, and Vipin Shah, and has no knowledge of what

was negotiated. (Ex. 24, Ramirez Tr. at 50) In fact, whatever negotiations took place

between Mr. Chand and Neminath were completed by the time Mr. Chand suggested

that she purchase the property for $425,000. (Ex. 24, Ramirez Tr. at 52) At first, she

testified that Mr. Troy was involved in whatever negotiations took place, but next

testified that she did not know whether Mr. Troy was involved in the negotiations. (Ex.

24, Ramirez Tr. at 52)

96.     She was present at the closing, as were Mr. Troy, Sanjiv Chand, Jesse

Gupta, Mahendra Shah, and Vipin Shah. (Ex. 24, Ramirez Tr. at 52-54)

97.     She learned on the date of the closing that Kedis had a mortgage on the

property in the amount of $600,000 (Ex. 24, Ramirez Tr. at 55), established by the

Commercial Loan Agreement and the Mortgage Agreement. (Exs. 4 & 5) She was

informed that the mortgage was paid but no one told her when that occurred. (See Ex.

24, Ramirez Tr. at 56)

98.     No discharge of the mortgage was filed or produced by anyone in this

case, including by Ms. Ramirez. Geo-Group's online of search of Nassau County

Clerk's Office records has revealed that, no discharge of the mortgage on the 235

Hillside Avenue, Williston Park, New York property has been recorded.

99.     Ms. Ramirez's Williston Park Realty LLC obtained title insurance on the

property, but the title insurance she obtained, with the help of Mr. Troy, contained an

important exclusion. Schedule B of the title insurance policy—which "[s]how[s] defects, liens, encumbrances and other matters against which the Company does not, by this by this Policy, insure[]"— expressly "excepts Mortgage made by Neminath Inc., to Kedis Enterprises LLC dated 1/18/2013 in the amount of $600,000.00 recorded 3/15/2013 in Liber 38434 page 724." (Ex. 25, Title Insurance Policy at WPR – 000140; Ex. 24, Ramirez Tr. at 77-79; Ex. 26, Title Insurance Policy Closing Invoice at WPR 000136, addressed to Mr. Troy)

100.    The Combined Real Estate Transfer Tax Return (TP-584) that Ms. Ramirez filled out at or for the closing (Ex. 29) undermines her contention that she is the only the member of Williston Park Realty LLC.

101.    That TP-584 return requires the "Grantee/Transferee" to identify itself as one of the following: an "Individual," a "Corporation," a "Partnership," an "Estate/Trust," a "Single Member LLC" or "Other." (Ex. 29)

102.    New York State's Instructions for form TP-584 (TP-584-I, copy attached as Ex. 30) provide, in bold letters, that: "If the grantor or grantee is a single member LLC, enter the names and identification numbers (SSN and/or EIN) for both the LLC and the Single Member."  (Ex. 30 at 2 of 7)

103.    Ms. Ramirez testified that she is the sole owner, manager, and member of Williston Park Realty LLC (Ex. 24, Ramirez Tr. at 48) If that is the case, then Williston Park Realty LLC is a single member LLC. But instead of checking the box on the return for "Single Member LLC," she checked "Other." (Ex. 29 at WPR 000127; Ex. 24, Ramirez Tr. at 64-67) She doesn't "remember" why the return did not identify her LLC as a single member LLC. (See Ex. 24, Ramirez Tr. at 67.)

104.    The Combined Real Estate Transfer Tax Return also has two boxes for employer identification or social security numbers. There are spaces for "Social security number," "Federal EIN," and "Single Member EIN or SSN." The "Federal EIN" number is filled in, but the "Single Member EIN or SSN" box was left empty. (Ex. 29 at WPR 000127; Ex. 24, Ramirez Tr. at 67-68) If, as Ms. Ramirez claims, Williston Park Realty, LLC is a single-member LLC, then she was *required* to provide the "**identification numbers (SSN and/or EIN) for both the LLC and the Single Member**." (Ex. 30 at 2 of 7 (emphasis in original)) She did not.

105.    Finally, the Combined Real Estate Transfer Tax Return has a line for the "Single member's name if grantee is a single-member LLC (see instructions)." (Ex. 29 at WPR 000127) The instructions (Ex. 30 at 2 of 7) provide, in bold, that if Williston Park Realty LLC "**is a single member LLC, enter the names. . . for both the LLC and the single member.**" (Ex. 30 at 2 of 7 (emphasis in original)) But neither Ms. Ramirez nor anyone else filled-in the line provided for the "Single member's name if the grantee is a single member LLC. . . ." (Ex. 29 at WPR 000127)

106.    In response to Geo-Group's subpoena, Williston Park Realty LLC produced, among other things, copies of the front page only of four checks that purportedly represent the balance due of the $425,000 cash-portion purchase price of the property. (See Ex. 31 at WPR 000137.) Those checks were written on Ms. Ramirez's personal bank account. (Id.) Since we do not have copies of the reverse side of the checks bearing an endorsement, we cannot confirm whether they were cashed or deposited.

MAHENDRA SHAH'S CLAIM THAT NEMINATH PAID $600,000 AS A "MISTAKE" IS SPECIOUS

36

*Background: Mahendra Shah, Jaina, and Neminath*

107.   Mahendra B. Shah ("M. Shah") is a natural person who, until a little more than two years ago, resided in Williston Park, New York, but has since moved to South Florida, near Tampa.

