# SPIRO | HARRISON

Shomik Ghosh<br>
250 Greenwich Street, 46th Floor<br>
New York, NY 10007<br>
Direct Dial: 203-285-4398<br>
sghosh@spiroharrison.com

May 6, 2022

**VIA ECF and EMAIL**

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square, Room 2103
New York, New York 10007
Failla_NYSDChambers@nysd.uscourts.gov

**Re: Geo-Group Communications, Inc. ("GCI") v. Shah, et. al., No. 15 Civ. 1756 (KPF)**

Dear Judge Failla:

We represent Defendant Vipin Shah in the above-captioned action. We write in opposition to Plaintiff Geo-Group Communications, Inc.'s ("GCI") letter-motion (Dkt. 341, corrected at Dkt. 342), which seeks relief that GCI is plainly not entitled to and that—if granted—would represent a drastic expansion of the scope and contours of the settlement agreement signed by the parties.

At the outset, however, we must make clear one inescapable fact that GCI conveniently downplays: in the course of the post-settlement process, the Shahs—at considerable personal expense—have produced ***over 10,000*** documents to GCI, many which the Shahs arguably did not need to produce but did so in the spirit of good faith and to attempt to avoid needless disputes in the post-settlement process. Indeed, GCI does not dispute that the Shahs (1) properly searched their residence; (2) properly searched their personal devices; and (3) properly applied GCI's list of search terms to their email accounts and produced all responsive messages. That GCI does not at all acknowledge these facts in their papers is reflective of GCI's general approach to this settlement process, within which it has adopted increasingly tortured interpretations of the settlement agreement and the caselaw to demand documents from the Shahs that are clearly outside of their possession, custody, or control and which GCI, separately, is not entitled to.

The Shahs remain fully willing and committed to work with GCI to resolve the parties' remaining disputes and candidly believe GCI's application was premature given the parties discussed as recently as Monday, May 1, 2022 exchanging proposals and counter-proposals for resolution of their discovery disputes by Friday, May 6, 2022. Regardless, to the extent Your Honor may help

clarify the parties' obligations under the Agreement, the Shahs are optimistic such clarification will allow the parties to expeditiously move forward and close out this matter for once and for all.

## The Settlement Agreement

As Your Honor knows, on July 1, 2021, the parties executed a settlement agreement (the "Agreement"). *See* Agreement, Dkt. 338. The Agreement was the product of intense negotiations between the parties and was only signed after Your Honor agreed to retain jurisdiction over the Agreement to resolve any disputes between the parties regarding the Agreement's provisions and/or execution.

Generally speaking, the Agreement provided for three major post-settlement events: (1) the Shahs would wire $50,000 to GCI, which would then trigger mutual releases by the parties of all known and unknown claims from that point onward as well as GCI's dismissal of its litigation against the Shahs; (2) the Shahs would engage in post-settlement discovery of documents and electronic devices in their possession, custody, and control, and transmit responsive documents to GCI; and (3) Mr. Vipin Shah would sit for a seven-hour interview with Geo-Group's counsel and principal.

During negotiations surrounding the drafting of the Agreement, counsel for the Shahs and GCI repeatedly discussed how to best balance, on one hand, GCI's desire to receive discovery on specific topics, with, on the other hand, the Shahs' desire for fair discovery obligations that would not be so costly and difficult that it would defeat the Shahs' primary reasons for settlement. In particular, the Shahs expressed (and GCI, at the time, acknowledged) that discovery of electronic devices could entail significant costs and thus the Agreement would need to reasonably limit the scope of electronic discovery required.

The final Agreement reflects these competing concerns.

*First,* Section 1(b)(i) of the Agreement outlines the categories of documents that the Shahs must search for and obligates the Shahs to produce "all documents and electronically-stored information" in a twelve-bullet list of categories that are in the Shahs' possession, custody, and control.

*Second*, Section 1(b)(iii) of the Agreement explains *how* the Shahs must search for the categories of documents listed above. There can be no good faith debate that Section 1(b)(iii) constitutes the Shahs' actual search obligations under the Agreement. As Section 1(b)(iii) clearly states: "**In order to satisfy their obligations to provide all documents in their possession, custody, or control**, V. Shah and N. Shah **shall conduct the following searches**." Put differently, Section 1(b)(iii) states that, by conducting the "following searches," the Shahs have satisfied their obligations under Section 1(b)(i) to produce all documents responsive to the categories listed in that Section.

