# THE LOREE LAW FIRM

**PHILIP J. LOREE JR**

June 22, 2022

**VIA ECF and EMAIL**

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York
Thurgood Marshall
United States Courthouse
40 Foley Square, Room 2103
New York, NY 10007
Failla_NYSDChambers@nysd.uscourts.gov

Re:    **Geo-Group Communications, Inc. ("GCI") v. Shah, et. al., No. 15 Civ. 1756
(KPF) | Plaintiff GCI's Response to Defendant Vipin Shah ("V. Shah")'s and
Nayana Shah ("N. Shah")'s Letter Brief on Enforcement of Settlement
Agreement**

Dear Judge Failla:

We represent plaintiff Geo-Group Communications, Inc. ("GCI").

GCI respectfully submits this Letter Brief in response to the June 1, 2022 Letter Brief of
Defendant Vipin Shah ("V. Shah")'s and Nayana Shah ("N. Shah").

## Summary of Argument

The central purpose of the Settlement Agreement (Dk. 338) was for the Shahs to provide to GCI
all documents and information falling into 13 bullet-pointed categories described in Section
1(b)(i). Eleven of these relate to Jaina, two to Neminath, Inc. ("Neminath"). Jaina's 11 categories
consist of:

1. Three lists (shareholders, banks, and lenders) (three categories);

2. An IRS Form 4506 authorizing GCI to obtain Jaina's tax returns from the IRS (one
   category); and

3. Documents (defined to include electronically stored information ("ESI")), including
   QuickBooks files (general ledger(s) for the period 2013 through 2015) (seven categories);

The two Neminath-related categories consist of documents.

GCI's requests for Jaina and Neminath documents (9 categories) related to what was reported in
the federal tax returns for those companies during or for specific periods.

June 22, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

Section 1(b)(iii) of the Agreement was added to ensure that, as part of the due diligence process, the Shahs searched for documents and devices (including devices owned by Jaina, Neminath, or the other specified entities), which are sources of ESI, in places where Jaina, Neminath, and the other specified entities would be expected to have back-up documents for the data reported in the income tax returns. These documents, of course, would have been shared with the entities' CPAs, including in the form of QuickBooks files.

Here is a summary of what the Shahs have provided to GCI responsive to the 13 bullet-point categories of Section 1(b)(i):

- No responsive documents or information in nine categories, which comprise the three list categories plus six of the document categories, including the QuickBooks category;
- Some documents falling into three of the document categories; and
- One signed IRS Form 4506.

The Shahs produced none of the Jaina-related items which were central to the litigation. As respects the two Neminath-related categories, key financial documents are missing.

While this was an ESI production, GCI believes this inadequacy was caused by the limited scope of the ESI searched, and in the Shahs' refusal to perform the due diligence required by Section 1(b)(i)'s unequivocal production command.

*Disputes*

There are three main disputes between GCI and the Shahs concerning the Agreement.

**1. Whether the Agreement Requires the Shahs to Produce the Three Lists, which Constitute "Information" that the Agreement Requires the Shahs to Produce**

The Shahs contend they are not required to compile and produce the three lists because they are not "documents" that are already in existence. They are, however, "information," which the Agreement requires the Shahs to produce.

Section 1(b) is entitled "Provision of Documents and Information," and Sections 1(b)(ii) and 1(b)(iv) expressly state that the Agreement requires the production of "documents *and* information." Section 1(b)(i) defines "documents" as "documents and [ESI]," so the references to "information in Sections 1(b), 1(b)(ii) and 1(b)(iv) are not intended to be references to ESI.

The Shahs do not dispute that, if the lists are "information" within the meaning of the Agreement, then they must prepare and produce them. They say that the only "information" that the Agreement requires them to produce is the information the Shahs must supply to prepare IRS Form 4506. But that argument fails because irrespective of whether Form 4506 requires the Shahs to produce information, the lists also require the Shahs to produce information.

June 22, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

> **2. Whether Section 1(b)(i) Unequivocally Commands the Shahs to Produce all Documents and Information in the Thirteen Bullet-Pointed Categories Independently, and Whether the Shahs have Complied with that Command**

Section 1(b) of the Agreement is entitled "Provision of Documents and Information." Section 1(b)(i) of the Agreement says "V. Shah and N. Shah *shall* produce all documents and electronically-stored information (collectively, 'documents') in [13 bullet-pointed] categories in their possession, custody, or control (including documents in the possession, custody, or control of Neminath, Inc. ('Neminath'), 235 Hillside LLC ('235 Hillside'); Jaina Systems Network, Inc. ('Jaina'), Jaina Infrastructure, Inc. ('Jaina Infrastructure'), and Ipsita Telecom Services, Inc. ('Ipsita')[)]" (collectively, the "Entities"). (emphasis added)

Section 1(b)(i) unequivocally commands the Shahs to produce the requested documents and information and Section 1(b)(iii) does not relieve them of their obligation to perform the due diligence necessary to ensure that they comply in good faith with that command, and to produce all responsive documents and information. (See Sections II-V, below.) The Shahs have possession, custody, or control over the responsive documents and information. (See Sections III-IV, below.)

