

# THE LOREE LAW FIRM

**PHILIP J. LOREE JR**

September 20, 2022

**By Email**

Shomik Ghosh, Esq.
Spiro Harrison
7 World Trade Center
46th Fl.
250 Greenwich St. New York, NY 10007
sghosh@spiroharrison.com

   Re:    Geo-Group Communications, Inc. ("GCI") v. Shah, et. al., No. 15 Civ. 1756 (KPF)

Dear Shomik:

This will respond to your email dated September 19, 2022.

The assertions and accusations set forth in your emails are unfounded and, in certain cases, over-the-top. We shall, however, limit our response to the three lists you produced with your email in alleged partial compliance with the Court's July 18, 2022, Order (the "Lists"). Once you claim to have complied with the rest of the Order, including the production of documents, then we shall respond to those compliance efforts.

### Due Diligence Required by the Court's July 18, 2022, Order as Applicable to the Lists

The Court's Order (Dk. 350) is clear and easy for the parties to follow. Your clients "must" "Compile the Lists, to the extent the information necessary to do so is obtainable via good-faith compliance with their diligence obligations as set forth in Section 1(b)(iii) (including by seeking such information from counsel or accountants)[.]" (Dk 350 at 13 of 15.)

In compiling the Lists your clients must provide the information obtained from: (a) their own knowledge; (b) their due diligence obligations set forth in Section 1(b)(iii) of the Settlement Agreement; and (c) the information they obtain from making proper inquiries to attorneys and accountants. (Dk. 350 at 13-14)

As Judge Failla said "the Agreement does not impose upon Defendants a free-standing obligation to produce all of the . . . information enumerated in Section 1(b)(i)." (Dk. 350 at 14 of 15.) But instead, "the Agreement meaningfully limits what Defendants must produce to those materials that are within their possession, custody, or control, which the Court has interpreted to include materials that can be acquired by seeking

September 20, 2022

Shomik Ghosh, Esq.
Spiro Harrison
7 World Trade Center

them from counsel or accountants." (Dk. 350 at 14 of 15) And just as access to information held by attorneys or accountants is within your clients' possession, custody and control, so too, is all information within their knowledge, as well as all the information that can be gleaned from: (a) the documents produced thus far, and (b) the documents you are required to produce in response to the Court's Order, but have not yet produced, despite the passage of the September 16, 2022 deadline for compliance. (See Dk. 350 at 14 of 15)).

### Your Clients Cannot Possibly Have Completed all the Required Due Diligence Because They Have Not Yet Completed Their Document Production Due Diligence and Have Said they May be Producing Documents Stored on Jaina's Servers

Your September 19, 2022 email states that Jaina's servers are "undergoing forensic examination and we will follow-up once we have the results of those examinations." No explanation is given as to why that forensic examination was not commenced and completed several weeks ago, or at least in time for documents to be produced in a timely fashion.

Your clients thus have no idea yet what responsive documents and information is contained on those servers, and what they will ultimately be producing to GCI pursuant to the Order.

Given that your clients have admittedly not only delivered the Lists untimely, and have not yet conducted the due diligence the Order requires, your clients have yet to comply with the Court's Order in any respect.

### Even Apart from the Noncompliance Described Above, the Documents the Shahs have Produced Show that the Lists are Inaccurate and Incomplete

Below we discuss why the documentary record, including documents previously produced by the Shahs in response to the Settlement Agreement, demonstrates that each of the lists is inaccurate and incomplete.

### GCI's Demand

GCI demands that your clients: explain in detail in writing what due diligence you and your clients undertook to prepare each of the Lists, including, without limitation: (a) what attorneys and accountants were contacted and whether they provided to you all requested documents and information; (b) whether each of your clients provided all responsive documents and information within their knowledge, possession, custody, and control; and (c) what efforts were made to glean the relevant information from the documents produced pursuant to the due diligence obligations set forth in Section 1(b)(iii) of the Settlement Agreement, including from the more than 87,000 pages previously produced. If you have not performed the due diligence described in this paragraph, then please immediately do so and advise of the results.

