# SPIRO HARRISON

250 Greenwich Street, 46th Floor
New York, NY 10007
spiroharrison.com

Shomik Ghosh
Direct Dial: 203-285-4398
sghosh@spiroharrison.com

October 11, 2022

**VIA ECF and EMAIL**

Hon. Katherine Polk Failla
United States District Court for the Southern District of New York
40 Foley Square, Room 2103
New York, New York 10007
Failla_NYSDChambers@nysd.uscourts.gov

**Re: Letter Regarding Server Search, *Geo-Group Communica-
tions, Inc. ("GCI") v. Shah, et. al., No. 15 Civ. 1756 (KPF)***

Dear Judge Failla:

I am counsel to Vipin and Nayana Shah in the above-captioned action, who I represent *pro bono*.

On July 18, 2022, the Court ordered my clients (the "Shahs") to search a series of servers located in a facility at 235 Hillside Avenue, Williston Park, NY 11596. In that order, the Court clarified that the Shahs would only need to search the servers if the servers were not "rendered fully inoperable" by past flooding at the facility. Dkt. 350. Promptly after the Court's July 18, 2022 order, the Shahs contacted, and ultimately contracted with, one of the country's leading e-discovery/forensic vendors to assess the operability of the servers and to, if possible, extract any data contained on them. On October 7, 2022, the vendor delivered a forensic memorandum summarizing its analysis of the servers. The memorandum is attached to this letter as **Exhibit A**.[1]

In its report, the vendor concluded that: (1) the servers had suffered extensive water damage, which had led to additional mold and rust damage; (2) the servers were not operable or functional; (3) traditional techniques used to extract data involving powering on the servers could result in damage to the servers; (4) even if data extraction were possible, no guarantee exists the data itself would be preserved given the aforementioned water damage to the physical servers, age of the servers, and possible encryption. Upon receipt of the report, the Shahs promptly sent the report to counsel for GCI on October 7, 2022. **Exhibit B**.

---

[1] The vendor is planning on preparing a declaration as ordered by the Court in its September 27, 2022 order, which will be submitted by the compliance date of October 18, 2022.

A fair reading of the report suggests that the Shahs are not obligated to perform further searches of the servers, as the vendor's report concludes the servers are not in functional order or operable. On the basis of such a reading, the Shahs thus could have chosen to cease any further inquiry into the servers, taking the position that because of the server's inoperability no further searches were required.

However, the Shahs did not wish to take this action for a few reasons. First, the Court's order does not define "fully inoperable," and while the Shahs believe that term does aptly describe the state of the servers, the Shahs wished to err on the side of caution rather than presume a meaning that the Court may not have intended. Second, the Shahs also recognized that the vendor's findings describe a situation which the Court may have not foreseen and which its order does not directly address—*i.e.*, where traditional data extraction techniques pose a risk of damage to the server hardware due to the server's water damage. While the Court's order requires the Shahs to search the servers if they are not "fully inoperable," the Shahs wanted signoff from either opposing counsel (or, as a last resort, the Court) before proceeding with a search that could incidentally damage the servers.

Thus, upon receipt of the report, the Shahs reached out to counsel for GCI on October 7, 2022, with hopes that the parties could agree upon an appropriate strategy for the searches, as parties in litigation often do. In particular, the Shahs presented two proposals to counsel for GCI.

First, the Shahs requested that GCI consent to the Shahs attempting to extract data from server through the traditional and industry-standard method of a "powered on" extraction. **Exhibit B.** As explained above, the Shahs sought GCI's consent because of the vendor's cautioning that any powered assessment could incidentally degrade a water-damaged server. Thus, the Shahs proposed they would attempt a "powered on" assessment for a subset of the servers, after which the parties could meet and confer regarding whether data could be extracted and whether such extraction efforts had led to collateral damage to the servers. The Shahs proposed conducting the assessment on a subset of the servers to ensure that, if the extraction did damage the servers, that degradation would be limited to a small portion of the server population.

