# SPIRO HARRISON

250 Greenwich Street, 46th Floor
New York, NY 10007
spiroharrison.com

Shomik Ghosh
Office: (973) 232-0881
sghosh@spiroharrison.com

October 18, 2022

**VIA ECF and EMAIL**

Hon. Katherine Polk Failla
United States District Court for the Southern District of New York
40 Foley Square, Room 2103
New York, New York 10007
Failla_NYSDChambers@nysd.uscourts.gov

**Re: Status Letter re Shahs' Compliance with Settlement Agreement, GCI v. Shah, Index No. 15-cv-01756 (KPF)**

Dear Judge Failla:

I am counsel to Vipin and Nayana Shah (the "Shahs") in the above-captioned action. I have represented the Shahs *pro bono* since my firm took over this matter in May 2022. I write in response to the Court's September 27, 2022 order, which required the Shahs to report back by October 18, 2022 on the status of certain diligence efforts the Court determined were required by a settlement agreement entered between the parties on July 1, 2021 (the "Agreement"). Accordingly, this letter provides the Court with a status report regarding the Shahs' compliance efforts while seeking an order from the Court finding, *inter alia*, the Shahs have satisfied their obligations under the Agreement, with a possible exception for the server dispute which is discussed in the parties' competing letters submitted October 11, 2022 and October 17, 2022.

As the Court will see, the Shahs—despite enormous personal difficulties—have engaged in all of the diligence efforts required by the Agreement (as interpreted by the Court in its July 18, 2022 order). The Shahs have done so at great personal expense. Indeed, the basic economics that motivated the initial settlement have all but vanquished. Whereas the Shahs sought to enter into the Agreement to (as stated in its preamble) "limit further costs," they now are completely indigent, with little funds available to pay for their medical and life expenses.

And yet, even as the Shahs' "all-in" settlement costs continue to increase, GCI argues (louder than ever before) the Shahs have not done enough. No matter what steps the Shahs take, GCI's objections persist, despite GCI's knowledge that this was not the Agreement the parties intended to follow. Rather, GCI appears to have set itself out on a mission to "monetize" the Agreement itself: *i.e.*, finding any way to allege a breach of the Agreement and recover more money from the Shahs. This behavior reached its nadir over the last week, during which counsel

for GCI frivolously threatened "contempt sanctions" against the Shahs—who are elderly, ill, and indigent—and their *pro bono* counsel, and, separately, with absolutely no basis, identified one of the Shahs' sons (a private individual who is not a party to any matter before this Court) on a public docket before insinuating he might be conspiring with the Shahs' vendor (one of the country's leading forensic vendors) on the sole basis that his resume suggested he had familiarity with informational technology.

For the foregoing reasons, the Shahs submit this letter to (a) apprise the Court of the Shahs' compliance efforts; (b) request an order from the Court finding that the Shahs have satisfied their obligations under the Agreement (with possible exception of the server issue); (c) request the Court permit the Shahs to submit a reply letter if GCI ultimately seeks to respond to this letter; (d) instruct GCI to abstain from future threats of contempt sanctions against the Shahs, who are elderly, ill, and indigent, or their *pro bono* counsel; and (e) direct counsel for GCI to re-file its letter of October 17, 2022 removing reference to the Shahs' son, who has no role in this litigation and should not have been named on a public docket.

This letter proceeds in the following order: Section I presents a brief survey of the underlying actors involved in this dispute so the Court has context in understanding the searches taken by the Shahs; Section II briefly details the history of the Agreement as well as the provenance of post-agreement disputes between GCI and the Shahs; Section III details the Shahs' previous compliance efforts; Section IV describes the Shahs' current full compliance with the Agreement; and Section V seeks relief from this Court in the form of an order finding the Shahs' have fully complied with the Agreement (as interpreted by the Court in its July 18, 2022 order).

## I.   BACKGROUND

Vipin and Nayana Shah are residents of Williston Park, New York. Both the Shahs are elderly, and in recent years have faced considerable medical issues. Nayana Shah is currently battling lymphatic cancer, while at the same time dealing with an autoimmune condition which prevents her from swallowing (and thus eating). **Exhibit B** ¶ 3. She is, for the most part, wheelchair bound. **Exhibit B** at ¶ 3. Vipin Shah suffered a quadruple bypass heart attack in 2016 which has since affected his speech, memory, and health. Moreover, in recent years, Vipin has lost his hearing. The Shahs are also indigent. As of October 18, 2022, the Shahs have less than $13,000 in their bank account. **Exhibit B** at ¶ 4.

The Shahs' calamitous financial condition is almost entirely due to the collapse of Jaina Systems Network, Inc. ("JSN"). JSN was formed in 2002 as a project between Vipin's brother, Mahendra, and an aspiring entrepreneur Surajit Bose. While Mahendra was JSN's initial investor, he had no technical knowledge, and instead relied entirely on Bose (an engineer) regarding JSN's management. For Bose's expertise, Bose received 25% shares in JSN (whereas JSN's other three shareholders received their shares in exchange for investing in the Company). At the same time he led JSN, Bose also served as the CEO of Jaina Systems Network (India) Pvt. Ltd., a wholly separate sister entity of JSN which was located in Kolkata, India. Bose owned Jaina Systems Network (India) Pvt. Ltd. with other individuals. That Shahs never had any ownership stake in Jaina Systems Network (India) Pvt. Ltd.

SPIRO HARRISON

As the head of JSN and Jaina Systems Network (India) Pvt. Ltd., Bose was in charge of Jaina. That Bose was the head (both in title and in operation) of JSN until 2015 has already been agreed to by all parties in this litigation. In a December 2014 email to GCI's President, Govind Vanjani, Bose reflected on the condition of the Jaina entities, which were collapsing at the time. In particular, reflecting on JSN specifically, Bose stated that "I am running the company along with [two employees in India]." **Exhibit C**.[1] In that same email, Bose stated that "all [of the part-ners], except me want to quit the association" and that "most of the shareholders had lost interest in the company, except myself and my team." **Exhibit C**. GCI also understood that Bose was the head of JSN. In an affidavit filed in New York Supreme Court, GCI's President, Govind Vanjani, outright rejected that Mahendra Shah ran JSN, stating "Mr. Bose, Jaina's founder and top officer (CEO) was and is clearly Mr. Shah's boss." **Exhibit D** at ¶ 9. Indeed, Vanjani, testifying on GCI's behalf, stated it was "humorous" to claim Bose was not in charge.  **Exhibit D** at ¶ 10. As Vanjani stated, he could "personally attest" that Bose was "hands on" and that it was Bose who "personally wired the money due to all carriers from his Blackberry." **Exhibit D** at ¶ 10. Indeed, GCI's strange argument that Bose was not JSN's CEO until 2015 is firmly defeated by a draft settlement agree-ment GCI prepared with Bose, which was emailed from Govind Vanjani to Bose on January 21, 2015. **Exhibit E**. As the first paragraph states, the putative agreement would be between GCI and "the founder and CEO of Jaina Systems Network, Inc. [x], Surajit Bose." **Exhibit E**.

