# THE LOREE LAW FIRM

**PHILIP J. LOREE JR**

October 27, 2022

**<u>VIA ECF and EMAIL</u>**

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York
Thurgood Marshall
United States Courthouse
40 Foley Square, Room 2103
New York, NY 10007
Failla_NYSDChambers@nysd.uscourts.gov

Re:     Geo-Group Communications, Inc. ("GCI") v. Shah, et. al., No. 15 Civ. 1756 (KPF)

Dear Judge Failla:

We represent Plaintiff GCI in the referenced matter.

We write to respond to Defendant Vipin Shah ("V. Shah")'s and Nayana Shah ("N. Shah")'s October 18, 2022, Status Report.

## I.     Introduction

 While the Shahs' counsel acts like he would like to contest the merits of the case against his clients, it was he and his former partner that were (understandably) most anxious to settle as the case progressed to trial in June 2021. The Shahs and their counsel, of course, do not really want to litigate the merits of the case now any more than they did then. Their barrage of invective, false assertions, and pleas for the Court to modify their obligations or discharge them altogether is designed principally: (a) to attempt to distract the Court's attention from the Shahs' repeated failures to comply with the Orders; (b) to portray the Shahs as blameless victims of a financial tragedy forced on them by a supposedly rogue and reckless Surajit Bose ("S. Bose" ); and (c) to attempt to convince the Court, on its own motion, to modify the Orders.

Instead of entertaining the Shahs' invitation to focus on what *isn't* before the Court, GCI will simply address in this letter the Shahs' noncompliance with the Courts' Orders and the relief GCI seeks to secure the Shahs' compliance.

## II.     Relief Requested

GCI respectfully requests that the Court deny all the Shahs' requests for relief and order the Shahs to:

(a) Contact CPA Mr. Aggarwal and his firm and obtain from him and produce any responsive documents and information that they may have;

October 27, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

(b)  Contact *all* of their attorneys and accountants that they either know or have reason to know may have responsive documents or information, and produce it to GCI;

(c) Obtain from each accountant or attorney all documents received from the Shahs, Jaina, or any representative of Jaina, and either: (i) review them to determine whether there are any responsive materials that should be produced; or (ii) simply turn them over to GCI;

(d) To follow directive set forth in (c) for each of the following persons: Maitri Patel, Seeraj Chawla, Ed Troy, and any other accountants or attorneys the Court directs the Shahs to contact, including Humayun Siddiqi ("H. Siddiqi");

(e) to produce all Category 2 and 3 documents: (i) of which they have knowledge; and (ii) to which they have access.

(f) To revise their shareholder List (List 2) so that it conforms to the documentary record;

(g) As an alternative to directive (f), to revise List 2 so that the shareholders of Jaina are, (i) through the year 2012, as they were set forth in the Citibank Loan documents— V. Shah, N. Shah, M. Shah, and S. Bose— plus one additional shareholder, to be identified by the Shahs, to account for the five shareholders referred to in Shashi Goyal's email correspondence with Jaina; and (ii) through the years 2013 through at least 2016, at least six persons consisting of V. Shah, N. Shah, M. Shah, S. Bose, and at least two additional shareholders, which are to be identified by the Shahs;

(h) To strike from their lender list (List 1), Vision Impex and Nexvoiz; and

(i) To add to List 1 TD Time, or in the alternative, if the Shahs do not believe that TD Time loaned money to Jaina, to explain why it has reached that conclusion.

GCI further respectfully requests that the Court grant leave to GCI to either: (a) submit a proposed order for your Honor's signature to be served by GCI on Anil Arora, which directs him to produce to the Shahs' counsel all documents he has received from the Shahs, Jaina, or any of Jaina's  representatives in the course of his representation of the Shahs; or (b) authorize GCI to serve on Mr. Arora and his firm a subpoena requiring the production of those documents.

## III.    The Shahs Have

### A.    The Shahs Cannot Have Complied with the Orders Because they Are Still Recovering Data from Four Hard Drives and Have Yet to Commence the Process for Extracting Data from the 55 Servers

While the Shahs repeatedly say they have complied with the Court's July 18, 2022 (Dk. 350) and September 27, 2022 (Dk. 352) Orders (the "Orders"), they have not. They are in violation of not one, but two of the Court's compliance deadlines. The original compliance date set by the July 18, 2022, Order came and went on September 16, 2022, with the Shahs doing nothing. That necessitated a further, September 27, 2022, Order of the Court which set another deadline, October 18, 2022. During the period following September 16, 2022, the Shahs announced for the first time that they were awaiting word from their Vendor on whether data could be extracted

October 27, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

from the servers found at the 235 Hillside Avenue premises. But they never advised GCI or the Court that they had *also* recovered four computer hard drives at the 235 Hillside and had sent them to the Vendor for analysis and data extraction.

They submitted to GCI a "memorandum" from the Vendor that conveniently made no mention whatsoever of the computer hard drives. Shortly thereafter, on October 11, 2022, the Shahs made their application for relief concerning the servers, which is currently pending before the Court, along with GCI's October 17, 2022, response and application. The Shahs made their application one week before the Court's second October 18, 2022 deadline would expire, and they included in it the Vendor's memorandum that said *nothing* about any hard drives having been recovered.

The Shahs' counsel remained silent about the hard drives it had recovered until October 18, 2022, the Court's second deadline for compliance, when it finally announced that the Vendor had recovered four hard drives from 235 Hillside Avenue. The Vendor advised that those hard drives were in better condition than the servers.

The Shahs offer no explanation as to when and how four computer disc drives were found, and why their existence was not disclosed until October 18, 2022. This is a serious breach not only of the Shahs' obligations to GCI, but also to the Court.

