UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
GEO-GROUP COMMUNICATIONS, INC.,

                Plaintiff,                      Index No. 15-cv-01756 (KPF)

-v.-

RAVI CHOPRA; MAHENDRA SHAH; VIPIN
SHAH; 728 MELVILLE PETRO LLC; KEDIS
ENTERPRISES LLC; JMVD HILLSIDE LLC;
NYC TELECOMMUNICATIONS CORP.; and
SHALU SURI,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

DECLARATION OF GOVIND VANJANI IN SUPPORT OF PLAINTIFF
GE0 GROUP'S 60(B) MOTION

Pursuant to 28 U.S.C. § 1746, I, Govind Vanjani, certify, state and declare under penalties of perjury as follows:

1.      I am President and co-founder of Plaintiff Geo-Group Communications, Inc. ("GCI"), a position that I have held since 2000, when the Company was formed. I submit this Declaration in support of Geo-Group's motion for relief, pursuant to Fed. R. Civ. P. 60(b)(3), from the portions of the final judgment pursuant to Fed. R. Civ. P. 60(b)(3) that dismissed GCI's actual and constructive fraudulent conveyance claims against Chopra and NYC Telecom arising out of the: (a) $1,350,000 Jaina transferred in 2014 to Brog Leninard Green & Genovese, P.C. (now known as Leech Tishman Brog) ("Brog"); and (b) $660,000 Jaina transferred in 2014 to JMVD Hillside LLC ("Hillside") and 728 Melville Petro LLC ("Melville").

2. Except where I indicate otherwise, I have personal knowledge of the facts set forth in this Declaration.

3. I submit this Declaration to put before the Court the 54 Exhibits (Exhibit 1-54) that are attached to this Declaration, and some pertinent information concerning my review of the more than 87,000 pages of documents that have been produced pursuant to the Settlement Agreement during the period November 2, 2021, and thereafter.

*Exhibits*

4. Attached as Appendix A is an Exhibit List, which identifies the 54 exhibits GCI submits in support of its motion. This Declaration attaches true and correct copies of each of those exhibits.

5. Many of those Exhibits are documents the Shahs produced pursuant to the Settlement Agreement. These documents bear Bates Numbers prefaced with "SHAH" followed immediately by a 5-digit number.

6. Not all the Exhibits were produced by the Shahs pursuant to the Settlement Agreement. The first six, for example are Tables, demonstrative Exhibits that GCI's counsel, Philip J. Loree Jr, and I prepared together. Tables 1 and 4 to 6 are designed to aid the Court's analysis and comparison of pertinent data concerning the transfers to Brog. Those Tables were prepared using the source documents (e.g., bank statements) they identify, which are themselves attached as Exhibits to this Declaration. (Exs. 1, 4-6)

7. Table 2 presents an image of the left-hand columns of what we

refer to as the "Hawala Spreadsheet," a true copy of which is attached as Exhibit 13.

8. We refer in our brief to a "Jaina Customer Spreadsheet" which is attached in pdf form as Exhibit 24. The Shahs have not produced any of the "invoices concerning the 2014 sales of $39,044,012 shown on Line 1c of Jaina's 2014 tax return (Form 1120)," which are documents that are supposed to be produced by Section 1(b)(i) of the Settlement Agreement. The Shahs have, however, produced in native, Excel file format (SHAH49547) a comprehensive spreadsheet, which contains information concerning Jaina's 2014 invoices to its customers and from its suppliers, as well as 2014 payment and collection information. (See Exs. 24 & 30.)

9. The Jaina Customer and Supplier Spreadsheet's file name is "Statements of Account-2011-14.xls." S. Bose sent it on April 23, 2015, to Alliance Accounting, copying V. Shah. (See Ex. 29 at SHAH49544-47.)

10. Because it was produced in native format, GCI's counsel converted it to pdf. (See Ex. 24.) The pdf, which consists of about 300 pages contains bookmarks which correspond with the tabs in the Excel version of the spreadsheet.

