UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
GEO-GROUP COMMUNICATIONS, INC.,

                      Plaintiff,                         Index No. 15-cv-01756 (KPF)

-v.-

RAVI CHOPRA; MAHENDRA SHAH; VIPIN
SHAH; 728 MELVILLE PETRO LLC; KEDIS
ENTERPRISES LLC; JMVD HILLSIDE LLC;
NYC TELECOMMUNICATIONS CORP.; and
SHALU SURI,

                      Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**PLAINTIFF GCI'S COMBINED RULE 60(B)(3) REPLY MEMORANDUM OF LAW
AND RULE 60(D)(3) MEMORANDUM OF LAW**

Philip J. Loree Jr. (PL-2213)
THE LOREE LAW FIRM
11 Broadway, Suite 615
New York, New York 10004
(646) 253-0560
(516) 627-1720 (alt. phone)
(516) 941-6094 (mobile)
PJL1@LoreeLawFirm.com

*Attorneys for Plaintiff Geo-Group
Communications, Inc.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... iii

PLAINTIFF GCI'S COMBINED RULE 60(B)(3) REPLY MEMORANDUM OF LAW AND RULE 60(D)(3) MEMORANDUM OF LAW ............................................................ 1

ARGUMENT ................................................................................................................... 2

POINT I .......................................................................................................................... 2

GCI'S RULE 60(B) MOTION was filed within the one-year cutoff ............................ 2

POINT II ......................................................................................................................... 2

GCI FILED ITS MOTION WITHIN A REASONABLE TIME ..................................... 2

    A.   The Case Law Does not Support Chopra's Reasonable Time Argument ....................... 3

    B.   What Constitutes a Reasonable Time Depends on The Circumstances of Each Case..... 4

    C.   The Circumstances Show there was No Unreasonable Delay Here................................. 5

       1.   Chopra's Argument Misstates Key Facts ..................................................... 5

       2.   Chopra's Argument Fails to Acknowledge the Unusual Procedural Posture of this Case  5

       3.   Events that Occurred after GCI Filed its Motion Demonstrate that GCI Did not Unreasonably Delay its Filing ........................................................................... 6

    D.   Chopra Effectively Concedes it was Not Prejudiced by any Delay ............................... 6

POINT III ........................................................................................................................ 7

Chopra's arguments concerning the merits of gci's rule 60(b)(3) motion are misplaced ............. 7

    A.   Chopra's Arguments about "Cashflows" and the Unreliability of Ledgers Fail.............. 7

    B.   The TD Time Payments were Hawala Payments, the Source of which was Cash Collected from Jaina's Customer TS USA ................................................................... 8

       1.   Chopra's Arguments Concerning GCI's Ex. 27 are Misplaced ................................... 9

       2.   Chopra Effectively Concedes that the TD Time Payments are Cash Payments Collected from Jaina's Customer TS USA ................................................................... 9

       3.   The Documents Show that TS USA was not a Catch-All Account but one for a Key Jaina Customer which Generated 2014 Revenue of $3,256,803 ......................................... 10

    C.   Chopra Produced an Altered Version of S. Bose's October 22, 2013, Email............... 10

    D.   Chopra's Attempt to Explain Away S. Bose's October 22, 2013, Email in its Unaltered Form is Contradicted by the Facts ................................................................................. 11

    E.   Chopra's Arguments are Contradicted by N. Shah's Second Declaration and Siddiqi's Supplemental Declaration ........................................................................................... 11

F.   Chopra's Attacks on the Hawala Spreadsheet are Unfounded and Contradicted by the Evidence ................................................................................................................ 12

    1.   M. Shah's January 7, 2017 Email Concerning the Hawala Spreadsheet Refutes Chopra's Arguments Regarding the Hawala Spreadsheet .................................................. 12

    2.   M. Shah's June 6, 2016 Correspondence with Arora Discussing "Money Laundering," "Made up Transactions," and Phony Invoices ...................................................................... 12

G.   The January 15, 2015 Letter Chopra Had S. Bose Sign Demonstrates that Chopra's Arguments Concerning the Impex Payments are Meritless ....................................................... 13

H.   The Evidence Shows Chopra was the Beneficiary of the Blog and LLC Transfers ...... 14

I.   Chopra's Attempt to Blame GCI for the Shahs' Deliberate Failure and Refusal to Produce Documents is Meritless .............................................................................................. 15

J.   NYC Telecom Should Be Subject to this Motion .................................................................. 16

POINT IV ............................................................................................................................... 17

THE COURT SHOULD GRANT RELIEF UNDER RULE 60(D)(3) for fraud on the Court .... 17

A.   Legal Standard ...................................................................................................................... 17

B.   The Evidence Clearly and Convincingly Shows That Fraud on the Court has been Perpetrated by Chopra, M. Shah, V. Shah, and Officers of the Court ...................................... 18

    1.   Setting the Stage ................................................................................................ 18

    2.   The Shahs' and Arora's Knowledge of the Sham Transfers ...................................... 19

    3.   The Shah Defendants and Arora had Reason to Fear R. Chopra, which Provided a Motive not to Cross Him ...................................................................................................... 20

    4.   The Shah Defendants, with Arora's Knowledge and Consent, engaged in a Reverse Engineering Exercise Designed to Portray Falsely the Brog Transfers as Loan Repayments 20

    5.   The November 8, 2016, Meeting .................................................................................. 22

    6.   Chopra's Proposal that Falsified Evidence be Used ................................................... 24

    7.   Attorney and Client Knowledge of the Hawala Spreadsheet .................................... 24

    8.   Arora's Subsequent Misrepresentation to the Court that Surajit Bose Absconded to India with All of Jaina's Documents. .................................................................................... 25

    9.   Chopra's Production of the Altered Email .................................................................. 26

CONCLUSION ....................................................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**

*Bouret-Echevarría v. Caribbean Aviation Maint. Corp.*, 784 F.3d 37, 43 (1st Cir. 2015) ............ 5

*Eastern Financing Corp. v. JSC Alchevsk Iron and Steel Works*, 258 F.R.D. 76, 85 (S.D.N.Y. 2008) ........................................................................................................................................... 19

*Federal Deposit Insurance Corporation v. Porco*, 75 N.Y.2d 840, 842 (1990) ......................... 14

*France v. Bernstein*, 43 F.4th 367, 379-81 (3d Cir. 2022) .......................................................... 16

*Grace v. Bank Leumi Trust Co.*, 443 F.3d 180, 190 n.8 (2d Cir. 2006). ....................................... 5

*Hazel-Atlas Co. v. Hartford Co.*, 322 U.S. 238, 244-50 (1944), *overruled on other grounds*, *Standard Oil Co. v. United States*, 429 U.S. 17 (1976) .................................................... 18, 19

*In re Air Crash at Belle Harbor, New York on Nov. 12, 2001*, 490 F.3d 99, 109 (2nd Cir. 2007). 2