108.   In addition to being the CEO of Jaina (Dk. 208 at ¶¶ 10-16), M. Shah was, until March 31, 2017, also an owner (along with Debtor Defendant Vipin Bhogilal Shah ("V. Shah")), and the President of, Neminath, Inc., which until recently, owned the 235 Hillside Ave. property in which Jaina conducted its operations. According to Defendant Vipin Shah's testimony, M. Shah owned 5% of Neminath, M. Shah's spouse Pooja Shah owned 45%, V. Shah owned 5%, and his spouse, Nayana Shah, owned 45%. (See Ex. 32, Transcript of the August 8, 2017 Deposition of Defendant Vipin Shah ("V. Shah Tr.") at 27, 29.)

109.   Neminath was, until March 31, 2017, therefore effectively the Shah family business. Each of the two families were fully represented as shareholders.

110.   Effective April 1, 2017, Mahendra Shah, "transferred complete ownership and Corporate Stock share ownership of Neminath Inc. to the following parties, with respective ownership percentages: [a] Vipin Shah: 50% ownership from April 1, 2017[;] [and] [b] Nayana Shah: 50% Ownership from April l, 2017[.]" (See Ex. 33, Neminath Corporate Resolution obtained from Mr. Andrew Bose, CPA, at Neminath-Bose – 000212.)

111.   Neminath is accordingly now the Vipin and Nayana Shah family business. Since Neminath's sale of the 235 Hillside Avenue property, it has leased the property from Williston Park Realty LLC. (Ex. 34, Lease Agreement)

112.    Mahendra Shah is the only Jaina owner and officer with both a formal education and substantial business experience. Mr. Shah has a Bachelor's in Science degree in physics and math and has some training in cost accounting. ((Ex. 7, M. Shah Tr. at 17-19) He had about six-years of experience with PaineWebber, Inc. followed by roughly a year at Republic National Bank. ((Ex. 7, M. Shah Tr. at 21-23) Then, beginning in 1996 he ran Neminath Inc., a convenience store, as President.

113.    Even prior to forming Jaina, M. Shah knew (or at least had to know) about the potential for growth and profitability in the telecom business.

114.    He formed Jaina in 2002 and was its CEO. The address M. Shah used for the incorporation of Jaina was 39 Capitol Avenue, Williston Park, New York 11596, which was his home address at the time. (See Ex. 36.)

*Mahendra Shah's Self-Serving and Dishonest Attempt to Explain Away the Fraudulent Transfer of $660,000 from Jaina to LLC Defendants*

115.    As discussed, M. Shah testified at his August 11, 2017 deposition that Neminath did not satisfy its $600,000 Commercial Loan Agreement debt to Kedis until it sold the 235 Hillside Avenue, Williston Park, New York property, at which time Neminath reduced the sale price of the property it sold by $600,000 in exchange for Kedis's discharge of Neminath's obligation to pay the loan.

116.    In his December 7, 2017 affidavit in support of his motion for summary judgment, M. Shah stated that, up until some unspecified time between his August 11, 2017 deposition and his December 2017 motion for summary judgment, that he "was always under the impression that Jaina still owed $600,000 to Neminath and in turn Neminath still owed (Kedis Enterprises) Sanjiv Chand $ 600,000." (Dk at 208 at 5 of 10) "So," M. Shah continued, "when I sold the building to Williston Park LLC [sic], I

thought that I sold the building for $1,025,000 of which $600,000 was towards the loan that Neminath took for Jaina but never repaid to Kedis (that is the reason why Neminath's tax return shows a loss of $ 600,000-loan not received from Jaina) and $425,000 was taken from Williston Park LLC for additional funds needed to satisfy other loans of Jaina and Neminath." (Dk at 208 at 5 of 10)

117.   M. Shah further stated that "I was under the impression that Williston Park realty belonged to Sanjiv Chand and Marianna Ramirez was an agent of Sanjiv Chand," and that it was "only when I saw the affidavit of Sanjiv Chand and Marianna Ramirez that I realized that I had sold the building to Marianna Ramirez of Williston Park LLC and not to Sanjiv Chand."  (Dk at 208 at 5 of 10)

118.   According to M. Shah, he was "handed the sale documents of Neminath building at the time of closing and not before and I made the grave mistake of signing the sale document of Neminath building without reading." "I now," M. Shah claimed, "realize what a grave mistake I did. I, in effect, sold the Building of Neminath for $425,000." (Dk at 208 at 5 of 10)

119.   Mahendra Shah's "explanation" for Jaina's $660,000 fraudulent transfer to Jaina strains credulity. He's not only an experienced businessperson but a highly educated one, who exercised control over both Jaina's and Neminath's finances.

120.   The Citibank and Capital One documents we received show that he maintained signing authority and control over Jaina's finances. As evidenced by Mr. Troy's previously discussed July 17, 2014 email (Ex. 27)), Mahendra Shah controlled the litigation and arbitration between Jaina and Geo-Group.

121.   The $600,000 loan Neminath took pursuant to the Commercial Loan

Agreement was a major undertaking for Neminath, a convenience store company whose gross sales for Neminath's Tax Years 2011 through 2015 were:

| Neminath Tax Year | 2016 | 2015 | 2014 | 2013 | 2012 |
|---|---|---|---|---|---|
| Gross Sales Per Neminath's Income Tax Returns | $ 327,710.00 | $ 349,059.00 | $ 356,929.00 | $ 355,869.00 | $ 462,822.00 |

(See Ex. 12 at Neminath Tax Returns – 000045;  Ex. 11 at Neminath Tax Returns – 000038; Ex. 10 at Neminath Tax Returns – 000025; Ex. 9 at Neminath Tax Returns – 000014; and Ex. 8 at Neminath Tax Returns – 000001.)