*Finally,* Section 1(b)(iv) further holds that the Shahs will only be able to satisfy their obligation to search all electronic devices in their possession, custody, or control (the third type of search

required by Section 1(b)(iii)) if they apply a set of search terms provided by and then turn over all responsive documents that hit upon those search terms.

Put simply, Section 1(b)(i) outlines the categories of documents the Shahs are obligated to search for, Section 1(b)(iii) outlines the specific types of searches the Shahs must conduct to satisfy that obligation, and Section 1(b)(iv) outlines the methods of searching for ESI the Shahs must use to satisfy 1(b)(iii).

That this was the clear intention of the parties is made clear by Section 1(b)(v) which states that "after conducting the searches **detailed in paragraphs 1(b)iii and 1(b)iv, above,** V. Shah and N. Shah shall produce all responsive documents . . ." Noticeably, Section 1(b)(i) is not included in this section nor characterized as constituting an independent search. Rather, the parties were in clear agreement that the Shahs were required to conduct the searches listed in Section 1(b)(iii) and 1(b)(iv) and produce all responsive documents identified after these two searches.

In agreeing to this structure, the parties clearly attempted to accommodate their competing interests. For example, the Agreement:

- limits the Shahs' responsibility to search electronic devices to only those electronic devices in the Shahs' possession, custody, or control, *see* Section 1(b)(iii)(c);

- requires the Shahs to apply search terms provided by Geo-Group and produce a log of all electronic searches applied upon GCI's request, *see* Section 1(b)(iv);

- requires the Shahs to request access to search the premises for 235 Hillside Avenue, Williston Park, NY 11596 for documents, *see* Section 1(b)(iii)(a).

## The Shahs Comply with the Agreement

Upon execution of the Agreement, the Shahs promptly began to comply with the Agreement, taking the following steps:

- Examining all electronic devices within Vipin and Nayana Shah's possession, custody, and control, applying GCI's search terms to those devices, and producing documents responsive to those search terms;

- Although not necessarily required by the Agreement, examining both Vipin and Nayana's cloud email accounts, applying GCI's search terms to both of those accounts, and producing *all* emails responsive to those search terms;

- Requesting and receiving access to the buildings at 235 Hillside Avenue, Williston Park, NY 11596, which were also the premises used by 235 Hillside LLC, Jaina, Jaina Infrastructure, Inc., Ipsita Telecom Services Inc. or Neminath, and conducting exhaustive

- searches for documents responsive to the categories outlined in Section 1(b)(i) in those buildings;

- Searching the Shah's personal residence for any documents responsive to the categories outlined in Section 1(b)(i).

As a result of these searches, on November 2, 2021, the Shahs **produced over 10,000 documents made up of more than 80,000 pages** to GCI, many which the Shahs arguably did not need to produce but did so in the spirit of good faith and to attempt to avoid needless disputes in the post-settlement process.

## **GCI's Objections Are Meritless**

Despite the Shahs' clear record of compliance with the Agreement, GCI has continued to insist that the Shahs have failed to live up to their obligations under the Agreement. While GCI's positions vary in their degree of frivolity, all are without merit. The Shahs have briefly analyzed the infirmities of GCI's allegations below. However, to the extent the Court does not grant the relief requested by the Shahs, the Shahs request the Court issue a briefing schedule through which the parties may address their competing positions in greater detail.

### A. *The Lists*

In its letter-motion, GCI requests that the Court "direct the Shahs to compile and provide" three lists that are included in Section 1(b)(i) as categories of documents the Shahs were intended to search for:

- A list of Jaina's shareholders and their percentage ownership interests as of January 1 of each year from 2012 until 2021;

- A list of all bank accounts (by bank name and last four digits of account number) used by Jaina, Neminath, Jaina Infrastructure or Ipsita during the period 2012 through 2015;

- A list of the Names of any individuals or entities that loaned money to Jaina between 2013 and 2015.

Agreement, Section 1(b)(i). As with the other categories of information listed in Section 1(b)(i), the Shahs faithfully and fully searched for these lists through the methods required by Section 1(b)(iii).