The Shahs either have this data, have ready access to it (including through their accountants and attorneys), or, at the very least, know or have reason to know where it is presently located and how it got there. The Shahs do not meaningfully dispute this fact. Nowhere contend that they are unable to produce all the documents described in Section 1(b)(i).

The Shahs have not carried out even the most minimal level of due diligence to ensure that they comply with their Section 1(b)(i) obligations, and they certainly haven't come close to producing what the Agreement requires them to produce. This is particularly inexcusable because nine of the Section 1(b)(i) categories consist of documents concerning the data reported in Jaina or Neminath's tax returns.

> **3. Whether the Shahs' "Interpretation" of their Section 1(b)(iii) Search Obligation Contravenes the Text of the Agreement, and Whether the Shahs have Used that "Interpretation" as an Excuse not to Perform their Obligations Under Section 1(b)(iii).**

The Shahs have "interpreted" Section 1(b)(iii) virtually out of any meaningful existence and used their "interpretation" as an excuse not to perform the searches and other due diligence required to comply with Section 1(b)(iii)'s text and applicable law on "possession, custody, or control"—both of which contravene that interpretation. This issue is addressed in Section VI, below, but to summarize briefly:

*First*, the Shahs misleadingly state that they have complied with Section 1(b)(iii)'s search obligations, a point that we refute in Sections VI & VII, below.

*Second*, they take the remarkable position that the only electronic devices in their possession, custody, or control are devices that they "own" or "use," even though Section 1(b)(iii) requires

June 22, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

them to search for ESI on electronic devices owned by Jaina, Neminath, and the other entities specified in the Agreement, and even though the Shahs have control over those entities and their devices. Apart from contravening applicable law, the Shah's definition would also read the term "control" out of "possession, custody, or control."

 *Third*, despite their close control over Jaina and Neminath, the Shahs incredibly contend that they do not know where the entity electronic devices are. But at the same time, they argue that Section 1(b)(iii)(c), despite its text to the contrary, somehow "does *not* require Vipin and Nayana to search the electronic devices owned by Vipin or Nayana or 235 Hillside LLC , Jaina, Jaina Infrastructure, Ipsita or Neminath. . . ." (Dk. 346 at 4) (emphasis added) That is effectively an admission that the Shahs are aware of the existence of electronic devices owned by the Entities that may contain responsive ESI. In any event, the Shahs had possession of the 235 Hillside Avenue premises until 2018, and therefore, if Jaina's servers, equipment, or other electronic devices have been moved, then they should know their current location.

*Fourth*, the Shahs have searched only their two personal email accounts and two personal iPhones. This is not an adequate search of either the devices themselves or devices, generally. (See Section VII.C, below.) For example, they have not searched Jaina's or Neminath's email accounts, the email accounts of any of the other entities, or any other sources of responsive ESI accessible from the Cloud through existing applications on their iPhones. (See Section VII.C, below.)

<em>Relief Requested</em>

The Shah's have violated materially not only the letter of the Agreement but the spirit of good faith that was supposed to animate its performance. As Your Honor explained on the record on June 30, 2021:

> I can make no guarantees to the parties about what this review of electronic materials will reveal, what has and has not been preserved or not preserved, and what causes of action result from that. I'm just here to ensure that the agreement that the parties have reached in good faith is also carried out in good faith.

(June 30, 2021 Tr. at 8:4-8:15.)

GCI respectfully requests that Your Honor enforce the Agreement by ordering the relief set forth in detail in Section VIII, below, which includes an order requiring the Shahs to: (a) produce the three lists; (b) produce all documents in the categories set forth in Section 1(b)(i);  and (c) perform the due diligence required by Sections 1(b)(i), 1(b)(ii), and 1(b)(iii) of the Agreement, which includes requiring the Shahs to: (i) ascertain the existence and location of the responsive documents, including documents within their possession, custody, or control that are within the hands of accountants or attorneys; and (ii) produce those documents.

<strong>Argument</strong>

## I.    The Agreement Requires the Shahs to Produce the Lists

4

June 22, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

Seven of the 13 Section 1(b)(i) categories are described as "Documents concerning. . . .[.]" Two others sought "All invoices concerning. . . ." and "A Quickbooks general ledger. . . ." One of the remaining four categories is: "Fully cooperate with any good faith effort by GCI to obtain tax records. . .[from the IRS] for Jaina for tax years 2013 through 2020[,] including. . . signing third-party authorizations allowing GCI to obtain the tax records. . . ."

The remaining three each seek "A list" of shareholders, bank accounts, or names of lenders, for certain specific periods (the "Lists"): (1) "A list of Jaina's shareholders and their percentage ownership interests as of January 1 of each year from 2012 until 2021[;]" (2) "A list of all bank accounts (by bank name and last four digits of account number) used by Jaina, Neminath, Jaina Infrastructure or Ipsita during the period 2012 through 2015[;]" and (3) "A list of the names of any individuals or entities that loaned money to Jaina between 2013 and 2015."