September 20, 2022

Shomik Ghosh, Esq.
Spiro Harrison
7 World Trade Center

In particular, and without limiting the scope of GCI's above demand, please advise whether you have contacted attorney Akhilesh Krishna concerning the matters to be included in List 2 or in any of the other Lists. According to an affidavit filed by Mr. Krishna, he had represented Jaina in matters unrelated to the Geo-Group/Jaina dispute and that "[a]s a result, [he is] well acquainted with [Jaina's] s shareholders and officers, including Surajit Bose." (See Ex. A at SHAH50909.)

We address each List below, starting with List 2.

**List 2: Jaina's Shareholders and their Percentage Ownership Interests**

*The Documents thus far Produced by N. Shah and V. Shah Show that List 2 is Incomplete and Inaccurate*

The documents the Shahs have produced thus far indicate that it is incomplete and inaccurate. That in turn raises further questions about what due diligence was performed and requires the Shahs to perform all required due diligence and submit an accurate and complete list.

Perhaps the most blatant inaccuracy exposed by documents the Shahs have produced is assertion that Frank Vella owned a 25% share of Jaina during the period 2012 through 2021. The documents indicate that Frank Vella did not own any shares during that period and that, in addition to M. Shah, N. Shah, and Surajit Bose, Jaina had one or more other shareholders.

Vella became a 25% shareholder of Jaina in or about June 2006, according to his share certificate. (See Ex. B, Plaintiff's Trial Ex. 48.) On December 28, 2014, Surajit Bose advised Mr. Vanjani that Vella had "left" Jaina in 2011. (See Ex. C, December 28, 2014, email from Surajit Bose to Govind Vanjani.)

Article 4 of the Jaina form shareholders' agreement contemplates that retiring shareholders will sell, and the remaining shareholders will purchase, their shares. (See Ex. D at SHAH66307.)

That Vella, as contemplated by Article 4, ceased being a shareholder upon his leaving Jaina in 2011 is evidenced by other documents produced by V. Shah and N. Shah. Vella's departure from Jaina in 2011 was marked by Jaina issuing a portion of his shares to others. In notarized correspondence between Jaina and Ketan Shah, which was signed jointly by M. Shah and N. Shah, N. Shah and M. Shah "confirm[ed] that a payment of $100,000 USD has been received on Tuesday, July 19, 2011 via Bank wire transfer for a 1% stock at Jaina Systems Network, US located at 235, Hillside Ave, Suite B, Williston Park, NY 11596, USA." (See Ex. E at SHAH76718, SHAH76719.)

The same day M. Shah and N. Shah, also in notarized correspondence, confirmed that a $100,000 payment had been received from Gaurav Sharma "for a 1% stock at Jaina Systems Network, US located at 235, Hillside Ave, Suite B, Williston Park, NY 11596, USA." Both K. Shah and Gaurav Sharma were informed that they would be sent

3

September 20, 2022

Shomik Ghosh, Esq.
Spiro Harrison
7 World Trade Center

shareholder agreements. (See Ex. E at SHAH76718, SHAH76719.) Yet List 2 not only inaccurately lists Vella as a Jaina shareholder as of 2012, but also does not disclose the persons to whom Mr. Vella's stock was distributed, including, without limitation, K. Shah and Gaurav Sharma.

According to email correspondence between V. Shah and Chandan Ghosh dated June 27, 2012—i.e., around the same time when shares were sold to K. Shah and Gaurav Sharma— V. Shah had the authority to issue shares in Jaina and intended to issue shares to Ghosh. V. Shah said that he had spoken with his attorney about issuing shares to Ghosh and conveyed to Ghosh documentation requirements for issuing the shares. (See Ex. F, SHAH86263.) Further correspondence indicates that a shareholder's agreement was sent by Surajit Bose to Mr. Ghosh, which had originally been sent to M. Shah by Jaina's attorney, Akhilesh Krishna. (See Ex. G, SHAH66301.)