Second, to the extent GCI wished to examine the servers themselves, the Shahs alternatively offered to transfer the entirety of the servers to GCI permanently, after which GCI could do whatever it wished with the servers. **Exhibit B.** The Shahs conditioned this option on GCI agreeing that, upon receipt of the servers, it would not allege the Shahs' breached the July 18, 2022 order by not searching the servers themselves. **Exhibit B.**

On October 10, 2022, counsel for GCI responded to the Shahs. Confusingly, counsel for GCI neither agreed not disagreed with the Shahs' proposals, instead writing that "GCI is not re-

quired or inclined to horse-trade its rights under the agreement, nor is it required to execute authorizations for your clients," before signing off with a threat to seek "contempt sanctions" from the Shahs. **Exhibit B.**[2]

On October 11, 2022, the Shahs responded to counsel for GCI, explaining that they were not asking GCI to "horse-trade" its rights. Rather, counsel for the Shahs explained they were writing to seek:

> "GCI's consent for [the Shahs] to pursue a "powered on" extraction. To the extent GCI does not consent, the Shahs alternatively are willing to turn over the servers to GCI so GCI may do whatever it wishes with them. However, the Shahs are only willing to do so if GCI subsequently does not claim the Shahs have not satisfied their obligation to search the servers."

**Exhibit B**. On October 11, 2022, counsel for GCI responded again to the Shahs, "stating GCI is not required or inclined to negotiate or waive any of its rights under those Orders, or to grant any authorizations or consents" before, once again, threatening contempt sanctions against the Shahs. **Exhibit B**.

By simultaneously refusing to consent to the Shahs' searching the servers while also demanding the Shahs search the servers, it is clear GCI is attempting to trap the Shahs in a Catch-22, whereby GCI can allege spoliation of evidence if the Shahs do search the servers but also seek contempt sanctions if the Shahs do not search the servers due to fears of data destruction. Putting aside the obstructionism exhibited by GCI and its counsel in taking this position, GCI's position is especially confusing given it was **GCI who sought discovery into the servers.**

In light of this situation, the Shahs now submit this letter[3], seeking:

(a) an order finding that the Shahs are not required to perform any further searches on the servers because they are "fully inoperable"; or

---

[2] Counsel for GCI also suggested that the forensic memorandum, which was sent in a password protected link, could not be "downloaded or printed." Counsel for GCI never emailed the Shahs asking for a digital copy nor alerted counsel that they could not save the document. Nor can GCI claim they did not review the document. Dropbox's analytics show counsel for GCI (and presumably others) accessed and reviewed the memorandum at minimum eight times between Friday, October 7th, and Monday, October 10th.

[3] The parties have chartered an inconsistent path regarding the proper vehicle to raise issues with the the settlement agreement with the court. This matter is not in discovery. Rather, the case has been settled, and the parties are now disputing their obligations under an operating contract. Moreover, Rule 3C is based on Local Civil Rule 37.2, which holds that "no motion under Rules 26 through 37" of the Federal Rules of Civil Procedure shall be heard without an initial request for an informal conference. Of course, neither party is moving for relief under any of the Rules 26 through 37, as they are not applicable given the posture of this matter. For this reason, the Shahs have submitted a letter to the Court, as the Shahs are seeking non-dispositive relief. To the extent the Court wishes, the Shahs will happily resubmit this letter in the form of a letter-motion or a formal motion.

(b)  in the alternative, an order permitting the Shahs to satisfy their obligation to search the servers by producing the servers in their entirety to GCI; or

(c)  in the alternative, an order permitting the Shahs to attempt a powered extraction on a sample subset of servers, after which the Shahs will report back to the Court regarding the results of the extraction attempts so the Court may determine the appropriate next steps.

Finally, on a personal note, in its September 27, 2022 endorsement, the Court conveyed it did "not look kindly" upon delays it perceived in Defendants' compliance with its July 18, 2022 order. Both the Shahs and counsel for the Shahs greatly regret that the Court is of the impression that the Shahs have not attempted to diligently comply with the Court's order. To the contrary, the Shahs have attempted to comply with each and every facet of the Court's order, in the face of a number of obstacles that have significantly burdened the Shahs. Indeed, Nayana Shah is currently battling cancer and has recently developed an autoimmune condition which has prevented her from swallowing (and thus necessarily eating food). She is largely wheelchair bound. Vipin Shah, who had a quadruple bypass surgery in 2016, is suffering from numerous health complications and has functionally lost his hearing. The Shahs are also indigent, with less than $10,000 in their bank account—indeed, my firm has taken on this representation *pro bono* so the Shahs can keep any funds they have to pay for medical and litigation costs they have and may continue to incur. Despite all of this, both the Shahs and counsel for the Shahs have worked diligently since the Court's July 18, 2022 order to implement its directives, and will continue to do so moving forward.