In recent filings, GCI has begun to abruptly change course on its prior statements, and instead claim that it was the Shahs who ran Jaina and that Bose was only a mere "director" of JSN. *See* Dkt. 356, Loree Letter at Pages 12-13. As proof of this, GCI points to the supposed fact the Shahs forced Bose to resign in 2015. *See* Dkt. 356 at 13. And yet, reviewing GCI's "proof" for this claim (Dkt. 356, Exhibits R, S, T), all it shows is that Vipin passed along a draft resignation letter to Bose in October 2015 prepared by Jaina's attorneys which Bose then endorsed. Rather, Bose's resignation (which appears entirely voluntary) confirms what the Shahs have always known—Bose was, and held himself out as, CEO of JSN at least up until October 2015. **Exhibit F**. Likewise, while GCI points to an email from Mahendra Shah where he "threatens to turn Jaina's switches off," that email was in 2016, well after Bose's tenure as JSN's CEO was over, and after Bose had abandoned JSN and pegged the Shahs as the scapegoats for his disastrous leadership.

Indeed, that GCI suggests the Shahs were wrong to want Bose to resign suggests GCI's current position is the product of an ulterior motive. Bose's leadership of JSN was calamitous. Under Bose's leadership, the Jaina entities incurred significant debts to a number of parties (in-cluding the Shahs) without any realistic plan of paying them back. Indeed, in Bose's December 2014 email to Vanjani, he admitted Jaina had a debt burden of $8,000,000. **Exhibit C**. As Bose himself also acknowledged in an email sent April 2015, the Jaina companies had defaulted on its salary obligations beginning December 2014, its network payment obligations in February 2014, while Jaina Systems Network, Inc. had failed its rent obligations in the United States in January 2014. **Exhibit G**. By the time Bose left JSN, JSN was bankrupted and hollowed out, with creditors around every corner. Indeed, a spreadsheet that Bose himself prepared and sent shows that, by

---

[1] There can be no debate Bose was referring to JSN, as he had identified JSN and its shareholders right above.

January 2015 (when Bose was still CEO), Jaina had taken in $4,626,940 in loans to certain individuals and only paid out a measly $702,000. **Exhibit H**.

Of all the parties who suffered from Bose's mismanagement, Vipin and Nayana stand out. The Shahs had no role in JSN's operations, IT, or accounting. Rather, out of a likely mistaken sense of family loyalty, the Shahs served as one of JSN's primary bankrollers, a perpetual piggy bank from which Bose would take loans to keep his increasingly failing Jaina empire afloat. The sheer number of loans provided by Vipin over the years is staggering. By the time JSN collapsed in 2015, according to calculations created by Surajit Bose ***himself***, the Shahs had lost over $2,000,000 in loans. **Exhibit H**. This represented all of Vipin's life savings and rendered him and Nayana broke despite working their whole lives.

Most perversely, with Bose's departure, the Shahs—who according to Bose himself had lost more to Jaina than even GCI—were left holding the bag for all of Jaina's (considerable) liabilities. GCI attempts to suggest the Shahs are bad-faith actors because they plotted to "blame" Bose for JSN's collapse. *See* Dkt. 356, Exhibit U. And yet, the Shahs **did blame** Bose for JSN's collapse, because he was responsible for it. That the Shahs genuinely felt aggrieved by Bose's leadership is confirmed by private communications between the Shahs and Bose around the same time. In one email, after receiving GCI's Third Amended Complaint, Mahendra Shah emailed Bose. As he stated in that email:

> We gave all money to Jaina on your words to keep the company alive. But you always lied. You never told us the truth. You & Ravi did lot of things behind me & vipin & we lost millions of money due to all your decisions. Never discuss the with me or Vipin & always lied about the business. Never ever give outgoing & incoming report (actual report) & lied all the time & made lots of loss. I borrowed money from my brother-in-law ,pooja's nephew , my nephew & his friends ,vipin's friends & relatives. How & when I will be able to pay all these money ? Do you have any answer. I put my building on Lien & get 600k that also you lost. Finally I have to sell it. Cause you made my situation so bad I have to sell it. You destroyed me & vipin's family financially. Today I don't have any money left to run my household expense. I don't have any money to give lawyers who can defend me from GCI's personal lawsuit. These all happened due to you. You are the "Creator" for these all situation. You lived lavishly on company's money until it dies. You always abused company's money, company's credit cards. What a misuse. Not only that you never paid to credit cards bill or all carrier's money. Always you misuse your skill. You never let me know about the company what's going on. You use me like a rubber stamp even if I was the president of the company. Cause I didn't have computer knowledge & trust you blindly. Very bad things you did. I don't know these "Karmas " can let u sleep. There is no ethic left in you.

**Exhibit I**.

Ultimately, Bose never responded to Mahendra or Vipin nor stood to account for his decisions as Jaina's CEO. Rather, it was Vipin Shah who was named as a Defendant in this action, just as his health catastrophically worsened, resulting in a quadruple bypass in 2016. Saddled by their JSN losses, medical bills, and costs from this action, the Shahs—who had once saved upwards of a million dollars through hard work—were forced into personal bankruptcy in 2017.

## II.    THE AGREEMENT

On July 30, 2018, the Court granted summary judgment for all Defendants in this action except Vipin Shah. About a year earlier, Vipin's last attorney—Anil Arora—had removed himself from the case because Vipin and Nayana were bankrupt. By June 2021, Vipin's trial was fast approaching a start date in July. At the encouragement of his sons, Vipin hired the Mandel Bhandari firm. Soon after, the parties began settlement negotiations, with the hope the money set aside for a trial could instead be provided to GCI in exchange for settlement.

On July 1, 2021, the Shahs and GCI settled this litigation. The principal benefit of the Agreement (as defined in the preamble) for the Shahs was the "limit[ation] [of] any further costs and expenses" related to the litigation, both through dismissal of the current litigation but also release from future legal action. Dkt. 338. Indeed, by this point, the Shahs were indigent. Thus, while the parties (including in the presence of Your Honor) discussed a purely cash settlement, the Shahs could not agree to it because they did not have the funds it seemed GCI would require to settle for only cash (*i.e.*, $100,000 or $75,000 with GCI paying its own post-settlement discovery costs).

Rather, per the Agreement, the Shahs agreed to pay $50,000 as well as engage in a limited subset of post-settlement information searches. Given the fact that the Shahs were committing functionally all of their available funds into the $50,000 payment, those searches were intended to limit the monetary costs that would be required of the Shahs. Rather, the intended currency, so to speak, of the searches was the Shahs' effort, which—although time consuming—was free. Thus, the Agreement (as the Shahs understood it at the time) required the Shahs to only search the property within which their convenience store operated (*i.e.* 235 Hillside, Williston Park, New York ("235 Hillside")), their residence, as well as any electronic devices (owned by them or certain Jaina entities) in their custody, possession, or control, which they understood to mean devices they might use but were technically owned by another party. Moreover, the list of actual entities the Shahs would have, in one way or the other, to search was limited to three US-based Jaina-related entities (Jaina Systems Network Inc., Jaina Infrastructure Inc., and Ipsita Telecom Services, Inc. (the "Settlement Jaina Entities")), as well as two entities associated with the Shahs' convenience store and tobacco shop (Neminath Inc. and 235 Hillside LLC, respectively) (collectively, the "Settlement Entities"). Because those searches would be limited, both in geographic and technological scope, the Shahs expected they would be relatively inexpensive to perform and, on that basis, entered into the Agreement.