### B.   The Shahs Have Yet to Complete their Production of Data to Be Extracted from the Previously Undisclosed Computer Disks, and Have Ensured that More Delay will Ensue Before any Server Data Might be Produced

Also on October 18, 2022, the Shahs made an "initial" production of data, all of which, as far as we have been able to tell relates to the period of the late 2000s and early 2010s, that is, the period *before* the critical 2013 through 2015 period for which most of GCI's requests seek documents. (See Dk. 338 at 2 of 10.) The Shahs did not explain why they let the October 18, 2022, *second* deadline elapse without producing all the data from those drives.

On October 25, 2022, the Shahs made a "supplemental" production of documents extracted from hard drives, but GCI has not yet been able to determine whether any of those documents relate to the relevant period – our very brief, initial review, indicates that they may relate to a period earlier than the 2013-2015 period that is the subject of most of GCI's document requests. Finally, on October 26, 2022, the Shahs advised that they would be making one more production either on October 27, 2022 or October 28, 2022.

Even if the Shahs complete their final production of the hard drive documents by October 27 or 28, they have still utterly failed to comply with the Court's deadlines. It will also require some additional time on GCI's part to determine what was produced in the October 25, 2022, and to review the October 28, 2022, productions, productions that should have been made to GCI no later than September 16, 2022 of this year.

In addition, to the inexcusable delay with the computer drives, the Shahs' conduct has also caused further delay on production of documents from the servers, delay that will require Court intervention

October 27, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

in response to the Shahs' and GCI's respective applications for relief.  And as we discuss below, the Shahs have not complied with the Court's Orders in other important respects.

## IV.   The Shahs Have Not Adequately Satisfied their Obligations to Obtain Responsive Documents from Their Attorneys and Accountants

The Shahs' assertion that it has "completely complied" with the Agreement as respects their obligations to contact attorneys and accountants misses the mark, and gravely so.

### A.   The Shahs Must Contact all Accountants and Attorneys that the Shahs Know or have Reason to Know may have Responsive Documents and Information

First, the Orders require the Shahs to make an independent, informed decision about which of their attorneys and accountants are likely to have documents or information responsive to the Agreement. In the September 23, 2022, joint letter, GCI identified, on a nonexclusive basis, several attorneys and accountants the Shahs should include in the universe of attorneys and accountants they contact. (See Dk. 352 at 4 of 14.)  While the Shahs have purported to reach out to those persons, they have not confirmed that they have contacted *all* attorneys and accountants of whom they have reason to believe may have responsive documents or information.

One such person likely to have responsive documents but apparently not contacted by the Shahs is CPA Braj Aggarwal, and his firm Braj Aggarwal CPA, P.C. Mr. Aggarwal was hired in or about early January 2015 to assist with Jaina-related matters. (See, e.g., Exs. A at SHAH51315-18, Ex. B at SHAH66738-40.)

GCI respectfully requests that the Court order the Shahs to contact Mr. Aggarwal and his firm to obtain from him and produce any responsive documents he or his firm may have. GCI also respectfully requests that the Court order the Shahs to contact *all* of their attorneys and accountants that they either know or have reason to know may have responsive documents.

### B.   The Shahs and Their Counsel Cannot Delegate to Accountants or Attorneys not Counsel of Record for the Shahs the Responsibility to Review Documents to Determine if they Are Responsive

Second, in several instances, the Shahs and their counsel—upon contacting an attorney or accountant and determining he or she has or may have documents that may be responsive—have allowed the attorney or accountant to make independently a decision whether the documents in question are, in fact responsive. This procedure tends to ensure that the attorneys or accountants will reach the conclusion the Shahs and they presumably hope for: no need to produce any documents. It insulates the Shahs and effectively relieves counsel of its obligation to make responsive-document determinations as an officer of the Court.

The Settlement Agreement does not allow counsel of record for the Shahs to delegate its production supervision duties to accountants or attorneys who are not currently counsel of record for the Shahs in this proceeding. Section 1(b)(ii) of the Settlement Agreement requires that the Shahs' counsel supervise and manage the production of documents pursuant to the Agreement, to do so with the same degree of professionalism and candor as it would were it producing

October 27, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

documents in an S.D.N.Y. civil action, and to do so "subject to the same obligations that [it] would have were [it] producing documents" in such an action. (See Dk. 338 at 2 of 10.)

GCI respectfully requests that the Court order the Shahs to obtain from each accountant and attorney all documents (including ESI) received from the Shahs, Jaina, or any representative of Jaina, and either: (a) review them to determine whether there are any responsive materials that should be produced; or (b) simply turn them over to GCI. This request for relief applies to the following persons, and requires them to produce, among other things, any QuickBook files received from the Shahs, Jaina, or any representative of Jaina: Maitri Patel (who represented Jaina for the 2010-16 tax audit), Seeraj Chawla (who forwarded QuickBooks files to Anil Arora), and Ed Troy. It also applies to any other persons the Court directs the Shahs to contact, including H. Siddiqi , who frequently gave V. Shah legal advice in this matter but did not appear of record for the Shahs. All these attorneys and accountants had to have been aware of ongoing litigations related to Jaina.

### C.    The Shahs Must Contact Humayan Siddiqi, who Provided Legal Advice to V. Shah in this Matter

Third, the Shahs did not contact H. Siddiqi because "Siddiqi [allegedly] never represented the Shahs," but represented Ravi Chopra. (Dk. 357 at 14 of 21) As the Court knows from prior correspondence in this matter, H. Siddiqi, while not counsel of record for the Shahs, provided V. Shahs with legal advice. That advice covered the period from 2018 up until at least June 2021, when Vipin was preparing for trial, and included editing legal documents prepared by V. Shah. (See, e.g., Exs. C, D (lengthy exhibits omitted from Ex. D).) GCI respectfully requests that the Court direct the Shahs to contact H. Siddiqi to determine if he has any potentially responsive documents or information, and if so, to obtain and produce it as required by the Agreement and Orders.