11. For ready access GCI's counsel has also created pdfs of the pertinent spreadsheet tabs for two of Jaina's customers, TS USA Inc. ("TS USA") and Vision Impex Ltd. ("Impex"). The TS USA tab containing the information pertinent to the TD Time Inc. payments is attached as Exhibit 25.

3

The Vision Impex tab is attached as Exhibit 26.

12. I understand GCI's counsel will, upon the filing of the motion later today email Chopra and NYC Telecom's counsel a copy of the spreadsheet in its native, Excel form, and will, in addition, include with the courtesy of copies of the motion a copy of the spreadsheet in its Excel native file format.

13. I received the Shahs' first production of documents on November 2, 2021, some 87,000 pages of .tiff files, which were Bates Numbered, and many text files, which were not. I immediately started reviewing these files, which were principally in .tiff format. This was my initial review, and given the volume of the production, my initial focus was to try to determine what was and was not produced per the Settlement Agreement.

14. I completed that initial review in mid-December 2021 and during the review I printed all documents that I thought were interesting. I separated the documents in manilla folders which were organized by the Section 1(b)(i) Settlement Agreement categories of documents and information and by other categories, depending on document content. I thereafter arranged the documents in each manilla folder by date. I concluded that while the Shahs had produced many documents – very few were responsive to Section 1(b)(i) of the Settlement Agreement, and it became clear that the Shahs' due diligence was profoundly inadequate.

15. That was a matter of great concern from my perspective because I had purposely designed the scope of Section 1(b)(i) to be narrow so that it

would yield the key documents to enable GCI to determine, among other things, how much money Jaina received in 2014 from its customers for the services sold and then to do further analysis of those numbers. I also wanted to determine who Jaina's real shareholders were and the approximate amount of their shareholding interest. That is why Section 1(b)(i) seeks, for example, documents concerning paid-in capital (to determine who paid it in and to whom it was paid back) and various other financial documents.

16. By GCI's counsel's December 24, 2021, letter, GCI complained to the Shahs about the inadequacies in their production (Ex. 41), and over a four-month period the parties exchanged correspondence, including an April 4, 2022, Proposal GCI made, and engaged in at least two telephone meet and confer sessions. (See Ex. 12, Dk. 360 at 1 & Exs A-D, & F.) The Shahs' counsel refused to budge, interpreting the Settlement Agreement in a very crabbed and unreasonable fashion.

17. GCI therefore had no choice but to request judicial intervention, which initially resulted in a May 11, 2022, telephone conference. GCI concluded that it was going to be very challenging to obtain from the Shahs the documents for which GCI had bargained, but was hopeful that the Court's intervention would change

18. I renewed my efforts to review and analyze more thoroughly and for the second time the 87,000 pages of documents to identify documents that might provide a basis for judicial relief, whether in conjunctions documents

GCI believed it could obtain from the Shahs, or even without the benefits of such documents.

19. By the time the Court's July 18, 2022, Order was made, GCI had begun to understand more thoroughly the roles of Vipin Shah, Ravi Chopra, Surajit Bose, Mahendra Shah, Nayana Shah, Sanjiv Chand, Mariana Ramirez, Jaina's various CPAs and attorneys, including Mr. Chopra's attorney. We had lots of pieces (maybe 80-85% of the financial puzzle), but if GCI and its counsel could just get the documents in 5 of the 13 bullet-point categories of Section 1(b)(i) of the Settlement Agreement, GCI would have arguments that would be more powerful.

20. GCI wanted to make as complete, strong, and persuasive a presentation to the Court as possible and believed that the odds of doing so would be increased if GCI could obtain as many of the Section 1(b)(i) documents as it reasonably could, especially the invoices (even though GCI had data from the Customer-Supplier Spreadsheet (native Excel file SHAH49547), an accurate list of shareholders, and the paid-in capital documents, which would show the names of the shareholders and their percentage shareholding interest. (We requested both the list and the paid-in capital data so that we could validate the list with the underlying data).