*King v. First American Investigations, Inc.*, 287 F.3d 91, 95 (2d Cir. 2002) ........................ 18, 20

*Kupferman v. Consolidated Research & Mfg. Corp.,* 459 F.2d 1072, 1078 (2d Cir.1972) (Friendly, J.).............................................................................................................................. 19

*Thai-Lao Lignite (Thailand) Co. v. Gov't of the Lao People's Democratic Republic*, 864 F.3d 172, 182-83 (2d Cir. 2017). ..................................................................................................... 7

*Wyche v. Advanced Drainage Systems, Inc.*, 332 F.R.D. 109, 116-17 (S.D.N.Y. 2019) (Failla, J.) ................................................................................................................................................... 3

**Rules**

Fed. R. Civ. P. 54(b) .................................................................................................................... 2

Fed. R. Civ. P. 60(b)(1)................................................................................................................. 3

FED. R. CIV. P. 60(B)(3) ............................................................................................................ 1

FED. R. CIV. P. 60(D)(3)............................................................................................................ 1

Philip J. Loree Jr. (PL-2213)
THE LOREE LAW FIRM
11 Broadway
Suite 615
New York, New York 10004
(646) 253-0560
(516) 627-1720 (alternative phone no.)
(516) 941-6094 (mobile)
PJL1@LoreeLawFirm.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
GEO-GROUP COMMUNICATIONS, INC.,

                    Plaintiff,                        Index No. 15-cv-01756 (KPF)

-v.-

RAVI CHOPRA; MAHENDRA SHAH; VIPIN
SHAH; 728 MELVILLE PETRO LLC; KEDIS
ENTERPRISES LLC; JMVD HILLSIDE LLC;
NYC TELECOMMUNICATIONS CORP.; and
SHALU SURI,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### PLAINTIFF GCI'S COMBINED RULE 60(B)(3) REPLY MEMORANDUM OF LAW AND RULE 60(D)(3) MEMORANDUM OF LAW

Plaintiff Geo-Group Communications, Inc. ("GCI") respectfully submits this Combined

Rule 60(b)(3) Reply Memorandum of Law and 60(d)(3) Memorandum of Law in further support

of its Fed. R. Civ. P. 60(b)(3) motion (the "Motion") (Dks. 368, 369, 370) and in support of its

supplemental claim for relief from judgment pursuant to Fed. R. Civ. P. 60(d)(3). (See Dks. 391,

399 at 5 of 5.) [1] While Chopra's opposition asserts a barrage of arguments, none has any merit

---

[1] Unless otherwise specified, GCI uses the same abbreviations and conventions as it used in its
Memorandum of Law in Support of the Motion (Dk. 369). References to "Ex. ___" shall be to

and they are, for the most part, based on distortions of the record, spin, or false narratives. We address the key ones below.

ARGUMENT

POINT I

GCI'S RULE 60(B) MOTION WAS FILED WITHIN THE ONE-YEAR CUTOFF

In Point I of the Moving Br., GCI explained why final judgment disposing of the entire litigation was deemed entered 150 days after the July 9, 2021, entry of the Conditional Order of Dismissal. (See Dk. 369 at 29-34 of 42.) Chopra does not seriously dispute the legal basis for that assertion but says the Court certified under Rule 54(b) the July 30, 2018, summary judgment order for immediate appeal, and the one-year cutoff period thus expired years ago.

The Court did not certify the summary judgment order for immediate appeal. *See* Fed. R. Civ. P. 54(b); *In re Air Crash at Belle Harbor, New York on Nov. 12, 2001*, 490 F.3d 99, 109 (2nd Cir. 2007) (requiring "express determination that there is no just reason for delay" and an "express[] direct[ion]" to "the clerk to enter [partial final] judgment"). The Court simply "direct[ed] the Clerk to terminate" the motion and M. Shah, Chopra, and NYC Telecom as parties.

POINT II

GCI FILED ITS MOTION WITHIN A REASONABLE TIME

GCI's moving papers explain why the Motion was made within a reasonable time. (See Dk. 370 at 4-9 of 10; Dk. 369 at 14-15, 34-37 of 42.) But Chopra suggests all that matters is that GCI received in November 2021 some 87,000 pages of electronic documents from the Shahs in November 2021, in response to the Settlement Agreement. According to Chopra, GCI not

---

the Exhibits attached to the V. Dec (Dk. 370) or to the Supplemental Declaration of Govind Vanjani executed on March 6, 2023 (the "V. Supp.").

moving for 60(b)(3) relief within a period less than four months or so of the production date is unreasonable in the same sense that it was unreasonable for the plaintiff in *Wyche v. Advanced Drainage Systems, Inc.*, 332 F.R.D. 109, 116-17 (S.D.N.Y. 2019) (Failla, J.), not to discover, for four months, a publicly available order of the Securities and Exchange Commission that provided potential grounds for a Rule 60(b)(2) motion. *Id*.

     A.     The Case Law Does not Support Chopra's Reasonable Time Argument

*Wyche* and the other cases cited by Chopra finding that a delay of x or y number of months is unreasonable principally involve: (a) Rule 60(b)(1), which governs post-judgment relief for "mistake, inadvertence, surprise, or excusable neglect[,]" a provision frequently invoked when a default judgment has been entered against the moving party, or when the movant is effectively making a motion for reconsideration; or (b) Rule 60(b)(2), which governs post-judgment relief based on "newly discovered evidence." Fed. R. Civ. P. 60(b)(1), 60(b)(2). In Section 1(b)(1) cases the "mistake" or "excusable neglect" is ordinarily apparent on or very shortly after judgment is entered, and its potential effect on the judgment is generally also apparent at that time. The question when "newly discovered evidence," should have been discovered ordinarily depends on the circumstances, but once the evidence itself is discovered (or deemed discovered), then its potential effect on the judgment, and the potential availability of Rule 60(b) relief, is frequently apparent (or deemed apparent) at or not long after actual or deemed discovery.

Not so with fraud.  Fraud by its nature is frequently difficult to discover because its perpetrators obviously wish to cover it up. This case is a good example of that. Investigations are often necessary, and those investigations may take a very substantial amount of time.

Chopra's cases do not deal with whether a Section 60(b)(3) motion was filed within a reasonable time when the evidence of the fraud: (a) was buried in various places among tens of thousands of electronic documents; (b) was not established by any one document in isolation, but had to be collectively established by matching and cross-referencing several documents, found in various other parts of the production, together; (c) had to be established without the benefit counsel having an opportunity to depose any witnesses on the documents that form the basis of the motion, and related documents forming part of the 87,000 page production; (d) involved unusual transactions, including hawala payments disguised and falsely represented to be alleged loans, when they were (in the case of the TD Time payments) used to transmit cash to Jaina in the U.S. that had been received from Jaina from its customer TS USA Inc. ("TS USA"); (e) required careful analysis and review of not only financial documents produced in November 2021, but also documents that were obtained during discovery in the litigation, to be sure that relief is warranted; and (f) to be properly conveyed to the Court required not only a very comprehensive and methodical explanation, but one that was succinct, simple and clear enough to explain what transpired and why it matters.