122.    The $600,000 loan exceeded by considerably more than $100,000 Neminath's gross sales for each of those years. It was secured by Neminath's largest asset, the 235 Hillside Avenue, Williston Park, New York premises, which were the subject of the $1,025,000 sale.

123.    It beggars belief that, after negotiating with Mr. Chand a sale of Neminath's largest business asset in exchange for a cash payment, plus Kedis's discharge of the $600,000 debt Neminath owed it, Mahendra Shah somehow "forgot" or didn't realize that Jaina had supposedly already paid the debt on Neminath's behalf.

124.    Mahendra Shah, who was CEO of both Jaina and Neminath, does not deny that he had knowledge of and consented to the transfer by Jaina of $660,000 to LLC Defendants 728 Melville and Hillside. His affidavit (Dk. 208) instead simply states "[w]hen Jaina repaid loan and interest of $460,000 to 728 Melville in October 2014 and $200,000 to JMVD Hillside in July 2014, I, M. Shah, did not know that these entities belonged to Sanjiv Chand." (Dk. 208 at 5 of 10)

125.   But if Mahendra did not know that those LLC entities—which were not customers or vendors of Jaina—were owned and controlled by his business associate Sanjiv Chand, then that would raise the question why he, as President, permitted that $660,000 to be paid in the first place, and, in fact, why he and Nayana Shah approved the wire transfers. For the LLC Entities certainly were not vendors of Jaina and did not purport to be (and were not) in the telecommunications business.

126.   Mahendra Shah's affidavit in support of his summary judgment motion deliberately misrepresents the role that Ms. Ramirez played in the sale of the 235 Hillside Avenue property. Contrary to M. Shah's suggestion, Ms. Ramirez testified she was not involved in any of the negotiations. As discussed above, by Ms. Ramirez's account, the deal had been negotiated by Mr. Chand with Neminath *without* her involvement, and, in any event, *before she even learned about the deal.*

127.   She professed to have no knowledge of the deal that Neminath negotiated with Mr. Chand, which included Kedis' discharge of Neminath's previously unsatisfied obligation to pay back the $600,000 loan Kedis made to Neminath pursuant to the Commercial Loan Agreement.

128.   Mahendra Shah was involved in the negotiations and he testified that he knew exactly what the deal was (Kedis's $600,000 discharge  plus a $425,000 cash payment); Neminath's tax returns detail the transaction; Neminath paid all the interest on the loan, including more than $90,000 in interest that accrued *after* the $660,000 was transferred to the LLC Defendants in August and October 2014; CPA Mr. A. Bose confirmed the details of the transaction, which Vipin conveyed to him, and which Mahendra independently confirmed. (See discussion, above.)

129.   Contrary to M. Shah's affidavit, whether or not Ms. Ramirez' LLC is or not owned or controlled directly or indirectly by Mr. Chand is irrelevant to whether M. Shah understood the transaction which he negotiated and entered into with Mr. Chand.

130.   The transaction was not a sale of property for a hugely discounted price to Ms. Ramirez, a close confidant of Mr. Chand, for purposes of allowing Mr. Chand to secure for Ms. Ramirez a wonderful business opportunity, all in exchange for no tangible benefit to Mr. Chand or the LLC Defendants and a $600,000 detriment to Neminath.

131.   At least $600,000 of the consideration went to Kedis, as did $285,000 in interest payments that were also made to Kedis in connection with the Commercial Loan Agreement, including some $60,000 in overdue interest that M. Shah paid to Chand out of the escrow fund into which the sale proceeds were paid. And Mr. Chand, even to this day, still exercises control over the property because he conveniently never filed a satisfaction of Kedis's mortgage on the property.

132.   But whatever side the details of the transaction may be among Mr. Chand, Mr. Chand's business entities, Williston Park Realty LLC, and Ms. Ramirez, Jaina paid $660,000 to Mr. Chand's entities in exchange for nothing whatsoever, and Kedis and/or other Chand-owned-or-controlled business entities accepted and received from Neminath $885,000 ($600,000 for the loan paid by the sale of the property, plus $285,000 in pre- and post-sale interest payments). That represents a total of $1,545,000 of consideration paid to or for the benefit of Kedis and/or Mr. Chand in exchange for Kedis loaning Neminath $600,000 at 15% interest per annum for three years.

42

133.    Even apart from its other defects, the timing of events as portrayed by M. Shah exposes his story as false. Mahendra Shah says it was "only when I saw the affidavit of Sanjiv Chand and Marianna Ramirez that I realized that I had sold the building to Marianna Ramirez of Williston Park LLC and not to Sanjiv Chand." (Ex. 38, Dk. 208 at 5 of 10) (A copy of the Chand Third Aff. is attached as Ex. 1 and a copy of the Ramirez Affidavit is attached as Ex. 37.)

134.    Mahendra's Shah's deposition was held on August 11, 2017 and it was there that he testified, and Geo-Group learned for the first time, that Neminath sold the 235 Hillside Avenue, Williston Park, New York property  sold for a total of $1,025,000, $425,000, plus Kedis's discharge of the $600,000 loan Kedis made to Neminath. (Ex. 7, M. Shah Tr. at 31-32)

135.    Mr. Chand's Third Affidavit, however, was filed on *March 31, 2016*, about a day after M. Shah filed his own motion to dismiss, and around two-and-one-half months after the January 14, 2016 closing of Neminath's sale of the 235 Hillside Avenue, Williston Park, New York property. (See Ex. 1.)