However, beginning with its first letter correspondence with Shahs, GCI has taken a remarkable (and, candidly, unexpected) position on the lists. GCI claims that Section 1(b)(i) does not obligate the Shahs to *search* for the above-described lists (which the Shahs did), but instead requires them to *prepare* those lists. GCI's position simply has no basis in the plain-text of the Agreement and is frivolous.

Section 1(b)(i) outlines the categories of documents the Shahs must search for. Critically, Section 1(b)(i) states the Shahs must search for documents "in the following categories" that are in the Shahs' "possession, custody, or control." This language, in and of itself, defeats GCI's argument. Section 1(b)(i) clearly contemplates the Shahs searching for, and producing, documents already in existence and which the Shahs have "possession, custody, or control" over. It does not anywhere state that the Shahs must create documents not currently in existence (and thus cannot be in the Shahs' possession, custody, or control) and then produce them.

GCI responds by pointing to the tenth bullet in Section 1(b)(i), which states that the Shahs must "[f]ully cooperate with any good faith effort by GCI to obtain tax records."[1] GCI argues that because this bullet does not describe a category of document but instead an action the Shahs must take, the same can be true for the lists. However, in making this argument, GCI inadvertently bolsters the Shahs' position.

The tenth bullet point clearly requires the Shahs to take an action because it includes language requiring the Shahs to "cooperate" with any good faith effort by GCI to receive tax records. However, the bullets describing the lists include no such verb form commanding the Shahs to prepare the lists, and instead merely describe the type of list that the Shahs must search for and produce. This is fatal for GCI because the Agreement makes clear the parties knew how to reflect that they were commanding the Shahs to take an action (*i.e.*, requiring the Shahs to "fully cooperate") but chose not to use that construction when describing the lists. Instead, the Agreement merely states the Shahs must search for three types of lists, without any language suggesting the parties instead intended for the Shahs to prepare those lists.

**B.** *GCI's Interpretation of Section 1(b)(i)*

As explained above, the Agreement has a clear three-part structure: Section 1(b)(i) outlines the categories of documents the Shahs are obligated to search for; Section 1(b)(iii) outlines the searches the Shahs must perform to satisfy their Section 1(b)(i) obligation; and Section 1(b)(iv) outlines how the Shahs' must search ESI in order to satisfy their obligation under Section 1(b)(iii)(c) to search electronic devices. This is made clear by the plain language of Section 1(b)(iii) of Agreement, which states that "***[i]n order to satisfy their obligations to provide all documents in their possession, custody, or control***, V. Shah and N. Shah shall conduct the following searches …"

Despite this, GCI continues to argue that Section 1(b)(i) exists independent of Section 1(b)(iii) and that the Shahs must separately search for the documents listed in Section 1(b)(i) above and beyond what is required by Section 1(b)(iii). *See, e.g.*, Ltr. Mot. at 2 (requesting the Court order the Shahs to "submit, for each Section 1(b)(i) documents and information category a complete and accurate description of the due diligence they have performed to ensure production of all required documents and information").

---

[1] The Shahs also note that GCI has still not asked the Shahs to provide authorizations for any tax records, despite inexplicably requesting the Court order the Shahs do so in its letter-motion.

GCI's reading would turn the Agreement on its head. Indeed, the entire reason Section 1(b)(iii) was drafted was to provide the parties with clear guidance on the exact searches the Shahs would have to undertake to satisfy the general search obligation codified by Section 1(b)(i).

That Section 1(b)(i) does not constitute an independent search under the Agreement is made crystal clear by Section 1(b)(v), which states that: "**After conducting the searches detailed in paragraphs 1(b)iii and 1(b)iv**, above, V.Shah and N. Shah shall produce all responsive documents within 60 days of the Effective Date of this Agreement." Notably, Section 1(b)(i) is not included as a search.

### C. *The Sufficiency of the Email Searches*

As described earlier, the Shahs (voluntarily) collected all of their emails predating June 1, 2021, applied the search terms provided by GCI to their email inboxes, and produced all documents that were responsive to those search terms.

In following this process, the Shahs strictly complied with Section 1(b)(iv) of the Agreement which states that, in searching electronic devices, the Shahs "shall use the word searches attached as Appendix One to this Agreement" and maintain a log of the result of these searches for GCI's inspection if requested.