These were not requests for specific lists known or believed to exist but lists of information the Shahs were required to compile and provide.

The Shahs refuse to provide the Lists, contending Section 1(b)(i) required the production of "documents" (defined to include ESI) only and then only *existing* documents. But Sections 1(b)(ii) and 1(b)(iv) establish that the Agreement requires the Shahs to produce not only documents, but also "*information*." (Dk. 338 at § 1(b)(ii) (emphasis added))

Section 1(b)(ii) refers to the Agreement requiring the Shah's to produce "information"—such as the Lists—no less than *three* times. (Dk. 338, Section 1(b)(ii)) References to "documents and *information*" likewise appear in Sections 1(b)(vi), and Section 1(b) itself is titled "Provision of Documents and *Information*."

The Shahs contend that the parties' use of the term "information" five times can be explained away by the tenth bullet point, which concerns the Shahs' cooperation to obtain tax returns from the IRS. The Shahs say to comply with that request they "will need to provide GCI with various pieces of information. . . ." (Dk. 346  at 10)

To put this misplaced argument in context, form 4506 requires N. Shah to attach two documents to prove her shareholder status, sign the form, and check a box to attest her authority. (See Ex. A, Form 4506.) This general information is, at best, incidental to the "production of documents and information pursuant to [the]. . . Agreement."  It would be unnecessary to use the phrase "documents [including ESI] and *information*"—once, let alone five times— to clarify that the Shahs were required to provide the "cooperat[ion]" expressly required by Section 1(b)(i), bullet-point 10.

By contrast, the Lists require the Shahs to produce information pertinent to the *substance* of GCI's disputes with Jaina and others. Even if the term "information" was intended to include the incidental, administrative information, the substantive information sought by the Lists is still "information" within the meaning of the Agreement.

The Shahs next argue that the use of the verb "cooperate" in Section 1(b)(i), bullet-point 10 (concerning tax return cooperation) is somehow decisive. But the Agreement requires the Shahs

5

June 22, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

to produce "information" and that would remain true even had the parties used a verb like "prepare" or "compile" in the bullet-points referring to "a list."

The Shahs also contend Section 1(b)(iii) does not require them to provide the Lists, and accordingly, they have no obligation to do so. But Section 1(b)(iii) applies only to "documents," which Section 1(b)(i) defines as including ESI. The Shahs obligation to produce "information" is regulated exclusively by Section 1(b)(i), 1(b)(ii), and 1(b)(vi), which require the Shahs to produce information, including the Lists.

## II.   The Shahs are Required to Produce all Documents, Including ESI, in their Possession, Custody and Control Falling into the Section 1(b)(i) Categories

Section 1(b)(i) says the Shahs "*shall* produce *all* documents and electronically-stored information (collectively, 'documents') in their possession, custody, or *control* (including documents in the possession, custody, or control of [the Entities][)]. . . ." falling into the specified categories. (emphasis added)

## III.   The Shahs have Possession Custody or Control of all the Documents and ESI that Section 1(b)(i) Requires them to Produce

### A.      The Shahs Misstate the Applicable Standard

The meaning of the "possession, custody, and control" is central here, and the critical question is what "control" means. The Shahs, citing authority principally from outside the Second Circuit, asserts that "control" is "the legal right to obtain the documents requested on demand." Dk. 346 at 5 (citations and quotations omitted). Some jurisdictions apply a strict test for "control" that turns on whether the responding party has the legal right to demand the documents from a third party. (Dk. 346 at 5-6)

But the "demand" test does not apply in the Second Circuit. "'[C]ontrol' of documents does not require legal ownership or physical possession; all that is required is that the party has the right, authority, or practical ability to obtain the documents at issue." *Gruss v. Zwirn*, 296 F.R.D. 224, 230 (S.D.N.Y. 2013); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 236 F.R.D. 177, 180 (S.D.N.Y. 2006) (citation and quotation omitted).) The Second Circuit has endorsed this more flexible test for control. *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 138 (2d Cir. 2007).  And the cases in the district concur that the test is "right, authority, or practical ability to obtain the documents. . . ." *See, e.g., Chevron Corp. v. Salazar*, 275 F.R.D. 437, 447 (S.D.N.Y. 2011); *In re Various Grand Jury Subpoenas*, 235 F. Supp. 3d 472, 477-78 (S.D.N.Y. 2017).

In an apparent attempt to create the impression that Courts in the Second Circuit follow the strict "demand" test, the Shahs purport to quote *U.S. v. Stein*, 488 F. Supp. 2d 350, 361 (S.D.N.Y. 2007) for the proposition that "control" is "the legal right to obtain the documents requested on demand." Dk. 346 at 5 of 11 (citations and quotations omitted). That statement is false in this Circuit, but *Stein* is not to blame: the Shahs omitted a critical term from the *Stein* quote to create that misimpression.

6

June 22, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

*Stein* was quoting 7 MOORE'S FEDERAL PRACTICE § 34.14[2][b] (3d ed. 2006), and the Shahs *deleted* from that quote the phrase: "Control has been defined to *include* `the legal right to obtain the documents requested upon demand." *Stein*, 488 F. Supp. 2d at 361 (citations and quotations omitted; emphasis added).