According to a Citibank Commercial Credit application dated December 11, 2011, V. Shah, not Vella, was a 25% shareholder. (See Ex. O.) In fact, Mr. Siddiqi, Ravi Chopra's attorney of record, clearly understood that V. Shah was a shareholder based on Mr. Siddiqi's dealings with V. Shah. Siddiqi provided informal advice to V. Shah, and prepared for Mr. Shah's use in the litigation a draft argument that stated: "I [i.e., V. Shah] am indisputably a shareholder of Jaina. . . ." (See Ex. H at SHAH49908.)

Further buttressing the inaccuracy of List 2 is a May 29, 2012, email from Shashi Goyal of FFECS IT & Ebusiness Consulting Services Inc., in which Mr. Goyal offers on behalf of his company to invest $500,000 in Jaina in exchange for a 1/6 share of the business. Tellingly Mr. Goyal states, after meeting with Jaina, and receiving information from them, that "[t]here are currently *five* partners in Jaina[,]" and that "[w]e would like to have a equal partnership stake of 1/6 in Jaina." (See Ex. I at SHAH66542; emphasis added.)

Also in 2012, Jaina executed and filed an amended tax return for 2010, which was prepared by the late Jagdish Alwani and signed by M. Shah on January 12, 2012. (See Ex. J at SHAH67076.) In Form 1120, Schedule G of that amended return, Jaina stated that Jaina had only three shareholders, M. Shah, N. Shah, and S. Bose, and that their respective percentage holdings were 37.5% each for M. Shah and N. Shah, and 25% for S. Bose. (See Ex. J at SHAH67082.)

Based on that amended 2010 tax return, Vella had given up his shares around 2011, as the original 2010 return shows Vella as one of the four shareholders, while the amended 2010 return, signed and filed in 2012 does *not* show him as a shareholder. That indicates Vella gave up his shares in 2011, when he retired.

In addition, Frank Vella has not signed any guarantee for the 2011 Citibank loan application, which requires all shareholders to indicate their shareholder percentages holdings in Jaina and net worth. And in all the more than 87,000 pages the Shahs produced from their email accounts there is not a single email on any subject addressed to or from Vella, or cc'd to him.

September 20, 2022

Shomik Ghosh, Esq.
Spiro Harrison
7 World Trade Center

Further evidence that Frank Vella was no longer a shareholder after 2011 is provided by the notes and guarantees that Surajit Bose, V. Shah, M. Shah, N. Shah and S. Bose signed in September 2012, securing a substantial debt Jaina owed to Broadband. M. Shah, N. Shah and S. Bose all signed in their capacities as Jaina officers or directors, and each also signed a guarantee in their individual capacity. V. Shah signed in his individual capacity as well. M. Shah and N. Shah also signed as officers or directors of Jaina Realty, Inc., Jaina Infrastructure, Inc., Ipsita Telecom Services, Inc., and Jaina Call India, Inc. But Vella did not sign. (See Ex. P at GCI_2017 – 000087-89.) Had Vella been a shareholder at the time, then surely Broadband would have insisted that he, too, guarantee the debt.

Other documents produced by Jaina likewise raise serious doubts about the accuracy and completeness of List 2. For example, the Shahs' production contains interrogatory answers provided by N. Shah to her bankruptcy counsel, but the interrogatories, which were propounded in an adversary proceeding to which GCI was not a party, were not included in the production.

The answers given to questions 8, 9, 10 & 11 purport to say whether certain persons were shareholders of Jaina, but we cannot tell who those persons were because GCI was not privy to the interrogatories, and they are not included in the Shahs' document production. Interrogatory answer 8 was apparently in response to a question about M. Shah, because the answer given was "Brother in Law and shareholder." The remaining three answers were simply "shareholder[,]" but there is no indication as to which three persons those answers related, and whether or not N. Shah was one of those persons. (See Ex. K at SHAH07331.)