## I.  **RELEVANT BACKGROUND**

### A.  **Vipin and Nayana Shah Invest and Lend Money to Jaina; Jaina Collapses**

Vipin and Nayana Shah first immigrated to the United States in the 1980s. Upon arriving in America, Vipin embarked on two jobs, working at--and eventually running--a convenience store, and, separately, running a phone card business. Through these two jobs, which routinely required Vipin to work 60+ hour weeks, the Shahs—over the span of multiple decades—were able to save and put away enough funds for them to own their own home, educate their sons, and enjoy a comfortable middle-class life.

In 2002, Jaina Systems Network Inc. ("Jaina"), was formed. Jaina was the brainchild of an individual named Surajit Bose. In order to fund the Jaina enterprise, Bose recruited Vipin's brother, Mahendra, to invest in Jaina in return for a 25% shareholder stake. Subsequently, Bose recruited another individual, Frank Vella, to invest in the company. Vella also received a 25% shareholding stake in exchange for his investment. Finally, in light of Vipin and Nayana's relative financial prosperity, Bose solicited the Shahs' investment. As with Mahendra, Nayana Shah was given a 25% shareholding stake in the Company in exchange for her investment. Bose retained 25% of Jaina's shares for himself.

Although Jaina was owned by four individuals, it was entirely run by Surajit Bose. This was confirmed by Govind Vanjani in a sworn affidavit submitted to New York Supreme Court, in which he stated that:

However, one of the rather amusing things about the Bose/Shah af-
fidavits is Mr. Bose description of himself as only a "shareholder of
Jaina compared with [Mahendra] Shah's description of himself as
its "president.' ***They both carefully avoid mentioning that Mr.
Bose, Jaina's founder and top officer (CEO) was and is clearly
[Mahendra] Shah's boss.***

**Exhibit C**.  Moreover, in an email to Mr. Vanjani from 2014, Surajit Bose made clear that while
there were four partners in Jaina, the other three wanted to "quit the association, allowing me to
run the Company" and that he alone was "running the Company" along with two associates'
help. **Exhibit D**. In his role as the CEO of Jaina, Bose oversaw all of Jaina's operations, includ-
ing its accounting, IT, and technical functions.

As Jaina's organizational charts made clear, the Shahs did not have any formal role in
Jaina. Instead, the only real interaction Vipin or Nayana Shah had with Jaina since its inception
was in the form of acting as lenders to Jaina, or in facilitating investments from other third-par-
ties on Jaina's behalf. Over the years, out of perhaps a misplaced sense of loyalty, Vipin and Na-
yana lent the near entirety of their life savings into Jaina. By the time Jaina collapsed in 2015,
according to calculations created by Surajit Bose himself, the Shahs had lost over $1,750,000 to
Jaina, the near entirety of their hard-earned life savings. **Exhibit E**.

Under Bose's calamitous leadership, Jaina incurred significant debts to a number of par-
ties (including the Shahs) without any realistic chance of paying them back. Beginning in 2014
and 2015, Bose's house of cards began to fall, and by 2015, Surajit Bose had fled the country,
leaving the Shahs and Mahendra Shahs as the only stateside representatives of Jaina (and thus
subject to countless lawsuits). As Bose himself acknowledged in an email sent April 2015, Jaina
had defaulted on its salary obligations beginning December 2014, its network payment obliga-
tions in February 2014, its rent obligations in the United States in January 2014.  **Exhibit F**. As
one of Jaina's largest lenders, the Shahs (just like GCI) were victims of Bose's terrible misman-
agement of Jaina, with their entire life savings squandered away. By 2017, as a result of both
Jaina's collapse and this litigation, the Shahs were forced to declare personal bankruptcy.

**B.  After Jaina's Collapse, Jaina's Equipment (Including its Servers) Are Aban-
doned at the 235 Hillside Suite B Location**

For the entirety of Jaina's existence, Jaina operated out of a complex at 235 Hillside Ave-
nue, Williston Park, NY 11596 ("235 Hillside"). The 235 Hillside complex has two components,
a street facing storefront building ("Suite A") and then an office building behind the storefront,
with a garage connected to it ("Suite B"). Vipin Shah's convenience store was located in the
street facing storefront (Suite A); Jaina's was located in the back (Suite B).