The purposes of the searches (outlined in Section 1(b)(iii)) was to uncover information on a category of documents that GCI was interested in. Seven of the nine categories related to Jaina Systems Network Inc.'s financials and accounting ***between a limited period between 2011 to 2015*** (with most further narrowed to cover 2012-2015). Dkt. 338 at 2. The other categories related to a sale by Neminath of the 235 Hillside complex to a third-party in 2016 and prior interactions with

that third-party in 2013. Thus, fairly stated, the primary years of focus for the post-settlement searches was 2012-2016.

In addition to the post-settlement information searches, the Agreement also called on the Shahs to take a number of other actions. First, as mentioned earlier, the Shahs were obligated to pay $50,000 to GCI. Dkt. 338. There is no dispute that payment was made. In addition, the Shahs were obligated to cooperate with GCI on the preparation of filing requests to the IRS for the Settlement Entities. There is no dispute the Shahs assisted GCI in preparation of those requests. The Agreement also included in categories of documents to be searched for three lists, addressing JSN's partnership structure, a list of lenders who loaned money to JSN, and a list of bank accountings for the Settlement Entities. Finally, upon the Shahs' production of documents, the Agreement obligated Vipin to sit for a 7-hour interview with counsel for GCI.

The Agreement also contained a broad release provision for both parties. Critically, the release was to go into effect upon the Shahs' payment of the $50,000 (which was before the Shahs' document production deadline under the Agreement). In particular, the Agreement states that upon receipt of the $50,000, GCI:

> irrevocably and unconditionally releases, covenants not to sue, acquits and forever discharges V. Shah and N. Shah and their agents, employees, representatives, attorneys, children, and assigns (collectively, the "Shah Releasees") from **any and all** actions, claims, causes of action, suits, debts, dues, costs, expenses, sums of money, accounts, controversies, agreements, promises, injunctive relief, fees, contracts, trespasses, damages, and demands whatsoever, in law and/or in equity, **whether known or unknown**, matured or unmatured, absolute or contingent, or liquidated or unliquidated, which the GCI Releasors ever had, now have, or hereafter can, shall or may have against the Shah Releasees, for, upon, or by reason of any matter, cause, event, transaction, occurrence, or thing whatsoever from the beginning of the world to the Effective Date.

Dkt. 338 at 4. Finally, in the release, GCI "acknowledge[d] that it **may hereafter discover facts different from or in addition to those which it now knows or believes to be true, and GCI agrees that, in such event, this Agreement shall nevertheless remain in full force** and effect in all respects, notwithstanding such different or additional facts, or the discovery thereof." *Id.*

### III.   THE SHAHS' EXISTING COMPLIANCE

Promptly after the Agreement, the Shahs conducted extensive (and costly) searches for responsive documents. In November 2021, the Shahs made an enormous production to GCI. The documents produced were identified as the result of review of the Shahs' electronic devices, their email accounts, as well as their cloud messaging applications (*i.e.*, iMessage and WhatsApp). And while the Shahs could have chosen to only produce documents that both hit upon GCI's search terms and were deemed to fit within the narrow categories listed in Section 1(b)(i), the Shahs instead agreed to produce **all** documents that hit upon any search term. As a result, the November 2021 production consisted of over 10,000 documents amounting to over 90,000 pages.

That these documents were valuable to GCI is best embodied by GCI's use of them in briefing in this post-settlement process. Indeed, GCI has extensively relied on documents produced by the Shahs (which bear the Bates stamp "SHAH") to argue the Shahs must make further production of documents. Nor does GCI limit its use of documents to documents that it had a right to under the Agreement (*i.e.*, those responsive to the categories listed in 1(b)(i)). Rather, GCI has consistently utilized *any* document produced by the Shahs, including just recently the resume of one of the Shahs' sons (who has no role in the litigation) which was picked up in the production. *See* Dkt. 356.

Had GCI wished to engage in fair-play, it would have promptly scheduled Vipin's interview after the November 2021 production. However, GCI was armed with greater ambition[2], and by December 2021 it had shifted its posture to claim that, notwithstanding the volume and probity of the November 2021 production, that the Shahs had agreed to not just search their own personal devices but also had agreed to conduct a forensic audit of all electronic devices owned by the Settlement Entities. GCI now also argued that in using the term "electronic devices" (which was undefined in the Agreement), the Shahs—who did not have enough money to hire counsel up until two weeks before trial—intended to commit themselves to searching complex systems architecture devices such as corporate servers.

Of course, the parties had **never** discussed the Shahs searching electronic devices owned by the Settlement Jaina Entities that the Shahs did not use, nor had they contemplated ever searching anything more than run-of-the-mill electronic devices that the Shahs would use and have access to (*e.g.*, phones, tablets, computers). Put simply, the Shahs would never have entered into the Agreement had GCI made clear its view that the Agreement encompassed such a broad, and costly, search. Regardless, GCI opportunistically persisted with this position, alleging the Shahs had failed to comply with the Agreement and raising a coterie of new demands in order for the Shahs to come into compliance. In taking this position, GCI effectively (and successfully) shifted the Overton window of the matter. Rather than the story being that the Shahs had searched and produced over 10,000 documents, GCI instead created a situation where the Shahs' failure to produce any documents after the November 2021 production would be perceived as a total failure of compliance and a material breach.

Unable to resolve a number of interpretive differences regarding the Agreement, the parties ultimately petitioned this Court to interpret the Agreement for the parties and establish clear parameters for the settlement process forward. On July 18, 2022, the Court issued its findings. Dkt. 350. In its order, the Court resolved three major disagreements between the parties.

*First,* the Court agreed with the Shahs that the Agreement did not require the Shahs to independently search for documents responsive to the categories listed in Section 1(b)(i), but instead required the Shahs to search for documents using the methods prescribed by Section 1(b)(iii). Upon the Shahs' satisfactory completion of the searches in Section 1(b)(iii), the Court agreed that

---

[2] All indications suggest GCI is motivated by two goals at this juncture in the post-settlement process: (1) uncover as many documents as possible from the Shahs, whether contemplated by the Shahs or not, with which to attempt to reopen the case against other Defendants; and (2) monetize the Agreement by attempting to find breaches from which GCI may then seek damages.