### D.    The Court should Order Anil Arora to Turn Over Immediately to the Shahs' Counsel all Documents Mr. Arora or or His Firm Obtained from the Shahs, Jaina, or any of Jaina's Representatives

The Shahs report that Mr. Arora, formerly counsel of record for V. Shah and M. Shah, has not returned calls from the Shahs concerning their requests for documents and information. This is a serious matter. Mr. Arora was formerly counsel of record for the Shahs in this litigation and owes duties to the Shahs and to the Court. Mr. Arora's noncooperation is undermining the Agreement and the Court's Orders.

In addition, as discussed in prior correspondence, it is highly likely that Mr. Arora has important documents that are responsive to GCI's requests, including QuickBooks files. (Dk. 349 at 10 of 16, and exhibits cited) He has also made a highly questionable representation to the Court about the alleged nonexistence of relevant Jaina-related documents that has been disproved by the documents that have been produced thus far by his clients, the Shahs (See Dk. 349 at 10 of 16, and exhibits cited.)

October 27, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

GCI respectfully requests that the Court either grant leave to GCI to: (a) submit a proposed order for your Honor's signature to be served by GCI on Mr. Arora, which directs him to produce to the Shahs' counsel all documents he has received from the Shahs, Jaina, or any of Jaina's representatives in the course of his representation of the Shahs in this litigation; or (b) authorize GCI to serve on Mr. Arora and his firm a subpoena requiring the production of those documents.

## V.      The Shahs Have Not Produced all the Category 2, and 3 Documents Within their Possession, Custody and Control

The Shahs, not S. Bose, had control over Jaina's finances, its banks, the 235 Hillside Avenue property and premises, and Neminath, Inc. ("Neminath"). With all that control and access, what more could they possibly need to produce the narrow categories of documents and information set forth in Section 1(b)(i) of the Settlement Agreement? (See Dk. 338 at 2 of 10.) But while the Shahs have produced a large volume of materials, very few are responsive to any of the categories of documents described in Section 1(b)(i) of the Settlement Agreement, and as respects most of the categories they have produced no responsive documents.

The purpose of the Settlement Agreement, as interpreted by the Orders, is to ensure that the Shahs produce three narrow categories of documents and information. The first category ("Category 1") is the Lists, which are discussed in Section VI. The second category ("Category 2") consists of seven subcategories of documents, all of which relate to Jaina. Six of the seven relate to Jaina's 2013-2015 income tax returns, including a QuickBooks file, specifically "[a] QuickBooks general ledger for Jaina for the periods 2013 through 2015. The other of the eight categories relates to a $1 million loan Jaina obtained from Citibank.

The Third Category ("Category 3") consists of two subcategories of documents related to Neminath, documents concerning the 2013 $600,000 loan to Kedis and documents concerning the sale of 235 Hillside Avenue by Neminath.

The Shahs are required to produce all documents that they know of and to which they have access, including, without limitation, documents held by their attorneys and accountants. (Dk. 350 at 13-15) ("[T]he Agreement meaningfully limits what Defendants must produce to those materials that are within their possession, custody, or control, which the Court has interpreted to include materials that can be acquired by seeking them from counsel or accountants.") Just as documents in the possession of their attorneys and accountants are within the Shahs' possession, custody and control, so too, are all documents of and to which they have knowledge and access.

GCI has demonstrated in its correspondence with the Court that the Shahs have ready access to these narrow categories of documents, but despite the 87,000 page or so production and a supplemental production, the Shahs have failed to produce any documents concerning the following categories of Category 2 documents:

1.  Documents concerning paid-in capital by individuals or entities (additions and withdrawals) as reflected in line item 23 of Schedule L form 1120 for the period between 2011 and 2015. (See Ex. E at 17 of 24, which discusses the anomalies with Jaina's paid-

6

October 27, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

    in capital.) (These should be among the easiest of documents for the Shahs to produce. Paid-in capital is the money Jaina's shareholders have invested into the company. We suspect the Shahs are withholding or delaying production of these documents because they will not only reveal the identity of the shareholders, but show how much capital each one invested.)

2. A QuickBooks general ledger for Jaina for the periods 2013 through 2015.

3. All invoices concerning 2014 sales of $39,044,012 shown on Line 1c of Jaina's 2014 tax return (Form 1120)

4. Documents concerning the $2,213,217 in Trade Notes and Accounts Receivable on Line 2a of Jaina's 2015 tax return (Form 1120 Schedule L), including the names of any entities that owed any portion of the $2,213,217

5. Documents concerning the $6,740,198 in Trade Notes and Accounts Receivable shown on Line 2a of Jaina's 2013 tax return (Form 1120, Schedule L), including the names of any entities that owed any portion of the $6,740,198.

As respects the remaining two subcategories of Category 2 documents, the Shahs' production contains at least some, but by no means all, documents that one would expect would fall under the following subcategory: "Documents concerning payables to Jaina's creditors, between 2013 and 2015.

As respects the other Category 2 subcategory— "Documents concerning the $1,000,000 Citibank loan, which is reflected in PX45[]"—the Shahs have produced very few, if any, documents that weren't already been produced by others in the litigation.

As respects the Category 3 documents, the Shahs have, with the exception of an email or two, produced no documents that have not already been produced by others in the litigation. The two subcategories of these Category 3 documents are:

1. Documents concerning the sale of 235 Hillside Avenue by Neminath.

2. Documents concerning the 2013 loan of $600,000 from Kedis LLC ("Kedis") to Neminath.

The Shahs have already admitted in the joint letter that they have knowledge of and access to "Jaina's general ledgers, accounting papers, and bank records." (Dk 351 at 9 of 13) That being the case, even apart from the search obligations imposed by Section 1(b)(iii), they must produce all responsive documents from those files and any others to which they have both knowledge and access.