21. That the Court had made on July 18, 2022 a powerful order directing the Shahs to comply with the Settlement Agreement within 60 days made GCI more optimistic that the Shahs would be forthcoming and turn over

the required documents.

22.   That, of course, did not happen.

23.   GCI did not expect the Shahs to be as recalcitrant as they have turned out to be and had assumed that they would have complied with the Court's July 18, 2022, Order. But they continued to fight GCI at every turn and were seeking to slow-walk the process. While GCI does not know, it suspects that the Shahs' behavior has been designed to prevent GCI from obtaining an accurate list of shareholders, the shareholders' respective shareholding interests, and all relevant 2014 financial data. For example, Nayana Shah has submitted a list of shareholders, each of which allegedly has a 25% shareholding interest. If the information she has provided is accurate, then that means that each shareholder would have contributed and, where indicated by the tax returns, withdrawn, 25% of the additional paid-in capital. While she contends that she does not have the paid-in capital documents for all shareholders, she should have submitted at least the documents she has to support her own portion of additional paid-in capital.

24.   In the meantime, it became clear by the latter part of September 2022 that there was a real risk that the Fed. R. Civ. P. 60(b) cutoff period would expire without the Shahs fully complying with the Court's orders and producing at least some of the Section 1(b)(i) documents. Alternatively, there was a risk that even if they obtained some of those documents before the cut-off date, there would still not be sufficient time to analyze and incorporate

those documents into a timely Rule 60(b) motion. With the looming December 6, 2022, cut-off date, and the Shahs' continued recalcitrance, if GCI was going to seek post-judgment relief, it needed to finalize its analysis, and proceed with what it had.

25. Fortunately, by then GCI had marshalled and analyzed by this time a good deal of evidence from its second review of the 87,000 pages of documents, and had the opportunity to cross-reference accounting documents and reconstruct from accounting and other records how Chopra was engaged in hawala transactions, and how those and other records showed, among other things, that Chopra was the beneficiary of the Brog transfers, and even the 2014 transfers to JMVD Hillside LLC ("Hillside") and 728 Melville Petro LLC. ("Melville")

26. We also were able to determine, though careful comparison of documents Williston Park Realty LLC ("WPR") had produced in response to GCI's subpoena, that WPR had produced copies of a signed, 235 Hillside Avenue sales contract, lease, and set of closing checks that indicated that the property was sold for $425,000. But the Shahs produced otherwise materially identical documentation that clearly indicated that the property was sold in 2016 for $1,025,000 million consisting of $425,000 plus Kedis giving Neminath a discharge of the $600,000 loan that Neminath owed Kedis. Under that scenario, of course, the 2014 transfers Jaina made to Hillside and Melville were not in discharge of an antecedent debt—they represented transfers made for the benefit of Chopra.

27. GCI and counsel accordingly set about finalizing their ongoing analysis, a process that involved much discussion between GCI and counsel, and forced the both to learn more about hawala and how Jaina and Chopra were converting cash received from Jaina's customers in India, transferring it through hawala to Jaina's U.S. bank accounts in U.S., and showing the transfers as "loans" from various individuals and entities. Documents submitted in support of this motion show that Jaina and Chopra was engaged in these types of transactions with respect to at least the Brog claims, other documents show that it engaged in such transaction with respect to transfers that were not the subject of GCI's Third Amended Complaint, and other documents suggest that certain other claims in the TAC not at issue in this motion were actually the result of the same kind of hawala transactions that are so prevalent in the Brog transfers.

28. The process of GCI finalizing its claims continued into October, which turned out to be a very busy month for order-compliance motion practice. GCI started drafting its papers in earnest as of November 1, 2022, and simultaneously continued reviewing deposition transcripts, doing research, reviewing and analyzing documents, and regularly discussing matters related to the motion. Those efforts culminated in this motion.

29. Pursuant to 28 U.S.C. § 1746, I certify and state, under penalty of perjury under the laws of the United States of America, that the forgoing is true

and correct.

Executed on: December 6, 2022
                Danbury, Connecticut

_____
Govind Vanjani