B.      What Constitutes a Reasonable Time Depends on The Circumstances of Each Case.

What constitutes a "reasonable time" for purposes of Rule 60(b) "depends upon the circumstances of each case." *See, e.g., Bouret-Echevarría v. Caribbean Aviation Maint. Corp.*, 784 F.3d 37, 43 (1st Cir. 2015); *Grace v. Bank Leumi Trust Co.*, 443 F.3d 180, 190 n.8 (2d Cir. 2006). For example, in *Bouret-Echevarria*, a Rule 60(b)(6) case, the Court held that the reasonable time clock did not begin to run until "the day they learned [many months after entry of judgment] of the potential [juror] misconduct[,]" and that "during  three-month and thirteen-

day period  before the filing of the 60(b) motion, appellants' counsel was actively attempting to substantiate the motion and find local counsel with whom to associate." 784 F.3d at 44.

C.      The Circumstances Show there was No Unreasonable Delay Here

Contrary to Chopra's misleading suggestions, this is not a case involving one or more apparently dispositive smoking gun documents, which, even if buried within 87,000 pages of documents, one would expect to be discovered fairly quickly and promptly made the subject of a 60(b) motion, because the effect of those smoking gun documents on the judgment would or should have been readily apparent. What the 87,000 pages of documents represented in this case was a complex puzzle, which was exceedingly difficult to solve for purposes making a Rule 60(b)(3) motion, especially given the gaps in the document production that generated extensive litigation, and V. Shah's and N. Shah's (collectively, the "Shahs") efforts to slow-walk the production and withhold the production of documents.

1.      Chopra's Argument Misstates Key Facts

Chopra misleadingly asserts that GCI "completed its review" of the 87,000 pages of documents in December 2021, but as GCI explained in its papers, as of December, GCI had completed only its "*initial* review," which was designed principally to determine whether the Shahs had produced the documents for which GCI bargained. (Dk. 370 at 4 of 10) It also misleadingly contends that the Shahs' initial production of documents was not made within 60 days of the Settlement Agreement's effective date but fails to advise the Court that the Agreement was not effective until it was approved by the Bankruptcy Court, which did not occur until September 3, 2021. (See Dk. 369 at 31 of 42; Dk. 338 at 1 of 10, 3 of 10 (§ 1(b)(v).)

2.      Chopra's Argument Fails to Acknowledge the Unusual Procedural Posture of this Case

Case 1:15-cv-01756-KPF   Document 401   Filed 03/06/23   Page 10 of 31

Chopra also fails to acknowledge that this case has an unusual procedural posture, which is described in detail in its Moving Br. and the V. Dec. (Dk. 370 at 4-9 of 10; Dk. 369 at 14-15, 34-37 of 42) A good deal of time was devoted to the important process of ensuring that GCI in fact had a solid, strong, good faith basis for seeking the relief authorized by Rule 60(b)(3). It is reasonable for a party to take the time necessary to "substantiate" a Rule 60(b) motion, especially if the motion, like this one, involves complex facts and circumstances. *See Bouret-Echevarría*, 784 F.3d at 44.

> 3. Events that Occurred after GCI Filed its Motion Demonstrate that GCI Did not Unreasonably Delay its Filing

The Shahs managed not to produce in 2022 any documents responsive to paragraph 1(b)(i) of the Settlement Agreement (apart from the lists). But weeks after GCI filed its motion on December 6, 2022, the last day of the cutoff period, the Shahs' former attorney, Anil Arora ("Arora") and CPA Maitri Patel ("CPA Patel") produced more documents, including, at long last, a QuickBooks file covering the relevant period. Ultimately, Arora made, on January 20, 2023, a supplemental production (the "AA Supp. Prod."), which included several documents relevant to the Motion.

Certain other documents Arora produced show that CPA Patel conducted in 2016 an extensive financial analysis of Jaina's books covering a ten-year period from January 2005 through a portion of 2015. Extensive negotiations with the V. Shah's and N. Shah's counsel ultimately led CPA Patel to produce two supplemental productions, one on February 9, 2023, and another on February 19, 2023. Documents in the February 19, 2023, in particular, are pertinent to both the 60(b)(3) and 60(d)(3) grounds for the Motion.

> D. Chopra Effectively Concedes it was Not Prejudiced by any Delay

An important reasonable-time consideration is whether the nonmovant has been prejudiced by delay. *Thai-Lao Lignite (Thailand) Co. v. Gov't of the Lao People's Democratic Republic*, 864 F.3d 172, 182-83 (2d Cir. 2017).  Chopra does not address prejudice in the reasonable time section of his brief but asserts he will be prejudiced if he has to defend on the merits. (See Dk. 387 at 37-38 of 40.) But it points only to events that occurred before the litigation was commenced (i.e., the death of Jagdish Alwani in 2014), events that occurred prior to his making the false statements in his summary judgment papers in late 2017 and early 2018 (i.e., the shutting down of Jaina's back offices in India and M. Shahs' move to Florida), events that he cannot establish occurred after he moved for summary judgment (i.e., the inoperability of the servers), and another irrelevant event –M. Shah's dismissal from the case on summary judgment. Chopra thus effectively concedes it suffered no prejudice, by unreasonable delay or otherwise.

## POINT III

### CHOPRA'S ARGUMENTS CONCERNING THE MERITS OF GCI'S RULE 60(B)(3) MOTION ARE MISPLACED

A.      Chopra's Arguments about "Cashflows" and the Unreliability of Ledgers Fail

Chopra contends that all the court should look at in this case are the bank statements, because they show "cashflow." While bank statements record incoming and outgoing funds and the identities of the payors and payees, general ledgers provide a more meaningful picture because they not only provide bank-statement-type information (on the left-hand side), but also identifies for incoming funds, the source; for outgoing funds the beneficiary, if the beneficiary is someone other than the payee; and for all funds, the account to which the transaction is assigned.

General ledgers are therefore more reliable than bank statements in identifying the true nature of a transaction, an important distinction Chopra conveniently blurs. Without them,

money laundering and other questionable transactions could be accomplished quite easily and without detection.

Attempting to fend of what the ledgers show in this case, Chopra declares (without proof) that Jaina's ledgers were "unreliable." This represents a rather wild departure from his view when he was working with Jaina. For example, Chopra, interfacing with his longtime associate, CPA Harvinder Dhody, oversaw the preparation of Jaina's 2013 Tax Return. (See Ex. 59 at SHAH5886.) Obviously, R. Chopra and Dhody had to rely on the accounting documents prepared in India by Jaina India, who handled Jaina's back-office operations, including bookkeeping and accounting, but there is no indication that either Chopra or Dhody thought there they were preparing tax returns based on unreliable data.