136.    When M. Shah first saw Mr. Chand's Third Aff. he had just sold the 235 Hillside Avenue property for $1,025,000. Thus, had Mahendra Shah really made the implausible mistake he claims to have made, it would have been painfully evident the minute M. Shah read Mr. Chand's Third Affidavit and the LLC Defendants' brief in support of its motion to dismiss.

137.    But Mahendra Shah did not inform the Court that he just entered into a transaction that contradicted Mr. Chand's version of events. He said nothing until his motion for summary judgment, because by that time Neminath had produced its tax

43

returns and bank statements, and he had read Geo-Group's September 22, 2017 response to Williston Park Realty LLC's motion to quash the subpoena, which tied together those documents with Mahendra Shah's August 11, 2017 deposition testimony, and explained to the Court why Geo-Group had concluded that Mr. Chand had submitted a false affidavit. (See Dk. 180.)

138.   In an attempt to obscure the obvious flaw in the timing in his story, Mahendra Shah's summary judgment affidavit misleadingly suggests that he did not know he had supposedly been duped until he read Ms. Ramirez's affidavit. But had Mahendra Shah somehow been duped by Mr. Chand into paying, on behalf of Jaina and Neminath, $1,545,000 to Chand in satisfaction of a three-year $600,000 loan made at 15% interest, then he would have known that the moment he saw Mr. Chand's Third Affidavit.

139.   Mahendra Shah has known for well over two years that the Chand Third Affidavit is false. The reason he's said nothing about it up until his summary judgment motion is because he is interested in the outcome of the fraudulent transfer dispute.

140.   As evidenced by Ms. Ramirez's testimony, Mr. Chand and Mahendra Shah are close confidants, represented by the same counsel. When Jaina, with M. Shah's knowledge and consent, transferred the $660,000 to certain of the LLC Defendants, the point of that transfer was to extract money from Jaina's coffers and put it into the Mr. Chand's hands for safekeeping, no doubt in exchange for money or other consideration in return.  The true nature of the sale of the property was deliberately obfuscated, and continues to be deliberately obfuscated, to help Chand, Mahendra Shah, and presumably also Vipin Shah, conceal their wrongdoing and its extent.

141.    The falsity of Mr. Shah's testimony is also demonstrated by Neminath's failure to file amended tax returns reflecting the version of the transaction falsely portrayed by Mr. Chand's Third Affidavit.

142.    Still more indicia of falsity is provided by Mahendra Shah's feigned despondency over his supposedly making a "grave" mistake by allegedly having let Mr. Chand pull the proverbial wool over Mahendra Shah's sophisticated and intelligent eyes, and supposedly duping him into paying $1,545,000 in principal and interest in exchange for an approximately three-year $600,000 loan at 15% interest per annum. But were Mr. Shah's recount of events in his affidavit were truthful, then one must wonder why Mahendra Shah did not commence an action against Chand to rescind the sale for fraud, and why he's otherwise being such a good sport about having allowed Mr. Chand to defraud Neminath and him.

143.    Mahendra Shah is not the victim of a fraud here, Geo-Group is. And that fraud is also fraud on the court because it was perpetrated by false affidavits submitted not only by Mr. Chand, but also by Mahendra Shah. Mahendra Shah, and we believe also Vipin Shah, have knowledge of this fraud and participated in it. At the very least, Mahendra Shah is guilty of having sat idly by while his close business associate submitted an affidavit to the Court that Mahendra Shah must have known was false based on a $1,025,000 transaction he had entered into a couple months prior to the submission of the affidavit.

144.    Mahendra Shah has an independent motive to lie about the transaction. As he points out in his affidavit, the contract of sale recited a sale price of only $425,000, even though the property was sold for $1,025,000. The New York Combined Real Estate Transfer Tax Return Mahendra signed also states that the sale price was

$425,000, not the full $1,025,000 paid for the property. (See Ex. 29)

145.    Mahendra's deposition testimony shows that he knew that he sold the property for $1,025,000 – that was the deal he negotiated, and the deal reflected on the federal tax returns. But he also signed a state transfer tax return document, and a sales contract, that mentioned only the cash price. No doubt he realizes that, in addition to risking civil liability to Geo-Group, he's a party to an apparent tax fraud designed to underreport the value of the property for property tax, and perhaps other purposes. M. Shah, by feigning ignorance, perhaps thinks he can avoid civil, and even criminal, responsibility for tax fraud were state tax authorities to audit the transaction.

## THE 728 MELVILLE PETRO SHELL GAME

146.    As discussed, Jaina transferred a total of $460,000 to 728 Melville Petro LLC, a New York Domestic Limited Liability Company that was formed on October 1, 2014, just before the transfers began on October 16, 2014. The New York Department of State Identification Number of that entity is 4644433. A copy of the articles of organization of that company, which Geo-Group obtained from the New York Department of State in or about April 2015, is attached as Exhibit 15.

147.    728 Melville Petro LLC was, along with the other two LLC Defendants, named as a party to this action for the first time on May 5, 2014. (Dk. 24) Prior to filing the complaint, Geo-Group did research online and determined that 728 Melville Petro LLC had been formed in or about October 1, 2014 and was an active LLC.

148.    That complaint was not formally served on 728 Melville until July 2, 2015. (Dk 44) On July 17, 2015, 728 Melville and the other two LLC defendants moved

46

to dismiss the Second Amended Complaint. (Dk. 56) One of the documents submitted in support of the motion was an Affidavit of Jesse Gupta, which was filed on July 20, 2015, and sworn to on July 14, 2015 (the "Gupta Aff."). (A copy of the Gupta Aff. is attached as Ex. 2.)