Upon the Shahs' production of all responsive emails, GCI frivolously accused the Shahs of withholding responsive emails, mistakenly believing that the Shahs manually reviewed the emails which were responsive to the search terms and then produced a subset of those emails. However, GCI's position was *demonstrably* false because the Shahs did not perform a subsequent review of emails that hit upon GCI's search terms. Rather, the Shahs produced *all* emails that were responsive to GCI's search terms, with the precise goal of preventing GCI from accusing the Shahs of withholding any emails.

After the Shahs notified GCI of this, GCI appeared to have dropped its claim that the Shahs had not properly searched their emails. Indeed, during a conversation with GCI's counsel, GCI's counsel stated GCI was not taking the position that the Shahs had not applied and produced all emails which hit upon GCI's search terms.

However, now in its letter-motion, GCI (much to the Shahs' surprise) claims that "significant gaps in the production cast serious doubts on the veracity of the" Shahs' claim that they have properly conducted the searches described in Section 1(b)(iii) and 1(b)(iv). To the extent GCI is claiming the Shahs have withheld responsive emails, that claim is belied by the Shahs' decision to produce *all* documents that GCI's search terms hit upon. Moreover, GCI raising this issue with the Court would be premature as GCI did not address it with the Shahs during the parties' meet and confer and, in fact, represented otherwise in a subsequent conversation.

### D. *The Parties' Disputes Regarding Possession, Custody, or Control*

Upon the execution of the Agreement, the Shahs (at considerable expense) diligently identified all electronic devices in their possession, custody, or control, applied the search terms required by Section 1(b)(iv) on those devices (as well as their email accounts), produced all documents that hit on GCI's search terms, and produced a log reflecting the details of those searches and results.

Despite this, GCI repeatedly claims (in multiple formulations) that the Shahs have not complied with the Agreement because the Shahs have not performed "searches of electronic devices owned by any of the [Jaina] [e]ntities that are in the possession, custody or control of V. Shah or N. Shah." But GCI's entire objection is hypothetical and speculative. GCI has never once identified the exact electronic devices it believes are in the possession, custody, or control of the Shahs but were not searched. The Shahs cannot respond to hypotheticals or speculation—to the extent GCI wishes to stand by its prior position, it should clearly list out the devices it believes the Shahs should have searched before asking the Shahs or this Court to make a decision about whether those devices qualify as (a) electronic devices under the Agreement; and (b) are within the Shahs' possession, custody, or control.

More broadly, the Shahs severely disagree with GCI's formulation of the possession, custody, or control inquiry. While the Shahs will not burden the Court in this letter with unsolicited briefing on the subject (which the Shahs are more than willing to provide should the Court wish), the Shahs believe GCI's position reflects a bad-faith attempt to expand the scope of the Agreement far beyond what (i) either party intended for the Agreement to provide for; and (ii) what the Agreement clearly provides for.

## **Relief Requested**

The Shahs, at significant personal expense, have provided GCI with all responsive documents that are in their possession, custody, or control. Rather than honor the Agreement and proceed with Mr. Shah's interview, GCI—perhaps believing the parties' asymmetry in financial resources will lead the Shahs to capitulate to each and every one of their demands—continues to attempt to expand the Agreement far beyond its text and in a way that betrays the clear intentions of the parties when they agreed to it.

Accordingly, the Shahs request the Court:

(i)   deny GCI's letter-motion in its entirety;
(ii)  find that the Agreement only requires the Shahs to *search* for the lists described in Section 1(b)(i), not *prepare* them;
(iii) find that the Shahs have satisfactorily completed discovery under the Agreement and order GCI to schedule Mr. Shah's interview within the next thirty days.

To the extent the Court does not, at this point, wish to make a determination on whether discovery has been completed, the Shahs alternatively/separately request the Court:

- (iv) require GCI to clearly identify which electronic devices GCI believes are in the Shahs' possession, custody, or control but were not searched by the Shahs;
- (v) require GCI to, in good-faith, meet and confer with the Shahs regarding the electronic devices identified by GCI and attempt to resolve any disputes regarding the Shahs' search obligations.

If the parties cannot agree over whether the identified devices qualify for a search under Section 1(b)(iii)(3), the Shahs propose the parties then submit briefing to the Court regarding those devices.

The Shahs remain committed to working with GCI on successfully resolving this matter with as little Court intervention as possible, and greatly appreciate the Court's attention to this matter.

Respectfully Submitted,

Shomik Ghosh

cc: All Counsel of Record via ECF