*Stein* was quite correct to say that control "*includes*" the right to demand. The "right, authority, or practical ability to obtain. . . documents. . . [,] *Zwirn*, 296 F.R.D. at 230; *Flag Telecom*, 236 F.R.D. at 180 (citation and quotation omitted), unquestionably "includes" that right, but in this district "control" does *require* the right to demand. It is enough to have the "practical ability to obtain. . . documents."

The Shahs attempt to engraft an additional requirement upon the "practical ability" test, asserting that it "must be accompanied by a similar ability to enforce compliance with that demand." (Dk. 346 at 6) (quoting *Klesch & Co. v. Liberty Media Corp*., 217 F.R.D. 517, 520 (D. Colo. 2003). Not so.

*Klesch* cites no authority for the proposition that some additional showing is necessary. *Kresch* also states that the test prevailing in its district is the "demand" test, not the "practical ability" test. *See Kresch*, 217 F.R.D. at 520. The Shahs cite no authority within the Second Circuit to support any such additional showing.

The Shahs attempt to bolster their argument by citing and quoting from the Seventh Circuit's decision in *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1426-27 (7th Cir. 1993), but that case expressly adopted the "demand" test, not the "practical ability" test. *See* 11 F.3d at 1426. The Seventh Circuit's quoted statement (Dk. 346 at 6) has no application—and would make no sense— where, as here, the test is whether the party has "right, authority, *or practical ability* to obtain the documents[,]" and not simply the right to demand them.

**B.    Under the "Practical Ability" Test Corporate Officers Generally have Control over the Corporation's Documents**

Officers of corporations, like the Shahs, generally have control over documents that are in the possession or custody of those corporations. *See Flag Telecom*, 236 F.R.D. at 181-82; *Stein*, 488 F. Supp. 2d at 361-62 (citations omitted); *WIWA v. Royal Dutch Petroleum Co.*, Nos. 96 Civ. 8386 (KMW) (HBP), 01 Civ. 1909 (KMW) (HBP), 02 Civ. 7618 (KMW) (HBP), slip op. at 6-9 (S.D.N.Y. Feb. 15, 2009) (copy annexed as Ex. B); *United States v. International Business Machines Corp.*, 71 F.R.D. 88, 90-91 (S.D.N.Y. 1976).

In addition, the documents show that the N. Shah and V. Shah had the legal right to surrender to Axis bank Jaina's switching equipment. (See Ex. C at Shah22551.) Because they have and have exercised the right to dispose of Jaina's very valuable equipment, they unquestionably have the legal right to obtain documents from Jaina.

**C.    The Shahs have "Control" Over the Entities**

There are five Entities referred to in the Agreement: Neminath, 235 Hillside, Jaina, Jaina Infrastructure, and Ipsita. (Dk. 338 at § 1(b)(i)) Section 1(b)(i) provides that the Shahs "shall

June 22, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

produce all documents" (defined to include ESI) described in Section 1(b)(i)'s bullet-pointed categories, "in their possession, custody, or control[,]" "including documents in the possession, custody, or control of" the Entities.  (Dk. 338 at § 1(b)(i)) If the Shahs, as officers and shareholders of these Entities did not have control over the requested documents and information, then there would have been no point in the parties entering the Agreement in the first place.

1.     **The Shahs have Control over Jaina Documents**

N. Shah is an officer of Jaina and was listed in Jaina's Federal Communications Commission ("FCC") filing as a "President or other Senior Officer," specifically, an "Exe. VP." (See Ex. D, PTX 38 at GCI_2017 – 004284 & 4285; see also Ex. E at Shah65269 (listing her as "V. President"). Jaina corporate filings list her as the contact for Jaina's "Principal Executive Office" (See Exs. F, PTX 31 at GCI-003780; G, PTX 32 at GCI-Post-Bankr-Prod - 000012.) According to unsigned 2007 Board Minutes, her title was "Secretary." (See Ex. H.)  N. Shah is also a 25% shareholder of Jaina. (See Ex. D at GCI_2017– 004285; Ex. I, PTX 48).

N. Shah also had the authority to sign checks on behalf of Jaina (See, e.g., Ex. K) and signed for Jaina when it returned certain switching equipment to Axis Bank. (See Ex. C at Shah22551.)

V. Shah has held himself out to Citibank as being the "President" of Jaina (Ex. Z, PTX 45 at NYC-CHOPRA 000162) and Jaina's "Vice President of Finance." (See Ex. E at Shah65271.) He has been closely involved with the day-to-day handling of Jaina's business affairs at all relevant times. As "Vice President of Finance," he unquestionably has control over the documents sought by Section 1(b)(i) of the Agreement, which are financial documents.

While V. Shah has continuously asserted that he was not a shareholder of Jaina, according to the documents produced thus far by the Shahs, not only was N. Shah a 25% shareholder, but so was Vipin. (See Ex. E at Shah65269 & Shah65271; see also Ex. J at Shah49907-08.)