Late 2014 and early 2015 Email correspondence between: (a) Vipin and Surajit Bose and (b) representatives of Jaina supplier Sify Technologies, Limited ("Sify") shows that, according to Sify, V. Shah and S. Bose represented to Sify that Ravi Chopra was a "partner" of Jaina (i.e., a shareholder), whose exit from the business in late 2014 was the reason for a delay in payment of a substantial debt to Sify. According to Sify's memorandum of a meeting between Sify and Jaina, V. Shah advised Sify that the delay in payment "was due to one of the partner[s] in the company choosing to exit the business." To that Surajit Bose "[a]dded" "[t]hat the Partner exiting was one named Ravi and it was due to the sudden and unannounced decision of him which caused the delay." (See Ex. L at SHAH51516.)

Finally, the documentary record shows that N. Shah had, as of February 10, 2015, full knowledge of who Jaina's shareholders are. In a February 10, 2015 email to Joseph Goldberg she advised that "all the shareholders of Jaina are united[]" in wanting Goldberg's "firm to continue representing the Jaina in the Geo Group Litigation." (See Ex. M.)

We are aware of no reason why she would not have that full knowledge today.

September 20, 2022

Shomik Ghosh, Esq.
Spiro Harrison
7 World Trade Center

*Apart from being Incomplete and Inaccurate, List 2's Reference to the Possibility of Assignment of Shares Injects Ambiguity into that List*

List 2 is prefaced by a "Note" that says "It is our understanding that these [listed] ownership percentages have remained consistent from 2012 onward. However, we have no way of completely assuring that Vela or Bose did not assign their ownership rights since then."

Please explain what you mean by "assign their ownership rights[.]" To "assign" something, including shares, can reasonably refer to more than one type of transaction. One can, for example, assign shares as collateral to a lender, in which case the ownership interest in the shares would ordinarily remain with the assignor unless and until the assignor defaults on the loan, in which case the lender would become the owner of the shares upon the default.

One can also "assign" shares by selling, or otherwise transferring, all their rights and interests in the shares to another person. In that case, the purchaser or transferee would become the owner of the shares upon the completion of the transaction. Please explain what you mean by "assign."

In addition, please explain the basis for your assertion that N. Shah or V. Shah would have "no way of completely assuring" that either Bose or Vella had not transferred their shares. The form Jaina shareholder agreement V. Shah and N. Shah produced prohibits any type of transfer, sale, encumbering, or hypothecation of shares unless the transferring shareholder gives written notice of the intent to transfer and provides the other shareholders with a 60-day "initial option" period within which to purchase those shares, followed by a second, 20-day option period in the event a shareholder does not elect to purchase all the shares he or she is entitled to purchase. (See Ex. D, Shareholder Agreement at §§ 1 & 2.)

### List 1: Individuals or Entities that have Loaned Money to Jaina

The List you provided appears to be missing certain persons and entities who loaned money to loaned money to Jaina during the period 2010 through 2015. In 2012, for example, Citibank extended a $1,000,000 business line of credit to Jaina. (See Ex. N, GCI Trial Ex. 50) Vipin and Nayana were personally involved in the application for that loan, which took place in late 2011. (See Ex. O at SHAH65269 & SHAH65271)

Sanjiv Chand's entity Kedis Enterprises LLC also allegedly made a $200,000 loan to Jaina on December 13, 2016. (See Dk. 273-1 at 4 of 5 (Third Affidavit of Sanjiv Chand, ¶ 14).) No loans from Mahendra Shah or Nayana Shah are listed even though reference to such loans appears on at least one Jaina tax return. (See GCI Trial Ex. 15 at NYC Chopra 000058.) No loan from Surinder Malhotra is listed.

September 20, 2022

Shomik Ghosh, Esq.
Spiro Harrison
7 World Trade Center

### List 3: List of Bank Accounts

The List is missing one or more bank accounts maintained by Neminath during the period 2012 through 2015, including HSBC Bank. In addition, it does not include the Jaina India's banks including Bank of Baroda (see Ex. Q) and HSBC Bank (Ex. R)

Finally, please identify the entity Jaina Telecom Services, Inc., letting us know where it is incorporated and where it has its principal place of business. According to our New York Department of State search, that entity is not incorporated or licensed to do business in New York.

Sincerely,

Philip J. Loree Jr.

cc:     Mr. Govind Vanjani (by email)