As already discussed, by January 2014, Jaina failed to make rent payments for its space at 235 Hillside. By 2015, Jaina no longer existed as a company. It had no employees (let alone IT professionals), no active networks, and no ongoing operations. Rather, with Surajit Bose's departure from the United States, Jaina's equipment and other materials were left abandoned in 235 Hillside's garage. To the best of the Shahs knowledge, no one used the Suite B premises after Jaina's collapse.

In 2016, the 235 Hillside complex was sold to a third-party. After the sale, the Shahs rented out Suite A (pictured above) from the new owner of 235 Hillside. Suite B and the garage, however, stayed in possession of the new owner (as detailed above). All of Jaina's abandoned furnishings and equipment (including apparently its computer systems and IT servers) remained in Suite B and the garage, absent a selection of equipment which Jaina had received in loan from a third-party and which was reseized by the lender.

At some point in the preceding years, the Shahs understand there was a significant flooding event in Suite B and the garage. The Shahs understand that in the period after the flooding, the property owner committed to renovating Suite B and turning it into a professional space for a dentistry practice. In the resultant cleanup and renovation, the Shahs understand Jaina's remaining items in Suite B were moved to Suite B's garage.

### C.  The Settlement Agreement and the Court's July 18, 2022 Order

On July 1, 2021, the Shahs and GCI settled this litigation. As part of the settlement agreement (the "Agreement"), the Shahs agreed to engage in limited post-settlement information searches.[4] Dkt. 338. Given the Shahs' precarious financial position at the time of settlement (which, indeed, was the primary motivation for the Shahs' entrance into the settlement in the first

---

[4] As the Court is aware, the parties discussed an only-cash settlement of $75,000 and $100,000 but could not reach that result because the Shahs did not have that amount of funds available.

place), the Shahs offered to commit to extensive searches for physical documents (which, for the most part, are not expensive but time consuming) while seeking to limit their obligation to search ESI to "electronic devices" (undefined in the Agreement) and, further, only those devices that were in their possession, custody, or control. **At no point in the negotiations did the parties <u>ever</u> discuss Jaina's servers or the Shahs potentially searching them. The Agreement does not explicitly refer to any searches of servers.**

Immediately following the July 1, 2021 settlement, the Shahs paid GCI the settlement amount (*i.e.*, $50,000) and promptly began to comply with the searches required by the Agreement. As a result of these searches, the Shahs produced over 10,000 documents (encompassing over 90,000 pages) to GCI. The breadth of the Shahs' production was enormous, and included extensive financial and accounting papers for Jaina, correspondence between Jaina and its investors regarding the company's finances, tax records, and invoices.[5]

Despite the Shahs' voluminous production, counsel for GCI refused to allow the settlement process to move forward and instead argued, for the first time, that the Agreement not only called for searches of electronic devices that the Shahs possessed or used but also any devices that were used by Jaina. The Shahs disagreed. Rather, the Shahs took the position that the Shahs were only required to search for physical documents in the 235 Hillside location, their residence, and in premises used by the Entities. As for ESI, the Shahs were of the position that Vipin and Nayana were only obligated to search those electronic devices that they had possession, custody, or control over, that they did not have control of Jaina's devices, and that electronic devices was intended to refer to personal devices such as phones, computers, and tablets.

On July 18, 2022, the Court resolved a number of the parties' disputes. With regards to ESI searches, the Court found the Shahs would need to search electronic devices (defined by the Court to include servers, IT infrastructure, and email accounts) that were used by Jaina or the Entities. Importantly, the Court noted those searches would need to occur when they were "practicable" and when they were likely to result in the discovery of responsive documents. Dkt. 350. With regards to Jaina's computer systems, the Court noted the Shahs would need to search the servers provided they were not "rendered fully inoperable." Dkt. 350. In its order, the Court did not define what would make the servers "fully inoperable."

## II.    THE VENDOR'S FORENSIC ASSESSMENT

Two days after the Court's July 18, 2022 order, the Shahs contacted one of the country's leading e-discovery vendors, Contact Discovery, to determine the scope and feasibility of searching the servers. Given that the servers had not been accessed or used for at least five years, the fact that they were not connected to any active network, and the Suite B garage was unelectrified, the vendor assessed that it would not be able to complete an assessment onsite and any search would require retrieving the servers and bringing them to the vendor's forensic examina-

---

[5] Indeed, the Court will notice that nearly all of the documents GCI has relied on in recent motion practice has born the Bates stamp "SHAH," which refers to a document produced by the Shahs as a part of this post-settlement process.