SPIRO HARRISON

the Shahs would be in compliance with the Agreement. *Second,* the Court agreed with the Shahs that Section 1(b)(i)'s reference to lists did not obviously require the Shahs to prepare the lists. Instead, the Court found the list requirement was ambiguous but determined that, in light of the Court's extensive history with the litigation and the parties, it was inconceivable that GCI did not intend for the Shahs to prepare the lists. Finally, the Court ruled in GCI's favor and determined that the Shahs—under the Agreement—were obligated to search a potentially broader universe of electronic devices than they had understood, including any devices that were accessible to them that were used by Settlement Entities. The Court also found that electronic devices (undefined in the Agreement) was not limited to the Shahs' understanding of phones, tablets, and computers, but to a broader coterie of devices, including servers and systems architecture devices. Finally, the Court found the Agreement required the Shahs to search cloud networks. This point was moot as the Shahs had already done so (*i.e.,* searching and producing their emails, iMessage, and WhatsApp in the November 2021 production); rather, the Shahs had pointed out to GCI cloud searches were not clearly required by the Agreement in an attempt to show GCI they were operating in good faith by searching for them nonetheless. That point was missed on GCI.

In its order, the Court clarified some of the ambiguities identified in the Agreement. In particular, the Court interpreted the Agreement to require the Shahs to:

- Compile the Lists, to the extent the information necessary to do so is obtainable via good-faith compliance with their diligence obligations as set forth in Section 1(b)(iii) (including by seeking such information from counsel or accountants);

- Conduct searches for both physical documents and ESI at any premises used by the Entities to conduct business pursuant to Section 1(b)(iii)(d);

- Expand their searches of electronic devices to servers and computer equipment that Defendants have the practical ability to obtain and either know or have reason to know contain responsive documents (including by seeking such material from counsel or accountants);

- Ascertain, to the extent practicable, the location of all Entities' servers and email accounts, and extract and produce from them all responsive documents (including, without limitation, by searching for ESI at the locations specified in Sections 1(b)(iii));

- and Expand their searches of electronic devices to include cloud networks or other IT infrastructure that have been used by Defendants or the entities, to the extent Defendants have the practical ability to access such networks.

As the Court made clear in its order, the term "Entities" was defined to refer to the same parties in the Agreement, namely Neminath Inc. ("Neminath"), 235 Hillside LLC ("235 Hillside"), Jaina Systems Network, Inc. ("Jaina"), Jaina Infrastructure, Inc. ("Jaina Infrastructure"), and Ipsita Telecom Services, Inc. *See* Dkt. 350, Footnote 1.

## III. THE SHAHS HAVE COMPLIED WITH THE AGREEMENT AS UNDERSTOOD BY THE JULY 18, 2022 ORDER

Promptly upon the Court's July 18, 2022 order interpreting the Agreement, the Shahs began to pursue the remaining diligence efforts required by the Agreement. Each of those efforts are described in detail below, as required the Court's subsequent order on September 27, 2022 requiring the Shahs to detail their diligence efforts to the Court by October 18, 2022.

### 1. REQUIREMENT TO PREPARE LISTS

Per the Court's order on July 18, 2022, the Agreement calls for the preparation of three lists:

- A list of Jaina's shareholders and their percentage ownership interests as of January 1 of each year from 2012 until 2021.

- A list of all bank accounts (by bank name and last four digits of account number) used by Jaina, Neminath, Jaina Infrastructure or Ipsita during the period 2012 through 2015.

- A list of the Names of any individuals or entities that loaned money to Jaina between 2013 and 2015.

In its July 18, 2022 order, the Court interpreted the Agreement to require compile the Lists "to the extent the information necessary to do so is obtainable via good-faith compliance with their diligence obligations," which included "by seeking such information from counsel or accountants." As of the filing of this status letter, the Shahs have produced all three lists to GCI. The efforts undertaken to prepare each list are described below.

A. The Shareholder List

The first list requires the Shahs to identify JSN's shareholders and their percentage ownership interests as of January 1 of each year from 2012 until 2021. The Shahs have done so. Since 2012 until 2021, JSN has had four consistent shareholders: Surajit Bose (25%), Mahendra Shah (25%), Frank Vella (25%), and Nayana Shah (25%).

To determine this, the Shahs searched through and reviewed hundreds of documents, including JSN's Board Minutes, incorporation documents, and tax returns. In addition, counsel for the Shahs spoke not only with Nayana Shah and Mahendra Shah regarding the shareholding percentages (who confirmed they were correct, *See* **Exhibit B** at ¶¶ 7-8), but also Frank Vella (who confirmed he had never alienated his shares in Jaina and remained a 25% shareholder to this day). The only partner the Shahs did not speak to was Surajit Bose, who is missing and could not be contacted by counsel for the Shahs.

But even then, the documentary record makes clear Bose viewed himself as a 25% shareholder as of 2014-2015. Indeed, in 2014, Bose wrote to Govind Vanjani and described JSN's shareholders to include four individuals: Frank Vella, Mahendra Shah, Nayana Shah, and himself.

**Exhibit C.** Likewise, in his resignation email, sent in October 2015, Bose wrote "as you know, I am still a shareholder of Jaina, with an ownership interest of 25% of all outstanding shares." **Exhibit F**. Finally, the Shahs also reached out to former accountants and attorneys as the Court interpreted the Agreement required (see below at Section D for further discussion regarding the Shahs' outreach).

On the basis of this documentary record and counsel interviews, the Shahs presented their shareholder list to GCI. Upon receipt of that initial shareholder list, however, GCI argued that the Shahs' list could not be accurate because of a series of emails and communications GCI had identified in the Shah production that suggested JSN may have had other shareholders. *See* Dkt. 351, Exhibit 1.

In even making this point, GCI revealed its fundamentally flawed understanding of the Agreement. The Shahs are not obligated to prepare lists that GCI agrees with, nor are they required to produce documents GCI wishes to get. Rather, the Shahs are required, under the Agreement, to conduct reasonable searches using the methods outlined in 1(b)(iii) and to then report back their findings. In this instance, the Shahs reviewed documents that came out of the 1(b)(iii) searches, interviewed each of the partners (except Bose), and reached out to attorneys and accountants as ordered by the Court. The Shahs then prepared the list. GCI is still welcome to disagree with the list; however, it should not be allowed to allege non-compliance solely on the basis that it disagrees with the Shahs' conclusions.

This is especially so given the fact that GCI's own analysis of the supposed "deficiencies" of the Shahs' list is exceptionally shoddy. First, GCI's own pieces of evidence do not create a harmonious record—rather, GCI posits that, at the same, JSN had both 3, 4, 5, and possibly 6 partners. Moreover, as has become sadly customary, counsel for GCI misstates key pieces of evidence to state its case.