Their failure to do so to date is inexcusable, and GCI respectfully requests that the Court order the Shahs to produce all Category 2 and 3 documents: (a) of which they have knowledge; and (b) to which they have access.

**VI.**     **The Shahs' Shareholder and Loan Lists are Contradicted by the Documents the**

October 27, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

**Shahs Themselves Have Produced**

    **A.**    **Background: The Lists**

The Court's July 18, 2022, Order (Dk. 350) provides that the Shahs "must" "Compile the Lists, to the extent the information necessary to do so is obtainable via good-faith compliance with their diligence obligations as set forth in Section 1(b)(iii) (including by seeking such information from counsel or accountants)[.]" (Dk 350 at 13 of 15.)

In compiling the Lists the Court required the Shahs to provide the information obtained from: (a) their own knowledge; (b) their due diligence obligations set forth in Section 1(b)(iii) of the Settlement Agreement; and (c) information they obtained from making proper inquiries to attorneys and accountants. (Dk. 350 at 13-15)  Just as access to information held by attorneys or accountants is within the Shahs' possession, custody and control, so too, is all information within their knowledge, as well as all the information that can be gleaned from: (a) the documents produced thus far, and (b) the documents they were required to produce in response to the Court's Orders, but still have yet  to produce, despite the passage of more than a month after the the September 16, 2022, deadline the Court set for compliance, which the Shahs have violated without offering any meaningful excuse. (See Dk. 350 at 14 of 15)).

    **B.**    **Although the Shahs have Submitted what they Contend are the Lists Required by the Agreement, those Lists Cannot Possibly Comply with the Courts' Order because the Shahs Have Not Completed their Production of ESI from the Computer Drives and the Servers and Have not Otherwise Discharged all of their Obligations under the Agreement and Orders**

The Shahs have yet to complete their extraction and production of data from the servers and the hard drives. The Shahs and their counsel therefore have no idea yet what responsive documents is contained on either the servers or the hard drives ,and what they will ultimately be producing to GCI pursuant to the Orders.

Even apart from the problems we discuss below concerning the shareholder and lender lists—both of which are contravened by numerous documents the Shahs themselves have produced—all three of the Shahs' lists do not comply with the Court's Orders because they do not reflect the the information the Shahs obtained by "their due diligence obligations set forth in Section 1(b)(iii) of the Settlement Agreement[,]" which includes review of the documents they have thus far and will in the future produce. Further, the Shahs have not yet complied fully with their obligations to seek documents and information from their attorneys and accountants.

October 27, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

### C.      Even Apart from the Noncompliance Described Above, the Documents the Shahs have Produced Show that the Shareholder Lists are Inaccurate and Incomplete

In preparing the shareholder list, the Shahs cannot have even cursorily reviewed the 87,000 pages of documents they produced. The detailed analysis below demonstrates that the Shahs' shareholder list cannot be squared with the documentary record.

The shareholder list (the "Shareholder List") the Settlement Agreement required the Shahs to produce is supposed to be "[a] list of Jaina's shareholders and their percentage ownership interests as of January 1 of each year from 2012 until 2021. (See Ex. F, at List 2.) The Shahs identify those shareholders as Frank Vella, N. Shah, Mahendra Shah ("M. Shah"), and Surajit Bose ("S. Bose"), each one of which is claimed to have a 25% ownership in Jaina as of January 1 of each year from 2012 until 2021. (Ex. F at List 2)

But the documents indicate that Frank Vella left Jaina in 2011, Jaina had more than six shareholders during the period 2013 through 2016, and that those shareholders were Vipin Shah, Nayana Shah, Mahendra Shah, Surajit Bose Ketan Shah, Gaurav Sharma, and Ravi Chopra.

Vella became a 25% shareholder of Jaina in or about June 2006, according to his share certificate. (See Ex. G, Plaintiff's Trial Ex. 48.) On December 28, 2014, Surajit Bose advised Mr. Vanjani that Vella had "left" Jaina in 2011. (See Ex. H.)

Article 4 of the Jaina form shareholders' agreement contemplates that retiring shareholders will sell, and the remaining shareholders will purchase, their shares. (See Ex. I at SHAH66307.)

### 1.      What the Shahs told Citibank

That Vella, as contemplated by Article 4, ceased being a shareholder upon his leaving Jaina in 2011 is evidenced by other documents produced by V. Shah and N. Shah. According to Jaina's Citibank Commercial Credit application dated December 11, 2011, the end of year in which Frank Vella left Jaina, V. Shah, *not Vella*, was a 25% shareholder. (See Ex. J.)

That Citibank Commercial Credit application was part of a three-step loan underwriting process. First there was the credit application, a copy of which is attached as Ex. J at Shah65265-Shah65272, which was executed by N. Shah, V. Shah, M. Shah, and S. Bose. Frank Vella did not execute it and his name nowhere appears on it. It shows that Vipin, Nayana, M. Shah, and S. Bose were each 25% shareholders of Jaina as of December 11, 2011. (See Ex. J.) These four shareholders account for 100% of the ownership of Jaina.

The second step was the Indicative Term sheet (the "Term Sheet"), which was dated March 22, 2012. (See Ex. K at NYC Chopra 000161-62.) That Term Sheet provided, in pertinent part,

Collateral; First Priority Lien on all Business assets of Jaina Systems Network Inc.

October 27, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

> Corporate Guarantor: All Affiliated entities and subsidiaries
>
> Personal Guarantor: Unlimited personal guarantee of *all 4 owners*.
>
> Financial reporting: CPA Reviewed Business financial Statements Annually and Personal Tax returns and personal Financial Statement of the 4 owners.

(See Ex. K; emphasis added.)