B.     The TD Time Payments were Hawala Payments, the Source of which was Cash Collected from Jaina's Customer TS USA

Chopra contends (Dk. 387 at 29 of 40) that "GCI has failed to adduce any evidence" that the source of the TD Time payment funds was "Jaina's customers." But GCI has thoroughly established in its moving brief that the source of the six TD Time payments in issue was cash collected from Jaina's customer, TS USA. (Dk. 369 at 5-6, 16-25, 39-41 of 42)

The TD Time payments were not loans from TD Time or loans TD Time made on behalf of Vision Impex or anyone else. *Id*. Once one accepts that the TD Time payments were not made to discharge any antecedent debt owing from TD Time or Vision Impex, then there is no basis for concluding that any of the *$1,350,000* in Brog Transfers were payments of antecedent debt. (Id.). Given that those transfers were made for the benefit of R. Chopra, Chopra is liable to pay

that money to GCI because the payments constituted an actual and constructively fraudulent transfer under the NY DCL. *See id*.[2]

1.      Chopra's Arguments Concerning GCI's Ex. 27 are Misplaced

Chopra says "Jaina appears to have used 'TS USA' as a catchall for a variety of transactions that involved carriers and other parties[]" (Dk. 387 at 25-26 of 40). In support of its argument, Chopra attached to Siddiqi's declaration (Dk. 388 at 2 of 2) Ex. G (Dk. 388-7), which Siddiqi says is a sort of all TS USA transactions appearing on GCI's Ex. 27 (Dk 370-28), a Jaina general ledger document. (See also Ex. 22A.)

Ex. G says nothing that would undermine in any meaningful way GCI's arguments concerning the source of funds for the TD Time payments. In any event, the only TS USA transactions that matter are the six that match with the six TD Time payments, each of which were made in the period October 23, 2013, through January 29, 2014. (See Exs. 1 & 6.) Jaina's general ledger (Exs. 22A & 27), Customer Spreadsheet (Dk 370-25 at 226-27), Hawala Spreadsheet (Ex. 13), and Jaina's Gross Margin, Income Statement & Daily Cash Flow Master Worksheet (Ex. 28) demonstrate that the source of the funds for each of the six TD Time payments was TS USA. (See Exs. 1 & 6; Ex. 55)

We have taken Chopra's Ex. G sort, extracted from it the six TD Time transactions at issue, and incorporated them, along with other data, into GCI's Ex. 55, which demonstrates that there is nothing at all unusual or "unreliable" about the six transactions. (Ex. 55)

2.      Chopra Effectively Concedes that the TD Time Payments are Cash
        Payments Collected from Jaina's Customer TS USA

---

[2] Applicable legal standards for the NY DCL claims are thoroughly discussed in the Court's summary judgment opinion. (See Ex. 18.)

GCI's Ex. 55 further demonstrates that the data— including data submitted by Chopra— concerning the six TD Time/TS USA transactions collectively shows that the TD Time payments were not loans but payments collected in cash from TS USA against Jaina invoices, which were transmitted to Jaina by TD Time through hawala.  The data is not susceptible to another interpretation, notwithstanding Chopra's valiant efforts to concoct one.

Chopra submitted Ex. G from which Ex. 55's Column A was created, Column B is data with which both Chopra and GCI agree, and Columns C and D represent data submitted by GCI as produced by V. Shah and N. Shah. The data in all four columns matches (save for two Hawala Spreadsheet typographical errors) (see Ex. 55).

   3.    The Documents Show that TS USA was not a Catch-All Account but one
         for a Key Jaina Customer which Generated 2014 Revenue of $3,256,803

Summing up TS USA data shows TS USA was no "catch-all" account. In 2014 Jaina invoiced TS USA in the amount of $3,256,803 for Jaina telecom services. (See Dk. 370-25 (Ex. 24) at 226-228 of 307; See Ex. 56) TS USA invoiced Jaina for $265,426. (Ex. 56) TS USA paid Jaina $3,262,417 for its services. (Ex. 56) All of the 2014 TS USA amounts shown as paid on Chopra's Ex. G therefore represented amounts for which Jaina invoiced TS USA.

C.    Chopra Produced an Altered Version of S. Bose's October 22, 2013, Email

Chopra, quite incredibly, denies that it altered S. Bose's October 22, 2013 email, but that denial is baseless and self-serving. A simple comparison of the unaltered version to the altered version demonstrates that the altered one lacks a header, sender and recipient email addresses, a subject line and a date. (Compare Ex. 37 to Ex. 38; see Dk. 369 at 17-19 of 42.) Chopra provides no evidence to back his assertion that other emails were produced in a similar form—they were not. (See, e.g., Ex. 57.)

10

D.      Chopra's Attempt to Explain Away S. Bose's October 22, 2013, Email in its Unaltered Form is Contradicted by the Facts

GCI explained why the unaltered version of S. Bose's October 22, 2013 email, construed in context with other documents, demonstrates the TD Time payments were hawala payments. (Dk. 369 at 17-21 of 42) Disregarding the text of the email, Chopra, parroting its deposition testimony, asserts the email requested Chopra to make a $440,000 loan, and did not ask him to "coordinate with" M. Shah "and Collect USD 60K cash and . . . wire me the amount in Jaina TODAY. . . ." (Aside from its facial absurdity, the argument is contradicted by the facts.

Jaina's October 2013 bank statements, and its general ledger (Dk 370-28), shows that on October 23, 2013, Jaina received the $60,000 hawala payment from TD Time, along with a few other customer payments, which allowed Jaina to make a series of wire transfer payments, including a $500,000 payment to Aircel. (Dk. 370-23 at Shah_Ds-000145; 370-28 at SHAH27876) That was the $500,000 payment S. Bose had to had to make "to Aircel today by hook or crook." (Dk. 370-38 at 2 of 2) S. Bose simply needed the $60,000 TD Time hawala payment to make the $500,000 Aircel payment and obviously wasn't requesting a $440,000 loan.

E.      Chopra's Arguments are Contradicted by N. Shah's Second Declaration and Siddiqi's Supplemental Declaration

N. Shah, who was an officer and shareholder of Jaina, swore under penalty of perjury that Jaina's "records do not show TD Time loaned money to [Jaina]." (Dk. 367-1 at 2 of 3; Ex. 58) That squarely contradicts Chopra's position and is in accord with GCI's.

The Court ordered Chopra's counsel Siddiqi to submit a declaration concerning whether, among other things, he or his firm had any "information" pertinent to the three lists the Shahs produced in response to the Settlement Agreement, including a list of "individuals or entities that loaned money to Jaina between 2013 and 2015." (Dk. 338 at 2 of 10; Dk. 360-6 at 3 of 5; Dk.