149.    That affidavit represents that Ms. Gupta is "managing direct[or] of Defendant, 728 Melville Petro LLC. . . [,]" and states that Ms. Gupta, "[a]s managing director[]" of 728 Melville is "fully familiar with the corporate structure of 728 Melville."

150.    What Ms. Gupta's affidavit does not say, however, is that on May 18, 2015, 13 days *after* Geo-Group filed its Second Amended Complaint, Ms. Gupta and/or Mr. Chand formed a *new* LLC with the exact same name of the entity formed on October 1, 2014: 728 Melville Petro, LLC. The New York Department of State ID No. for *that* entity is 4760640. (See Ex. 20, NYDOS Online Info for 728 Melville Petro; see also Ex. 2, Gupta Aff.)

151.    At some point, Ms. Gupta and/or Mr. Chand rendered the 728 Melville Petro formed on 10/1/2014 "inactive," perhaps as early as May 18, 2015, when the *new* 728 Melville Petro LLC was first formed. (See Ex. 19, NYDOS Online Info for 728 Melville Petro (entity formed 10/1/2014).

152.    Ms. Gupta says nothing in her affidavit about the original 728 Melville Petro entity (formed 10/1/2014) being rendered inactive and replaced by a new entity with the same name. (See Ex. 2.) Thus, it is impossible to tell whether her affidavit refers to: (a)  one of the two entities, and if so, which entity; or (b) both entities, and, if so, whether she considers the entities to be separate entities or whether the May 18, 2015 entity is the successor-in-interest to the rights and obligations of the October 1,

2014 entity.

153.    Mr. Chand perpetuated this apparent deception in his Third Affidavit, which was submitted on March 31, 2016, in support of its motion to dismiss Geo-Group's Third Amended Complaint. (See Ex. 1, Dk. 115-1.) Paragraph 2 of Mr. Chand's Third Affidavit states that "728 Melville Petro LLC ("Melville") is managed by Jessie Gupta, my sister-in-law, and is family-owned[,]" citing for that proposition the Gupta Aff. (See Ex. 1 at ¶ 2; Ex. 2, Gupta Aff.)

154.    Mr. Chand, like Ms. Gupta, also did not advise the Court that there are really two entities named 728 Melville Petro LLC, one active and one inactive. His affidavit suggests that he is either referring to the 728 Melville Petro LLC entity created on October 1, 2014 or that the May 18, 2014 728 Melville Petro LLC entity is a successor-in-interest to the rights and liabilities to the October 1, 2014 entity (see Ex. 1, Chand Third Aff. at 10-13 & 15).

155.    But Mr. Chand does not specify whether he's referring to: (a) one of the two entities, and if so, which one; or (b) both entities, and if so, whether he considers the two entities to be separate, or whether the May 18, 2015 entity is the successor-in-interest to the rights and obligations of the October 1, 2014 entity.

### THE DOCUMENTS OBTAINED FROM NRM HOLDINGS SHOW THAT MAHENDRA SHAH HAS MADE OTHER FALSE STATEMENTS THAT CONCERN MATTERS PERTINENT TO THIS MOTION

*Mahendra Shah has Made Material Misrepresentations Designed to Conceal the Reason why Millions of Dollars of Cash has Disappeared from Jaina's Bank Accounts and Cannot be Accounted For*

156.    M. Shah has made a number of statements under oath that documents recently obtained from NRM Holdings demonstrate to be false. These statements are materially false because the statements were made in an unavailing attempt to offer a

plausible explanation as to why Jaina was seemingly perennially short on cash and why Jaina stopped paying its suppliers.

157.    As I explained in my Certification in Opposition to the Defendants' Motion for Summary Judgment, executed on January 24, 2018 (the "GV January 24, 2018 Cert.") (Dk. 218 at 42-48 of 49, ¶¶ 137-153), Geo-Group determined that there is at least $4,231,993.00 in cash that in 2014 should have been, but was not, deposited into the Jaina bank accounts for which we have account statements.  (Pages 42-49 of 49 of the GV January 24, 2018 Cert. is attached as Ex. 45.)  That shortfall increases to $6,814,811.00 if the analysis is adjusted to include in the calculation the $2,582,818.00 in loans M. Shah and V. Shah claim were made to Jaina in 2014. (See Ex. 45 at 46-48 of 49, ¶¶ 148-53.)

158.    This cash did not simply disappear into thin air. Cash from suppliers that should have been deposited in Jaina's bank accounts was deposited elsewhere, and/or with other persons, and thus was misappropriated from Jaina with the intent to defraud Jaina's creditors, and to benefit personally from that fraud.

159.    In an attempt to explain Jaina's cash shortfalls, Mahendra Shah submitted an affidavit in support of his summary judgment motion, which swore that originally, "JSN  had a 30/60 credit arrangement from various suppliers, for example JSN would have 60 days to pay back its suppliers for the wholesale minutes the suppliers provided." According to M. Shah, "[w]hen JSN received payments from its customers, JSN paid off its suppliers[,] and in that "way functioned very well from 2002 to 2010." (Ex. 38, Dk. 208 at 2 of 10, ¶ 2)

160.    But, M. Shah falsely claimed, all that supposedly changed in 2008, when

"two of JSN's customers (Skynet and TNE). . . went bankrupt and defaulted on their payments to JSN." (Dk. 208 at 2 of 10, ¶ 3) "JSN," M. Shah continued, "had no reserves to repay the suppliers and the suppliers in turn stopped the 30/60 day credit to JSN." (Ex. 38, Dk. 208 at 2 of 10, ¶ 3)

161.    "From then on," M. Shah claimed, "JSN had to pre-pay to its suppliers[,]" which "caused severe cash crunch and forced JSN to borrow money from various lenders." (Ex. 38, Dk. 208 at 2 of 10, ¶¶ 3-4)

162.    But the documents NRM Holdings has thus far produced in response to Geo-Group's subpoena demonstrate conclusively that Mahendra Shah, like his close ally Sanjiv Chand, has lied to the Court.