Jaina was, for all intents and purposes, a family business, owned and controlled by V. Shah, N. Shah, Mahendra Shah and his spouse, Pooja Shah. V. Shah and N. Shah exercised and had control over it. They certainly have the "practical ability to obtain" Jaina documents in the possession or custody of Jaina or third parties and appear to have the "right" and "authority" to do so as well.

2.     **The Shahs have Control Over the Other Jaina Entities' Documents**

The Shahs also had the practical ability to obtain documents from the other two Jaina Entities, Ipsita and Jaina Infrastructure. N. Shah held herself out as a "Senior Officer" of Ipsita in the company's FCC filing (Ex. L, PTX 55), and signed a guarantee of a Jaina promissory note as a "Director" of Ipsita and Jaina Infrastructure. (See Ex. M, PTX 116 at GCI_2017 – 000088.)

 Ipsita had an account at Citibank, and the address Ipsita used for that account was, until March 19, 2012, the same as Jaina's: 235 Hillside Avenue, Williston Park, New York 11596. (See Ex. N, PTX 151 at Citibank – 003803.) But effective March 20, 2012, Ipsita changed its address from the Jaina 235 Hillside Avenue, Williston Park, New York address to V. Shah's and N.

8

June 22, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

Shah's *home* address at Smith Place, Williston Park, New York. (See Ex. N, PTX 151, at Citibank – 003805.) Under these circumstances, the Shahs certainly have at least the practical ability to obtain Jaina's documents if the Shahs moved those documents to these entities.

### 3.    The Shahs have Control over Neminath Documents

Neminath, the Shah family business, was originally owned by V. Shah, N. Shah, Mahendra Shah, and his spouse Pooja. According to V. Shah's deposition testimony, M. Shah owned 5% of Neminath, M. Shah's spouse Pooja Shah owned 45%, V. Shah owned 5%, and Nayana Shah, owned 45%. (V. Shah Tr. at 27, 29) Historically, V. Shah was the Vice President of Neminath and N. Shah, the Secretary. (See Ex. O, PTX 119, Neminath 2016 Board Resolution.)

More recently, and as reflected in Form 1125-E of Neminath's 2016 tax return, Neminath is now 100% owned by both V. Shah and N. Shah, who bought out M. Shah's and Pooja Shah's shares, and who are now the sole officers and shareholders of Neminath. (See Ex. P, PTX 23 at Neminath Tax Returns – 000052) Thus, they now have *100%* ownership and control.

### 4.    The Shahs have Control Over 235 Hillside Documents

The Shahs have control of 235 Hillside, which is an LLC that we believe is owned and managed by V. Shah, and as far as we know, solely by him (or possibly also by one or both of his sons). V. Shah has very substantial management or ownership authority over that LLC as he signed on behalf of 235 Hillside, as landlord, a lease of the 235 Hillside Avenue premises to Neminath, as tenant.. (See Ex. Q.) If the Shahs have moved Neminath's or Jaina's documents to this entity then they should produce them.

## IV.   The Shahs have Knowledge of and Access to the Documents Specified in Section 1(b)(i)

### A.    The Shahs have Had Access to Jaina's 235 Hillside Avenue Premises During the Period Jaina Actively Conducted Business there and Through at Least 2018

Throughout Jaina's history, Neminath, the owner of the 235 Hillside Avenue premises, rented a section of those premises to Jaina. Neminath and the Shahs have had possession of the 235 Hillside Avenue premises through at least 2018. Neminath owned 235 Hillside Avenue long before Jaina began conducting operations. When on January 14, 2016, Neminath sold the building to Williston Park Realty, Neminath entered a two-year lease with Williston Park Realty, which included an option to buy back the property or extend the lease term. (See Ex. R at WPR000178-79, WPR000184.)

### B.    The Shahs have Access to Jaina's Servers, Computers, and Computer Drives

During the 2018 judicially-moderated settlement negotiations between GCI and the Shahs, the Shahs disclosed the continued existence of Jaina's computer servers at the 235 Hillside Avenue premises. We now know that V. Shah was in constant touch with Surajit Bose, who not only provided password information for Jaina's Quickbooks file, which was maintained on Jaina's servers, but at their request extracted a report from Quickbooks for the Shahs from those servers. (See Ex. T at Shah22583; see also Ex. AA at Shah22293)

9

June 22, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

### C.    The Shahs have Possession, Custody, and Control of Jaina's Quickbooks Files and Can Access Copies of the Files from Anil Arora, Esq. and Accountants Hired by V. Shah or Jaina

One of the categories of documents that must be produced is "[a] Quickbooks general ledger for Jaina for the periods 2013 through 2015." (Dk. 338 at § 1(b)(i)) Production of Jaina's QuickBooks company file (or files) for the period 2013 through 2015 in the Quickbooks ".qbw" file format, which would include general ledgers for each year of account, would satisfy the Shah's production obligation with respect to this category. In addition, there are five or more other categories of documents concerning which QuickBooks company files would contain many responsive documents.  (Dk. 338 at § 1(b)(i))

The documents show that Jaina indeed used QuickBooks, maintained one or more QuickBooks company files, and Jaina's accountants and V. Shah had access to those files. (See, e.g., Ex. S at Shah72671; Ex. T at Shah22583; Ex. U at Shah49552; Ex. V at Shah27655) Even Anil Arora, a former attorney of the Shahs in this case, knew about and had access to Jaina's ledgers and QuickBooks files. (See Ex. W at Shah74844; Ex. X at Shah27440.)