SPIRO HARRISON

tion laboratory in Washington DC. Despite the considerable costs associated with such an examination, and the clear observable fact that the servers were not operable, the Shahs agreed with this approach.

The Shahs have attached Contact's forensic assessment report, dated October 7, 2022, as **Exhibit A** to this letter. The report makes the following findings:

(a) The servers have not been used or operated for many years;

(b) The servers are not operable or in functioning order;

(c) The servers have suffered extensive water damage, which has also led to considerable rust and mold damage. In particular, the vendor noted "extensive mold across the entire population of equipment" and "visible mold growing on the internal components of the server equipment."

(d) Traditional techniques related to extraction of data from servers involve either (i) powering on the server network; or (ii) individually powering on each individual server and attempting extraction. In this case, given the extensive water damage to the servers, there is a risk that powering on the servers may further degrade the data on the servers.

(e) The only process that can potentially mitigate the risk of electrification of the servers would require contracting to an even more specialized vendor, at an estimated cost ranging between $200,000 to $500,000.

(f)  Even if data were able to be extracted from the servers, there is still a chance the data recovered will not be usable, either due to damage resulting from the environmental degradation of the servers or due to access issues. As the Shahs made clear to counsel for GCI in 2018, the Shahs do not have encryption keys associated with the servers.

Upon receipt of the Report, the Shahs promptly transmitted it to GCI. Based on the report's findings, the Shahs believed that they had satisfied their search obligations and the vendor's report confirmed the servers were "fully inoperable."

With that being said, the Shahs did not feel comfortable ceasing their diligence regarding the servers for a few reasons. First, the Court's July 18, 2022 order does not define "fully inoperable," and while the Shahs believe that phrase accurately describes the servers, they wished to err on the side of caution. Moreover, the Shahs recognized the vendor's findings described a circumstance which the Court may not have considered—*i.e.*, where any extraction effort that involves powering on the servers would carry a risk of damaging the servers because of the water damage. In light of the possibility that the Court may have not foreseen this circumstance, the Shahs believed it best to present a proposal to GCI on how to proceed with the hope of avoiding needless further intervention by the Court.

Principally, the Shahs offered to conduct a "powered on" extraction effort on a subset of the servers, with the goal of (a) determining whether data could be extracted from the servers;

8

and (b) the extent of damage such extraction efforts might have. The Shahs proposed "powering on" only a subset of servers for a very simple reason: in case electrification of the servers did damage the relevant hardware, the remaining population would still be preserved. Under the Shahs' proposal, after the sample extraction, the parties would meet and confer regarding the results and the appropriate next steps. Given the risk that "powering on" any of the servers might degrade some of the data, however, the Shahs sought GCI's consent before undertaking that option.

In the alternative, the Shahs also offered to forego further extraction efforts and instead hand over the servers to GCI so it could pursue its own forensic examination. The Shahs felt this was an optimal solution for a number of reasons. *First*, it would allow GCI (who is requesting the server searches) to determine the appropriate risk-reward with regards to extraction efforts. *Second*, it would remove GCI's already stated (and completely premature and unfounded) fear that the Shahs would not properly search the servers. *Finally*, it would provide GCI with the ability to run unlimited searches on the servers, as opposed to the discrete set of searches provided for in the Agreement. The Shahs however were only willing to pursue this option if GCI agreed it would not subsequently allege the Shahs breached the agreement by failing to search the servers.

On October 10, 2022, three-days after the Shahs shared the vendor's report and their proposals, counsel for GCI tersely responded to the Shahs. Rather than squarely address the Shahs' proposals, counsel for GCI merely responded "GCI is not required or inclined to horse-trade its rights under the agreement, nor is it required to execute authorizations for your clients to do what the Orders already require them to do," before threatening the Shahs with "contempt sanctions." **Exhibit B.**

On October 11, 2022, the Shahs responded to counsel for GCI, explaining that they were not asking GCI to "horse-trade" its rights. Rather, counsel for the Shahs explained they were writing to seek:

> "GCI's consent for [the Shahs] to pursue a "powered on" extraction. To the extent GCI does not consent, the Shahs alternatively are willing to turn over the servers to GCI so GCI may do whatever it wishes with them. However, the Shahs are only willing to do so if GCI subsequently does not claim the Shahs have not satisfied their obligation to search the servers."