For example, GCI pointed the Shahs to a correspondence in which Surajit Bose solicited investments from two individuals in 2011, Ketan Shah and Gaurav Sharma, in exchange for supposedly 1% a piece of Jaina Systems Network's stock. In pointing this document, however, GCI failed to look (or, more likely, conveniently ignored) a subsequent correspondence between the parties, in which Ketan Shah made clear he had not received a shareholder agreement. **Exhibit J**. Moreover, both Shah and Sharma's wires were booked as loans in Jaina's accounting papers (one as "sundry borrowing" and another as a "line of credit"), and indeed the papers show Jaina repaid Sharma over subsequent years under the title "loan refunds" and paid interest to him for the loan. **Exhibit K** (excerpts of 139 page accounting records). If GCI's previous claim that it reviewed "every produced document" is to be believed, then GCI intentionally failed to provide full context to the Shahs and Court in making this claims. Moreover, there is simply no evidence that either Shah or Sharma ever became shareholders. No shareholding certificates exist reflecting they owned shares in Jaina. Rather, JSN's 2012 tax return specifically stated that JSN had four shareholders: Frank Vella, Nayana Shah, Mahendra Shah, and Surajit Bose, as did Surajit Bose in 2014 and 2015.

Each of GCI's supposed pieces of evidence regarding potential other shareholders follows this pattern of making an explosive allegation but backing it up with (at best) ambiguous documentary evidence (seemingly with the hope the Shahs would not investigate further). The Shahs

will not burden the Court with further analysis of each of these misstatements but are happy to provide more detail if needed. At root, the Shahs (a) reviewed the documents; (b) interviewed all available partners; (c) and solicited a 28 § 1746 declaration from Nayana Shah attesting to the accuracy of the shareholders list. The Shahs have satisfied their obligation to prepare the shareholders list.

## B. The Loans List

The Agreement, as interpreted by the Court's July 18, 2022 order, also requires the Shahs to prepare a list of "[a] list of the Names of any individuals or entities that loaned money to Jaina between 2013 and 2015" through use of the search techniques described in Section 1(b)(iii). As noted before, "Jaina" as referred to in the Agreement refers specifically to Jaina Systems Network, Inc. The Shahs have satisfied their obligations to produce the list.

Upon receipt of the Shahs' initial loans list, counsel for GCI objected in a typically obtuse (and imprecise) manner. *See* Dkt. 351, Exhibit 1. First, GCI claimed the list was inaccurate because it did not include a Citibank loan from 2012. Of course, such a loan would not be required as the Agreement only calls for a list of individuals or entities that loaned money to JSN **between 2013 and 2015**. *Second*, GCI claimed that the list was inaccurate because it did not include a loan made on December 13, 2016. Again, such a loan would not be required as the Agreement only calls for a list of individuals or entities that loaned money to JSN **between 2013 and 2015.**

Finally, GCI claimed that the list was inaccurate because it did not include loans by Mahendra Shah, Nayana Shah (a party to the Agreement itself), or an individual named Surinder Malhotra. The Shahs were unsure of GCI's inquiry regarding Malhotra and agreed to review the documentary record and revise the lists if needed to account for him. Ultimately, the Shahs determined Malhotra's loan was included on the initial list, but under Ravi Chopra, who JSN accounting papers stated was the real party of interest behind the loan. The Shahs' revised list includes Malhotra as a separate line item, as well as a few other parties that were identified through further analysis.

The Shahs (and counsel for Shah) expended considerable effort in terms of determining individuals and entities that loaned money to JSN from 2013 to 2015. This included review of hundreds of financial, accounting, and tax records that the Shahs had identified and produced through their Section 1(b)(iii) searches. Among the significant papers relied on by the Shahs were:

- A review of over 5,200 entries (amounting to over 130 pages) reflected in JSN's complete banking records for 2012, 2013, and 2014. These records were produced by the Shahs in November 2021, and were prepared by Surajit Bose who exported the records from JSN's Quickbooks. These records appear to embody a complete capture of all funds received and sent out by JSN for those years.

- A review of over 9,000 entries (amounting to over 139 pages) reflecting JSN's complete banking records from 2010 to 2015. These records were produced by the Shahs in November 2021, and were prepared by Surajit Bose who exported the records from JSN's Quickbooks. These records appear to embody a complete capture of all funds received and sent out by JSN for those years.

- Daily cash flow analyses (exported from Quickbooks) for JSN capturing various periods within 2013-2015;

- A 77-page Quickbooks export "Deposit Analysis" prepared by JSN for 2014;

- A 159 page Quickbooks export of all receivables received by JSN for 2014;

- JSN's tax records from 2013, 2014, and 2015.

- Reaching out to accountants and attorneys as required by the July 18, 2022 order (see below at Section D for results of that outreach).

The Shahs have diligently, and reasonably, utilized the results of the searches described in Section 1(b)(iii) to prepare the loans list. Whether GCI ultimately agrees with the list or not is immaterial; the Shahs have satisfied their obligation under the Agreement.

C.  The Bank Account Lists

Finally, the Agreement (as interpreted by the Court in its July 18, 2022 order), requires the Shahs to prepare a list of "bank accounts (by bank name and last four digits of account number) used by Jaina, Neminath, Jaina Infrastructure or Ipsita during the period 2012 through 2015." As noted before, the Agreements defines "Jaina" as "Jaina Systems Network, Inc." The Shahs have satisfied their obligations to produce this list.

In order to prepare this list, the Shahs reviewed hundreds of Jaina's accounting and tax papers. As with the loans list, the Shahs primarily relied on the following documents for JSN:

- A review of over 5,200 entries (amounting to over 130 pages) reflected in JSN's complete banking records for 2012, 2013, and 2014. These records were produced by the Shahs in November 2021, and were prepared by Surajit Bose who exported the records from JSN's Quickbooks. These records appear to embody a complete capture of all funds received and sent out by JSN for those years.

- A review of over 9,000 entries (amounting to over 139 pages) reflecting JSN's complete banking records from 2010 to 2015. These records were produced by the Shahs in November 2021, and were prepared by Surajit Bose who exported the records from JSN's Quickbooks. These records appear to embody a complete capture of all funds received and sent out by JSN for those years.

- Daily cash flow analyses (exported from Quickbooks) for JSN for periods within 2013-2015;

- A 77-page Quickbooks export "Deposit Analysis" prepared by JSN for 2014;

- A 159 page Quickbooks export of all receivables received by JSN for 2014;

- JSN's tax records from 2013, 2014, and 2015.

- Reaching out to accountants and attorneys as required by the July 18, 2022 order (see below at Section D for results of that outreach).

For the other non-Settlement Jaina Entities, the Shahs reviewed hundreds of documents within their production to determine accounts, along with review of tax papers, accounting papers, and general ledgers.

GCI's objection to the bank account list was limited to one HSBC account it believes was not listed for Neminath. The Shahs have inquired into this account and added it, along with two others, to the list. Separately, GCI requested that the Shahs also include accounts used by "Jaina India," which the Shahs understand to refer to Jaina Systems Network (Pvt) Ltd. Of course, there would be no reason for a bank account owned by Jaina Systems Network (Pvt) Ltd. to be included on the bank account list. The list is clear it only requests accounts held by Jaina Systems Network, Inc., Neminath, Jaina Infrastructure or Ipsita. Jaina Systems Network (Pvt) Ltd. was owned exclusively by Surajit Bose and his confederates in India, and is not an entity referred to or covered by the Agreement. GCI's objection was thus frivolous.