V. Shah claimed that he signed the Term Sheet as an individual guarantor but that assertion is belied by the Term Sheet itself, which specifies that an "unlimited personal guarantee was required of *all four owners*." (See Ex. K.) Even to the extent he signed the Term Sheet as an Individual Guarantor, he did so precisely because he was (and likely still is) one of Jaina's owners, i.e., shareholders.

Tellingly, Frank Vella's name nowhere appears on the Term Sheet, Commercial Credit Application, or any of the other Citibank Loan documents.

The third step was the Credit Approval Summary, which was dated August 21, 2012. (See Ex. L at Citibank 003966.) That document shows that Jaina had submitted all the documents required by the Term Sheet (Ex. K) and had verified the truthfulness of the statements Jaina's owners, including V. Shah, made in the other loan documents, including the statement that V. Shah was a 25% shareholder of Jaina. (See Ex. L.) Presumably, Jaina must have produced to Citibank documentary evidence of V. Shah's, N. Shah's, M. Shah's, and S. Bose's shareholder status.

The fourth step was the Credit Approval Letter, a copy of which is attached as Exhibit M. Again, V. Shah, as well as N. Shah and M. Shah, signed individually, as was required of Jaina's shareholders by the Term Sheet (See Ex. M at Citibank 003972-73.)

## 2. What the Shahs told the IRS in Jaina's 2013 through 2016 Tax Returns

In 2012 Jaina executed and filed an amended tax return for 2010, which was prepared by the late Jagdish Alwani and signed by M. Shah on January 12, 2012. (See Ex. N at SHAH67076.)  In Form 1120, Schedule G of that amended return, Jaina stated that Jaina had only three shareholders, M. Shah, N. Shah, and S. Bose, and that their respective percentage holdings were 37.5% each for M. Shah and N. Shah, and 25% for S. Bose.  (See Ex. N at SHAH67082.)

That amended 2010 return indicates that Vella had given up his shares around 2011, as the original 2010 return shows Vella as one of the four shareholders, while the amended 2010 return, signed and filed in 2012 does *not* show him as a shareholder. That indicates Vella gave up his shares in 2011, when he retired.

Each of the income tax returns Jaina filed for the 2013 through 2016 tax years represented to the IRS that Jaina had at least 6 shareholders and that no one shareholder owned more than 20% of Jaina's shares. Schedule K line 4(b) of each of those returns requires Jaina to answer "yes" or "no" to the following question: "Did any individual or estate own directly 20% or more, or own,

10

October 27, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

directly or indirectly, 50% or more of the total voting power of all classes of the corporation's stock entitled to vote? If "Yes," complete Part II of Schedule G Form 1120 (attach Schedule G)." For each of the 2013 through 2016 tax returns, Jaina answered that question "no." (See Ex. O at Shah_Ds-000232) (2013 Return); Ex. P at NYC-CHOPRA 000377 (2014 Return); Ex. Q at Shah_Ds-000271 (2015 Return); Ex. R at SHAH20775 (2016 Return).

These tax returns establish that during the period 2013 through 2016, Jaina had at least 6 shareholders, for without at least 6 shareholders, at least one shareholder would have to own at least 20% of Jaina. And from the period 2013 forward, Jaina told the IRS that wasn't so.

### 3. What was Communicated to Jaina's CPA Dhody by Ravi Chopra, not S. Bose, About Jaina's 2013 Tax Return—the First Return that Shows Jaina had at Least 6 Shareholders

In 2019 the Court granted leave for GCI to subpoena, among other persons, CPA Harvinder Dhody. We wanted to subpoena him because we learned that he was the CPA responsible for Jaina's 2013 tax return, and that he had helped Chopra form one of his companies. There was a good deal of correspondence between Dhody and GCI's counsel, including correspondence about the "no" answer Jaina gave in line 4(b) of Schedule K of Jaina's 2013 return.

On September 19, 2019, GCI's counsel emailed Dhody, stating "Your email states that 'Surajit mentioned me that nobody owned directly or indirectly 20% or more of Jaina System Network Inc.'s voting power. But I don't think he provided me any documentation about this. Even if he provided which I don't remember now, nothing is available because we shred the hard files in 2018.'" (See Ex. S.)

GCI's counsel asked Dhody to "let [GCI] know whether, based on what Surajit told you, you concluded that Jaina must have had at least six shareholders because nobody owned directly or indirectly 20% or more of Jaina's shares." "Finally," requested GCI's counsel, "please let us know if you ever did any work for Ravi Chopra, or any entity owned or controlled by him." (See Ex. S) (GCI's September 19, 2019 email to H. Dhody.)

On October 9, 2019, Dhody responded, stating, "[i]n reference to your first question, I never told you that I concluded that Jaina must have at least six shareholders. I just accepted Surajit representation that there were no shareholder with more than 20% voting power." Dhody added, as respects "Ravi Chopra, I will not reveal any information on Ravi without a subpoena." (See Ex. T.)

GCI's counsel followed up on October 10, 2019, stating "[t]he broad nature of [your] response has made us question whether you might have, for some reason, withheld from production document[s] that are (a) responsive to our document request; but (b) were authored [by] or sent to Ravi Chopra, or otherwise refer to him." (Ex. U at 1 of 2) GCI's counsel then pointed out to Dhody that the subpoena requested, among other things: "All books of account, working papers, and *other documents* in Your possession, custody and control *concerning any federal tax returns*

11

October 27, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

*prepared for or filed by any of the Jaina Affiliated Entities by any Person during the Relevant Period* (including, without limitation, all IRS 1099 Forms). . . ." (Ex. U at 1 of 2) (emphasis added)

On October 11, 2019, Dhody responded in boldtype: "My answer to withheld the above five documents is NO. I have not withheld any document/information on Jaina's case related to Ravi Chopra for any reason." (Ex. V; emphasis in original)

At the time, GCI took Dhody at his word. But we were surprised to discover in the Shahs' production email correspondence between Ravi Chopra and Dhody concerning Jaina's 2013 tax return, which Dhody did not produce in response to the subpoena and which he denied withholding. That correspondence (attached as Ex. W) also shows that it was Ravi—not, as Dhody claimed, S. Bose—that interfaced with Dhody about the preparation of the 2013 tax return, and that the return was filed on behalf of Jaina even before M. Shah or anyone else from Jaina had executed the required e-file authorization. (See Ex. W.)