360-6 at 3 of 5) While Chopra argues vociferously that TD Time —and Impex—were "individuals or entities that loaned money to Jaina" in 2013 and 2014, Siddiqi declared that "neither I nor my firm are in possession of. . . information pertinent to the lists contemplated by the Settlement Agreement." (Ex. 60) Having made that statement under oath, Siddiqi cannot, without contradicting his own declaration, make the certification required by Fed. Rule Civ. P. 11(b)(3).

Chopra also claims that GCI did not provide him with a copy of the lists, but GCI did so on December 18, 2022, weeks before Siddiqi made his supplemental declaration. (See Ex. 61.)

F.     Chopra's Attacks on the Hawala Spreadsheet are Unfounded and Contradicted by the Evidence

Chopra contends the Hawala Spreadsheet is "unreliable" and does not establish that the TD Time payments were hawala payments, but these arguments are based on what Chopra would like the Hawala Spreadsheet and other documents to say if it could rewrite them, not on what they actually say. (See GCI Br., Dk. 369 at 16-23 of 42.) AA Supp. Prod. correspondence also forecloses Chopra's inventive but misguided "interpretations."

1.     M. Shah's January 7, 2017 Email Concerning the Hawala Spreadsheet Refutes Chopra's Arguments Regarding the Hawala Spreadsheet

The AA Supp. Prod. contains correspondence from M. Shah, dated January 7, 2017 (Ex. 62), in which he responds to Arora's November 23, 2023 email concerning "payments made to Ravi in India" (Ex. 63) by explaining to Arora what the Hawala Spreadsheet shows and how the Chopra hawala scheme operated. The email is self-explanatory. (See Ex. 62.)[3]

2.     M. Shah's June 6, 2016 Correspondence with Arora Discussing "Money

---

[3] The reference to "TSN" in both the file name of the Hawala Spreadsheet, and in M. Shah's email, is a reference to Telecom Services USA, Inc. ("TS USA"). TSN was the moniker of a related company, Telecom Services Network, LLC ("TSN LLC"), which did business with Jaina from March 2010 until May 2, 2013. (See Dk. 370-25 at 129-131 of 307.) TS USA did business with Jaina from the period April 2013 through 2015.

Laundering," "Made up Transactions," and Phony Invoices

Arora also produced on January 20, 2023 email correspondence from Mahendra Shah to Arora in which M. Shah explained that Chopra and Kedis Enterprises LLC ("Kedis") were engaged in "something like money laundering" and that "all" the transactions were "made up transactions." (Ex. 64)

The "letter and invoices" to which the email refers are those attached to M. Shah's June 3, 2016 email to Arora (Ex. 33; see Dk. 369 at 23 of 42) These included S. Bose's January 15, 2015 letter to Impex (see Dk 369 at 22-23 of 42; Dk. 370-34 at SHAH01658), and three supposed "STI Phone Card Warehouse" invoices to Jaina for phone cards and certain cell phone accessories. (Dk. 370-34 at SHAH01659-61) As respects these invoices, M. Shah explained, "[w]e never did these phone cardbusiness through Jaina." (Ex. 64)

G.     The January 15, 2015 Letter Chopra Had S. Bose Sign Demonstrates that
Chopra's Arguments Concerning the Impex Payments are Meritless

Chopra offers no response to GCI's argument that the January 15, 2015, letter to Impex's Kumar, that, according to M. Shah, Chopra "made" S. Bose sign. (See Dk. 370-34 at SHAH01657, 01658; Dk 369 at 22-23 of 42.) That letter demonstrates, among other things, that the TD Time payments were not loans, and the $1,350,000 Brog payments were not good faith payments of antecedent debt allegedly owed to Impex.

To establish the context for the letter, we have prepared Ex. 65, which is a chart that decouples the TD Time payments from the Brog and Impex payments and chronologically lists the Brog and Impex payments, showing that once those payments were made, there was a $110,182 balance in favor of Jaina once Jaina transferred $1,350,000 to Brog. (Ex. 65; see also Dk. 370-6 at 2 of 2 (Table 5)) S. Bose's letter expressly asked Impex to confirm the $110,182

balance due and owing Jaina in writing.  That would never have occurred had the TD Time payments been loans on behalf of Impex.

H.     The Evidence Shows Chopra was the Beneficiary of the Blog and LLC Transfers

The NYDCL's fraudulent conveyance provisions provide a remedy only against "transferees" or "beneficiaries" of a fraudulent conveyance. See *Federal Deposit Insurance Corporation v. Porco*, 75 N.Y.2d 840, 842 (1990). A "beneficiary" must "benefit[]" "in [some]. . . way from the conveyance." See Id.

As respects the Brog transfers, GCI demonstrated that: (a) Jaina's "Deposit Analysis" shows that Impex's payments to Jaina were not booked as Impex payments but were identified as "STI Loan/Ravinder Chopra" payments (Dk. 369 at 23 of 42); (b) The Banking Spreadsheet (Ex. 22A), and the materially identical Ex. 27 (Dk. 370-28), shows that all but the first two Brog transfers were booked by Jaina as "Ravi Chopra – Foreign Loan Refund – Loan Refunds" (see Dk. 369 at 24 of 42; see, e.g. Dk. 370-28 at 125 of 141); and (c) the Hawala Spreadsheet shows that the first two Brog payments were payments made for the benefit of R. Chopra.  (Dk. 370-14 at 3 of 3) Aside from self-serving denials, Chopra's only explanation is that he allegedly played some role in brokering the alleged "loans," and that, he says, is why the accounting documents booked them under his name. But a review of Ex. 27 shows that is not how Jaina booked other financial transactions – it used the right-hand side of the ledger to show the source or beneficiary of funds.  Further, it makes no sense from an accounting or economic perspective to book a loan under an account named for the broker – whose financial stake in the transaction is limited to its commission—as opposed to under the name of the lender, who is the real party in interest.

Chopra makes essentially the same arguments in its discussion of the LLC Transfers and in Point VII, concerning the materiality of the fraud, and they fail for the same reasons, and for the reasons set forth in GCI's Moving Br.  As part of that Chopra argues that it must prevail

14

because evidence has not yet surfaced showing that Chopra *received* all or part of the funds sent to Brog or the LLC Defendants, but that ignores what the Court of Appeals said about being a "beneficiary" of a transfer: a beneficiary is someone who "benefits in any" or some "way" from the transfer. Had Chopra and the persons who testified for him, been honest about Chopra's financial interest in the transaction, then there would have been meaningful discovery concerning it, and, even without that meaningful discovery, summary judgment would have been impossible.