163.    First, NRM produced the contract between Jaina and Dishnet Wireless Ltd. (a/k/a "Aircel"), which was Jaina's major supplier of minutes through 2014 and 2015. That contract, which remained in effect in 2014 and 2015, was signed by none other than Mahendra Shah on October 16, 2008. (A copy of the contract is attached as Ex. 46.) (See Ex. 46 at NRM000076, NRM000081, & NRM000084; see also Ex. 47 at NRM0000124 (contract in effect even in 2015).)

164.    Contrary to Mr. Shah's sworn affidavit, the Jaina /Dishnet contract—which incepted in October 2008—did not provide for prepayment by Jaina. Instead, it provided for invoices to be prepared on a twice-monthly basis, one for the period from the 1st to the 15th of the month, and one from the 16th to the end of the month. (Ex. 46 at A3.1, NRM000078) It also provided for settlement of "all undisputed amounts in US Dollars within 15 days of the date of issue of [the] Invoice. . . ." (Ex. 46 at A4.1, NRM000080) Such invoicing and payment credit terms are referred to as 15/15 in the

telecommunications business.

165.    Second, the documents produced by NRM demonstrate that Jaina obtained letters of credit from NRM that, in 2014, which provided Jaina credit ranging from $1,000,000 to $3,000,000 per month to purchase minutes from its largest supplier, Aircel (a/k/a "Dishnet Wireless Ltd.") on *credit*. The chart attached as Exhibit 42 identifies the letter of credit information. Copies of documents I used to prepared to prepare that chart are included in Exhibit 40, which is a compilation of certain documents produced by NRM that relate to letters of credit in place in 2014 and 2015.

166.    Attached as Exhibit 41 is a chart that identifies the letters of credit Jaina had in place during January through April of 2015, which provided Jaina credit in the amount of $3,000,000 in January and February 2015 and $1,000,000 in March and April of 2015. The documents I used to prepare that chart are included in Exhibit 40.

167.    Obviously, if Mahendra Shah were telling the truth, and Jaina was required to prepay its suppliers, then there would be no reason for Jaina to have obtained the letters of credit that it did.

168.    The documents NRM produced show that Mahendra Shah was well aware of the letters of credit that Jaina purchased through NRM Holdings. For example, attached as Exhibit 48 is a copy of an application for a letter of credit that Mahendra Shah signed on July 27, 2014. Attached as Exhibit 49 is an indemnification agreement Mahendra Shah signed on May 22, 2014 as part of the consideration Jaina gave to NRM Holdings in exchange for NRM Holdings' "agreement to obtain a Letter of Credit ("Letter of Credit") on [Jaina's] behalf in the maximum outstanding face amount

of $1,000,000 at our request for beneficiary: Dishnet Wireless Ltd. . . .” (Ex. 49 at NRM0000133 & NRM0000135)

169.    Third, while NRM Holdings’ document production has thus far been fairly scant, it contains two invoices from Aircel. One is dated May 20, 2014 in the amount of $2,025,422.36 (DWL/Jaina/INV 0350) (copy attached as Ex. 50) and another dated November 20, 2014 for $984,843.17 (DWL/Jaina/INV/0360) (Ex. 47 at NRM0000125-26)

170.    These are not invoices or receipts for “prepaid” minutes, and each expressly contemplates payment in the future. (See Ex. 50 at NRM0000137; Ex. 47 at NRM0000125.)

171.    Invoice DWL/Jaina/INV/0360 in the amount of $984,843.17 (“Invoice 0360”) (Ex. 47 at NRM0000125-26) shows not only that Jaina was not required to prepay Aircel, its largest supplier, but also confirms that Jaina was not paying its suppliers in 2014 and in 2015.

172.    Invoice 0360 was dated November 20, 2014 and covered the period November 1 to November 15, 2014. But the presenting bank, the State Bank of India, did not present it to the issuing bank, IDB Bank in New York for payment until April 16, 2015. (Ex. 47 at NRM0000124). On April 20, 2015, NRM Holdings’ bank received notice of the rejection by the issuing bank, and as a consequence, NRM Holdings prepared (and presumably sent) Jaina an Arrival of Documents notice, which informed Jaina that payment was rejected effective April 21, 2015 and informed Jaina that, if it chose to do so, it could make payment on its own behalf. (Ex. 47 at NRM0000123 & NRM0000124)

173.   I have checked, and can confirm, that no such payment is reflected in any of Jaina's bank records.

174.   Fourth, Mahendra Shah's own bankruptcy petition further corroborates that Jaina was not required to prepay its suppliers. Mahendra Shah (and his brother, Vipin) claim in their bankruptcy proceedings that they are responsible as guarantors for huge amounts of money that Jaina owed to its suppliers.

175.   Attached as Exhibit 51 is a chart I prepared (counsel assisted by putting it into Excel form) using the data Mahendra Shah provided in his bankruptcy petition. Based on my years of experience working in the telecommunications industry, I determined which of the debts on Mahendra Shah's petition constituted debts of Jaina's suppliers or were otherwise related to Jaina.