This is a disturbing fact to learn given that: (a) neither Mahendra Shah nor V. Shah produced Jaina's financial books and records despite GCI's demands for production of those documents; (b) at a July 25, 2017 conference before Your Honor, Mr. Arora told Your Honor that he had produced all documents responsive to GCI's document requests and that Surajit Bose, who had left the country, had taken all of Jaina's records with him, including the financial records. (Ex. DD, Tr. at 9:2-11:9, 13:7-13:13) It is also disturbing to learn that Mr. Arora knew that as of 2016 Mahendra Shah had, and presumably still has, in his possession and custody almost all of Jaina's documents from 2009 forward. (See Ex. Y at Shah86736.)

The Shahs can easily obtain Jaina QuickBooks company files from: (a) Jaina's computer system or servers by searching for the QuickBooks company file type (".qbw." or ".qbx"); (b) Jaina's or Vipin's accountants, including Seeraj Chawla and Ashkay Kumar; and (c) attorney Anil Arora.

### V.    The Shahs' Counsel Must Ascertain from the Shahs the Existence and Location of the Documents, Including ESI, and Produce them

Putting aside momentarily the Shahs' Section 1(b)(iii) search obligations, in the first instance, the Shahs and their counsel were required to have a discussion to ascertain the existence and location of the documents that Section 1(b)(i) requires the Shahs to produce. That obligation would exist as a matter of law in an ordinary litigation proceeding in this district, and the parties expressly agreed it would also apply here. (See Dk. 338 at § 1(b)(ii).)

The Shahs should have been questioned about the location and existence of hard copy documents wherever located, including in any storage facilities, as well as the existence of responsive hard copy or digital files, including documents transmitted to accountants, attorneys, and other service providers. Simply because there may be no relevant hardcopy documents currently stored at the 235 Hillside Avenue premises does not mean that the Shahs do not know of the existence and

June 22, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

location of such documents, whether they be in a storage facility or in the hands of a lawyer, accountant, or other service provider.

The Shahs and their attorneys must carry out the due diligence the Agreement provides, ascertain the existence and location of each of the limited categories of documents requested, and disclose that information to the Court and GCI. They must also produce the documents if they are in their possession and custody or control or in the possession, custody or control. This includes requesting from the Entities' and the Shahs' accountants, lawyers, and other service providers, any responsive documents that the Shahs have forwarded to them in the past. Jaina and Neminath documents should also be requested from Mahendra Shah. If the Shahs know or have reason to believe that any responsive exist or may exist, but do not believe that those documents are within their possession, custody or control, then the Court should require them to state in writing the basis for that contention so that the claim can be intelligently evaluated and quickly resolved.

## VI.   The Shahs' Interpretation of their Section 1(b)(iii) Search Obligations is Gravely Flawed

The Shahs claim to have satisfied Section 1(b)(iii)'s search obligations, but that claim is based on the following four misinterpretations of the Agreement, each of which contravenes its text:

1.  Sections 1(b)(iii)(a), (b), and (d) allegedly require the Shahs to search for "physical documents," only, and not ESI;

2.  Section 1(b)(iii)(c) is the only provision requiring a search for ESI, and sources of ESI, including electronic devices;

3.  The parties supposedly agreed that the only electronic devices that are in the possession, custody, or control of the Shahs, and therefore must be searched, are devices owned by the Shahs or used by the Shahs; and

4.  The parties supposedly agreed that the only electronic devices referred to in Section 1(b)(iii)(c) are so-called "consumer-facing" devices and therefore did not include business computers and servers, such as Jaina's computers and servers.

### A.      Section 1(b)(iii)(a), (b), and (d) Requires the Shahs to Search for both Physical Documents and ESI

Section 1(b)(iii)'s prefatory phrase explains that the purpose of the search requirement is to "provide *documents*" to GCI. Section 1(b)(i) of the Agreement, defines "documents" to mean both "documents and electronically stored information." (Dk. 338 at § 1(b)(i)) Accordingly, the searches that Section 1(b)(iii)(a), (b), and (d) required were searches for "documents," which includes not only hard-copy documents, but also ESI and sources of ESI, such as electronic devices.

11

June 22, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

### B.      Under the Plain Terms of the Agreement, the Shahs have Possession, Custody, or Control over Electronic Devices they have the Right, Authority, or Practical Ability to Obtain from the Entities

The Shahs contend that the parties agreed that the only devices in the "possession, custody, or control" of the Shahs are devices that they either: (a) own; or (b) use. This interpretation rewrites "possession, custody, or control" to mean "possession or custody." Whether the Shahs "own" or "use" a device goes to whether the Shahs have possession or custody over the device, not whether they have control over it.