**Exhibit B**. On October 11, 2022, counsel for GCI responded again to the Shahs, "stating GCI is not required or inclined to negotiate or waive any of its rights under those Orders, or to grant any authorizations or consents" before, once again, threatening contempt sanctions against the Shahs. **Exhibit B**.

GCI's response was neither helpful nor constructive. Nor was it accurate. Contrary to GCI's claim, the July 18, 2022 order does not squarely address the circumstance presented here. Given the significant stakes involved (*i.e.*, potential risk of further degradation of the servers through data extraction efforts), the Shahs were plainly correct to (a) inform GCI of this consideration; and (b) seek GCI's consent before undertaking any further searches. Moreover, the

Shahs' plan was eminently reasonable, and devised to sample the servers with the goal of helping the parties making an informed decision regarding next steps. However, as it has done throughout this Agreement, GCI rejected the Shahs' good-faith outreach, and instead responded with intransigence.

For this reason, the Shahs now write to the Court seeking clarification of its responsibilities in light of the vendor's report. In particular, the Shahs seek from the Court:

(a) an order finding that the Shahs are not required to perform any further searches on the servers because they are "fully inoperable"; or

(b) in the alternative, an order permitting the Shahs to satisfy their obligation to search the servers by producing the servers in their entirety to GCI; or

(c) in the alternative, an order permitting the Shahs to attempt a powered extraction on a sample subset of servers, after which the Shahs will report back to the Court regarding the results of the extraction attempts so the Court may determine the appropriate next steps.

Each of these requested reliefs is described below.

## III.     REQUEST FOR RELIEF

### A. The Shahs Request The Court Order They Are Not Required To Perform Further Searches Because The Servers Are "Fully Inoperable"

In its July 18, 2022 order, the Court found that the Shahs must search the servers provided they have not been rendered "fully inoperable" by the flooding and associated water damage. Dkt. 350. Although there is no precise definition for what renders a piece of equipment "operable" or conversely "inoperable," any consideration of operability must inquire at some point whether the device can be used—in some fashion—as intended. *See* Cambridge Dictionary (defining operable as the quality of being "able to be used").

Here, the servers located at 235 Hillside cannot be used as servers in any capacity as a result of the water and mold damage that has developed on the servers. As the Report explains, the servers are not in "functional order." While data *may* be able to be extracted from the servers, the servers themselves will not be able to be used as servers in the future. Per the terms of the Court's order, the Shahs thus do not believe they have any further obligation to search the servers given that they are no longer functioning.

Furthermore, in wake of the vendor's report, the balance of equities favors a finding that the Shahs' have satisfied their obligation to search the servers. The Shahs' obligations to search the servers comes from the Agreement. Of course, the Agreement does not specifically refer to the servers or explicitly require the Shahs to search the servers. Rather, Section 1(b)(iii)(c), which obligates the Shahs to search "electronic devices" owned by the Shahs or the Entities that are in the Shahs' possession, custody, or control. The Agreement itself does not define "electronic devices," and in previous briefing the parties have strongly disputed what was intended by that term's use. In its July 18, 2022 order, the Court found "electronic devices" encompassed

data servers. Had the servers been operable, online, and maintained, it is arguable (although the Shahs would not agree) that the search required would reasonably fit within the type of efforts the parties agreed for the Shahs to have to undertake in Section 1(b)(iii)(c). However, it is simply implausible that the parties mutually intended for the Shahs to have to conduct an extensive, forensic recovery of moribund, water damaged servers in drafting Section 1(b)(iii). Indeed, as the Court knows, the Shahs were unable to offer a "six-figure" settlement to GCI because they did not have the funds available. There is no basis to believe that, at the same time, the Shahs intended to agree to a settlement that could obligate them to such an expensive endeavor.[6]

Moreover, in light of the vendor's report, it is clear the burden of continued searches is not proportional to the likely benefit of the searches. Most obviously, the servers have suffered significant water damage, which has resulted in extensive mold damage as well. Thus, as the vendor's report makes clear, even if the data is able to be extracted, that does not speak to whether it will be usable or whether it has been corrupted. Moreover, in all likelihood the servers will require passwords and other forms of encryption codes to be accessed, which neither the Shahs nor GCI possess, and which the Shahs understand GCI did not uncover from parties who might be able to provide that information (*i.e.*, Surajit Bose) when they were in contact with them.