The Shahs have satisfied their obligation to prepare the bank accounts list.

D.  Outreach to Accountants and Attorneys

As part of the Court's July 18, 2022 interpretation of the Agreement, the Court identified two circumstances within which the Agreement imposed a duty on the Shahs to seek information from the Shahs' attorneys or accountants. *First,* the Court interpreted the Agreement to require the Shahs to seek information from counsel or accountants in preparing the lists. *Second*, the Court interpreted the Agreement to seeking responsive documents in the categories outlined in Section 1(b)(i) from the Shahs' attorneys or accountants.

In the parties' joint-status letter, submitted on September 23, 2022, GCI requested that the Court order the Shahs to: "if they have not already done so, contact the attorneys and accountants identified by GCI in its discussion of the Category 2 and Category 3 documents, and obtain from them and produce any responsive materials." *See* Dkt. 351 at page 6. GCI's request was in reference to a list of attorneys and accountants that GCI had identified in the joint-status letter as likely possessing documents in the categories listed in Section 1(b)(i). *See* Dkt. 351 at page 4.

GCI's list was quite obviously overbroad and, in some instances, absurd. Indeed, GCI not only listed a number of dead individuals, but also individuals who were historically adverse to either the Shahs or the Settlement Entities. Most importantly, as GCI well knows, the near majority of individuals included on its list worked for Jaina more than five years ago and many were primarily in touch with Surajit Bose. Despite this, the Shahs—in the interest of moving this process forward—reached out to those individuals who they had not already spoken to and to whom there were no obvious conflicts of interest. The results of those outreaches are below.

a.  **Akshay Kumar**: Deceased. The Shahs understand his practice shut down after his death.

b.  **Anil Arora:** The Shahs reached out to Arora on a number of occasions, including by phone and email. Arora did not return any of the Shahs' calls,

and after an initial response over email subsequently stopped responding to all outreach (call and email).

c.  **Akhilesh Krishna**: Deceased.

d.  **CPAAlliance**: CPAAlliance no longer exists. It has no active website, phone number, and messages to its email address receive a bounce back error.

e.  **Maitri Patel**: The Shahs were able to successfully reach Patel, who committed to review her files for any of the categories of documents listed in Section 1(b)(i). Patel responded to the Shahs confirming she had no documents responsive to any of the categories and had only been engaged in a limited capacity to file final tax returns for Jaina in 2016.

f.  **Seeraj Chawla**: Chawla had left the firm he previously worked for (which had Jaina as a client) and had moved to Canada before only recently returning to the United States. The Shahs were able to successfully reach Chawla, who agreed to review any files he still had to determine if he had any documents response to Section 1(b)(i). Chawla indicated that he did not have any responsive documents or files.

g.  **Ed Troy:** The Shahs were able to successfully reach Troy, who committed to review his casefile to see if he still had any documents responsive to the categories listed. Troy responded in writing to the Shahs confirming that he did not have any documents responsive to the Section 1(b)(i) categories.

h.  **Humayun Siddiqi**: Siddiqi never represented the Shahs nor any of the Settlement Entities. The Shahs understand Siddiqi represented Ravi Chopra.

i.  **Harvinder Dhody**: Dhody responded to the Shah stating that his firm did not have any Jaina records, and that his firm's retention policy only required maintenance for 3 to 5 years.

As the Court may remember, GCI subpoenaed Dhodhy in 2019, **Exhibit L**, and had extensive discussions with Dhody regarding his responses to the subpoena (which appears to have sought substantially similar documents).

j.  **Hasan@malikesq.com**: Malik never represented the Shahs. As GCI well knows, the Shahs considered hiring Malik to represent them in this litigation but the parties could not come to terms and Malik was never retained. GCI's inclusion of Malik on the list was intentionally misleading.

k.  **Zafar Siddiqi**: As GCI knows, Siddiqi never represented the Shahs nor any of the Settlement Entities. The Shahs understand Siddiqi represented Ravi Chopra's wife.

l.   **Andrew Bose (CPA)**: Bose has shut down his accounting practice due to old age and poor health. The Shahs were able to speak to his godson, who checked the remnants of Bose's files and confirmed in writing the only responsive file he possessed for any of the Settlement Entities was Neminath's 2019 tax return (which is not responsive to any of the categories).

As the Court will remember, GCI subpoenaed Bose in 2019. **Exhibit L**. It is the Shahs' understanding that at that time Bose sent GCI all of Neminath's Quickbooks files.

Thus, the Shahs have completely complied with the Agreement as interpreted by the Court with regards to the lists, including their obligation to "seek" information and responsive documents from accountants and attorneys.

## 2.   SEARCHES REQUIRED BY THE AGREEMENT

The Shahs have never disputed that the Agreement requires the Shahs to conduct certain searches for responsive documents. Those searches are outlined in Section 1(b)(iii) of the Agreement. The Shahs analyze here their diligence efforts under each of Section 1(b)(iii)'s subsections.

### A.   The Residence Search

Section 1(b)(iii)(b) requires the Shahs to "conduct a search of their home." Dkt. 338. The Shahs conducted that search. As a result of that search, the Shahs did not identify any responsive physical documents. With regards to electronic devices, the Shahs do not own a computer. **Exhibit B** at ¶ 5. Rather, the Shahs exclusively use their iPhones for their computing needs (which are quite limited). **Exhibit B** at ¶ 5. As part of their November 2021 production, the Shahs searched their iPhones, emails, and cloud messaging applications (*i.e.*, iMessage and WhatsApp) and produced responsive documents. Accordingly, the Shahs have thus satisfied their obligation to search their residence pursuant to Section 1(b)(iii)(b).

### B.   The 235 Hillside Search

Section 1(b)(iii)(a) requires the Shahs to conduct a search of "any buildings located at 235 Hillside Avenue, Williston Park, NY 11596 that V. Shah or N. Shah have access to or can legally obtain access to." In its July 18, 2022 order, the Court interpreted this to require the Shahs to search for both physical documents and ESI at 235 Hillside. As the Court may have noticed, the 235 Hillside search requirement includes a caveat that the Shahs are only required to search buildings at the complex that they "have access to or can legally obtain access to." Dkt. 338. The reason for this caveat is because the Shahs do not own 235 Hillside. While GCI has often attempted to play loose-and-fast with the ownership of 235 Hillside, the indisputable fact is that the Shahs currently own no portion of 235 Hillside.



235 Hillside Suite A
Owned by Third-Party; Rented
by Shahs

235 Hillside Suite B
Jaina Headquarters
Owned by Third-Party

235 Hillside Suite B Garage
Owned by Third-Party

As the image above demonstrates, the 235 Hillside complex is segmented into two buildings: Suite A and Suite B. The Shahs currently rent Suite A from the owner of 235 Hillside, and operate their convenience store and tobacco shop out of that suite. Suite B was previously Jaina's headquarters, but after Jaina's collapse in 2015 has been abandoned. At some point subsequent, it was renovated into a dentist's office. Also, at some period after 2015, it suffered a significant flooding event.