On September 16, 2014, Ravi Chopra emailed Dhody asking him to "send the acknowledgment of Tax returns to Jains's[,]" and "also send the account information and signed copies." (Ex. W at SHAH55889) Dhody replied to Ravi on the same date: "[t]his is the filed copies of each tax return for the year 2013." "Please[,]" Dhody added, "get it signed from the President on form 8879 & IT 579 and send them back to me for each year." (Id.)

Dhody enclosed with that email the already filed 2013 tax returns and efile authorizations not only for Jaina, but also Jaina Call India, Jaina Infrastructure, Jaina Realty Inc., and Ipsita Telecom Services Inc.[1] (See Ex. W at SHAH55890.)

This correspondence shows that Ravi and Dhody, not S. Bose and Dhody, worked together to prepare the 2013 tax returns, and filed them before Jaina signed e-file authorizations. It also shows that Dhody was not forthcoming in his correspondence with GCI's counsel.

First, Dhody insisted that he had withheld no responsive documents that were authored by or sent to Chopra, or otherwise referred to him. But Dhody's email correspondence with Ravi about the tax returns was unquestionably responsive to the subpoena, as would be any other correspondence he might have had with Ravi about the tax returns. The only reason this email correspondence ended up in the Shahs' files was because Ravi forwarded it to S. Bose, who forwarded it to V. Shah. (See Ex. W at SHAH55888.)

Second, Dhody's explanation that *S. Bose* told him, without explanation, that none of Jaina's shareholders owned more 20% or more of Jaina, is suspect because the evidence shows that Dhody, who had in the past helped Chopra incorporate at least one of his companies, interfaced directly with Chopra about Jaina's 2013 tax returns. Apparently covering for Chopra, Dhody adopted the Shahs' familiar litigation strategy of "blam[ing]" "everything" on S. Bose. (See Dk. 356 at 13 of 14.)

---

[1] GCI does not include in Ex. W copies of the tax returns or e-file authorizations because exhibit would be inordinately lengthy

October 27, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

### 4.    What M. Shah told Anil Arora about Ravi Chopra's Role in Jaina

On June 3, 2016, M. Shah told Anil Arora that he was "sending one more interesting document which Ravi Chopra (*one of the investor* in Jaina & I believe did lot of manipulation) made Surajit [B]ose to sign this document." (See Ex. X at SHAH31489 (emphasis added).)  Despite taking contrary positions in his deposition and public court filings, M. Shah, President of Jaina, knew that Chopra was not "a broker, lender, or consultant," as Chopra often portrayed himself, but an *investor*, i.e. a shareholder.

### 5.    What the Shahs Communicated to the Their Consulting Attorney, Mr. Siddiqi, about Jaina's Shareholders

H. Siddiqi, Ravi Chopra's attorney of record, understood that V. Shah was a shareholder based on Mr. Siddiqi's dealings with V. Shah. Although he did not appear on behalf of V. Shah, Siddiqi provided informal advice to him as a consulting attorney of sorts. He prepared for V. Shah's use in the litigation a draft argument that stated: "I [i.e., V. Shah] am indisputably a shareholder of Jaina. . . ." (See Ex. Y at SHAH49908.)  While V. Shah apparently did not include that portion of Mr. Siddiqi's recommended language in his court submission, it demonstrates that Mr. H. Siddiqi believed (not surprisingly and we think quite correctly) that V. Shah was da shareholder of Jaina.

### 6.    What the Shahs Communicated to Outside Investors and Suppliers

Shashi Goyal of FFECS IT & Ebusiness Consulting Services Inc., corresponded in 2012 about his company purchasing a stake in Jaina. In a May 29, 2012 email he offers on behalf of his company to invest $500,000 in Jaina in exchange for a 1/6 share of the business. Tellingly Mr. Goyal states, after meeting with Jaina, and receiving information from them, that "[t]here are currently *five* partners in Jaina[,]" and that "[w]e would like to have a equal partnership stake of 1/6 in Jaina." (See Ex. Z at SHAH66542; emphasis added.)

Vella's departure from Jaina in 2011 was marked by Jaina issuing a portion of his shares to others. In notarized correspondence between Jaina and Ketan Shah, which was signed jointly by M. Shah and N. Shah, N. Shah and M. Shah "confirm[ed] that a payment of $100,000 USD has been received on Tuesday, July 19, 2011 via Bank wire transfer for a 1% stock at Jaina Systems Network, US located at 235, Hillside Ave, Suite B, Williston Park, NY 11596, USA." (See Ex. AA at SHAH76718-19.)

The same day M. Shah and N. Shah, also in notarized correspondence, confirmed that a $100,000 payment had been received from Gaurav Sharma "for a 1% stock at Jaina Systems Network, US located at 235, Hillside Ave, Suite B, Williston Park, NY 11596, USA." Both K. Shah and Gaurav Sharma were informed that they would be sent shareholder agreements. (See Ex. AA at SHAH76718-19.) Yet List 2 not only inaccurately lists Vella as a Jaina shareholder as of 2013, but also does not disclose persons to whom Mr. Vella's stock was distributed, including, without limitation, K. Shah and Gaurav Sharma.