Finally, evidence that has surfaced from the Shahs' February 19, 2023, CPA Patel production, and Arora's January 20, 2023, production, underscores that Chopra was the beneficiary of the Brog and LLC Transfers. CPA Patel, prepared and sent to Arora on November 3, 2016, certain analyses of the transactions that were subject to GCI's TAC. Her letter to Arora about the Brog Transfers records M. Shah's understanding, in his capacity of Jaina's CEO, that Impex and TD Time were "affiliated companies of Ravi Chopra." (Ex. 66) Her workpapers for her analyses show that, for all the Brog Transfers, the alleged "Lender Name" under which Jaina booked the transaction was "Ravi Chopra." (Ex 67)

In a document entitled "Mahendra Loan Workings.xlsx," produced by Arora and also by CPA Patel, confirms that Jaina booked the Brog and LLC Transfers as alleged loans made by and refunded to "Ravi Chopra." (Exs. 68, 69) A spreadsheet entitled "File sent to Anil 11.16.16.xlsx" shows the same thing. (Ex. 70)

The other arguments Chopra makes about the LLC Transfers are refuted by GCI's Moving Brief arguments. (See Dk. 369 at 12-14, 25-29, 41-42 of 42.)

I.     Chopra's Attempt to Blame GCI for the Shahs' Deliberate Failure and Refusal to Produce Documents is Meritless

Chopra blames GCI for the Shah Defendants not producing key documents in their possession, or to which they had access, principally because GCI did not subpoena Jaina. But at

the July 25, 2017, judicial conference, the discussion centered on why the Shah Defendants were producing very few of Jaina's books and records and whether they were withholding any responsive documents that they possessed or had access to. (Ex. 9, 370-10 at 4 of 35, 6 of 35, 8-11 of 35). In response to the Court's questioning, Arora told the Court the reason his clients had not produced the requested documents was because their clients did not have possession of, or access to, them, supposedly because S. Bose had supposedly fled to India, taking the documents with him. (Dk. 370-10 at 10-11) That was a false statement – we now know both the Shahs and Arora had possession of and ready access to a huge trove of responsive, relevant documents. GCI had a right to rely on counsel's representation about discovery compliance made in open court to a Federal District Judge. *See, e.g.*, *France v. Bernstein*, 43 F.4th 367, 379-81 (3d Cir. 2022).

J.      NYC Telecom Should Be Subject to this Motion

Contrary to Chopra's contention NYC Telecom jointly moved for summary judgment and the Court expressly granted summary judgment to both NYC Telecom and R. Chopra "to the extent Plaintiff seeks to hold Chopra or NYC Telecom liable" for the LLC Transfers. (Dk. 236 at 13 of 39, 29 of 39 n.11) The same should be true for the Brog Transfers, and NYC Telecom should remain subject to this Motion.

16

<u>POINT IV</u>

THE COURT SHOULD GRANT RELIEF UNDER RULE 60(D)(3) FOR FRAUD
ON THE COURT

GCI respectfully submits this ten-page brief to supplement the Motion briefing to include

a Fed. R. Civ. P. 60(d)(3) claim for fraud on the Court. (Dk. 399 at 5 of 5) GCI respectfully

requests that the Court overturn for fraud on the Court the judgment in favor of R. Chopra and

NYC Telecom insofar as it concerns the Brog and LLC Transfers, that is, to grant the same relief

as set forth in GCI's December 6, 2022, Notice of Motion. (See Dk. 368.) The fraud on the court

was perpetrated by attorneys and officers of the Court, Arora and Siddiqi

A.     Legal Standard

Fed. R. Civ. P. 60(d) provides that Rule 60 "does not limit a court's power to. . . (3) set

aside a judgment for fraud on the court." Fed. R. Civ. P. 60(d)(3); *see Hazel-Atlas Co. v.*

*Hartford Co.*, 322 U.S. 238, 244-50 (1944), *overruled on other grounds*, *Standard Oil Co. v.*

*United States*, 429 U.S. 17 (1976). Fraud on the Court, an equitable doctrine, is "narrower in

scope" than Fed. R. Civ. P. 60(b)(3) "fraud."  *King v. First American Investigations, Inc.*, 287

F.3d 91, 95 (2d Cir. 2002); *accord Hazel-Atlas*, 322 U.S. at 247-48. It encompasses fraud that

"seriously affects the integrity of the normal process of adjudication[,]" "fraud which does or

attempts to, defile the court itself, *or* is *a fraud perpetrated by officers of the court* so that the

judicial machinery cannot perform in the usual manner its impartial task of adjudging cases." Id.

(citations and quotations omitted; emphasis added).

Attorneys are officers of the Court. They "should represent [their] client

with singular loyalty" but "that loyalty obviously does not demand that [they] act dishonestly or

fraudulently; on the contrary [their] loyalty to the court, as an officer thereof, demands integrity

17

and honest dealing with the court. And when [they] depart[] from that standard in the conduct of a case [they] perpetrate[] a fraud upon the court." *Kupferman v. Consolidated Research & Mfg. Corp.,* 459 F.2d 1072, 1078 (2d Cir.1972) (Friendly, J.) (quotations and citations omitted) If "an attorney misrepresents or omits material facts to the court, or acts on a client's perjury or distortion of evidence," then their "conduct may constitute a 'fraud on the court.'" *Eastern Financing Corp. v. JSC Alchevsk Iron and Steel Works*, 258 F.R.D. 76, 85 (S.D.N.Y. 2008) (quoting *Hazel-Atlas*, 322 U.S. at 238; other citations omitted); s*ee, e.g., Kupferman*, 459 F.2d at 1078. Fabrication or misrepresentation of evidence, if perpetrated by an attorney constitutes a fraud on the court.

Like other fraud, fraud on the Court requires clear and convincing evidence. 287 F.3d at 95. It is not subject to Rule 60's one-year cutoff period or any other "reasonable time" stricture (other than laches). See 287 F.3d at 95.

B.     The Evidence Clearly and Convincingly Shows That Fraud on the Court has been Perpetrated by Chopra, M. Shah, V. Shah, and Officers of the Court

The fraud on the Court revealed by the AA Supp. Prod., and in the CPA Patel documents produced on February 19, 2023, construed in conjunction with the 60(b)(3) evidence already before the Court, involved officers of the Court, and "seriously affect[ed] the integrity of the normal process of adjudication[]" so that the Court could not "perform in the usual manner" its adjudicative function. *See First American Investigations,* 287 F.3d at 95 (citations omitted). It is summarized below.

1.     Setting the Stage

Much (but not all) of the conduct pertinent to GCI's Rule 60(d)(3) claim took place in the latter part of 2016, more than a year after the litigation was commenced. A significant event during this period was a November 8, 2016, meeting at R. Chopra's offices, at which  the Shah

Defendants, Chopra and their attorneys were present. (Ex. 71) What occurred both prior to and after that meeting demonstrates that the Persons and Attorneys Involved were actively coordinating a strategy to misrepresent to the Court and GCI that the Brog and LLC Transfers were made to discharge antecedent debt, Attorneys Involved knew those transfers were nothing of the sort, and that R. Chopra was a beneficiary of the Transfers.