176.   As set forth in Exhibit 51, $13,377,126.02 of the debts claimed by Mahendra Shah fall into this category. (I have also attached as Exhibit 52 a copy of Mahendra Shah's bankruptcy petition, which is the source of the data reported in the chart attached as Ex. 51.)

*Mahendra Shah's False Statements under Oath Demonstrate an Intent to Conceal his Role in Diverting Cash from Jaina, Including his Transfer of some $660,000 to the LLC Defendants*

177.   Mahendra Shah's false assertion that Jaina was required to prepay its suppliers was designed to conceal the reasons why Jaina was so short on cash in 2014 and 2015 and, to try to convince the Court to infer that he—the person with financial and management control over Jaina—was somehow not personally involved in the diversion of cash from Jaina, and did not benefit from the diversion of $660,000 to the LLC Defendants.

178.   But the evidence shows that the cash was there, and had it not been diverted from Jaina, then Jaina would have been able to meet its obligations to its suppliers, including Geo-Group. Recall that Mahendra Shah stated under oath that Jaina had 30/60 credit terms with its suppliers, and how, as a consequence "JSN would have 60 days to pay back its suppliers for the wholesale minutes the suppliers provided[,]" and accordingly Jaina "functioned very well from 2002 to 2010."

179.   That was because Jaina's customers either prepaid for minutes or had very short (7-day) payment terms with Jaina. Jaina's switch-based telecommunications transactions were, like all other such transactions, simultaneous and instantaneous. Each time a Jaina customer would place a call, Jaina's switches would automatically switch the call to the appropriate carrier, which was Jaina's supplier. Jaina's customer would incur a charge for the call and Jaina would incur a charge to the supplier who directed the call.

180.   The key to Jaina's cash flow was in how customers were billed and how Jaina's suppliers billed Jaina.

181.   Jaina's smaller customers prepaid for the minutes they purchased, something I learned during my many years of business dealings with Jaina, but which is also borne out by the bank statements.

182.   Their larger customers ordinarily had 7/7 payment terms, which meant that customers would be billed every seven days for minutes purchased from Jaina, and would have to pay Jaina within seven days of the date of the invoice. This practice is illustrated, for example, by looking at Jaina's 2014 Citibank bank statements, which are attached as Ex. 35.

183.    IVY Telecom AG was one of Jaina's larger customers. The Citibank bank statement shows that during the period April 8, 2014 – May 7, 2014, Jaina received five payments from IVY Telecom AG in the amounts of $299,980, $349,980, $399,980, $399,980, and $249,980 during that period, that is, one every seven days. (See Ex. 35 at Shah Ds – 000167 – 69.)

184.    Mainburg LTD was another one of Jaina's larger customers. Jaina's Capital One bank statement for the period April 1, 2014 – April 30, 2014 shows that Jaina received four payments from Mainburg in the amounts of $69,972, $99,972, $119,972 and $ 79,972 during that period, that is, one every seven days. (See Ex. 53 at Shah Ds – 000069-71.)

185.    As discussed above Jaina had 15/15 credit terms with its largest supplier Aircel. Because Jaina had either prepayment arrangements or 7/7 arrangements with its customers, and because customer and supplier transactions occurred at the same time, Jaina's 7/7 credit terms with its customers and 15/15 credit terms with its suppliers ensured that, by the time Jaina was required to pay a supplier bill covering a 15-day period, Jaina would have already received from its customers the funds generated not only for the 15-day period covered by the supplier's bill, but also for an additional seven-day period.

186.    Assuming that Jaina managed its cash flow reasonably, then each time a supplier's bill came due, Jaina would have more than enough funds to pay for the period covered by the bill.

187.    Jaina's letters of credit with its largest supplier further ensured that Jaina would have the cash flow to meet its obligations.

188.    Jaina ceased doing business without paying millions of dollars of

supplier bills. (See Ex. 51, and discussion above.) That cannot possibly have been the result of Jaina not having cash because it had supposedly been forced to *prepay* its suppliers. Had that been the case, then Jaina could not have had the opportunity to have become indebted to those same suppliers.

189.   But it is not just that Jaina defaulted on its obligations to pay its suppliers. There is cash that Jaina's financial records (as set forth in its tax returns) establish must have existed, but which was not deposited in its bank accounts. (See Ex. 45, and discussion above.)

190.   And contrary to Mahendra Shah's testimony, Jaina's customer and supplier relationships, and its letters of credit, establish that there is no reason why that cash should have disappeared from Jaina's books, and why Jaina's suppliers should have been left in the proverbial lurch.

191.   The  only explanation is that the persons who directly and indirectly owned and controlled Jaina, Mahendra Shah, and his brother, Vipin Shah, diverted millions of dollars of cash Jaina received, or was supposed to receive, from its customers and directed it into the hands of other persons. This was done not for the benefit of Jaina but for the personal benefit of those, including Mahendra Shah, who are responsible for having diverted those assets.

192.   Before the Court on this motion is one particular transaction where the facts clearly and unmistakably show reveal an actual fraudulent transfer of some $660,000 from Jaina to the LLC Defendants and Mr. Chand, a transaction for which Jaina received no benefit whatsoever. The evidence shows that both Mr. Chand and Mahendra Shah have lied about that transaction. The evidence further shows that Mahendra Shah also lied about how Jaina conducted business in an effort to obscure his role in diverting millions of dollars from Jaina for the purposes of enriching himself

56

at Geo-Group's and other creditors' expense.