The Shah's interpretation cannot be squared with Section 1(b)(iii)(c), which obligates the Shahs to conduct "[a] search of all electronic devices owned by [any of the Entities] that are in the possession, custody, or control of V. Shah or N. Shah." (Dk. 338 at § 1(b)(iii)(c)) "Control" is the "right, authority, or practical ability to obtain" the device from the Entity that owns it. If the Shahs already "use" a device, they, by definition, do not have to "obtain" the device from the Entity. The same is true if the Shahs own a device. The Shah's definition of "possession, custody, or control" renders the term "control" superfluous, and thus legally erroneous. *See Stein*, 488 F. Supp. 2d at 363.

### C.      The Term "Electronic Devices" in Section 1(b)(iii)(c) is not Limited to So-Called "Consumer-Facing" Devices

The Shahs argue that Section 1(b)(iii)(c) business computers and servers are not "electronic devices." But business computers and servers are unquestionably "electronic devices." *See, e.g.*, *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 728-29 (2d Cir. 2012) (quoting Conn. Gen. Stat. § 53-451(a)(1)).

Even apart from the lack of any textual support in the Agreement for the Shah's interpretation, it makes no sense here. Section 1(b)(iii)(c) expressly states that the Shahs are required to search devices owned by the Entities and within the possession, custody, or control of the Shahs. It would make no sense to limit the search obligations to consumer-facing devices when the parties expressly contemplated the search of business computers and servers.

Further, Section 1(b)(i)'s document categories relate mainly to Jaina or Neminath finances and financial transactions, matters reported in their tax returns. (Dk. 338 at § 1(b)(i)) Exempting from the Shahs' search obligations business computers, servers, or other electronic devices used by businesses would enable the Shahs to ignore the source of ESI that is most likely to contain the financial documents GCI bargained to obtain from the Shahs: business computers and servers.

### VII.  The Shahs Have not Satisfied their Search Obligations Under Section 1(b)(iii)

### A.      Search of Buildings at 235 Hillside Avenue

Section 1(b)(iii)(a) states: "to provide all documents" in their possession, custody, or control, the Shahs must "[c]onduct a search of any buildings located at 235 Hillside Avenue, Williston Park, NY 11596 that V. Shah or N. Shah have access to or. . . can legally obtain access to." (Dk. 338 at § 1(b)(iii)(a)) The Shahs have conducted this search but only with respect to hard copy

June 22, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

documents. The Shahs must conduct a search of those premises to ascertain the existence and location of any sources of responsive ESI located on those premises, including Entity computers, servers, drives, and other devices, and image, search, and produce the ESI that may be stored on those devices.

### B.      Search of the Shahs Home

The Shah's search of their Home did not comply with the Agreement for the same reason the search of 235 Hillside Avenue did not comply..

### C.      Search of All Electronic Devices owned by the Shahs or the Entities

Section 1(b)(iii)(c) provides that "to provide all documents" in their possession, custody, or control, the Shahs must conduct "[a] search of all electronic devices owned by V. Shah, N. Shah, [or any of the Entities] (Dk. 338 at § 1(b)(iii)(c)) The Shahs search of and for electronic devices was insufficient because it rested on the Shah's erroneous constructions of the Agreement, which we previously discussed.  The Shahs must carry out a search that complies fully with the parties' agreement, as properly interpreted.

In addition to the Shahs' failing to search for the universe of electronic devices contemplated by Section 1(b)(iii), the Shahs' search of the two iPhones was also insufficient in scope and must be redone. The Shahs are taking the position that "searching" a "device" in the context of this Agreement is limited to what exists on the device's hard drive and does not include email accounts, WhatsApp messages, or any other source of responsive documents that are accessible through the device but which are stored on the Cloud.  A "search" of a device that is designed to determine whether there are responsive documents within the "control" of the Shahs obviously includes a search of email accounts accessible through the device, even though the accessible documents are maintained in the Cloud. A proper "search" of a device entails the Shahs' attorney asking each of the Shahs whether there are any Cloud-stored documents accessible through applications on their devices that fall into any of the specified categories.

### VIII. Relief Sought

GCI respectfully requests that the Court enforce the Settlement Agreement by making an Order directing the Shahs to:

1.  Produce the three Lists;

2.  Ascertain the location of all Jaina QuickBooks files and extract and produce from them the financial documents and data requested in Section 1(b)(i) of the Agreement, or alternatively, produce to GCI all Jaina QuickBooks files in their native, company file or accountant file QuickBooks-accessible format;

3.  Ascertain the location of all the Entities' servers and e-mail accounts, and extract and produce from them all responsive documents;

4.  If the Entities have moved or transferred servers or other electronic devices, extract and

June 22, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

produce from them all responsive documents;

5.   Produce all documents falling into the categories specified by Section 1(b)(i) of the Agreement, including, without limitation:

   a.      All "[d]ocuments concerning paid-in capital by individuals or entities (additions and withdrawals) as reflected in line item 23 of Schedule L form 1120 for the period between 2011 and 2015," including, without limitation, all documents concerning the following amounts paid by investors (names and amounts) as of the following dates:  (i) $1,530, 250 paid as of the beginning of 2011; (ii) $2,399,250 paid as of end of 2011; (iii) $1,900,000 paid as of the end of 2012; (iv) $1,992,864 as of the end of 2013; and (v) $1,992,864 as of the end of 2015 and 2016.