Contrasted against this highly diminished benefit, the burden of further searches is likely to be extensive. As described the vendor's report, the servers are not operational and have not been actively used or maintained for over seven years. Unlike instances where discovery is sought against an active corporate entity with active servers, any extraction of server data will necessarily require forensic imaging of each server drive along with the possibility of having to rebuild the servers in order to even access the data. This is an extraordinarily complex, time consuming, and difficult process, with an uncertain cost trajectory that could range in the tens to hundreds of thousands of dollars. Even then, these techniques are only relevant for extracting the data; post extraction, the data will still need to be accessed (including decryption), digested, and then prepared for review, and (assuming all of that goes well), produced.

While this would pose a considerable burden on any party, it is essentially impossible for the Shahs to meet given their limited resources. As described above, the Shahs are indigent (almost entirely due to their lost loans in Jaina, medical expenses, as well as the instant litigation) and have less than $10,000 in their bank account. While counsel for the Shahs has taken on this representation *pro bono*, this is not work that can be undertaken by counsel for the Shahs and instead requires contracting with sophisticated private vendors. Already, the process of having the vendor assess the servers has cost the Shahs $10,000. Finally, as explained earlier, the Shahs are currently going through significant personal difficulties which has already posed considerable burden on them. Nayana Shah is currently battling cancer and has recently developed an autoim-

---

[6] Indeed, a reading of the Agreement that would encompass a search of no longer functioning or operable servers would directly contradicted the stated purpose of the Agreement, reflected in its preamble, which states the parties reached it to "limit any further costs and expenses relating thereto" the litigation.

mune condition which has prevented her from swallowing or eating food. She is currently wheel-chair bound. Vipin Shah, who had a quadruple bypass surgery in 2016, is suffering from numerous health complications and has functionally lost his hearing. Despite this all, the Shahs have consistently attempted to comply with the Court's order fully, which will be made apparent in the compliance letter the Shahs are planning on filing by the compliance deadline of October 18, 2022.

The Shahs thus request the Court order they have satisfied their obligation to search the servers because the servers are "fully inoperable." In addition, this Court should, separate from the operability inquiry, determine the Shahs have satisfied their search obligations because of the limited benefit any such search is likely to confer to GCI in relation to the disproportionate, and devastating, burden it will render on the Shahs.

### B. In The Alternative, The Shahs Request The Court Order The Shahs May Fulfill Their Search Obligations By Producing The Servers, In Their Entirety, To GCI For GCI's Inspection

To the extent the Court does not believe the Shahs have fulfilled their obligation to search the servers, the Shahs request an order from the Court permitting them to satisfy their obligations to search the servers by producing the servers, in their entirety, to GCI.

As a general principle, forensic examination of an opposing parties' devices is considered an extraordinary remedy granted ***in favor*** of the requesting party. Indeed, in weighing whether inspection of devices is warranted, courts generally consider how prejudicial such inspection would be to the ***producing party***.

Here, GCI has refused to consent, or take a position, on the Shahs "powering on" of the servers in order to attempt to extra data from them. **Exhibit B**. Despite the Shahs' outreach regarding this issue, counsel for GCI failed to offer any basis for their unwillingness to consent to the search, except to threaten sanctions against the Shahs if the Shahs did not produce server documents by October 18, 2022. Of course, production of server documents can only occur if the server data is extracted, which, at this juncture, requires the parties to make a determination whether to "power on" the servers.

In light of GCI's refusal to agree to a "powered on" search, as well as its failure to even meet and confer on this issue in good faith, the Shahs request that the Court find that the Shahs may satisfy their obligation to search the servers by producing the servers, in their entirety, to GCI.