The Shahs searched Suite A of the 235 Hillside complex and did not identify any responsive documents (ESI or physical) in the convenience shop or the tobacco shop.

As described earlier, prior to the Court's July 18, 2022 ruling, the Shahs had conducted physical document searches of Suite B. The Shahs did not identify any responsive physical documents in Suite B. Indeed, the only JSN related physical materials that were identified were in the garage/storage facility and were promotional materials.

In its July 18, 2022 ruling, the Court ordered the Shahs to search not only personal electronic devices that they owned or used, but also electronic devices that they could practically access that were used by any of the Settlement Entities. The Court further included servers in the definition of electronic devices. In response, the Shahs proceeded with searching a series of servers and four computer hard drives that were identified in the garage/storage facility portion of Suite B of 235 Hillside. Despite the Shahs' belief that all of these items were inoperable, to do this, the Shahs hired one of the country's leading forensic vendors to analyze the devices and, to the extent possible, extract data from them. The vendor's findings regarding the servers are presented in the 28 USC §1746 declaration attached as **Exhibit A**, which the Court ordered to be prepared in light of concerns (completely unfoundedly) raised by GCI of the vendor's independence.

Issues regarding the server search were presented to the Court in a separate letter on October 11, 2022. *See* Dkt. 353. GCI responded to that letter on October 17, 2022. *See* Dkt. 356. While

the Shahs are planning on requesting leave to respond to GCI's letter, they will use this letter as an opportunity to do so, as the Court has already acknowledged that separate track.

As for the computer hard drives, as explained in the vendor declaration, the hard drives exhibited less indications of damage than the servers. **Exhibit A** at ¶ 15. On or around October 12, 2022, the vendor concluded its analysis of the hard drives and determined that the risk to powering up the drives was much lower than with powering up servers. Accordingly, the Shahs authorized the vendor to forensically image the drives and extract all accessible data from them, which was completed on October 14, 2022. **Exhibit A** at ¶ 15. Upon that imaging, the vendor determined that the data was accessible. **Exhibit A** at ¶ 15**.**

As of the filing of this letter, the Shahs have made an initial production of documents from the hard drives to GCI. The Shahs are still analyzing the drives and will supplement their production (if necessary) by October 28, 2022.

C.   The Electronic Devices Search

Section 1(b)(iii)(c) requires the Shahs to search "all electronic devices owned by V. Shah, N. Shah, 235 Hillside LLC, Jaina, Jaina Infrastructure, Ipsita or Neminath, that are in the possession, custody, or control of V. Shah or N. Shah." Dkt. 338. As addressed earlier, the Agreement defines Jaina to refer to Jaina Systems Network, Inc. Dkt. 338. In its July 18, 2022 order, the Court interpreted this provision to require the Shahs to search for the Entities' servers and computer equipment, email accounts, and cloud networks. The Court's order defines "Entities" to refer to Neminath Inc., 235 Hillside LLC, Jaina Systems Network, Inc., Jaina Infrastructure, Inc., and Ipsita Telecom Services, Inc. Dkt. 350, Footnote 1.

Beginning with Neminath Inc. and 235 Hillside LLC, those entities own the convenience store located at 235 Hillside (Neminath) and the smoke shop at 235 Hillside (235 Hillside). The address for each of these entities, acknowledged by GCI on multiple occasions, is 235 Hillside. *See* **Exhibit M**. Neither of those entities maintain email addresses, servers, computer equipment, or other electronic devices, let alone devices likely to contain data responsive to the categories listed in Section 1(b)(i).

The Settlement Jaina Entities likewise have historically only had one listed address: 235 Hillside, Suite B. **Exhibit M**. To be sure, the Shahs understand that Jaina Network Systems, Inc. did have servers, email accounts, and equipment in Suite B, which maintained on the servers and hard drives identified by the Shahs and discussed above. The Shahs also understand that Ipsita and Jaina Infrastructure also used the servers and hard drives in Suite B. And, as discussed above, the Shahs have not identified any other devices at 235 Hillside (the only address for the Settlement Jaina Entities). This is not particularly surprising, as according to Surajit Bose himself, JNS only had two employees. **Exhibit C.** This also appears to comport with GCI's understanding of the Settlement Jaina Entities' devices. As GCI wrote in the joint status letter, documents responsive to the categories identified in Section 1(b)(i) were "presumably stored on Jaina's server." Dkt. 351.

Finally, the Shahs refer the Court to Subsection D of the Lists Section regarding their attempt to locate any responsive documents from attorneys and accountants.

D.   The Premises Searches

SPIRO HARRISON

Finally, Section 1(b)(iii)(d) requires the Shahs to search any "premises used by 235 Hillside LLC, Jaina, Jaina Infrastructure, Inc., Ipsita Telecom Services Inc. or Neminath to conduct business." Dkt. 338. The Agreement defines Jaina to refer to Jaina Systems Network, Inc. Dkt. 338. As described above, the premises used for all of the Settlement Entities was 235 Hillside, with Neminath and 235 Hillside LLC operating out of Suite A and the remaining parties operating out of Suite B. **Exhibit M**. And, as described earlier, the 235 Hillside location has been searched and— beyond the servers and hard drives discovered in the Suite B garage facility—no other electronic devices or responsive physical documents were discovered.

GCI has long known that this is the case. Indeed, in numerous previous Court records, GCI has always stated that "Jaina's address is 235 Hillside Avenue, Williston Park, New York 11596." *See, e.g.*, **Exhibit L** at 9. And yet, for the first time in May 2022, GCI made the claim that "[t]he emails the Shahs produced show that Jaina used premises not only in the United States, but also in India, Singapore, and Dubai." Dkt. 342 at page 4. That filing defined "Jaina" to mean Jaina Network Systems, Inc. Dkt. 342 at page 1.

The Shahs were surprised by this allegation, especially because GCI (conspicuously) did not offer any citations for this proposition. As the Shahs would eventually discover, counsel for GCI did not include citations for this proposition because it was a blatant misrepresentation to the Court, made solely with the intention to make it appear as if the Shahs had not engaged in due diligence.