October 27, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

Incredibly, the Shahs in their October 18, 2022, letter ignore what the documents plainly say and mischaracterize as "loans" the transactions between Jaina and K. Shah and Gaurav Sharma as "loans," and claim those "loans" were supposedly paid back over time.  In support of this assertion they submit, as Exhibit K to their letter, a "Worksheet Master Sheet" which purports to characterize as "foreign cash injected," "sundry borrowing" and a "line of credit," the $100,000 investments K. Shah and Gaurav Shah made in exchange for 1% shareholder interests. And, contrary to the Shahs' contentions, these $100,000 payments were not paid back over time. Exhibit K indicates that only one $10,000 payment was made to Gaurav Sharma and none to K. Shah. That they may have been characterized as loans in a Worksheet Master Sheet does not transform the stock transaction into something other than what the contemporaneous documentary evidence shows it to be.

The Shahs also claim that Exhibit J to their letter shows that Gaurav Sharma and K. Shah were never issued shareholder agreements, and therefore were somehow not shareholders despite Jaina having declared them so in notarized documents. But the Shahs' Exhibit J demonstrates that these two investors were shareholders, not lenders.

As set forth in the Shah's Exhibit J, on July 19, 2011, the same day that the two investors were made Jaina shareholders, S. Bose sent to K. Shah the "Jaina Presentation" he requested. And one week later, on July 26, 2011, K. Shah replied to S. Bose, saying "I went through the presentation and it looks good." K. Shah added, "[a]ny progress on the shareholder agreement? Gaurav was asking regarding the same." (Dk. 357-10) That is hardly evidence that K. Shah and Gaurav Sharma somehow never became shareholders even though Jaina appointed them to be shareholders.

Late 2014 and early 2015 Email correspondence between: (a) Vipin and Surajit Bose and (b) representatives of Jaina supplier Sify Technologies, Limited ("Sify") shows that, according to Sify, V. Shah and S. Bose represented to Sify that Ravi Chopra was a "partner" of Jaina (i.e., a shareholder), whose exit from the business in late 2014 was the reason for a delay in payment of a substantial debt to Sify. According to Sify's memorandum of a meeting between Sify and Jaina, which was recorded by transcription software, V. Shah advised Sify that the delay in payment "was due to one of the partner[s] in the company choosing to exit the business." To that S. Bose "[a]dded" "[t]hat the Partner exiting was one named Ravi and it was due to the sudden and unannounced decision of him which caused the delay." (See Ex. BB at SHAH51516.)

### 7.     Frank Vella's Noninvolvement in Jaina after he Left in 2011

Frank Vella did not signed any guarantee for the 2011 Citibank loan application, which requires all shareholders to indicate their shareholder percentages holdings in Jaina and net worth. And in all the more than 87,000 pages the Shahs produced from their email accounts there is not a single email on any subject addressed to or from Vella or cc'd to him.

Further evidence that Frank Vella was no longer a shareholder after 2011 is provided by the notes and guarantees that Surajit Bose, V. Shah, M. Shah, N. Shah and S. Bose signed in

October 27, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

September 2012, securing a substantial debt Jaina owed to Broadband. M. Shah, N. Shah and S. Bose all signed in their capacities as Jaina officers or directors, and each also signed a guarantee in their individual capacity. V. Shah signed in his individual capacity as well. M. Shah and N. Shah also signed as officers or directors of Jaina Realty, Inc., Jaina Infrastructure, Inc., Ipsita Telecom Services, Inc., and Jaina Call India, Inc. But Vella did not sign. (See Ex. CC at GCI_2017 – 000087-89.) Had Vella been a shareholder at the time, then surely Broadband would have insisted that he, too, guarantee the debt.

###### 8.      The Shahs' Evidence is Contradicted by the Documentary Record

The Shahs rely principally on two assertions, neither of which can change what the documentary record shows. First, the Shahs say that they have contacted Mr. Vella, who informed them that he was still a 25% shareholder of Jaina. But that is not surprising, because Mr. Vella has not been involved in Jaina's affairs since 2011, and it is not surprising that Jaina never informed him that it was adding shareholders.

Second, N. Shah has submitted a declaration in which she says little or nothing pertinent to what the make up of Jaina's shareholders was during the relevant period. Paragraph 8 of her declaration states: "I have not received any notice that any of the other initial shareholders in JSN— Mahendra Shah, Frank Vella, or Surajit Bose—have given up, sold, or alienated any of their shares, and I understand they all remain 25% shareholders in JSN." (Dk. 357-2 at 2 of 2) That may be so, but it does not mean Jaina's shareholder makeup did not change from what it was in 2006, especially where, as here, the contemporary documentary evidence demonstrates that it did. In fact, N. Shahs' declaration is contradicted by, among other things, the Citibank Loan documentation. She signed that documentation, knowing that Vipin was a shareholder. That sounds like "notice" to us.

###### 9.      What it all Shows

The Shahs List 2 is contradicted by the evidence. As evidenced by Jaina's 2013 through 2016 tax returns, there were had to be at least 6 shareholders during the period from 2013 to 2016. Frank Vella, who left Jaina in 2011, was not one of those shareholders. The evidence indicates that those shareholders were, most likely, at least V. Shah, M. Shah, N. Shah, S. Bose, Gaurav Sharma, K. Shah, and R. Chopra (we do not know who the other shareholders could be as we have not received all documents, including additional paid-in capital documents). Gaurav Sharma's and K. Shah each had a 1% ownership interest. Even if the other five shareholders had an equal share of the remaining 98% of Jaina, their respective shares would be less than 20%, which would explain Jaina's representations on their tax returns. Those representations would remain true even if Frank Vella was the eighth shareholder.

The Court should order the Shahs to revise their list so that it conforms to the documentary record.