In assessing the evidence, it is important to remember the uncomplicated version that Siddiqi, the defendants, TD Time, and Impex, portrayed to the Court: Impex supposedly lent funds to Jaina, albeit after the first two payments had already been made to Brog. That inconvenient truth was conveniently dealt with by Chopra and TD Time claiming that two of the TD Time payments, which predated the first two Brog payments, were loans TD Time allegedly made to Jaina on behalf of Impex, supposedly in discharge of a debt TD Time allegedly owed Impex. The payments were made to Brog, the Court was told, because Impex allegedly is a client of Brog who, from time-to-time deposits funds into Brog's IOLA trust account. Were this story truthful, none of the events discussed below would have occurred.

2.    The Shahs' and Arora's Knowledge of the Sham Transfers

The Shah Defendants and Arora were well aware that the Brog and LLC transfers were sham transactions, something the Shahs admitted in their Supp. Prod. correspondence with Arora. In his June 6, 2016 email to Arora, M. Shah explained, among other things, that R. Chopra and Kedis were doing "something like money laundering," that R. Chopra "made" S Bose sign the January 15, 2015, letter to Impex, which demonstrates, among other things, that the TD Time payments were not loans, and that none of the Brog Transfers were made to discharge antecedent debt; and that "all" the R. Chopra-related "transactions" "were made up[.]"  M. Shah also informs Arora that Chopra was using phony STI Phonecard Warehouse's

invoices  to justify payments, even though "[w]e never did these phone card business through

Jaina [which was the subject of the phony invoices]." (emphasis added) (See Ex. 71.)

An email dated August 26, 2016 (Dk. 72), further informed Arora that attorney Ed Troy

because the facts show the Kedis loan to Neminath was not discharged until Neminath sold the

235 Hillside Avenue Property. (See Dk. 369 at 25-29 of 42; Dk. 370-45 (Ex. 45) at ¶¶ 16-45.)

   3. The Shah Defendants and Arora had Reason to Fear R. Chopra, which
     Provided a Motive not to Cross Him

In an email dated June 8, 2016, M. Shah expressed to Arora the need to keep confidential

S. Bose's expected visit to the U.S. to testify because "Ravi Chopra sent bad guys over his house

[in India] & gave him threaten [sic] to hurt him & his family." (Ex. 73) This report very likely

led the Shah Defendants and Arora to fear Chopra and not wish to cross him by telling the truth

about the Transfers.

   4. The Shah Defendants, with Arora's Knowledge and Consent, engaged in a
     Reverse Engineering Exercise Designed to Portray Falsely the Brog Transfers as
     Loan Repayments

Settlement Agreement documents produced by V. Shah and N. Shah show that prior to

meeting with Chopra on November 8, 2016, the Shahs engaged in an exercise designed to

misrepresent the true nature of the TD Time and Impex payments.  The spreadsheets created

featured various permutations of how Vision Impex and TD Time payments and other payments

might be misrepresented to be loan payments. (See, e.g., Ex. 74.)

 The AA Supp. Prod. documents, and CPA Patel documents on Feb 19, 2023, show that

Arora and the Shah Defendants considered at least three options for presenting to the Court

scenarios under which the Brog Transfers might be deemed to discharge antecedent debt. Option

1, set forth in an October 7, 2016 was set forth in an email exchange beginning on October 7,

2016 (Ex. 75), and proposed the following combination of payments: (a) one payment from New

York Main Street Consultants, Inc. in the amount of $100,000; (b) two TD Time payments in the amount of $314,000; (c) a Sun World Trading (HK) Ltd. payment of $94,930; (d) a Nexvoiz Communications Inc. payment of $100,100; and (e) four payments from Impex in the amount of $743,400. (See Ex. _75.)[4] The total payment was $1,352,430.

Option 2 was set forth in CPA Patel's November 3, 2016, letter to Arora (produced on February 19, 2023). CPA Patel's letter states that, "[a]s Per [M. Shah], CEO Jaina Systems Networks, Inc. . . . [Jaina] borrowed $1,352,720 from TD Time Inc., and Vision Impex Ltd., affiliated companies of Ravi Chopra during the fiscal year 2014. . . ." (Ex. 76) CPA Patel's letter proposes a very different breakdown: (a) three payments from TD Time in the total amount of $414,250; (b) six payments from Impex in the total amount of $938,450. (Ex. 76) The total payment $1,352,720.

Option 3 represents Chopra's position on summary judgment. As explained in the Rule 60(b)(3) moving Br., the $1,350,000 transferred to Brog was according to Chopra —and the Court's summary judgment findings—in partial satisfaction of: (a) a series of eight payments from Impex to Jaina (totaling $1,146,570.00)  and (b) two payments TD Time made to Jaina, totaling $314,000,  allegedly made on behalf of Impex, and which allegedly constituted loans from Impex to Jaina. (Dk. 369 at 10 of 42)

This third option, which was decided upon after the November 8, 2016, meeting, was different in at least four ways from the ones the Shah Defendants, CPA Patel, Mehta, and Arora had previously considered.  First, it did not acknowledge that TD Time or Impex had any formal or informal affiliation with one another. Second, it did not portray R. Chopra as being the real

---

[4] The email does not contain the amounts of these payments, but they are readily available from accounting documents, which list them in chronological order, including ones in the possession of Arora and the Shahs. (See, e.g., Ex. 27.)

party in interest as respects the "loans." Third, it relied on only two payments from TD Time, not three. Fourth, it introduced the fiction that the two TD Time payments were made on behalf of Impex.

Throughout this process the Shah Defendants and their attorney correctly understood that Chopra, using Impex, TD Time and other Chopra "affiliated" entities as fronts (or dummy companies), was the real party in interest of the alleged "loan" payments made to Brog and the LLC Defendants. By email dated November 16, 2016, M. Shah sent "a list of all the monies borrowed and Repaid to Ravi Chopra and his associates." (See Ex. 70.) The attachment, an Excel file entitled "Sent to Anil 11.16.2016" identifies R. Chopra as the beneficiary of the Brog Transfers and the $660,000 in LLC Transfers (made to Hillside and 728 Melville). (See Ex. 70.) TD Time is not mentioned anywhere in the spreadsheet. (See Ex. 70.)

Contrary to Chopra's contentions, the reverse engineering process was not "a postmortem" designed to discover what had occurred with respect to alleged loans. If what had really happened was the simple story Chopra recounted in his summary judgment motion, then no November 8 strategy meeting would have been required.

5.      The November 8, 2016, Meeting

The Shah Defendants, Mehta, Chopra, Arora and Siddiqi knew the Brog and LLC Transfers did not discharge antecedent debt. They nevertheless worked together to portray them to be loan repayments. This cooperation included a meeting held at Chopra's office on November 8, 2016, at which all were present.  (See Ex. 71.)