193.    Were Mahendra Shah some innocent actor in this dispute who allegedly received no benefit from having diverted $660,000 from Jaina into the hands of Mr. Chand and his business entities, and no benefit from using his ownership and control over Jaina to divert millions of dollars from the company, then there would be no reason for Mr. Shah to lie under oath about those transactions. But that's what the evidence shows he did.

*Mahendra Shah has Made False Statements in his Deposition that Show an Intent to Conceal Information about Jaina's Financial Operations*

194.    Geo-Group asked Mahendra Shah at his August 11, 2017 deposition about the purpose of the Jaina-affiliated entities, including Ipsita Telecom Services, Inc. ("Ipsita"). Mr. Shah testified: "Surajit Bose knows. I don't know. Because I was busy with my convenience store. Very busy." Ex. 7, M. Shah Tr. at 45.

195.    Geo-Group pressed him, asking "[b]ut you are saying that you have no understanding of what the business of those other companies was, even though you were an investor and an officer in each of them?" Mahendra Shah replied:

> Because he wanted to do some kind of, you know, things, and he say --
> because as I say to you, he wasn't having any status, he was on the
> business visa. So he tells me, and I open. Because I was on paper CEO.
> So I used to do that.
> . . . .
> And I used to trust him blindly. . . .

(Ex. 7, M. Shah Tr. at 46)

But documents we have obtained as a result of the subpoenas demonstrate that M. Shah must have been well aware of Ipsita's operations. According to New York State Department of State's website, Ipsita's address was, and still is, the same as Jaina's: 235 Hillside Avenue, Williston Park, New York 11596. (See Ex. 54, New York

Department of State online information form for Ipsita).

196.    The documents we obtained from Citibank in response to the subpoena demonstrate that Ipsita had an account at Citibank, and the address Ipsita used for that account was, until March 19, 2012, the same as Jaina's: 235 Hillside Avenue, Williston Park, New York 11596. (See Ex. 55, Ipsita Citibank bank statements for the period February 18, 2012 – April 18, 2012, at Citibank – 003803.) Effective March 20, 2012 Ipsita changed its address from the Jaina 235 Hillside Avenue address to Vipin Shah's and Nayana Shah's address: 35 Smith Place, Williston Park, New York 11596. (See Ex. 55 at Citibank – 003805.)

197.    During the period April through December 2012, Jaina transferred $4,338,400 from its Capital One account into the Ipsita Citibank account.

198.    During the same April through December 2012 period, Ipsita transferred to Jaina $213,000, making the net amount Jaina transferred to Ipsita $4,125,400.00.

199.    Exhibit 56 details and summarizes these transfers. I prepared this chart based on Jaina's 2012 Capital One bank statements, a copy of which is attached as Exhibit 57.

200.    One Bank account and that he did not "think" that Surajit Bose was a signatory and did not "remember" Surajit Bose being a signatory. (Ex. 7, M. Shah Tr. at 80-81) Based on my review of various checks drawn on that account, Mahendra Shah is one of the signatories on that account, and it appears the other signatories are Mahendra Shah's spouse, Pooja Shah; Nayana Shah; and her spouse, Vipin Shah.

## JAINA TRANSFERS TO MAHENDRA SHAH, HIS SPOUSE POOJA SHAH, AND NEMINATH

201.   In his affidavit in support of his summary judgment motion, Mr. Shah proclaimed, in capital letters for emphasis, that "M. SHAH DID NOT MAKE ANY TRANSFERS TO HIMSELF PERSONALLY OR TO HIS FAMILY OR TO ANY BUSINESS ENTITIES OWNED BY HIM." (Ex. 38, Dk. 208 at 7 of 10; emphasis in original) He also swore that "I did not directly or indirectly fraudulently transfer any money to myself or business entities owned or controlled by me." (Ex. 38, Dk. 208 at 8 of 10)

202.   The discovery obtained from Citibank and Capital One, however, shows that Jaina transferred at least $89,000 to Mahendra Shah, and of that $85,000 was transferred subsequent to the commencement of the arbitration in May 30, 2013. (Ex. 39)

203.   The discovery also showed that in 2014, after the commencement of the arbitration, Jaina transferred $22,000 to Mahendra Shah's spouse, Pooja Shah.

204.   It also showed that subsequent to the commencement of the arbitration, Jaina transferred $11,800 to Neminath. While Jaina actually paid Neminath much more than that during 2013 and 2014, I did not include those payments in my calculations because they appeared to have been made for Jaina's rent or were interest payments or other Jaina expenses.

205.   Exhibit 39 summarizes those transfers and identifies Bates Numbers of documents from which I obtained the data concerning the transfers. The transfers are summarized in Exhibit 39, which identifies the Bates Numbers of documents from which I obtained the data. Exhibit 43 is a compilation of Citibank-produced documents evidencing these transfers and Exhibit 44 is a compilation of Capital-One-

produced documents evidencing the transfers.

206.   In closing, I note that the subpoenas the Court granted Geo-Group leave to serve also yielded a substantial amount of information that is not necessarily pertinent to this motion but is pertinent to the matter generally. That data is not addressed in this Declaration.

207.   Pursuant to 28 U.S.C. § 1746, I certify and state, under penalty of perjury under the laws of the United States of America, that the forgoing is true and correct.

Executed on:    October 4, 2019
                Danbury, Connecticut


_____
Govind Vanjani


To: All counsel of record and parties set forth in the attached certificate of service (by ECF)