   b.      All "[d]ocuments concerning payables to Jaina's creditors, between 2013 and 2015[,]" including without limitation, all documents related to payments made in India to Ravi Chopra that are reflected in Exhibit BB at Shah55401-02, and total $1,405,571.

   c.      "All invoices concerning the 2014 sales of $39,044,012 shown on line 1c of Jaina's 2014 tax return (Form 1120)[,]" including, without limitation, all invoices to Jaina's customers as set forth in the large Excel file the Shahs produced in native format as Shah49547, including, without limitation, all Vision Impex invoices (totaling $1,241,250).

   d.      All "[d]ocuments concerning the $6,740,198 in Trade Notes and Accounts Receivables shown on Line 2a of Jaina's 2013 tax return (Form 1120 Schedule L), including the names of any entities that owed any portion of the $6,740,198[,]" including the data supporting this 2013 tax return entry.

   e.       All "[d]ocuments concerning the $2,213,217 in Trade Notes and Accounts Receivables shown on Line 2a of Jaina's 2015 tax return (Form 1120 Schedule L), including the names of any entities that owed any portion of the $2,213,217[,]" including the data supporting this 2015 tax return entry.

   f.      All "[d]ocuments concerning the $1,000,000 Citibank loan, which is reflected in PX45," including all documents from April 8, 2015, forward and all documents concerning how the loan was paid and settled.

   g.      All "documents concerning the 2013 loan of $600,000 from Kedis LLC ("Kedis") to Neminath, including all (i) communications from January 2, 2013 between or among V. Shah, Mahendra Shah, Surajit Bose, Ravi Chopra and Sanjiv Chand; (ii) communications that took place once the loan was not paid on April 19, 2014; (iii) documents concerning the extension of the loan; (iv) documents (including checks) showing interest payments made on the loan; and (v) documents concerning instructions for repayments of the loan.

   h.      All "documents concerning the sale of 235 Hillside Avenue to Neminath[,]" including, without limitation: (i) copies of the front and back of cashed checks numbers

14

June 22, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

153, 155, and 156 issued by Mariana Ramirez (see Ex. CC, Shah79597, showing front copy of checks only);  (ii) bank statements within the Shahs' possession, custody, or control of the entities or persons who cashed the checks (including, without limitation, Edward Troy as Escrow Agent); and (iii) documents, if any, showing that 235 Hillside LLC owned the 235 Hillside Avenue, Williston Park, New York on February 28th, 2015.

6.  In the event the Shahs claim they cannot produce any of the documents set forth in paragraph 5, above, to require the Shahs to state the basis for why they contend those documents are not within their possession, custody, or control.

7.   To conduct the due diligence and reasonable investigation necessary ascertain, for each category of documents or information requested by Section 1(b)(i) of the Agreement, where those documents are presently located, and in whose possession, custody, or control, including without limitation, all responsive QuickBooks files;

8.  To obtain from any of the Entities' attorneys, accountants, and other service providers, and produce, any documents falling into the categories specified in Section 1(b)(i) of the Agreement that the Shahs or any of the Entities provided to them in the past, including, without limitation, all responsive QuickBooks files;

9.  To report to the Court in writing concerning the results of the due diligence, investigation, and production referred to in paragraphs 1-8 above;

10. To the extent the investigation reveals the existence of any Section 1(b)(i) documents that the Shahs contend are not in their possession, custody and control, to require the Shahs to state in their report the present location of those documents and state the basis for why the Shahs contend those documents are not in their possession, custody and control;

11. To the extent the investigation reveals that any responsive documents have been destroyed, transferred or otherwise disposed of, to require the Shahs to so state that in their report, specifying the details, including the identity of the persons who destroyed, transferred, or otherwise disposed of the documents; the identity of the person(s) (if any) presently having possession, custody, or control of the documents; and the date(s) on which the destruction, transfer, or other disposition of the documents occurred.

12. To conduct the searches described in Section 1(b)(iii) in the manner described, and according to the rules discussed, in Sections VI & VII, above, and image, search, and produce all responsive ESI; and produce any hard copy documents.

13. To image and search the servers and computer equipment within their possession, custody, or control that the Shahs know or have reason to know contain responsive documents, including servers and computer equipment that is also in the possession, custody, or control of any of the Entities.

June 22, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

14. To include in the report a fulsome description of the results of each of the Section 1(b)(iii) searches conducted, including what was found, what was and was not produced, and the basis of any determinations that any located documents or devices were not required to be produced or imaged pursuant to the Agreement.

Respectfully submitted,

Philip J. Loree Jr.

cc:     All Counsel of Record via ECF
        Mr. Govind Vanjani (by email)
        Shomik Ghosh, Esq. (by ECF)
        Pro se Party Mahendra Shah (by email and ECF)