Production of the servers to GCI should be deemed satisfactory for a number of reasons. *First,* as GCI is the party seeking this discovery, turning the servers over to GCI will allow GCI to determine for itself how it wishes to balance, on one hand, a desire to search the data on the server, with, on the other hand, the risk that data extraction efforts may damage the data. *Second*, providing GCI with the servers will provide GCI with more access to potential information than bargained for in the Agreement, as searches of the servers will not be limited to the keywords identified in Appendix A of the Agreement but to any types of searches GCI wishes. *Third,* permitting the Shahs to produce the servers to GCI will likely avoid needless future disputes between the parties regarding the server searches. Before the vendor's report was finished, GCI made clear to

the Court (and the Shahs) that it would consider any inability by the vendor to extract data a clear sign of "spoliation of evidence." Of course, GCI's proclamation—made before *any* findings had been made on the server—was entirely premature and unfounded. But moreover, it revealed that GCI has no intention of believing anything reported by the Shahs or—by extension—its vendor. By permitting the Shahs to produce the servers to GCI, GCI will be able to have its own vendor examine the servers (whose findings it presumably it will trust).

### C. In The Alternative, The Shahs Request The Court Authorize The Shahs To "Power On" A Subset Of The Servers To Determine The Feasibility Of Extracting Data And Risk Of Damage

Finally, to the extent the Court denies the Shahs' above-referenced requests for relief, the Shahs request the Court authorize the Shahs to proceed with "powering on" of the servers to extract data. The Shahs are seeking this authorization due to the vendor's report, which makes clear that introducing electricity to the hardware (the traditional approach to server data extraction) may result in data damage due to the server's water damage. While the Court's July 18, 2022 order requires the Shahs' to "search" the servers, the Shahs believe the Court did not at the time foresee the instant circumstance—*i.e.*, where a traditional search of the servers could result in corresponding damage to the servers. The Shahs thus seek (and should have the right to seek) permission from the Court before proceeding with an extraction technique which could risk damage to the servers.

As explained above, the Shahs initially reached out to GCI to procure its consent to this approach, which would have avoided the need for Court intervention at this juncture. For reasons unknown to the Shahs, counsel for GCI flat-out refused to engage with the Shahs regarding this topic, **despite the fact that it is GCI that has requested the servers to be searched**. Rather, GCI claimed they were not "required or inclined" to offer any authorizations or consents to the Shahs, and they would seek contempt sanctions if the Shahs did not produce server documents by October 11, 2022. In making this statement, GCI appears to have conveniently ignored the fact that production of any server documents requires extraction of data from the server, which was the subject of the Shahs' outreach.

The Shahs would propose that, with Court permission, they "power on" a subset of servers to determine (a) whether data can be extracted from those servers; (b) whether introducing electricity risks damage to the servers. After that assessment is made, the Shahs can report back to the Court, after which the Court can determine appropriate next steps.[7] The Shahs propose only applying this extraction method to a subset of servers at first to ensure that—if electrification does lead to damage—the entire server population is not affected. If extraction is not possible, the Court can then consider the appropriate remedy (*e.g.*, finding the Shahs do not need to perform further searches or shifting the cost of further discovery, including mitigation attempts, to GCI).

---

[7] While in a traditional context, the parties should be expected to work together to resolve these type of disputes, GCI's instant behavior makes clear it cannot be trusted to act in good faith in this process. Thus, the Shahs propose the Shahs directly report to the Court regarding the findings of the searches as well as to determine next steps.

SPIRO HARRISON

### **Conclusion**

In the Court's July 18, 2022 order, the Court required the Shahs to search a series of servers at 235 Hillside as long as the servers were not "fully inoperable." The Shahs dutifully contracted with a vendor to assess the conditions of the servers and to extract data from them if possible. The vendor's analysis, however, made clear the servers had suffered considerable water damage, which meant traditional extraction techniques could, in turn, lead to further degradation of the servers. When the Shahs attempted to meet and confer with GCI regarding this, GCI rebuffed them. In essence, GCI both refused to consent to the Shahs searching the servers and threatened the Shahs with sanctions if they did not search the servers.

The Shahs thus humbly request the Court order the relief requested in this letter. The Shahs have nothing to hide or conceal—indeed, the Shahs have offered to transfer the servers to GCI so GCI may conduct its own examination and searches. Nor do the Shahs have any interest in prolonging this post-settlement process. As explained above, the Shahs are indigent and of extremely poor health. With each passing day, the Shahs continue to accrue extensive litigation costs (including, now, storage fees for the servers near the vendor's office). Despite this, the Shahs will not be bullied by GCI into conducting potentially risky searches without clear authorization to do so from the Court, which it seeks now if the Court finds the Shahs must continue to search despite the servers' condition.

Respectfully submitted,

Shomik Ghosh