Indeed, as the documents make clear, Jaina Systems Network, Inc. did not have any offices in India, Singapore, or Dubai. As for, the documentary record instead shows only that Jaina Systems Network (Pvt) Ltd., a wholly separate company owned by Surajit Bose and other non-affiliated individuals, had offices in India. As GCI itself has explained in its previous Court papers, "Jaina India means Jaina Systems Network (India) Private Limited, the last known address of which is Matrix Tower, DN Block, Sector V, Salt Lake City, Bidhannagar, West Bengal 700091, India." **Exhibit L** at 10. Accountants. Even more significantly, GCI has clearly recognized the separate existence of Jaina Systems Network (Pvt) Ltd. and treated it as a wholly separate company when convenient. In a filing made in bankruptcy court, GCI stated "Mr. Bose, ***who, while once actively involved in the affairs of Jaina, is now, and has been for years, based in India, where he is a Director of Jaina Systems Network (India) Private Limited, a company organized and existing under the laws of India.***" **Exhibit N** at 59. Indeed, as recent as October 17, 2022, GCI again sought to drive a formal divide between Jaina Systems Network (Pvt) Ltd. and JSN, stating that while "[i]t may be that S. Bose was the CEO of the India operation, Jaina Systems Network India PVT LTD ("Jaina India"), but he was not CEO of Jaina's U.S.-based operations—M. Shah was. That would explain why S. Bose is held out as CEO on a presentation page featuring only officers of Jaina India." Dkt. 356.

SPIRO HARRISON

Of course, neither the Agreement nor the Court's July 18, 2022 order ***in any place*** even reference Jaina Systems Network India (Pvt) Ltd. More specifically, Section 1(b)(iii)(iv) requires the Shahs to search premises used by "235 Hillside LLC, Jaina, Jaina Infrastructure, Inc., Ipsita Telecom Services Inc. or Neminath." The Agreement defines Jaina as Jaina Systems Network, Inc. Put simply, the Agreement does not require the Shahs to search the premises of any other companies, including Jaina Systems Network (Pvt) Ltd. Nor would it make any sense for the Agreement to have done so, as Jaina Systems Network (Pvt) Ltd. was a wholly separate company owned by none of the Shahs. Moreover, it is simply unbelievable the Shahs agreed to search office premises halfway across the world as part of the Settlement. The plain language of the Agreement forecloses GCI's misleading position as does GCI's own statements acknowledging that the affairs of Jaina Systems Network, Inc. were different than those of Jaina Systems Network (Pvt) Ltd. From that context, GCI's representation to the Court, with no further clarification to the Court, was misleading and improper.[3]

Regardless, the issue is also moot. Counsel for Shahs had a third-party located in Kolkata, India visit Jaina System Network (Pvt) Ltd.'s putative offices at #701, Matrix Tower, Block-DN/24, Sec-V, Salt Lake City, Kolkata – 700091, W.B, India. That individual spoke to the building manager who conveyed that Jaina System Network (Pvt) Ltd.'s office had been shut down and cleared out for at least five years and multiple tenants had resided in the space after its departure.[4]

The Shahs have plainly satisfied their obligations to search the Settlement Entities' premises pursuant to Section 1(b)(iv), as well as gone beyond that through sending a third-party to search, if possible, Jaina Systems Network (Pvt) Ltd.'s putative office location in Kolkata, India.

**Relief Requested**

This letter makes clear the Shahs have fully complied with the Agreement as interpreted by the Court on July 18, 2022.

On the basis of this letter, the Shahs request the Court enter an order finding that the Shahs have satisfied their search obligations under the Agreement and directing GCI to promptly schedule Vipin's interview. While the Shahs are of the opinion that the Court may order this in totality in light of the vendor's findings regarding the servers (*see* **Exhibit A**), to the extent the Court wishes to segregate the servers from the rest of the Shahs' compliance requirements, the Shahs request an order at minimum finding the other requirements satisfied.

---

[4] GCI's claim that Jaina maintained offices in Singapore and Dubai was similarly misleading. As supposed proof of this claim, counsel for GCI pointed to **Exhibit O**. In that document, Surajit Bose wrote Vipin Shah forwarding an office space listing he thought "look[ed] nice" and wanted to possibly convert into "Jaina's new ME Organization." **Exhibit O**. Right underneath that, Bose wrote he would "need to get approval" before doing so. **Exhibit O**. This certainly is not indicative proof of a Dubai office, nor that any office in the Middle East operated under JNS (the party whose premises' the agreement calls to be searched). Likewise, it is clear Jaina's short-lived offices in Singapore were owned and used by Jaina Systems Network (Singapore) Pte Limited. Of course, that entity is not covered by the Agreement nor the Court's order.

To the extent the Court wishes to permit GCI a reply to this letter (which the Shahs do not think it should do), the Shahs also request the Court simultaneously grant it the right to submit an additional reply to GCI's submission. If the record makes anything clear, it is that GCI's representations need to be constantly checked, and that GCI frequently moves the goalposts upon the Shahs doing the exact thing GCI previously demanded. Given the incredibly high stakes this matter poses for my clients, the only way to prevent this is by permitting the Shahs an opportunity to ensure GCI will not resort to prior habits.

The Shahs also request the Court instruct GCI to cease from further frivolous threats of contempt sanctions. There simply is no basis for contempt sanctions in this matter. In its July 18, 2022 order, the Court interpreted the Agreement and clarified the parties' obligations under the Agreement. To the extent GCI still believes certain searches have not been committed, the appropriate remedy is to either (a) address those deficiencies with the Shahs or the Court; or (b) seek a claim for breach of the Agreement. The notion that the Shahs, who are elderly, indigent, and ill, should be held in contempt is completely inappropriate, especially given their clear record of compliance evidenced above.

Finally, the Shahs request the Court order GCI to refile its letter, *see* Dkt. 356, omitting any reference to Vipin and Nayana's son. In that letter, GCI, in a public docket, insinuated the Shahs' son, who is a stranger to this controversy, could possibly be conspiring with the Shahs' forensic vendor (one of the leading forensic vendors in the country). GCI's only basis for this flabbergasting and inappropriate statement was that it had reviewed Vipin and Nayana's son's resume and it noticed he had IT experience. Even for GCI, this was a new low, and unduly prejudices a complete third-party. That the vendor's certification makes clear what was patently obvious—*i.e.*, that there are no conflicts—only adds insult to this injury.

\*\*\*

## CONCLUSION

In the end, the Shahs believe this letter makes clear not only that the Shahs have complied with their diligence efforts but have done so in good faith and with sincere intention. Indeed, the Shahs have done all of this during extremely difficult times, including battling cancer and entering their older years with no savings. To the extent the Court believes the Shahs should take some further action to come into compliance, the Shahs will certainly do so, but the Shahs hope the Court will do so with an eye towards ensuring the Agreement—as interpreted and enforced—retains some relation to the clear intentions of the parties when they adopted it. Moreover, the Shahs hope the Court recognizes that, absent clear limits, GCI has no real incentive to ever stop asking for more and more from the Shahs, regardless of what the Agreement says or was meant to embody.

Finally, counsel for the Shahs (who has worked on this matter *pro bono* and has in fact spent his own money to help represent the Shahs) personally requests the Court attempt to reign GCI in. While litigation is a notoriously adversarial process, GCI's wanton threats of sanctions and wrongdoing, let alone injection of the Shahs' children into this litigation, has caused the Shahs

SPIRO HARRISON

considerable stress at a time when they are already suffering. It is simply neither helpful nor warranted.

Respectfully submitted,

Shomik Ghosh

October 18, 2022