Alternatively, the Court should declare that: (a) the shareholders of Jaina were as they were set forth in the Citibank Loan documents through 2012—V. Shah, N. Shah, M. Shah, and S. Bose;

October 27, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

and (b) Jaina had at least six shareholders during the period 2013 forward, V. Shah, N. Shah, M.
Shah, S. Bose, and two additional shareholders, to be identified by the Shahs.

>    **D.      The Shahs' List of Persons or Entities who Allegedly Loaned Money to Jaina
>            is Contradicted by the Documents the Shahs have Produced**

The Shahs list of loans contains certain entries that the documentary evidence shows to be
payments that are not loans. The items that must be removed from the List fall into two
categories. First, certain payments that have been alleged to have been loans made to Jaina were
payments of customer invoices. Second, certain other payments represent what is commonly
referred to as "Hawala" payments, which Jaina and others claimed to be loans, even though they
were not.

>    **1.      Vision Impex LTD ("Vision Impex") and Nexvoiz were Jaina
>            Customers and the Alleged "Loans" they Made were not Loans but
>            Payments in Satisfaction of Customer Invoices**

At least two of the List 1 "individuals or entities that loaned money to Jaina between 2013 and
2015" were customers of Jaina according to a master Spreadsheet of customers and suppliers
prepared by Jaina and produced to us a native Excel file (Shah49547). That file, named
"Statements of Account-2011-14.xls," was a large, comprehensive Excel spreadsheet that listed
all of Jaina's customers and suppliers during the relevant period (the "Spreadsheet"). It was sent
by S. Bose on April 23, 2015, to Alliance Accounting, and copied to V. Shah. (See Ex. DD at
SHAH49544-47.)

Exhibits EE and FF are pdf files we created from the tabs of the Excel Spreadsheet that contain
information on Vision Impex and Nexvoiz. As respects Vision Impex, the Court will recall that
Ravi Chopra, and Vision Impex President, Dalip Kumar, testified, among other things, that
Vision Impex had allegedly loaned $1,252,450 to Jaina during the period February 2014 to
November 2014. Jaina allegedly paid back a large portion of these funds, along with loans
allegedly made by TD Time, by transferring, over a period, $1,350,000 to Vision Impex's
lawyers, then Robinson Brog Leinwand Greene Genovese & Gluck, P.C. ("Robinson Brog"). (Dk.
236 at 4-7 of 39).

The Vision Impex portion of the Spreadsheet, however, states that Vision Impex was a *customer*
of Jaina. (See Ex. EE.)  It lists the invoices Jaina presented to Vision Impex as well as the
payments Vision Impex made in discharge of those payments. It also lists the amounts collected
from Vision Impex by amount and date. (See Ex. EE.)

We have attached as Exhibit F our October 10, 2018 Revised Settlement-Proposal Presentation
Charts. Chart 5A at 22 of 24 lists transfers made from Vision Impex to Jaina, which were
reflected on Jaina's bank statements, and which Defendants had (successfully) argued are loans.
The amounts and dates set forth in the Vision Impex portion of the Spreadsheet match the
amounts and dates of the Vision Impex transfers that are set forth in Ex. F at 22 of 24, Chart 5A.
The Vision Impex Section of the Spreadsheet properly records those Vision Impex payments as

October 27, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

payments made by a customer of Jaina pursuant to and in discharge of invoices presented to Vision Impex by Jaina.  (See Ex. EE.)

Jaina's own books and records therefore contradict the Shahs' claim that the payments Vision Impex made to Jaina were loans.

Likewise, the loans allegedly made by Nexvoiz to Jaina are not loans either. Nexvoiz was a customer, as indicated by Ex. Ex. FF)  which is the pdf portion of the Spreadsheet that relates to Jaina customer Nexvoiz.

### 2.      The Loan List does not List TD Time as a Lender to Jaina

The Defendants have in the past contended that TD Time made various loans to Jaina, but TD Time does not appear on the Loan List. The Court should Order the Shahs to include TD Time on the Loan List if it contends that the payments made by TD Time to Jaina were loans. (See Ex. F at 22 of 24.) If the Shahs do not believe the transfers from TD Time to Jaina were loans, then the Court should order the Shahs to explain why it does not believe the TD Time transfers were loans.

## VII.   The Shahs' Request that the Court Order Vishal Shah's Name to be Deleted from its October 17, 2022 Letter is Groundless

The Shahs surprisingly request the Court to "direct counsel for GCI to re-file its letter of October 17, 2022 removing reference to the Shahs' son, who has no role in this litigation and should not have been named on a public docket." That request is groundless at best and should be denied.

As the Court knows, Vishal Shah, along with his son, Nishant Shah, has been assisting V. Shah and N. Shah with this litigation for years, including attempts to settle the case. He has voluntarily appeared at and in participated in court hearings along with his brother, Nishant.  In its October 17, 2022, letter GCI did not disparage Vishal in any way. It merely pointed out that, in light of many years of informational technology skill and experience set out in his CV, it is important for Vendor to disclose, among other things, any relationships it might have with any of the Shah family members.[2]

There is no legal basis for the Shahs' request, particularly under the circumstances here, and the Shahs cite none. In any event, the Shahs do not have the standing to make the request on behalf of their adult son, and Vishal has wisely and understandably not sought leave to intervene to

---

[2] The Vendor's report, apparently in light of GCI's October 17, 2022, letter, now makes more robust disclosures, something that its earlier "memorandum" did not (other than to make the unsurprising statement that the Shahs do not "control" the Vendor).

17

October 27, 2022

Hon. Katherine Polk Failla
United States District Judge
United States District Court
Southern District of New York

make it on his own behalf.

Respectfully submitted,

Philip J. Loree Jr.

cc:  Shomik Ghosh, Esq. (by ECF and email)
     Mr. Govind Vanjani (by email)
     All other parties (via ECF)