Supp. Prod. correspondence shows the parties discussed whether the parties could misrepresent to the Court that two of the TD Time payments—which GCI has established were not loans, see Dk. 369 at 16-23 of 42—were loans to Jaina that were supposedly discharged by

the Brog Transfers. Mehta's November 10, 2016, email to Arora confirmed that they "are waiting for Ravi [Chopra] to let us know if we can use TD Time funds for the first two entries of Robinson Brog." (Ex. 78). The attorneys involved needed to identify, and mischaracterize as loans, payments made to Jaina that predated the first two Brog Transfers, or else the story that the Brog Transfers discharged antecedent debt would collapse. (See Dk. 369 at 22 of 42; Dk. 370-6.)

Chopra and his counsel had not, as of the date of the meeting, yet scripted the simple story they ultimately presented to the Court. For were what they fabricated true, then there would be no reason for Chopra to "confirm" that the parties could characterize one or more TD Time payments as loan payments.

The balance of Mehta's email underscores how the attorneys and defendants involved had not yet agreed on the story and were still in the process of creating it. Mehta says, "If Not [i.e., if TD Time could not be used] then here are some points." (Ex. 78) One of those was "[i]f Robinson Borg (thru sworn statement or deposition) says that the funds they received from Jaina were not for the benefit of Ravi [Chopra] and were not given to Ravi [Chopra] in any form then does Geo group have a case Re Robinson Borg [sic] Count." (Ex. 78) To this he added a related point: "[i]f Borg [sic] says that they received the payments for/on behalf of Vision Impex—that may also help us close the loop." (Ex. 78)

Mehta therefore recognized that, if the Brog payments were not for antecedent debt (which they were not), then Chopra might still have a defense if, contrary to what the documents show, he was not a beneficiary or transferee of the Brog funds. Thus, Mehta's suggestion supposing that Brog might give testimony to the contrary was either: (a) evidence that the parties wanted Brog to give false testimony, and were perhaps considering suborning it; or (b) in the

event Brog was unaware of the relationship between Impex and Chopra, and unaware of the true nature of the alleged loan repayments, and Chopra's interest in them,  then Brog might innocently give that testimony, thereby making it easier for Chopra to conceal his interest. But either way, the attorneys and defendants involved knew Chopra was the beneficiary, but wanted the Court and GCI to think that Impex was the only beneficiary.

Email correspondence on November 12 and 14, 2016 indicates that Arora contacted Mitchell Greene at the Brog law firm, but there is no documentation of any communications Arora or anyone else had with Brog. (Ex. 79)

On November 15, 2016, Mehta sent a follow-up email, explaining that he was "back in town," and inquiring whether there was "any progress with Ravi, Siddiqui [sic], Robinson Borg [sic], Vision Impex, TD Time, NYC Telecom." (Ex. 82) Were things as simple as Chopra ultimately told court , then none of these efforts were needed.

### 6.     Chopra's Proposal that Falsified Evidence be Used

Mehta's correspondence also shows that, at the meeting and in the presence of counsel, Chopra proposed using certain falsified invoices to justify certain payments made to one of his companies. (See Ex. 78.) Mehta subsequently instructed Arora to advise Siddiqi that the Shah Defendants were not "comfortable" with that proposal. This Proposal should have been emphatically rejected by Siddiqi and Arora from the outset.

Chopra conclusorily denies this assertion and claims that it cannot form the basis for GCI's motion because the invoices ultimately were not presented to the Court. Jaina's accounts payable for 2014 show that $300,000 was paid based on those fabricated invoices.

### 7.     Attorney and Client Knowledge of the Hawala Spreadsheet

The AA Supp. Prod. contains documents, including the "Hawala Spreadsheet," which show that the Shahs and Arora was aware that the TD Time payments and other transactions were hawala payments.  (See Dk. 369 at 16-24 of 42; Exs. 62, 80) On November 22, 2016, M. Shah emailed the Hawala Spreadsheet to Arora, two weeks after the meeting. (Ex. 80) The email's subject line was "Payments made to Ravi in India." (Ex. 80) In an email dated November 23, 2016, Arora requested an explanation of what the Hawala Spreadsheet "means[,]" and stated he was "unable to adequately proceed until all uncertainties and confusions are cleared up regarding what we borrowed from Ravi Chopra and others and what we paid back and to whom." (Ex. 81)

The Shah Defendants did not reply to Arora until January 7, 2017, when M. Shah explained to Arora in detail how the hawala scheme operated and "how Ravi got paid lot of money in India." (Ex. 62)  "

Anil Arora knew about hawala spreadsheet since Nov 22, 2016 and Mahendra's explanation by email dated January 7, 2017. GCI did not have the benefit of that email as of December 6, 2023, when it made the Motion, and it was not produced until January 20, 2023.

8.      Arora's Subsequent Misrepresentation to the Court that Surajit Bose Absconded to India with All of Jaina's Documents.

GCI complained about the paucity of document production at the July 25, 2017, conference, Arora told Your Honor that S. Bose had fled to India with Jaina's business records and, accordingly, neither V. Shah or M. Shah could produce them. (See Dk. 369 at 9 of 42.) The supplemental production is, however, loaded with documents that should have been produced back in 2016 or 2017, including an extensive financial analysis that CPA Patel prepared for Jaina for the period 2005 through part of 2015, including Jaina General Ledgers, Balance Sheets and Profit and Loss statements, all part of Jaina's books and records. Other pertinent documents

contained in the supplemental production have been the subject of this briefing. Had these documents been produced, and available to GCI during discovery, GCI would, we believe, have defeated summary judgment against Chopra, and had its day in court with him. Arora should also have revealed the existence of the 87,000 pages or so of electronic documents that V. Shah and N. Shah later produced pursuant to the Settlement Agreement.

Arora's false representation were required for the scheme to work. Chopra, the Shah Defendants, and their attorneys could not produce any documents that would reveal the true nature of the Brog and LLC Transfers.

Siddiqi raises the same groundless argument about this issue as he did in response to the 60(b)(3) motion, which we refuted in the Rule 60(b)(3) portion of this brief.

9.    Chopra's Production of the Altered Email

Chopra altered a key email that helped unwind the TD Time hawala scheme. The response of Chopra and his counsel when confronted with the unaltered version of the email was to double-down and deny what is patently obvious. Siddiqi had to know the document was altered; how could an email be delivered to his client without a header, sender and receiver addresses or a date?

<u>CONCLUSION</u>

For all of the forgoing reasons, GCI respectfully requests that the Court grant the Motion in its entirety, including the portion of the Motion seeking relief under Fed. R. Civ. P. 60(d)(3) .

Dated:   March 6, 2023
      New York, New York

            Respectfully Submitted,

            THE LOREE LAW FIRM

By:  /s/ Philip J. Loree Jr.
            Philip J. Loree Jr.
            11 Broadway
            Suite 615
            New York, New York 10004
            (646) 253-0560
            (516) 627-1720 (alt.)
            (516) 941-6094 (mobile)
            PJL1@LoreeLawFirm.com

            *Attorneys for Plaintiff Geo-Group*
            *Communications, Inc.*